IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

PATRICK HATELY,                    )
                                   )
          Plaintiff,               )        16-cv-1143
                                   )
     VS.                           )        June 5, 2017
                                   )
NICOLE TORRENZANO,                 )
                                   )
          Defendant.               )
_____)


TRIAL


BEFORE:     THE HONORABLE GERALD BRUCE LEE
            UNITED STATES DISTRICT JUDGE


APPEARANCES:

  FOR THE PLAINTIFF: LEXERO LAW
                     BY: ERIC MENHART, ESQ.
                     ROBINSON LAW SERVICES
                     BY: WILLIAM P. ROBINSON, III

  FOR THE DEFENDANT: GREENBERG COSTLE PC
                     BY: CARY S. GREENBERG, ESQ.
                         TIMOTHY R. BRADLEY, ESQ.


                      ---


OFFICIAL COURT REPORTER: RENECIA A. SMITH-WILSON,RMR,CRR
                         U.S. District Court
                         401 Courthouse Square,5th Floor
                         Alexandria, VA  22314
                         (703)501-1580

<u>INDEX</u>

JURY SELECTION                    4

PRELIMINARY INSTRUCTIONS         71

OPENING BY PLAINTIFF             81

OPENING BY DEFENSE              103

| <u>WITNESSES</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> |
|---|---|---|---|
| N. Torrenzano | 119 | 158 | 175 |
| K. Ashby | 182 | 188 | |
| P. Hately | 189 | | |

---

1              (Thereupon, the following was heard in open
2    court at 10:03 a.m.)
3              THE CLERK:  Civil action 16-1143, Patrick
4    Hately versus Nicole Torrenzano, et al.
5              Would counsel note your appearances for the
6    record.
7              MR. GREENBERG:  Your Honor, Cary Greenberg
8    for Ms. Nicole Torrenzano.
9              THE COURT:  Good morning.
10             MR. BRADLEY:  Good morning, Your Honor.
11   Timothy Bradley as co-counsel for Nicole Torrenzano.
12             THE COURT:  Good morning.
13             Good morning, Ms. Torrenzano.
14             MS. TORRENZANO:  Good morning.
15             MR. MENHART:  Good morning, Your Honor.
16   Eric Menhart on behalf of the plaintiff, Wade Hately.
17             MR. ROBINSON:  Good morning, Your Honor.
18   Williams Robinson on behalf of the plaintiff,
19   Mr. Hately.
20             THE COURT:  Good morning, Mr. Hately.
21             MR. HATELY:  Good morning, Your Honor.
22             THE COURT:  And who is that at the back
23   table?
24             MR. MENHART:  Your Honor, this is Colleen
25   Egan.  She is an attorney, but she is not counsel of

 1   record in this case.  And for purposes of this trial,

 2   she will be a paralegal.

 3            THE COURT:  All right.  Is there anything I

 4   need to take up before I bring the jurors up?

 5            MR. MENHART:  Nothing for the plaintiff,

 6   Your Honor.

 7            MR. GREENBERG:  No.

 8            THE COURT:  All right.  Then we'll have

 9   Mr. Hendrick and the clerk bring the jury up.  Thank

10   you.  Take a brief recess to bring the jury up.

11            (Court recessed at 10:04 a.m. and reconvened

12   at 10:11 a.m.)

13            THE CLERK:  Civil action 16-1143, Patrick

14   Hately versus Nicole Torrenzano, et al.  This case comes

15   open for trial by jury.

16            Would counsel please note your appearances

17   for the record.

18            MR. GREENBERG:  Good morning, Your Honor.

19   Cary Greenberg for Ms. Torrenzano.

20            THE COURT:  Good morning.

21            MR. BRADLEY:  Good morning, Your Honor.

22   Timothy Bradley as co-counsel for Ms. Torrenzano.

23            THE COURT:  Good morning.

24            Good morning, Ms. Torrenzano.

25            MS. TORRENZANO:  Good morning.

```
 1              MR. MENHART:  Good morning, Your Honor.
 2   Eric Menhart on behalf of the plaintiff, Wade Hately.
 3              THE COURT:  Good morning.
 4              MR. ROBINSON:  Good morning, Your Honor.
 5   William Robinson for the plaintiff, Mr. Hately.
 6              THE COURT:  Good morning.
 7              Good morning, Mr. Hately.
 8              MR. HATELY:  Good morning, Your Honor.
 9              MS. EGAN:  Good morning, Your Honor.
10   Colleen Egan on behalf of the plaintiff, Mr. Hately.
11              THE COURT:  Good morning.
12              Good morning, ladies and gentlemen.  My name
13   is Gerald Bruce Lee, and today we have for trial a civil
14   lawsuit involving Mr. Patrick Hately, against Ms. Nicole
15   Torrenzano.
16              I want to ask first a few brief questions.
17   And counsel you can turn around and look at the jury for
18   this.
19              I'm going to have the clerk call the role,
20   and ladies and gentlemen, if you would stand and wait
21   until you're recognized and then be seated after the
22   next person's name is called.
23              THE CLERK:  Juror number one, MD Salim
24   Akter.
25              THE JUROR:  (No audible response.)
```

```
 1                THE CLERK:  Juror number two, Elizabeth
 2   Claire Allen.
 3                THE JUROR:  (No audible response.)
 4                THE CLERK:  Juror number three, Nancy Adly
 5   Boulos Shafik.
 6                THE COURT:  You have to say "present" or
 7   "here".
 8                THE JUROR:  Present.
 9                THE CLERK:  Juror number four, Sheila Louise
10   Burns.
11                THE JUROR:  Present.
12                THE CLERK:  Juror number five, Emily Brooks
13   Burrell.
14                THE JUROR:  Present.
15                THE CLERK:  Juror number six, Rosario Sofia
16   Bustillos.
17                THE JUROR:  Present.
18                THE CLERK:  Juror number seven, Zachary
19   Aaron Chesley.
20                THE JUROR:  Present.
21                THE CLERK:  Juror number eight, H. Nathan
22   Nicolas Chubb.
23                THE JUROR:  Present.
24                THE CLERK:  Juror number nine, Peter Gilbert
25   Clay.
```

```
 1                    THE JUROR:  Present.
 2                    THE CLERK:  Juror number ten, Gavin
 3   Cunningham.
 4                    THE JUROR:  Present.
 5                    THE CLERK:  Juror number 11, Adolph Martin
 6   Essigmann, Jr.
 7                    THE JUROR:  Present.
 8                    THE CLERK:  Junior number 12, Marcelle
 9   Kathryn Flynn.
10                    THE JUROR:  Present.
11                    THE CLERK:  Juror number 13, Gregory Lynn
12   Fuller.
13                    THE JUROR:  Present.
14                    THE CLERK:  Juror number 14, John William
15   Hagen.
16                    THE JUROR:  Present.
17                    THE CLERK:  Juror number 15, Francis Eugene
18   Hale.
19                    THE JUROR:  Present.
20                    THE CLERK:  Juror number 16, James Dewey
21   Hamilton.
22                    THE JUROR:  Present.
23                    THE CLERK:  Juror number 17, Gary Edward
24   Harter.
25                    THE JUROR:  Present.
```

```
1              THE CLERK:  Juror number 18, Sharon Eileen
2   Hendrickx.
3              THE JUROR:  Present.
4              THE CLERK:  Juror number 20, Daniel Tyler
5   Hostetler.
6              THE JUROR:  Present.
7              THE CLERK:  Juror number 21, Karl Lewis
8   Kraus.
9              THE JUROR:  Present.
10             THE CLERK:  Juror number 22, Janet Melinda
11  Lawrence.
12             THE JUROR:  Here.
13             THE CLERK:  Juror number 23, Jacob Kurtis
14  Logan.
15             THE JUROR:  Present.
16             THE CLERK:  Juror number 24, Molly Kathleen
17  McCall.
18             THE JUROR:  Present.
19             THE CLERK:  Juror number 25, Patricia Ann
20  Milon.
21             THE JUROR:  Present.
22             THE CLERK:  Juror number 26, William James
23  Murphy.
24             THE JUROR:  Present.
25             THE CLERK:  Juror number 26, Dobromir Ivanov
```

```
 1   Rabovianski.
 2                 THE JUROR:  Present.
 3                 THE CLERK:  Juror number 28, Rafael Rivera.
 4                 THE JUROR:  Present.
 5                 THE CLERK:  Juror number 29, Elizabeth
 6   Rosemary Sakati.
 7                 THE JUROR:  Present.
 8                 THE CLERK:  Juror number 30, Pamela Ann
 9   Scott.
10                 THE JUROR:  Present.
11                 THE CLERK:  Juror number 31, Tobias Arthur
12   Vandall.
13                 THE JUROR:  Present.
14                 THE CLERK:  Juror number 32, Theresa Ann
15   Vickers.
16                 THE JUROR:  Present.
17                 THE CLERK:  Juror number 33, Matthew Weir.
18                 THE JUROR:  Here.
19                 THE CLERK:  Is there anyone here for jury
20   duty whose name I did not call?
21                 THE COURT:  We'll have the clerk administer
22   the oath and you all will be sworn.  If you would please
23   stand and take the oath from the clerk.
24                 THE CLERK:  Please raise your right hand
25                 (Jury panel duly sworn.)
```

1              THE JURORS:  I do.

2              THE CLERK:  Thank you.  You may be seated.

3              THE COURT:  Good morning, again, ladies and

4    gentlemen.  What I'd like to do is explain to you the

5    process that we use to select the jury.  And, first

6    thing I want to make sure can everyone hear me okay?

7              THE JURORS:  Yes.

8              THE COURT:  And counsel, pay attention to

9    this question.

10             Would everybody, please, who speaks and

11   understands English please raise your right hand now.

12             Does anyone have trouble speaking or

13   understanding English?

14             Okay, I take it by your silence that no one

15   does.  All right.

16             As I said, this is a civil suit for money

17   damages.  And the parties here estimate the case will

18   take approximately 2 to 3 days for trial.

19             And, what I'd like to do is tell you a

20   little bit about the case and tell you how we're going

21   to go about the process of selecting a jury.

22             In this case, the plaintiff, Mr. Patrick

23   Hately has brought a lawsuit against Ms. Nicole

24   Torrenzano alleging that he, Mr. Hately, maintained an

25   e-mail account.

1    He alleges that Ms. Torrenzano, without

2 permission and authorization, entered into and accessed

3 data that he had stored in his e-mail account, and this

4 was a violation of the Electronic Stored Communications

5 Act.  And for that, he seeks money damages.

6    Ms. Torrenzano denies the allegations, and

7 the parties here estimate the trial will take 2 to

8 3 days for trial and your job will be to decide whether

9 or not the plaintiff can prove by what's called

10 preponderance of the evidence that Ms. Torrenzano

11 violated Electronic Stored Communications Act.

12    What I'd like to do is to have the lawyers

13 introduce themselves.  And before they do that, let me

14 introduce my staff.  And the question I'm asking you now

15 is whether you recognize any of us.  And if you do, just

16 stand and then I'll recognize you, ask your name, and

17 give me your answer.

18    So, first I'm Gerald Bruce Lee.  I'm the

19 United States District Judge who will hear the case.

20    In front of me is Yolanda Guyton, the deputy

21 clerk.  In front of her is Ms. Renecia Smith-Wilson, the

22 court reporter, and to my left is Mr. Pierre Hines, my

23 law clerk and my lawyer for the trial.

24    Does anyone recognize me or my staff?  I

25 take it by your silence -- yes, stand.  Tell me your

1   name, please.

2                   THE JUROR:  H. Nicholas Chubb.

3                   THE COURT:  How is your last name spelled?

4                   THE JUROR:  C-H-U-B-B.

5                   THE COURT:  Yes, Mr. Chubb.

6                   THE JUROR:  Your Honor, you and I attended

7   the American Inns of Courts -- well, it was there

8   several years ago.  That's the only --

9                   THE COURT:  The George Mason Inns of Court?

10                   THE JUROR:  That's correct, sir.

11                   THE COURT:  And, when was the last time you

12   saw me there?

13                   THE JUROR:  I last attended in 2011, and I

14   think it was around that time.

15                   THE COURT:  Probably right, about 2011.

16                   THE JUROR:  Yes, sir.

17                   THE COURT:  Were we on any program together?

18                   THE JUROR:  No, sir.  We sat together a few

19   times, but that was it.

20                   THE COURT:  All right, thank you.

21                   Anyone else?

22                   All right.  Now, ladies and gentlemen, what

23   I'm going to do is I'm going to ask questions of the

24   group as a whole.  And if you have an answer to any of

25   my questions, I'll need you to stand, wait until you're

1 recognized, and then give me an answer to my questions.

2 And, if there's any question that I ask

3 calls for personal information that you'd rather give

4 your answer outside the hearing of your fellow jurors,

5 please let me know.  We'll have you come to sidebar

6 outside the hearing of your fellow jurors and give me

7 your answer.

8 So the first thing I want to happen is I

9 want the lawyers for the plaintiff and the defendant and

10 everybody seated at counsel table to introduce

11 themselves to the jury.  Tell us your name and where you

12 work.

13 And that way, if ladies and gentlemen, if

14 you recognize any of these individuals who will be

15 introduced to you now, I'll need you to stand.

16 And lead counsel, if you have your witness

17 list with you, tell the jury the names of the witnesses

18 that you think might be called in the case.

19 And again, if you recognize any of the names

20 that are called, ladies and gentlemen, please stand.

21 Everybody understand?

22 All right.  Counsel for plaintiff, go first.

23 MR. MENHART:  Good morning.  My name is Eric

24 Menhart.  I'm the attorney for the plaintiff in this

25 case.  I'm joined today by the plaintiff, Wade Hately,

1   I'm also joined by another attorney for --

2                 THE COURT:  Have everyone stand and

3   introduce themselves so the jury can hear their voices.

4                 MR. ROBINSON:  I'm William Robinson, and I'm

5   local co-counsel for the plaintiff here.  I'm a sole

6   practitioner --

7                 THE COURT:  That's fine.

8                 MR. ROBINSON:  -- in Virginia and DC.

9                 THE COURT:  Tell us your name, Mr. Hately.

10                 MR. HATELY:  My name is Patrick Wade Hately

11   and I'm the plaintiff in this case.

12                 MS. EGAN:  My name is Colleen Egan.  I'm an

13   associate with Lexero Law --

14                 THE REPORTER:  I'm sorry.  I can't hear you.

15                 MS. EGAN:  I'm sorry.  I'm Colleen Egan, an

16   associate with Lexero Law in Washington, DC.  And I'm

17   acting as paralegal for this case.

18                 THE COURT:  She's acting as paralegal today.

19   All right, thank you.

20                 MR. MENHART:  Your Honor, I'd say that we do

21   expect to call a woman by the name Kelly Ashby who is an

22   attorney in Virginia.  That is an individual that we

23   should also like to identify for purposes of the record.

24                 THE COURT:  All right.  Is there anyone

25   who's having trouble understanding English?  No?

```
 1                   Yes, please stand and tell me your name,
 2   please.
 3                   THE JUROR:  Good morning.  I understand but
 4   maybe I'm not sure.
 5                   THE COURT:  Could you come a little closer,
 6   I couldn't hear you.
 7                   THE JUROR:  My name is Rosario Bustillos.
 8                   THE COURT:  Rosario Stokes?  Let me see if I
 9   can find that.
10                   THE CLERK:  Number six.
11                   THE COURT:  Juror number six.  Is that it
12   Rosario Bustillos?
13                   THE JUROR:  Yes.
14                   THE COURT:  Ms. Bustillos, what is your
15   first language?
16                   THE JUROR:  Spanish.
17                   THE COURT:  And, what kind of work do you
18   do?
19                   THE JUROR:  I work at Giant.
20                   THE COURT:  You work at the Giant Food
21   Store?
22                   THE JUROR:  Yes.
23                   THE COURT:  What do you do with the Giant
24   Food Store?
25                   THE JUROR:  I work in the deli.
```

1        THE COURT:  You work where?

2        THE JUROR:  I work service deli.

3        THE COURT:  The service deli.

4        THE JUROR:  Yes.

5        THE COURT:  Do you ever take orders from

6  customers in the store?

7        THE JUROR:  Yes.

8        THE COURT:  And, what language do you take

9  those orders from the customers in the store?

10        THE JUROR:  English.

11        THE COURT:  English.  You'll do just fine.

12  Have a seat.

13        All right.  Plaintiff's counsel.

14        MR. GREENBERG:  Good morning, Your Honor.

15        My name is Cary Greenberg and work for the

16  law firm of Greenberg and Costle.  And one of the

17  persons you may hear about today is Nicole Torrenzano

18  who is our client, and she is an emergency room nurse at

19  Winchester Medical Hospital.  And there's another man is

20  a doctor named David Watts.  So, if you're familiar with

21  those names, please let the Court know.

22        THE COURT:  Anyone know David Watts or Ms.

23  Torrenzano?

24        All right, Counsel.

25        MR. BRADLEY:  Good morning.  My name is

1   Timothy Bradley.  I'm acting as co-counsel for Ms.

2   Torrenzano.  I'm an associate attorney at law firm of

3   Greenberg Costle out of Tysons Corner.

4           MS. TORRENZANO:  My name is Nicole

5   Torrenzano, and I'm the defendant in this case.

6           THE COURT:  Ladies and gentlemen, my first

7   question is whether any member of the jury panel, has

8   now or in the past, either sued someone or been sued

9   themselves.  And I'm not talking about divorce cases,

10  just sued or been sued in civil court, whether it's in

11  state or federal court.

12          All right.  Tell me your name, please.

13          THE JUROR:  Jan Lawrence.  Janet is on the

14  list.

15          THE COURT:  How is your last name spelled?

16          THE JUROR:  L-A-W-R-E-N-C-E.

17          THE COURT:  All right, Ms. Lawrence.  Thank

18  you very much.  You can have a seat.

19          Anyone else?  All right.

20          As I said a moment ago, this is a civil suit

21  for money damages.  And, the burden of proof requires

22  the plaintiff to establish by what's called the greater

23  weight or the preponderance of the evidence their claim.

24          And, so, in terms of how you would

25  understand what that means, it's about 51 percent is

1   what it generally means.  That you -- it's more likely

2   than not that -- by greater weight of the evidence that

3   the evidence is sufficient.

4            There are couple other questions I want to

5   ask you.  And one is, is there anyone here who does not

6   have e-mail?  Anyone here who does not have e-mail?

7            Is there anyone here who has not sent an

8   e-mail?  I take it by your silence that everyone has

9   sent and received e-mails.

10            Has everyone here created a password before

11   for e-mail?  Anyone here who has not created a password?

12   Again, I take it by your silence that everyone here has

13   done that before.

14            Has anyone in the jury panel been a juror in

15   a civil lawsuit before, whether in state or federal

16   court?  I take it by your silence -- is there one

17   person?

18            Tell me your name, please.

19            THE JUROR:  Gregory Fuller.

20            THE COURT:  Mr. Fuller, you served as a

21   juror in what court?

22            THE JUROR:  Prince William County Court.

23            THE COURT:  Prince William County.  And was

24   it a civil case for money damages?

25            THE JUROR:  Yes, it was civil.

1          THE COURT:  How long ago was that?

2          THE JUROR:  About ten -- ten years ago.

3          THE COURT:  Did the jury reach a verdict?

4          THE JUROR:  Yes.

5          THE COURT:  Thank you very much.

6          Has any member of the jury panel ever been a

7  witness or a party to a lawsuit where you were deposed?

8  That is to say, you appeared in a law office and lawyers

9  asked you questions under oath in front of the court

10  reporter?

11          Yes, please stand and tell me your name.

12          THE JUROR:  Rafael Rivera.

13          THE COURT:  Mr. Rivera, was it a lawsuit

14  where you were engaged or someone brought you in as a

15  witness?

16          THE JUROR:  Someone brought me as a witness.

17          THE COURT:  Was it a civil suit for money

18  damages?

19          THE JUROR:  No.

20          THE COURT:  Okay.  I'll ask you about it at

21  sidebar.  Thank you very much.

22          The next series of questions I'm going to

23  ask I may need to --

24          MR. GREENBERG:  We have another.

25          THE COURT:  I'm sorry.

1          THE JUROR:  The same case I mentioned

2  before, I was deposed in that case.

3          THE COURT:  Okay, thank you, Ms. Lawrence,

4  juror number 22.

5          Yes, sir, your name, please.

6          THE JUROR:  Yes, I was deposed in a --

7          THE COURT:  Tell me your name, please.

8          THE JUROR:  James Hamilton.

9          THE COURT:  Mr. Hamilton, yes, number 16.

10  You were deposed in what kind of a case?

11          THE JUROR:  It was a patent prosecution

12  case.

13          THE COURT:  Thank you very much.

14          Anyone else?  Has anyone here ever met or

15  had any contact with Mr. Patrick Hately or Ms. Nicole

16  Torrenzano?

17          I take it by your silence the answer is no.

18          The next series of questions I'm going to

19  ask I think may call for personal information.  So if

20  you have an answer to any of these questions, I need you

21  to take -- line up on this side of the courtroom and

22  we'll take your answer privately outside the hearing of

23  your fellow jurors as sidebar.  I'll tell you what the

24  category of information are and I'll repeat it twice so

25  you hopefully can hear it and think about whether or not

you have an answer to any of these questions.

The first has to do with any medical issue, hearing, vision or sitting for more than 90 minutes that you think might prevent you from being a fair and impartial juror in this case.  So medical issue is first.

The second issue has to do with hardship. Juror duty always comes at an inconvenient time.  There is never a convenient time for jury duty.  There is never a convenient time to go to urgent care or the emergency room.

You were called as jurors today because we require to have full participation of all members of the community from all segments of the community in jury duty.

The Constitution of the United States thinks the right to trial by jury is so important it's written about it in the text of the Constitution, so it's a fundamental right.

And so if you or a relative had a suit in federal court, then you'd have the right to have a cross section of the jury -- of the community represented to serve as your jury.

Of course, we can go to nursing homes and get people who are idle and have nothing better to do.

1   But I think it's better to have jurors who are active

2   and engaged like you are, busy people, to serve as

3   jurors.

4          Having said that, if you have some medical

5   procedure set for tomorrow or the next couple of days,

6   or relative has a medical procedure or you have some

7   nonrefundable plane ticket, then I will consider it.

8          But the fact that you have a meeting or are

9   important -- have an important meeting is not going to

10  be persuasive to me.  And if you've never served on jury

11  duty before, it's your turn.

12         So, having said that, hardship is the second

13  category.

14         The third has to do with only the issue of

15  child custody.  Half the people in America have been

16  divorced.  I'm concerned about whether or not you've had

17  any child custody suit or visitation suit that went to

18  court, and I want to know about that.  So, if you've had

19  that, you need to line up on this side of the room and

20  we'll take your answers at sidebar privately with the

21  lawyers present.

22         So it only has to do with child custody or

23  visitation.  I don't really need to know about divorce.

24         When I've finished giving out the category

25  of questions, you can line up on this side of the room

1    and the next category has to do with you had -- you have

2    a computer e-mail address.  And the question is whether

3    you've had any situation where someone without your

4    permission, authorization accessed your e-mail and/or

5    took your password and accessed your e-mail.

6              So, those are the categories I want to talk

7    to you about at sidebar.

8              So the first is medical.  The second is

9    hardship.  And remember I'm not going to let anybody out

10   without a really good reason.  The third is if you had a

11   lawsuit in court involved child custody or visitation.

12   And the fifth has to do with whether you had a situation

13   where someone took your password or accessed your e-mail

14   without permission or authorization.

15             So, if you have an answer to any of those

16   questions, I need you to line up on this side of the

17   room and we'll take your answer one at a time at

18   sidebar.  And the counsel, you come to sidebar and the

19   court reporter will come to sidebar.

20             THE JUROR:  Your Honor, may I ask a

21   qualifying question on the last one?

22             THE COURT:  Yes, can you tell me your name,

23   please.

24             THE JUROR:  John Hagen.

25             THE COURT:  Mr. Hagen is number 14.  Yes,

1  Mr. Hagen.

2            THE JUROR:  On the password and the

3  e-mail --

4            THE COURT:  Can we do that at sidebar?  Can

5  you come to sidebar to do it as opposed to doing it in

6  front of everyone else, because I don't know what you

7  want to say.

8            THE JUROR:  Well, I think --

9            THE COURT:  It would be helpful if you'd

10 come to sidebar.

11            THE JUROR:  All right.

12            THE COURT:  I'll have you come up first, and

13 that way if there's something we need to tell the jury,

14 we can do that.  Come stand in line right here.

15            One other matter, whether you are employed

16 as an IT professional on a network or have access to

17 administrative control over a network, just a second.

18 If you do that, stand in line as well.

19            All right, counsel come to sidebar.

20            (Thereupon, the following side-bar

21 conference was had.)

22            THE COURT:  Okay, send up the first person.

23            MR. HENDRICK:  Number 14.

24            THE COURT:  Mr. Haden.

25            Give him a little bit of room.  He's going

1    to stand at that line.

2              Hi, if you'd stop right there, please.

3              Tell me your name, please.

4              THE JUROR:  John Hagen.

5              THE COURT:  Yes, Mr. Hagen.

6              THE JUROR:  On the e-mail and password, I

7    was active duty military, so I'm one of the members who

8    lost or had ID and things and password and e-mails were

9    compromised where OPM was a part of it.

10             THE COURT:  That's just what I wanted to

11   know.  When did that happen?

12             THE JUROR:  Oh, it was a couple of years

13   ago.  But, you know, it's part of the military records,

14   we were -- I guess our e-mails were compromised.  Social

15   security numbers could have been compromised.  It was

16   part of the big OPM --

17             THE COURT:  All right.  Were you -- did you

18   ever encounter a situation where -- how did that affect

19   you?  Your identity was stolen or anything like that?

20             THE JUROR:  Well, as far as I know, they

21   were taken.  I've had no repercussions.  Lucky, I'm

22   under the -- OPM offered identity protection.

23             THE COURT:  Okay.  That's just what I want

24   to know.  Thank you very much.

25             THE JUROR:  Thank you.

1        THE COURT:  Uh-huh.

2        If you all have any objection of anybody

3   when I question them, you need to tell me then.

4        MR. GREENBERG:  Your Honor, I have an

5   objection to him.

6        I would move to strike.  I was going to

7   follow up.  I wasn't sure.

8        THE COURT:  I do the questioning here.  What

9   is your question?

10       MR. GREENBERG:  Well, my point would be that

11  I think that it would be hard for him to separate what

12  he's hearing today from his own personal experiences,

13  and that he would likely use his personal experiences to

14  make a decision in the case and not judge it solely on

15  the laws as provided and the facts as he hears it.

16       I think he's prejudiced, unduly

17  inappropriately prejudiced and could lean to one side

18  which could be the plaintiff's side, but certainly one

19  side or the other and couldn't be neutral.  So I ask you

20  to strike him for cause.

21       THE COURT:  Let me ask that question,

22  Mr. Hagen, come back.

23       Send Mr. Hagen back.

24       THE JUROR:  Yes, Your Honor.

25       THE COURT:  An additional question.

1           THE JUROR:  Okay.

2           THE COURT:  How would you go about deciding

3    this case and how if it all would the information about

4    your OPM e-mail being hacked affect you?

5           THE JUROR:  I guess I'm sensitive to the

6    theft and always have it in the back of your mind

7    whether someone has your e-mail address and things like

8    that.  Just -- my social security number been

9    compromised.

10           THE COURT:  My question is, how would you go

11    about deciding this case?  Would that information impact

12    your consideration of this case?

13           THE JUROR:  Your Honor, I'm not sure.  I

14    would have to hear the evidence.  I would try and be

15    impartial.  So, I don't know how -- I would have to hear

16    the case.  I've actually never sat on a case before.

17           THE COURT:  Thank you very much.  You can go

18    back now.

19           THE JUROR:  Yes.

20           THE COURT:  I'll strike Mr. Hagen.

21           MR. GREENBERG:  Thank you.

22           THE COURT:  Number 14 for cause.

23           Next.

24           MR. HENDRICK:  Number 22.

25           THE COURT:  Good morning, if you'd stop at

```
1   the little line right there.  Tell me your name, please.
2                THE JUROR:  Janet Lawrence.
3                THE COURT:  All right, Ms. Lawrence.  First
4   tell me about the lawsuit that you were engaged in.
5                THE JUROR:  It was a lawsuit in the State of
6   Florida.
7                THE COURT:  Okay.
8                THE JUROR:  It was in civil court.  It was
9   what amounted to a -- I have to sue somebody to get them
10  out of my house.
11               THE COURT:  Landlord/tenant matter?
12               THE JUROR:  Roommate.
13               THE COURT:  Roommate.  All right.  And did
14  it turn out okay, or --
15               THE JUROR:  It did.
16               THE COURT:  And, were you deposed in
17  connection with that lawsuit?
18               THE JUROR:  I was.
19               THE COURT:  Okay.  How if it all do you
20  think that experience might affect your consideration of
21  this case?
22               THE JUROR:  Not at all.
23               THE COURT:  I gave several questions.  Those
24  are the answers you have to the questions I asked?
25               THE JUROR:  Yes, I have two.  One is you
```

1   asked about IT professional.  So I worked in IT for a

2   federal contractor for several years.  I left that

3   employment last July.

4                   But, prior to that, I had access to a lot of

5   things.

6                   THE COURT:  All right.  Were you like a

7   network administrator so you could access people's

8   passwords and change the software?

9                   THE JUROR:  Not in my last assignment, I was

10  not.

11                  THE COURT:  But have you ever --

12                  THE JUROR:  I have had that responsibility.

13                  THE COURT:  As you've heard, this case

14  involves access or unauthorized access to computer.

15  How, if at all, do you think your background and

16  experience might impact your consideration of this case?

17                  THE JUROR:  I can't see that it would.  It

18  may help me understand some of it a little better.

19                  THE COURT:  All right.

20                  Are you able to listen to the evidence

21  presented here in court and decide the case only on what

22  you hear here in court?

23                  THE JUROR:  Yes.

24                  THE COURT:  Thank you.

25                  THE JUROR:  And one other thing.

1          THE COURT:  Yes.

2          THE JUROR:  I can fall on the hardship.  I

3    don't know if it qualifies.  I just started a new job

4    last Wednesday so this is day three on the job, so.

5          THE COURT:  Okay.  Well, if you've never

6    served as a juror before --

7          THE JUROR:  I served as a juror once.  I've

8    been called several times, but only seated on one jury

9    and that lasted less than a day.  A mistrial was called.

10         THE COURT:  And where was that?

11         THE JUROR:  It was in Florida.  It was a

12   county court.

13         THE COURT:  How long ago was that?

14         THE JUROR:  20 years, probably.

15         THE COURT:  20 years ago.  Okay, it's your

16   turn.  Thank you very much.

17         Next.

18         MR. HENDRICK:  Number 17.

19         THE COURT:  Good morning.  Can you stop

20   right there.

21         THE JUROR:  How are you?

22         THE COURT:  Good.  Tell me your name,

23   please.

24         THE JUROR:  Gary Harter.

25         THE COURT:  Yes, I asked several questions.

1   This is your chance to tell me.

2            THE JUROR:  The only one that applied to me

3   was I had a custody in Fairfax County Court.  It was

4   September 2002.  I was appointed guardian of my grandson

5   either late 2000 or 2001.  And the father of the -- the

6   family of the father who lived in Florida brought a suit

7   to remove custody from me and transfer it to them in

8   Florida.

9            THE COURT:  And, the matter was in court?

10           THE JUROR:  Yes, sir.

11           THE COURT:  Did the judge make a ruling in

12  the case?

13           THE JUROR:  Yes, sir, he did.

14           THE COURT:  All right.  And, what did the

15  judge decide?

16           THE JUROR:  The judge decided that he should

17  remain with me.

18           THE COURT:  Okay.  Well, this is not a

19  divorce case in --

20           THE JUROR:  No, sir.

21           THE COURT:  In federal court, we don't hear

22  domestic cases, but there may be evidence concerning a

23  child custody proceeding.  So my question is, given your

24  experience, how if at all, do you think hearing about

25  child custody proceedings might affect your

1   consideration of this case?

2                THE JUROR:  I don't think it would affect it

3   at all, Your Honor.

4                THE COURT:  All right.  Those are the only

5   questions you came up about?

6                THE JUROR:  Yes, sir.  That's it.

7                THE COURT:  Thank you very much.

8                THE JUROR:  Thank you, Your Honor.

9                MR. HENDRICK:  Number 24.

10               THE COURT:  Hi, if you'd stop right there.

11  Tell me your name, please.

12               THE JUROR:  Molly McCall.

13               THE COURT:  Yes, Ms. McCall.

14               THE JUROR:  So the question around whether

15  my e-mail has been -- someone used my e-mail.

16               THE COURT:  Yes.

17               THE JUROR:  So, this is probably ten years

18  ago.  I have a Hotmail account and I don't know if it

19  was malware or what it was, but someone gained access to

20  it and sent e-mails on my behalf.  So, I changed the

21  password really quickly.  I did not know who it was.  It

22  may have been a virus of some sort.

23               THE COURT:  Was there any adverse impact

24  from the change, from the hacking of the e-mail?

25               THE JUROR:  No, because it's an e-mail I use

1   just for getting, you know, sign up for retail coupons,
2   things like that.
3            THE COURT:  All right.  Well, this case may
4   involve allegations that e-mail was accessed without
5   authorization to access things stored in e-mail.
6            THE JUROR:  Gotcha.
7            THE COURT:  My question to you would be,
8   would you -- do you think your experience might impact
9   your consideration of this case, if at all?
10           THE JUROR:  I don't think it would impact
11  it.
12           THE COURT:  All right.
13           THE JUROR:  The other question I just wanted
14  to respond to, the last question you had around whether
15  I worked as a system administrator.  I do not, but I do
16  work in a role where I audit system administrators.
17           THE COURT:  So, you audit system
18  administrators?
19           THE JUROR:  I'm working for an accounting
20  firm as an IT auditor and I have access and control
21  along the system, change management controls, things of
22  that nature.
23           THE COURT:  To make sure they're compliant
24  with best practices?
25           THE JUROR:  Correct.

```
 1                    THE COURT:  Okay.
 2                    How, if at it all, do you think that would
 3   impact your consideration of this case?
 4                    THE JUROR:  So I understand general control
 5   concepts as I audit that on a daily basis, because I
 6   would understand what is going on.
 7                    THE COURT:  Okay.
 8                    Are you able to confine yourself to the
 9   evidence you hear only in open court about what took
10   place only in this case, as opposed to what may have
11   happened at work?
12                    THE JUROR:  Yeah.  I mean, I would
13   understand the facts and circumstances here.  I don't
14   know if that answered your question.
15                    THE COURT:  I want to make sure you
16   understand, you would be deciding the case only based on
17   what you see and hear in court, not what you've seen and
18   heard in the past, only what you heard in court.  Are
19   you able to do that?
20                    THE JUROR:  Yes.
21                    THE COURT:  Okay, thank you.
22                    MR. HENDRICK:  Number nine.
23                    THE COURT:  Hi, stop right there.
24                    THE JUROR:  Yes, sir.
25                    THE COURT:  Tell me your name, please.
```

 1                         THE JUROR:  Peter Clay.

 2                         THE COURT:  Yes, Mr. Clay.

 3                         THE JUROR:  I have a potential hardship for

 4    Thursday and Friday if the case strays there.  I've been

 5    out of work for two and a half months and signed up for

 6    a thousand dollar training out of pocket.

 7                         THE COURT:  Just Thursday and Friday.

 8                         THE JUROR:  Just Thursday and Friday.

 9                         THE COURT:  Well, I expect we will be gone

10    by Thursday, but I'll have the clerk make a note if

11    we're here on Thursday to let me know.

12                         THE JUROR:  Thank you very much.

13                         MR. HENDRICK:  Number 31.

14                         THE COURT:  Yes, sir.  If you'd stop right

15    there.  Good morning.

16                         THE JUROR:  Good morning.

17                         THE COURT:  Tell me your name, please.

18                         THE JUROR:  Tobias Vandall.

19                         THE COURT:  Yes, Mr. Vandall.

20                         THE JUROR:  These fall under the hardship

21    category.  I have work travel scheduled on Sunday,

22    and --

23                         THE COURT:  This Sunday coming?

24                         THE JUROR:  Yes, just my fear is --

25                         THE COURT:  We will be all gone -- we will

1   be all gone before Sunday.  I promise you, long gone.

2            THE JUROR:  Okay.

3            THE COURT:  Is that it?

4            THE JUROR:  Yes, sir.

5            THE COURT:  Thank you.

6            MR. HENDRICK:  Number 29.

7            THE COURT:  Good morning, if you'd stop at

8   the line right there.

9            Good morning.  Tell my your name, please.

10           THE JUROR:  My name is Elizabeth Farmer

11  Sakati.  I have previously been a plaintiff in a custody

12  suit with my ex-husband which was resolved.  I have

13  primary custody of my children, but it was fairly

14  contentious, child protective services were resolved.

15  It's all resolved and I'm the primary custodian, but I

16  did have a chance to see that -- the fun side of the

17  civil disputes.

18           THE COURT:  How long ago were you in court?

19           THE JUROR:  Just 1 or 2 days.  It was very

20  brief.  I think one day, actually.  I would have to go

21  back and formally check.

22           THE COURT:  What court was it in?

23           THE JUROR:  Fairfax County.

24           THE COURT:  Okay.  And, you said you were

25  held as the primary?

1             THE JUROR:  Modified in the final order of

2  divorce for the custody arrangement.

3             THE COURT:  Well, this is not divorce court.

4             THE JUROR:  That's true.

5             THE COURT:  And federal court does not hear

6  domestic relations case.  But there may be some

7  reference to a child custody proceeding.

8             THE JUROR:  Yes.

9             THE COURT:  And so my question to you would

10  be how, if at all, do you think your experience with

11  your child custody proceeding might affect your

12  consideration of this case, if at all?

13             THE JUROR:  Well, it worked in my favor.

14  However, I felt at many times, though, there were

15  components of it that I understand I'm supposed to be

16  impartial and just look at the law.  It was pretty

17  expensive and what's the right word, crazy process for

18  something fairly simplified.  But I would try to look at

19  the letter of the law and what's actually being asked of

20  me as a juror.

21             So my process, my experience was pretty --

22  not heartening, let's say that.  And it did work out in

23  my favor, but I don't know if that's a correct answer.

24             THE COURT:  Well, I'm not trying to make

25  your give a correct answer.  I just want to know from

1  this case, as I said a moment ago --

2          THE JUROR:  I would try to put aside my

3  personal experience, but it did affect a large part of

4  2015 and, you know, everything worked, as far as I need

5  it to work, my children, and myself and my primary

6  custody.  It just was very disheartening experience as

7  far as the process.

8          THE COURT:  Well, two things.  I don't know

9  anyone that had a happy divorce.

10          THE JUROR:  I know.  I'm happy to be

11  divorced.  I am remarried, but --

12          THE COURT:  That's fine, but I mean --

13          THE JUROR:  I understand.

14          THE COURT:  Nobody leaves divorce court

15  celebrating except the person who won, maybe.

16          THE JUROR:  Yes.

17          THE COURT:  But, this is not a divorce case.

18          THE JUROR:  Yes.

19          THE COURT:  This is not a child custody.

20  This is a case involving electronic stored

21  communications and what the parties want and what I want

22  is your experience, the way you evaluate this case.

23          THE JUROR:  I would be able to impartially.

24  It's interesting to look at the letter of the law as far

25  as e-mail, breaking into someone private messages, that

1 sort of thing.  Sort of interesting in some ways as far

2 as the burden of proof and those components.

3            Did I answer that question fully?

4            THE COURT:  I think so.

5            Thank you very much.

6            THE JUROR:  Thank you.

7            MR. MENHART:  Your Honor, plaintiff move to

8 strike for cause.  She seems to be pretty emotionally

9 invested in that custody battle.  Seems like it was

10 affecting her and her potential to be an impartial

11 juror.  We ask you to strike her for cause.

12            THE COURT:  She was a bit animated in her

13 presentation and verbal response might have been

14 appropriate, but nonverbal seem a bit agitated.  And I

15 have the impression that you all know this is not a

16 divorce case, and you're not going to relitigate the

17 custody case.  You all both know that.

18            MR. GREENBERG:  Yes, we do know that.

19            MR. MENHART:  Very aware.

20            THE COURT:  I'll excuse Ms. Sakati, 29, for

21 cause.

22            Yes.

23            MR. HENDRICK:  Number 30.

24            THE COURT:  Good morning.  If you'd stop at

25 the line, please.

1          Tell me your name.

2          THE JUROR:  Emma Scott.

3          THE COURT:  Yes, Ms. Scott.

4          THE JUROR:  I came up here because I'm in

5   IT, user ID, get them into access.

6          THE COURT:  How long have you been in the IT

7   field?

8          THE JUROR:  Since 1990.

9          THE COURT:  Okay.  Have you had any

10  instances as an IT administrator where someone used

11  someone else's password without authorization?

12         THE JUROR:  No.

13         THE COURT:  No.  How do you think your work

14  might impact your consideration of this case, if at all?

15         THE JUROR:  I don't know.  Not at all,

16  really.

17         THE COURT:  Okay.  Thank you very much.  You

18  can have a seat.  Thank you.

19         MR. HENDRICK:  Number 28.

20         THE COURT:  Yes, sir.  If you'd stop right

21  there.  Tell me your name.

22         THE JUROR:  Rafael Rivera.

23         THE COURT:  Mr. Rivera, you were deposed.

24  You were in a deposition?

25         THE JUROR:  Actually the reason -- it's not

1  because of that.  Your question about whether I had a

2  computer e-mail that had been hacked.  So that's the

3  main reason why I stood up.

4          THE COURT:  Yes.  When did that happen and

5  what happened?

6          THE JUROR:  It happened a few years ago.  I

7  mean, there was no legal proceedings about it.

8          THE COURT:  Right.

9          THE JUROR:  But I was impacted.  It was a

10  family member who had the ability to hack computers.

11          THE COURT:  How were you impacted?

12          THE JUROR:  I was impacted by the

13  information that was shared and the information that was

14  retrieved and my privacy.  It was no -- no legal

15  proceedings at all.  Just I've been a victim of it so I

16  have a strong feelings about it.

17          THE COURT:  All right.  Tell me about the

18  strong feelings about it.

19          THE JUROR:  I'm a firm believer in citizen's

20  privacy.  I -- I'm aware about the electronic world, so

21  I have e-mails, but I stop using the cloud.  I'm going

22  back to paper on my calendar, that kind of stuff.

23          THE COURT:  Okay.  Well, this case involves

24  allegations of someone without authorization accessing

25  private information on the e-mail server.  And so my

1   question to you is how, if at all, do you think your
2   experience might impact your consideration of this case?
3                 THE JUROR:  I would like to think that I can
4   weigh the evidence and the proceedings and be impartial
5   about it.  I do have strong feelings.  I don't know.
6   This is my first time, so.
7                 THE COURT:  All right.  Well, I want to know
8   about strong feelings.  Strong feelings in -- in favor
9   of people not breaking the law?
10                THE JUROR:  Strong feelings in favor of
11  people not breaking the law.  Strong feelings in favor
12  of people not invading the privacy of citizens.
13                THE COURT:  If the evidence shows here that
14  there may have been a situation where someone accessed
15  someone's stored e-mail or did not access someone's
16  stored e-mail, how would your experience considering
17  it -- how would you go about considering the evidence
18  here?  How would you go about deciding the case?
19                THE JUROR:  I would have to see what the
20  evidence is, and I guess, I've never been part of the
21  process, so I guess -- I'm actually a science-thinking
22  person.  So I would like to think that I do have strong
23  feelings about the impact of theft, but I can be -- I
24  can use my -- my thinking to determine, you know, to
25  make the best -- to reach some conclusion.  And there's

1   other people in the jury, so I guess that would balance
2   my thinking on it.
3          THE COURT:  All right.  And, you mentioned
4   you've been deposed.  When were you deposed?
5          THE JUROR:  I was deposed probably about
6   27 years ago.
7          THE COURT:  What kind of case was it?
8          THE JUROR:  It was actually the -- it was
9   actually the wife of my former boss, and she was trying
10  to implicate him in an adultery case, so I was being
11  brought in as a witness.
12         THE COURT:  Okay.  Well, in this case,
13  again, I don't know what all the evidence is going to
14  be, but there may be allegations having to do with
15  romantic relationship that ended and things like that
16  and depositions.  How would your experience, if at all,
17  impact your consideration of this case?
18         THE JUROR:  I wouldn't think it would.  I
19  would like to think it would not impact.
20         THE COURT:  Okay.  Thank you.
21         THE JUROR:  You're welcome.
22         THE COURT:  You can have a seat, thank you.
23         Who is first?
24         MR. MENHART:  Your Honor, the plaintiffs
25  would like to clone Mr. Rivera and have him appear on

1  the jury.

2          MR. GREENBERG:  I would move to strike him

3  for cause.

4          THE COURT:  I'll strike him for cause.

5          A little too close.

6          MR. HENDRICK:  Number 16.

7          THE COURT:  Good morning, sir.  If you'd

8  stop right there.  Tell me your name.

9          THE JUROR:  James Hamilton.

10         THE COURT:  Yes, Mr. Hamilton.  You came up

11 for several reasons.  I'm listening.

12         THE JUROR:  Yes, Your Honor, just with

13 regard to the question about illegal access to e-mail

14 account.

15         THE COURT:  Yes.

16         THE JUROR:  My account about four months ago

17 was hacked by an unidentified group who wanted me to

18 call them to get the matter resolved, and clearly was,

19 you know, somebody was probably trying to do it for

20 reimbursement.  And, I was able to obtain an independent

21 group to clear my computer of that issue at, you know,

22 expense of a few hundred dollars.  And it was

23 successfully resolved.  But, any way, I just wanted to

24 check with you if that's an issue at all, or.

25         THE COURT:  That's just the kind of

1    information I want to know about.

2              THE JUROR:  Sure, general information.

3              THE COURT:  And you said this was 3 or

4    4 months ago?

5              THE JUROR:  Yes.

6              THE COURT:  All right.  And, were you

7    impacted in any way as a result of this incident?

8              THE JUROR:  Only to the extent of having to

9    hire, you know, a computer assistance group to clear my

10   computer.  But I didn't lose any other information or

11   financial, you know.  It was just a cost of getting it

12   fixed.

13             I think it was more a matter they had to

14   take the battery out and put it back in, and that

15   rebooted the system and cleansed the system to my -- to

16   my understanding any way.

17             THE COURT:  All right.  Well, in this case,

18   there may be allegations that someone without

19   authorization accessed e-mail --

20             THE JUROR:  Yes.

21             THE COURT:  -- and took information from the

22   stored --

23             THE JUROR:  I understand.

24             THE COURT:  -- communications provider.

25             So, my question is, how if at all, would

1   your experience impact your consideration of this case,

2   if at all?

3            THE JUROR:  Well, only if to the extent

4   that -- that, you know, I considered it to be illegal in

5   the wing when it happened to me.

6            But, you know, I didn't know the person who

7   did it or anything of that nature.  So, I think I could

8   remain independent on that issue, you know.  But to the

9   extent that it's disturbing, I think, you know, that

10  everyone would understand that no one would like to have

11  that happen to them, I guess.

12           THE COURT:  All right.  What would you want

13  to see in this case before you decide it?

14           THE JUROR:  Well, I would say that if

15  there's really no proof that the defendant did this,

16  then certainly, you know, that person should be fined

17  and not punished in any way.

18           But, to the extent there was proof and then

19  there was, you know, I guess should say some harm to the

20  plaintiff, certainly, I would agree that the plaintiff

21  should win in a case like that.

22           THE COURT:  All right.  Thank you very much.

23           THE JUROR:  Sure, you're welcome, thank you.

24           THE LAW CLERK:  He was deposed in a patent

25  case.

1    THE COURT:  He said that.

2    MR. GREENBERG:  Your Honor, can I make a

3  motion on that?

4    THE COURT:  Just a second.

5    MR. GREENBERG:  Your Honor, I think that one

6  of the factors that we have in this case is not just the

7  liability, but also the punitive damages.  And I submit

8  to the Court that he has a proclivity already of a

9  punishment perspective that I think he should be more

10  neutral about.  He -- and he called himself a victim and

11  that was four months ago.

12    And given the freshness of what happened and

13  the fact what he has to -- I don't think he's starting

14  with a clean slate.  And I'd ask you to strike him for

15  cause for that.

16    MR. MENHART:  My response to that, he said

17  before all that, he said if the proof was not

18  sufficient, he would find in favor of the defendant.

19  So, he seemed evenhanded from our perspective.

20    THE COURT:  All right.  I'll deny the

21  motion.  I don't think he's biased at all.  You can use

22  your strikes if you need to, but he was not biased in my

23  view.

24    MR. GREENBERG:  Your Honor, I have a --

25  Mr. Bradley would like to use -- to go to men's room.

1               THE COURT:  That's all right.

2               MR. HENDRICK:  26.

3               THE COURT:  Good morning.  If you'd stop

4  right there at the line.  Backup a little bit to that

5  little line there so the lawyers can see you when you

6  answer.

7               Tell me your name.

8               THE JUROR:  William Murphy.

9               THE COURT:  Yes, Mr. Murphy.

10              THE JUROR:  The IT network.  I don't

11  actually manage IT networks, however, I do supervise and

12  manage a team that manages IT network.

13              THE COURT:  So, in other words you're the

14  boss of a team that manages the IT?

15              THE JUROR:  So that means I know nothing.

16  So, yes.

17              THE COURT:  Well, you've answered my

18  question.  That was my question.  Anything else?

19              THE JUROR:  One other thing, I did -- I did

20  bring a company to civil court.  However, we settled

21  before the court date, met in arbitration.  So, we

22  didn't actually go --

23              THE COURT:  You didn't actually go to court?

24  You went to arbitration?  What kind of case was it?

25              THE JUROR:  It was like a -- this company

1    was a -- like a vacation company who had a vacation

2    certificate, and I sued them to try and get that

3    certificate.  They didn't deliver the certificate.

4              THE COURT:  I see.  And, what court was it

5    in?

6              THE JUROR:  Down in Florida, Miami Dade.

7              THE COURT:  Was the case resolved to your

8    satisfaction?

9              THE JUROR:  Yeah, yes, it was.

10             THE COURT:  How, if at all, do you think

11   that experience might impact your consideration of this

12   case if at all?

13             THE JUROR:  Not at all.  I forgot about it

14   until I started thinking about it.  My -- you know,

15   calculate guilt, and I started thinking about it.  So it

16   really wouldn't have any influence.

17             THE COURT:  All right.  Thank you very much.

18   You may have a seat.

19             MR. HENDRICK:  Number three.

20             THE COURT:  Good morning.  If you'd stop

21   right at the line right there.  Tell me your name.

22             THE JUROR:  Nancy Boulos.

23             THE COURT:  Yes, Ms. Boulos.

24             THE JUROR:  I'm asking for permission to go

25   to the restroom.

1          THE COURT:  I cannot hear.

2          MR. GREENBERG:  She wants to go to the

3   restroom.

4          THE COURT:  You can do that.  Just right

5   outside to your right.  Thank you.

6          MR. HENDRICK:  27.

7          THE COURT:  Yes, sir.  If you'd stop right

8   there, please.  Tell me your name.

9          THE JUROR:  Rabovianski.

10          THE COURT:  Yes, sir.

11          THE JUROR:  So, you asked if I'm IT

12   professional, and I'm a software developer at my job.

13   It's not the same as IT, but so, I don't do IT

14   functions, but just let it be known.  I know a lot of

15   people from the outside, they don't make a distinction

16   between IT and software engineer.  So, just --

17          THE COURT:  So a software engineer could

18   also set up a system for passwords and protections and

19   security things like that, too, right?

20          THE JUROR:  We don't do that.  I don't do

21   that --

22          THE COURT:  Okay.

23          THE JUROR:  -- at my job, but there's a

24   separate person who does that.

25          THE COURT:  Separate person who does that.

1   Okay.  How do you think your experience as a software

2   developer may impact your consideration of this case, if

3   at all?

4               THE JUROR:  I don't believe it will.  I

5   don't think -- no, it's not that I have my -- I don't

6   believe.

7               THE COURT:  Okay, thank you, you can have a

8   seat.

9               MR. HENDRICK:  Number one.

10              THE COURT:  Good morning.  If you'd stop at

11   the line.  Tell me your name.

12              THE JUROR:  My name is MD Salim Akter.

13              THE COURT:  Yes, sir.

14              THE JUROR:  Your last question you ask for

15   IT.  I'm with the IT.

16              THE COURT:  Okay.  And, what kind of work do

17   you do in IT?

18              THE JUROR:  I'm in software testing.

19              THE COURT:  Software testing, okay.

20              Does your work involve looking into

21   instances where passwords have been exchanged or taken?

22              THE JUROR:  Actually, I never felt like

23   this.  My job also does run things because we proceed to

24   the testing so we do something like changing the

25   password.  Like I'm working in the patent office before.

1   We have to do this kind of testing so anyone can hack or
2   it's like stolen the password they cannot do check like
3   a code.  They cannot change the code, but --
4            THE COURT:  They can't change the code in
5   the software?
6            THE JUROR:  No one can change it.
7            THE COURT:  And you also test to see if the
8   password --
9            THE JUROR:  Like a negative testing, like
10  positive testing, the 12 character, if it's 12
11  character.
12           THE COURT:  12 character?
13           THE JUROR:  Like ID, like ID like a 12
14  character or password like a 12 character.  So when you
15  enter like a 13 character, it part of working that's
16  when it's not good.  If it's not work, that's when five,
17  so we just, like this kind of testing we did.
18           THE COURT:  All right.  So, in other words,
19  a password might have a code for 12 words, and letters
20  and capital letters.  And if someone puts in 13 letters,
21  it shouldn't work?
22           THE JUROR:  Should not work.  This is called
23  like a negative testing.
24           THE COURT:  Well, this case involves
25  allegations that someone without authorization may have

1    accessed data stored on the e-mail account without

2    permission or authorization.  And, given your

3    background, my question is, do you think your work --

4    how would your work affect your consideration of this

5    case?  So how would your work --

6              THE JUROR:  This is very bad things if it's

7    something somebody stole my password and ID because,

8    this is an acknowledge, a decision, that password and --

9    although, in the conversation, very vital.  All we have

10   complicated e-mail.  So, it's very important to keep

11   safe, so.  If somebody still steal like my password and

12   my ID, and they use it on behalf of my name, Salim.

13   Someone, if someone use my behalf of Salim, that shoot

14   e-mail on behalf of me, but I don't know, and then they

15   claim something, it's really bad for me, really horrible

16   for me.  So I don't know.  This is really bad things.  I

17   don't like anyone do like this way.  So that's why I

18   change 60 days, my password, always I'm changing.

19             THE COURT:  I understand what you just said

20   then.  If someone were to change your e-mail and sent

21   out e-mail impersonating you, claiming to be you to

22   others, that that might harm you and that might affect

23   you.

24             THE JUROR:  That's definitely, definitely.

25             THE COURT:  So, in this case, the plaintiff

1   has to show by a greater weight of the evidence that

2   that happened, that someone took someone's e-mail,

3   accessed data stored on the e-mail and caused some kind

4   of damage.

5            So, my question to you is, do you think your

6   background would make you -- let me start over.  How

7   would you go about deciding this case?  How would go

8   about deciding this case?

9            THE JUROR:  Big caution, if I know someone

10  stole my password and using, um, I don't excuse him.

11  So, should have -- should have to have funds.  That's my

12  opinion.

13           THE COURT:  All right.

14           THE JUROR:  No one can steal my password

15  and --

16           THE COURT:  Thank you very much.  You can

17  have a seat.  Thank you.

18           I'm going to excuse for cause.

19           Counsel, I believe I've used most if not all

20  of your questions.  But are there any questions I did

21  not ask that you thought I should have asked?

22           MR. MENHART:  Your Honor, we have five

23  questions regarding tort reform and lawsuit abuse.

24  That's one that we -- it's a series of 3 or 4 questions,

25  potentially question that would be appreciated.

1          THE COURT:  Thank you.

2          MR. GREENBERG:  Your Honor, we have two we

3   submitted to you.  One was an issue about taking the

4   Fifth Amendment.  And the other one that we had was

5   whether or not someone would weigh, I know -- someone

6   who is in the military, whether they would give

7   additional credence to that person over someone else

8   because of the military background.

9          MR. MENHART:  We would object to that second

10  request.  We don't think --

11          THE COURT:  What does that have to do with

12  this case?

13          MR. GREENBERG:  Mr. Hately, when I was

14  deposing him, he mentioned he was an honorably

15  discharged Marine.  And he made that a point about why

16  this was egregious for him.  And so I just want to know

17  whether they would be more likely to listen to what he

18  might say because of the military background, as opposed

19  to what Ms. Torrenzano might say.

20          THE COURT:  Generally of the witnesses -- I

21  ask that generally in my instructions to the jury at the

22  beginning of the trial and at the end of the trial.

23          And, I don't want to call attention to that,

24  because -- is he going to stand and say he's Army -- a

25  discharged Marine man in this case?

1      MR. MENHART:  He will.

2      THE COURT:  What does that have to do with

3  the case?

4      MR. MENHART:  We think it has.  We think it

5  demonstrates that he is an honest person.

6      THE COURT:  Okay.  So you're offering to

7  show his credibility?

8      MR. MENHART:  We are.

9      THE COURT:  All right.  Then I would sustain

10  the objection.  So you're not going to bring up his

11  Marine work.  If he has a job now -- he's still in the

12  Marine Corps now?

13      MR. MENHART:  Yes.  He's in the reserves.

14      THE COURT:  All right.  What does he do

15  during the day when the rest of us go to work?

16      MR. MENHART:  He's in IT.  He's an IT

17  computer consultant, information category.

18      THE COURT:  We don't want to hear about the

19  Marine Corps.

20      MR. MENHART:  It's relevant to the purposes

21  of his suit, you know.  He, you know, I don't want to

22  get into right now.  He fought for justice in Iraq and

23  that's part of the reason we're all here today.  So --

24      THE COURT:  I don't think the war in Iraq

25  has anything to do with the lawsuit, and I don't

1   think -- I can't make a judgment what you're going to
2   argue to the jury.
3            What I will do, since you say it's
4   important, I'll ask if anybody is a member of the
5   military now or a Marine.  I will ask that question.  If
6   Marine tends to -- that means something to other
7   Marines.  I will ask that.
8            I'll ask about lawsuit abuse, too many
9   lawsuits, and whether someone is a member of the Marine
10  Corps.
11           MR. MENHART:  And we'll talk about that
12  issue when it comes up.
13           THE COURT:  Stay here.
14           MR. GREENBERG:  Two things, you sustained
15  the objection.  If you're asking that still open
16  question of whether he's going to get -- he fought for
17  privacy and all that kind of stuff.
18           THE COURT:  Let me hear the evidence, but
19  before closing argument if it comes up, let me know.
20  And, he's not going to take the stand and say, I went to
21  Iraq and fought for justice.  It has nothing to do with
22  e-mail.
23           MR. MENHART:  I understand that.  But the
24  reason it's relevant to the case is that's part of the
25  information technology background.  He earned some of

1   the skills there and that's part of the presentation

2   demonstrating how he was able to pull all of the

3   evidence together that he later demonstrate in his

4   testimony.

5          So, that's -- we're not exactly like, hey

6   you're a member of the Marine, great guy, and move on.

7   But it does have to do with the background, professional

8   background which is at issue in this case.

9          THE COURT:  So, his background was IT

10  professional in the Marine Corps and his work now, so

11  that helped him figure out he had been hacked?

12         MR. MENHART:  That's correct.

13         THE COURT:  I'm using the word "hack".  I

14  don't know if I should be using that word.

15         MR. MENHART:  It's a colloquialism.  It's

16  unauthorized.

17         MR. GREENBERG:  We have objections to it.

18         MR. MENHART:  Fine.

19         THE COURT:  Unauthorized access.  I'll try

20  to say that.

21         MR. GREENBERG:  Yes, sir.  And then, the

22  Fifth Amendment, Judge, if you look at our question on

23  the Fifth Amendment.

24         THE COURT:  I saw that.  I'm not sure what I

25  should say.  I'm not going to bless her because she

1  wants to take the Fifth.  I have an instruction for the

2  jury about Fifth Amendment.  And of course, the law

3  allows her to assert it, but I don't think I need to

4  bring that up now.  That's something I'll do in

5  instructions.

6          MR. GREENBERG:  Your Honor, I heard your

7  ruling, and I guess the thinking we had was somebody

8  takes the Fifth, we have an instruction that some people

9  take the Fifth even when they're innocent.  It doesn't

10  necessarily mean you're guilty.

11          THE COURT:  I don't know if you're going to

12  get that instruction to me, but she has a right to

13  assert the Fifth Amendment.

14          MR. GREENBERG:  I guess the question is

15  whether someone would be prejudice from the word go that

16  she is guilty and would stop listening to the evidence.

17  That would be the question I have for the jury in voir

18  dire so I could use any preemptory strikes.

19          MR. MENHART:  For us, it's a jury

20  instruction.  No question about it.

21          THE COURT:  I'm not going to instruct the

22  jury about the Fifth Amendment.

23          MR. GREENBERG:  It's a strike to use for a

24  preemptory if I knew someone, as soon as they heard the

25  Fifth Amendment being uttered, then they would

1   immediately decide she's guilty and need to find no

2   further evidence.  If I knew that were the case, I would

3   use my preemptory strikes to remove that person from the

4   jury panel.

5           THE COURT:  I'm going to have you stand here

6   when I ask the next question.

7           MR. GREENBERG:  Yes, sir.

8           THE COURT:  A few more questions, ladies and

9   gentlemen.  And again, if you have an answer to my

10  questions, we will take your answer here at sidebar.

11          The questions have to do with whether you

12  belong to an organization or participate in a program or

13  have any view that too many lawsuits are brought in

14  federal courts or lawsuits brought to court in general,

15  or too many claims for damages being brought in

16  lawsuits.

17          So, the first question has to do with

18  whether you or an organization have an opinion about too

19  many lawsuits or too many claims for damages brought to

20  court, if you have a view about that.

21          All right, I take it by your silence the

22  answer is no.

23          I'm sorry.  All right, if you'd come up,

24  Mr. Chubb.

25          All right, number eight, all right.  Just

1   stand in line right there.

2            The next question has to do with whether

3   anyone here is now or in the past been a member of the

4   Marine Corps?  All right.  Any person now a member of

5   the military or armed forces of the United States?

6            THE JUROR:  I'm work as a contractor for the

7   Marine at Quantico.

8            THE COURT:  I mean, are you in the Marines?

9            Are you a member of the military?  Do you

10  wear a uniform?

11           THE JUROR:  No.

12           THE COURT:  I'm only asking about people

13  wearing uniform.

14           If you all would come in the line.  Are you

15  a member of the Marine Corps?

16           THE JUROR:  No, Your Honor.  I'm retired

17  military.

18           THE COURT:  Retired military.  Okay, what

19  branch?

20           THE JUROR:  United States Air Force.

21           THE COURT:  Okay.  I'm only asking about the

22  Marine Corps.  And that speaker was Mr. Hagen, number

23  14.

24           If you come up, Mr. Chubb.  Thank you.

25           Yes.

 1                    THE JUROR:  I'm a defense attorney, Your
 2      Honor, for Baker Botts, LLP.
 3                    THE COURT:  Yes.
 4                    THE JUROR:  It's -- I can't say we as the
 5      firm have a position, but we're constantly in court
 6      defending against suits we think are frivolous.  That's
 7      where I think we're standing now.
 8                    THE COURT:  Okay.  And how long have you
 9      been a lawyer, Mr. Chubb?
10                    THE JUROR:  Six years, since 2011.
11                    THE COURT:  Your firm bills by the hour?
12                    THE JUROR:  Yes, sir.
13                    THE COURT:  So, then your firm does not want
14      to defend lawsuits where you get paid by the hour
15      because they're too many lawsuits?
16                    THE JUROR:  I'm sorry.  I'm not sure I
17      followed your question, sir.
18                    THE COURT:  I want to make sure you follow
19      my question.  Do you work by the hour as a lawyer?
20                    THE JUROR:  Yes, sir.
21                    THE COURT:  And, do you defend cases that
22      you are paid in where the other side might lose?
23                    THE JUROR:  Yes, sir.
24                    THE COURT:  So, is it your view then that as
25      a lawyer defending cases, you'd rather they not be

1   lawsuits brought because if they're frivolous, they

2   shouldn't go to court at all.

3            THE JUROR:  Absolutely.  I want to do what's

4   best for my clients.  My clients are constantly being

5   sued because they're big oil companies for the most part

6   and most of those claims are frivolous.

7            THE COURT:  Okay.

8            THE JUROR:  I don't think -- let me just --

9   I don't think it affects me here, my ability to serve.

10           THE COURT:  It does not.

11           THE JUROR:  You asked about that question.

12           THE COURT:  I did ask that question.  The

13  next question has to do with assessing damages.  Is it

14  your view that unless someone has a broken arm or loss

15  of a leg that the damage should be zero or very small

16  amount?

17           THE JUROR:  No, sir.

18           THE COURT:  How would you go about deciding

19  damages in a case where there's no loss of arm or loss

20  of leg?  How would you go about deciding damages?

21           THE JUROR:  There are many other types of

22  damages other than physical damages.  There is all kinds

23  of monetary damages, what I deal with every day in terms

24  of loss value to the company.

25           THE COURT:  All the cases you've been in,

1  have you ever lost a case?

2        THE JUROR:  I've never actually been trying

3  the case.  We always have settled.

4        THE COURT:  You've always settled?

5        THE JUROR:  Yes, sir.

6        THE COURT:  So you've never been in the

7  court to try a case?

8        THE JUROR:  No, sir.  No, sir.

9        THE COURT:  Thank you very much.

10        Yes.

11        MR. MENHART:  Your Honor, plaintiff moves to

12  strike for cause.

13        THE COURT:  Let me say for the record, that

14  I've now met a lawyer who works by the hour who thinks

15  that you should assess a lawsuit before it's brought to

16  court, and you would not want to defend a case that you

17  could not win, and you would not want to charge for it.

18        So I'm going to excuse him for cause.  I

19  think he just wants to get out of the jury duty as well.

20        MR. MENHART:  I think so as well.

21        THE COURT:  That's it.  We're going to seat

22  eight.  We're going to seat six first, actually, seat

23  eight and go down to six if I need to because there

24  won't be alternates.  All eight deliberate.

25        You understand?

1          MR. GREENBERG:  I do.

2          MR. MENHART:  Okay.

3          THE COURT:  Any issue during the jury

4    selection process involving race, gender, as it relates

5    to the strike, before the strike's announced ask to

6    approach the bench and take them up at sidebar, okay?

7          MR. GREENBERG:  Yes, one question.

8          THE COURT:  Yes.

9          MR. GREENBERG:  I was under the impression

10   that we had three preemptory strikes for the first six

11   and one for the next one.  How many are you going to

12   give us if you're seating eight?

13         THE COURT:  You just counted four, right?

14         MR. GREENBERG:  I did.

15         THE COURT:  I'll give you four.

16         MR. GREENBERG:  That's all I'm asking.

17         THE COURT:  But have eight jurors.

18         And have you all picked jurors in this court

19   before?  You know how the board works?

20         MR. MENHART:  Not in this court.

21         THE COURT:  Show them the board, Ms. Guyton.

22         MR. GREENBERG:  This is the no back strike

23   rule?

24         THE COURT:  I'm going to explain that to

25   you.  So, what happens is when the eight are seated,

1   you'll get the board first and you get to pick up

2   whoever you want to strike.  You have to pick off all at

3   one time because once somebody is on here and not been

4   stricken and the board goes to him, you don't get to go

5   back and take somebody off.

6                  Do you understand?

7                  MR. MENHART:  We take them all off at once.

8                  THE COURT:  Anybody you want to remove, you

9   have to take off the first time you see the board.  Once

10  on the board and the other side sees it, they're on the

11  jury.  Okay?

12                 MR. MENHART:  Yes.

13                 THE COURT:  Are we ready?

14                 MR. GREENBERG:  Yes, sir.

15                 THE COURT:  All right, let's go.

16                 (THEREUPON, side-bar conference was

17  concluded.)

18                 THE COURT:  Ladies and gentlemen, we're

19  going to begin the jury selection process.  Only eight

20  of you will have the honor of serving on this jury.  If

21  you're not selected, it's no reflection on you.

22                 And I ask the clerk and the court security

23  officer to direct you in the jury box.

24                 Thank you very much.

25                 THE CLERK:  As I call your name, please come

1   forward and have a seat in the jury box.

2         Juror number 30, Pamela Ann Scott; juror

3   number 33, Matthew Weir; juror number 11, Adolph

4   Essigmann, Junior; juror number 7, Zachary Chesley;

5   juror number 2, Elizabeth Allen; juror number 5, Emily

6   Burrell; juror number 31, Tobias Vandall; juror number

7   23, Jacob Logan.

8         THE COURT:  Back row, back row.

9         THE CLERK:  If I call your name, you may

10  return to your seat in the courtroom.  Juror number 2,

11  Elizabeth Allen; juror number 30, Pamela Ann Scott;

12  juror number 5, Emily Burrell; juror number 33, Matthew

13  Weir.

14        If I call your name, please come forward and

15  have a seat in the jury box.

16        Juror number 4, Sheila Burns; juror number

17  18, Sharon Hendrickx; juror number 21, Karl Kraus; juror

18  number 13, Gregory Fuller.

19        If I call your name, you may return to your

20  seat in the courtroom.  Juror number 21, Karl Kraus;

21  juror number 4, Sheila Burns.

22        If I call your name, please come forward and

23  have a seat in the jury box.  Juror number 27, Dobromir

24  Rabovianski.

25        THE COURT:  Sir, all the way at the end.

1              THE CLERK:  Juror number 22, Janet Lawrence.

2              If I call your name, you may return to the

3    seat in the courtroom, juror number 27, Dobromir

4    Rabovianski.

5              If I call your name, please come forward,

6    have a seat in the jury box.  Juror number 12, Marcelle

7    Flynn.

8              If I call your name, you may return to your

9    seat in the courtroom.  Juror number 12, Marcelle Flynn.

10             If I call your name, please come forward and

11   have a seat in the jury box.  Juror number 15, Francis

12   Hale.

13             MR. GREENBERG:  Your Honor, may we approach

14   the bench?

15             THE COURT:  Sure.

16             (Thereupon, the following side-bar

17   conference was had.)

18             MR. GREENBERG:  Your Honor, I asked to

19   approach the bench because I realize the last juror that

20   was seated was juror number 15, and I see he's a

21   software engineer.  But in my notes, I don't see him

22   ever coming up when you asked the question about having

23   IT background or experience.

24             So, I am -- I'm surprised by that because I

25   saw that I looked for the notes thinking that he would

1    have come up because it seems to me -- now I candidly
2    admit my expertise in IT may not be high, but I noticed
3    the other people listed as software engineers did
4    approach the bench and clarified with the Court that it
5    might be different.  But they were here in an abundance
6    of caution.
7              And so I'm concerned about that because it
8    may be a reason that we would have struck for cause.
9    And -- and, that person might have information that
10   might make it unduly tip towards the plaintiff's
11   perspective.
12             MR. MENHART:  Our response to that, the jury
13   was supposed to self select, and if the individual
14   didn't feel they had a security background or worked in
15   a security background -- software you can write code all
16   today and not do anything regarding security.  So, we
17   don't see any -- on its face, we don't see a problem.
18             THE COURT:  Let me speak.  We had a juror
19   come up, I think juror number one who said he wrote code
20   and was a software engineer.  And we had a second juror
21   come up and say software engineer but they don't do --
22   monitor the network.  They write the code that operates
23   the software that's the brain of the computer.
24             I'm happy to have him come up and tell us
25   what he does if you think that's appropriate.

1            MR. GREENBERG:  Yes.

2            THE COURT:  Mr. Hale, can you come to the

3    sidebar for a moment, please.

4            Hi, if you'd stop right there.  You didn't

5    do anything wrong.  I want to ask a couple questions.

6            What kind of work do you do?

7            THE JUROR:  I'm a software engineer for

8    applications for FAA.

9            THE COURT:  What do you do as a software

10   engineer?

11           THE JUROR:  I work on a contract application

12   for people -- for companies who want to bid on work for

13   the FAA.

14           THE COURT:  I don't want it seem like I know

15   a lot.  So that mean you create apps?

16           THE JUROR:  I work on an application,

17   uh-huh.

18           THE COURT:  Okay, is that the same as IT?

19           THE JUROR:  Yes.

20           THE COURT:  All right.  Have you ever had to

21   do software where the issue was passwords and access to

22   passwords and things like that?

23           THE JUROR:  No.

24           THE COURT:  How do you think your background

25   might affect your consideration of this case at all --

1   if at all?

2            THE JUROR:  Shouldn't have any bearing I

3   don't think.

4            THE COURT:  All right.  Thank you very much.

5            THE JUROR:  You're welcome.

6            THE COURT:  You can have a seat.

7            THE JUROR:  Thank you.

8            MR. GREENBERG:  With that response, I don't

9   have any motion to make, Your Honor.

10           THE COURT:  All right.

11           MR. MENHART:  I'm sorry.  What did you say?

12           THE COURT:  He said he didn't have any

13   motion.

14           MR. MENHART:  Okay.

15           THE COURT:  All right.

16           (THEREUPON, side-bar conference was

17   concluded.)

18           THE CLERK:  Ladies and gentlemen, would you

19   please stand and raise your right hand.

20           (Thereupon, the jury was duly sworn.)

21           THE JURORS:  I do.

22           THE CLERK:  Thank you.  You may be seated.

23           THE COURT:  You may be seated.

24           All right, ladies and gentlemen, all of you

25   who were not in the jury box, first I want to thank you

1  for coming to court and reporting for jury duty as
2  directed.
3              As I said to you earlier, the right to trial
4  by jury is fundamental, and you've now done your duty
5  for the day.
6              On your way out, please stop at the second
7  floor Clerk's Office and tell them that you've completed
8  jury service for the day, and they'll give you a
9  voucher.  And you're now excused with the thanks of the
10  court.  Thank you very much.
11             Ladies and gentlemen, I want to explain to
12  you just a few things about how the trial will proceed
13  in this courtroom.
14             We will normally sit each day from
15  10:00 a.m. until 5:00 a.m., that's 10:00 a.m. to
16  5:00 p.m.
17             We'll take a break normally at 11:30 for
18  about 15 minutes.  We'll break for lunch between 1 and 2
19  and 3:30, there will be another break and we'll stop
20  exactly 5 o'clock each day.
21             Please don't discuss the case amongst
22  yourselves throughout the trial until I tell you when to
23  start talking about the case.  Don't do any research on
24  the case.  And, what we'll do now is we'll take about a
25  15-minute recess.

1          There are two phones back there if you need
2   to call your offices to let someone know you're on the
3   jury, that you made the jury, that's fine.  And we'll
4   start in about 15 minutes.
5          We'll take a 15-minute recess.  If you'd go
6   with Mr. Hendrick now.  Thank you.
7          (Jury excused at 11:42 a.m.)
8          THE COURT:  Plaintiff counsel, how much time
9   do you need for opening statement?
10         MR. MENHART:  My suspicion would be 10,
11  15 minutes, Your Honor.
12         THE COURT:  All right.  Defense?
13         MR. GREENBERG:  Same, Your Honor.
14         THE COURT:  All right.  We'll take a
15  15-minute recess and come back and start the trial.
16  Thank you.
17         (Court recessed at 11:43 a.m. and reconvened
18         at 12:00 p.m.)
19         THE COURT:  Is there anything I need to take
20  up before I bring the jury out?
21         MR. GREENBERG:  Yes, Your Honor.
22         THE COURT:  I'm listening.
23         MR. GREENBERG:  Just have a couple of
24  matters I'd like to ask you about.  The first is this.
25         I was thinking about the dialog at the

1  sidebar, and I realized that I believe that

2  Mr. Menhart's intention is to try to demonstrate that

3  his client is kind of an expert in IT.  And I -- I want

4  to start by pointing out what he might have done in the

5  Marines or what his IT background is, is irrelevant

6  because he's not an expert in this case.  And it's our

7  view that he can't testify as to the expertise of IT

8  work because he hasn't been identified.

9         We don't -- we don't have a cross as an

10 expert.  And I'm anticipating from what I've heard and

11 from the stack of documents I've been -- I've received

12 without any other witnesses that they're hoping he'll be

13 able to put them in.

14        I did try to find out whether -- how they'll

15 try to get in some of the documents they have.  I was

16 told they won't respond to that.  So I have to speculate

17 and imagine that it would be -- they expect him to be an

18 IT professional, which he is not.  And I just want to

19 bring it to the Court's attention.  Also the fact that I

20 believe from --

21        THE COURT:  Let us take that up first.

22        MR. GREENBERG:  Yes, sir.

23        THE COURT:  If Mr. Hately has experience in

24 IT and used that expertise to do his investigation, is

25 that a statement of fact or a statement of opinion?

 1              MR. GREENBERG:  Depends upon the question
 2       asked.
 3              THE COURT:  Okay, fair enough.  But the
 4       questions are what did you do, and how did you do it,
 5       and how did you know to do it?  Would that be opinion or
 6       would that be fact?
 7              MR. GREENBERG:  How you knew to do it,
 8       arguably would be opinion.  What did you do, would be a
 9       fact.
10              THE COURT:  Okay.  Well, I think -- I can't
11       make a judgment hypothetically without knowing what
12       questions he's going to ask, but I understand your
13       point.  And that is that a witness can only testify
14       about facts, that is what they did, not necessarily what
15       their opinions are.
16              MR. GREENBERG:  That's right, Your Honor.
17              THE COURT:  You can make that objection at
18       the time if the question is asked.
19              MR. GREENBERG:  Yes.
20              THE COURT:  Is there something else?
21              MR. GREENBERG:  The other one was about the
22       armed service.  I'm unclear about what the Court -- I
23       believe there was going to be maybe something in opening
24       statement that he fought for the country.  He fought for
25       privacy.  He fought for justice and liberty.  And this

1    is why this is such an important thing to him.

2              And I'm not sure that whether it's important

3    to him about the lawsuit is relevant.  I think it tries

4    to sway the prejudice -- unfairly sway the prejudice of

5    the jury.

6              I wasn't sure if the Court -- you said to

7    bring that up, but I was unclear if that might develop

8    over evidence or if I'm going to hear that now from

9    Mr. Menhart in the opening statement.  So I thought I

10   should bring it up now.

11             THE COURT:  All right, Mr. Menhart, if you'd

12   come to the podium, please.

13             The question is what do you intend to say in

14   opening statement about Mr. Hately?

15             MR. MENHART:  I will represent to the Court

16   that while it will be part of the opening statement, it

17   will be a very small amount.

18             THE COURT:  I don't know what will be a part

19   of the opening statement.  Tell me what will be a part

20   of the opening statement.

21             MR. MENHART:  His background, including some

22   of his military history which will all come out in the

23   individual's testimony when he takes the stand.

24             THE COURT:  What background are you

25   referring to so I know what you're planning to say?

1      MR. MENHART:  His -- his technology and
2  information technology initial interests, experience,
3  background, and how eventually it brought us to the
4  point where we are today where he has the ability to
5  understand what various IP address is and geo-location,
6  tools do and what they mean.
7      THE COURT:  Okay.  So I want to understand
8  what you're going to say about his military background.
9      MR. MENHART:  I'm sorry.  Could you repeat?
10      THE COURT:  I want to understand what you're
11  going to say about his military background.
12      MR. MENHART:  I'm going to say that he was
13  in the military -- that he was in the military, and that
14  his -- that while in the military, that led to his
15  interest in information technology, and he eventually
16  became an IT professional.
17      And we do agree that there is no opinion
18  testimony allowed.  We are not going to present that.
19  We have no intention to.  So, that's not a question for
20  us.
21      THE COURT:  Okay.  So, then as I understand
22  it, you're going to refer to Mr. Hately's background
23  having been in the military working in the field of IT,
24  became an IT professional.
25      MR. MENHART:  Right.

1          THE COURT:  He is now not employed in that
2    field, but because he had that background, he was able
3    to ascertain some incident involving his e-mail?
4          MR. MENHART:  Yes, and just to make it
5    perfectly clear to the Court, we're not suggesting that
6    he was a quote, unquote IT professional in the military.
7    But what we are going to point out is the fact that he
8    uses pieces of technology that kept him safe, and so
9    that was of interest to him and led to his eventual IT
10   professionalism here today.
11         THE COURT:  In terms of investigation of his
12   e-mail?
13         MR. MENHART:  Correct.
14         THE COURT:  Okay, the facts about it, not
15   the opinions?
16         MR. MENHART:  That's correct.  And again, we
17   are perfectly clear on that distinction, and it is an
18   important distinction because we have not presented him
19   as an expert -- as an expert witness at any point.
20         THE COURT:  All right, okay.
21         Mr. Greenberg, I think I understand what he
22   wants to say.  Your response is?
23         MR. GREENBERG:  Well, Your Honor, as far as
24   him saying -- I'm not sure it matters what -- that he
25   learned technology allowed him to be safe and not get

1   blown up in Afghanistan and based on his desire to keep

2   himself safe, he decided to go to IT school, took

3   courses in college and now works in INOVA Hospital.

4              THE COURT:  He didn't say all that.  He

5   didn't say what you just said.

6              MR. GREENBERG:  That's what I heard, that he

7   became interested because technology kept him safe.  And

8   I know what he said in the deposition, so I guess I have

9   a little more I can read into.

10             THE COURT:  Well, this is not about

11  technology keeping him safe.  This is about him being

12  able to investigate what happened to his e-mail.

13             MR. GREENBERG:  Right.  That's what I'm

14  suggesting, Your Honor.

15             THE COURT:  Okay.  You can't say technology

16  kept him safe.  Nobody is safe.  Everything can be

17  hacked.

18             Go ahead.

19             MR. GREENBERG:  Your Honor, and I also heard

20  him say that he was hoping that Mr. Hately was going to

21  explain about geo-positioning and IT, and how you

22  have -- not IT, IP addresses and how they're made up.  I

23  can't imagine that's not expert testimony, but I guess

24  you'll rule on that as that comes along.  But that

25  seems --

1      THE COURT:  I will, but it's such a basic
2  kind of thing that it's not really anything special to
3  know that there are number code and address, just like
4  numbers on the house.  That's all it is.
5      MR. GREENBERG:  Okay.  And the last thing I
6  want to ask you is this, we were in court -- two things
7  happened.  When we were in court last Thursday, the
8  Court found that certain information wasn't provided to
9  the defense and, therefore, would not be submitted
10 during the course of this trial, in particular certain
11 witnesses, Mr. Spicer, et cetera.
12      But when we got the plaintiff's exhibits, we
13 noticed that all of the information that we're hoping to
14 get from those witnesses is now contained in the
15 exhibits I think they're trying to introduce.  So it
16 seems like getting in the back door what the Court
17 denied --
18      THE COURT:  Witnesses and evidence are two
19 different things, aren't they, Mr. Greenberg?
20      MR. GREENBERG:  Yes, they are.
21      THE COURT:  If you lay a foundation, you can
22 offer documents and things in evidence, correct?
23      MR. GREENBERG:  Yes, you can.
24      THE COURT:  All right.
25      MR. GREENBERG:  With regard to that, Your

1  Honor, I want to ask if you want to during the course of
2  the --
3              THE COURT:  Well, my practice is not to do
4  motions during trial.  That's why I had the hearing on
5  Thursday.  I'm prepared to go forward with the evidence.
6  If there's some objection you have to make to an
7  exhibit, you just make it when the exhibit is offered.
8  Fair enough?
9              MR. GREENBERG:  Yes.
10              THE COURT:  All right.  Ready to bring the
11  jury out?  All right.
12              You can bring the jury out, Mr. Hendrick.
13  Thank you.
14              MR. HENDRICK:  Yes, sir.
15              THE COURT:  Mr. Hendrick, can you close
16  those blinds for me, please.
17              MR. HENDRICK:  Yes, sir.
18              THE COURT:  Thank you.
19              Thank you very much.  Ladies and gentlemen,
20  as I told you at the beginning of the trial, this is a
21  lawsuit for money damages brought by Mr. Patrick Hately,
22  who we call the plaintiff, against Ms. Nicole
23  Torrenzano.
24              The claim involves accessing stored
25  communications involving the Electronic Stored

1   Communications Act.

2           And the plaintiff has the burden of proving

3   by what's called the preponderance of the greater weight

4   of the evidence his claim against Ms. Torrenzano.

5           At the end of the trial, I'll give you more

6   detailed instructions about the Electronic Stored

7   Communications Act.  But for right now, the basic

8   aspects of it have to do with showing that plaintiff

9   must show that, without authorization, that the

10  defendant, Ms. Torrenzano, accessed a system through

11  which electronic communications service is provided,

12  could be e-mail, could be something else; or accessed a

13  system through which electronic communication service is

14  provided with authorization but exceeded that

15  authorization in accessing the information in question.

16          So if she had authority and she exceeded it,

17  that might be a basis.  Or that the access was without

18  authorization and without permission or consent, so two

19  different theories.  And that the information was taken,

20  altered or used in some way from the electronic storage

21  system and that the person, the defendant acted with

22  what's called knowing or intentional state of mind,

23  meaning it wasn't by accident.  They did it on purpose.

24  And there will be further information I'll gave about

25  the intent or the state of mind later.  But for right

1   now, it can't be by mistake.  It has to be done
2   something knowingly or intentionally.

3            And I will also instruct you on the issue of
4   damages because as I said to you this is a case
5   involving a suit where if plaintiff prevails, then there
6   may or may not be a monetary award.

7            And of course, if the plaintiff cannot prove
8   their case against Ms. Torrenzano, then you must return
9   a verdict for the defendant.

10           I want to tell you how the case will proceed
11   in this courtroom.  And, generally at the beginning of
12   the case, we'll have the plaintiff's attorney will make
13   what's called opening statement, describing to you his
14   theory of the case, what the facts will be and what the
15   witnesses will say during the testimony of the trial.

16           Following the plaintiff's opening statement,
17   the defense attorney for Ms. Torrenzano may make an
18   opening statement, again, describing to you what the
19   witnesses may say, what questions that they want you to
20   focus in on, because the evidence that are asked by
21   Mr. Greenberg in cross-examination is the evidence they
22   want you to consider about the case as well.

23           And following that, then the plaintiff's
24   counsel, Mr. Menhart, will call witnesses into court.
25   The witnesses will come in, take the oath and take the

1   witness stand.  Mr. Menhart or Mr. Robinson will ask the
2   witness questions about what they know about the facts
3   of this case.
4          Following that questioning by Mr. Menhart,
5   then the defense counsel, either Mr. Greenberg or
6   Mr. Bradley will have the right to ask that witness
7   questions to challenge the witness's truthfulness, to
8   point out any inconsistencies in the witness's testimony
9   and point out any reason the witness might have to favor
10  or to lie, to favor the plaintiff's case.
11         Following that, then Mr. Menhart has the
12  right to ask follow-up questions of the witness.
13         After the plaintiff's presented all of its
14  witnesses, then the defendant, Ms. Torrenzano, has the
15  right to present witnesses if she chooses to do so.
16  She's not required to call witnesses, but if she chooses
17  to call witnesses, then Mr. Greenberg will call the
18  witness in the court or Mr. Bradley will call the
19  witness in the court.
20         The witness will take the oath and take the
21  stand, and then Mr. Greenberg or Mr. Bradley will ask
22  questions that bring out facts that bear on the evidence
23  offered by Mr. Hately, and bring out information that
24  they think is important for you to know through the
25  questions asked.

1        Following that, then Mr. Menhart or

2   Mr. Bradley, as defense -- as plaintiff's counsel, have

3   the right to ask the witness questions, to challenge the

4   witness's truthfulness, to point out any inconsistency

5   in the witness testimony, to point out any reason the

6   witness might have to favor Ms. Torrenzano and to

7   contradict Mr. Hately.

8        Following that then, Mr. Greenberg or

9   Mr. Bradley will have the right to ask follow-up

10  questions.

11       So, after all the evidence has been

12  presented by both sides, then plaintiff's counsel has

13  the right to respond to what's been offered by the

14  defense.

15       And so they may or may not call additional

16  witnesses or recall witnesses to respond to something

17  that was brought up that had not been covered earlier by

18  plaintiff in their testimony.

19       The purpose of the questions and answers are

20  to bring out information that the parties think is

21  important for you to understand.

22       And bear in mind, if during the questioning

23  of a witness that you think of some question that's not

24  asked, if it's not asked by the lawyers, it must not be

25  important so do not concern yourself with it.

1    These lawyers are highly trained.  They've
2  studied this case.  They can present to you what they
3  think is important in the case.

4    So after all the evidence has been presented
5  by both sides and I will instruct you on the law as I'm
6  doing right now.  I'll explain to you orally what the
7  law is.  I'll also give you written -- copy of the
8  written instructions so you have that along with any
9  documents submitted into evidence to take back to the
10  jury room for your consideration.

11    So, after I do the instructions, then the
12  lawyers will have a chance to argue the case.
13  Plaintiff's counsel will go first, summarizing the
14  evidence from the plaintiff's point of view, explain to
15  you what they prove and why Mr. Hately is entitled to a
16  verdict.

17    And following that, Mr. Greenberg and
18  Mr. Bradley will then have their closing argument, where
19  they summarize the evidence from the defense point of
20  view, pointing out the insufficiency of the evidence or
21  the admission of evidence and point out why Ms.
22  Torrenzano is entitled to a verdict.

23    Following that, the last argument will be
24  given by the plaintiff's counsel, Mr. Menhart or
25  Mr. Robinson explaining to you again their view of the

1   evidence and why a verdict is -- should be returned for
2   the plaintiff.
3           After that, then you all will be given all
4   the documents and all the written instructions.  You'll
5   go back, elect the foreperson and render a unanimous
6   verdict.
7           Your verdict should be based upon the
8   instructions of the law as you hear in court and the
9   written instructions which I've given you.  You are to
10  consider only evidence presented here in open court and
11  evidence from the witness stand.
12          The arguments of the lawyers, the statements
13  of the lawyers and the objections are not evidence.
14  What is evidence are things that come from the witness
15  stand that is subject to cross-examination.
16          You must not decide this case upon any
17  feeling of sympathy or prejudice for either party, and
18  you must not engage in guesswork or speculation.
19  Everything you need to know will be presented to you
20  here in court.
21          The admission of evidence, what is perceived
22  in evidence is governed by the rules of law, and the
23  rules of evidence which have been developed over many
24  years.  And my job during the trial is to decide on
25  issues involving what's admissible and what's not.

1    So, if a lawyer believes the evidence
2    presented or the question to it violates the rules of
3    evidence, that lawyer will stand and say "objection" and
4    explain to me why he thinks the evidence should not be
5    admitted.  And I may or may not hear from the other
6    side, and I'll make a judgment about whether or not the
7    evidence is admissible under rules of law.
8    You should not keep track of the number of
9    objections sustained or overruled.  And if I say the
10   objection is sustained, that means that argument by the
11   lawyer is well taken and would violate the rules of
12   evidence.  You're not to consider any partial answer or
13   the testimony or the document.
14   If I say objection is overruled, that means
15   I made a judgment that the evidence is admissible, and
16   you may consider it and the answer to it.
17   You are to determine the facts from this
18   case what's presented.  Of course, as jurors you have to
19   decide -- one of the most important responsibilities you
20   would have would be to decide what's called the
21   credibility of the witnesses.  Who is telling the truth?
22   What facts may you considered in deciding who you find
23   more truthful and who is not so truthful?
24   The law says you may take into consideration
25   the appearance of the witness on the stand, the way they

1   present themselves in terms of whether or not they sound
2   truthful to you, whether or not their statements are
3   consistent with the evidence you see or inconsistent
4   with the evidence that's presented, whether or not the
5   witness has a motive or interest in the outcome of the
6   case which might make them lean to one side or the other
7   and what you discern to be the probability or
8   improbability of the witness statements.  That is to say
9   you use your common sense and good judgment to decide
10   whether or not the witness testimony is truthful to you.
11         In weighing the evidence you may give it
12   such weight as you determine it is to receive.  Some,
13   all or none, depending upon your judgment about the
14   credibility of the witnesses.
15         Until the case is submitted to you and that
16   will be when I give you instruction that you may begin
17   to discuss the case, you're not to discuss the case
18   amongst yourselves on any break or anything like that.
19   You're not to do any research on the case.  Everything
20   you need to see and hear will be presented to you in
21   court.
22         I know you all have computers and you have
23   access to smart phones and the Internet.
24         You should not do any research on the
25   Internet at all.  You should not go visit any area that

1   might be mentioned in this case at all.  And, you may
2   not do any posting on Facebook, Twitter, all those
3   things you know what I'm talking about.  Don't post
4   anything that I've been selected for a jury or anything
5   like that, and don't do any research on the case.
6                Everything you need to hear will be
7   presented to you here in court.  And what we ask is that
8   you give this case your complete attention and keep an
9   open mind to all the evidence presented.  At the end of
10  the case, we ask you to return a unanimous verdict.
11               Plaintiff's counsel.
12               MR. MENHART:  May it please the Court,
13  members of the jury, welcome.
14               I want to tell you right away that I'm a
15  little jealous of you.  I've never served on a jury.  I
16  very rarely even made it to the back well.  So, I'm a
17  little jealous of you.
18               I know that if I was in your position right
19  now, I would be a little nervous, wouldn't know what to
20  do.  So -- but I think that one thing I would feel if I
21  was in your position is a lot of pride, because this is
22  a hard.  And there is a lot of things that are unjust in
23  the world, and we work really hard to put fair-minded
24  people in juries to help us come to the decisions that
25  are fair and just.

1          So, you've all raised your right hand and

2      sworn to do that today.  So I want you to know that we

3      certainly thank you and certainly everyone else in the

4      courtroom does as well.

5          So, why are we here today?  This case is

6      about three primary things.  First is revenge.  You're

7      going to see facts in this case that demonstrate that

8      the defendant, Ms. Torrenzano, had a clear intent to

9      take revenge upon Mr. Hately based on the information

10      she knew about him.

11          Second, intent.  Each and every action that

12      you're going to see evidence about was intentional.  It

13      had to be done with a knowing state of mind.  None of

14      these things happened by accident.

15          Third, personal responsibility.  We all have

16      responsibilities in our day-to-day lives, right?  If we

17      don't take responsibility for our actions, bad things

18      happen.  We can all think of certain situations where

19      that may have happened in the past.

20          So this case is about the three things.

21      You're going to see revenge.  You're going to see

22      intent.  And with your help, we're going to see personal

23      responsibility for the actions that were undertaken in

24      this case.

25          Let me introduce you to the individuals in

1  this case.  Mr. Patrick Wade Hately, I will typically

2  call him Wade during this case, is the plaintiff in this

3  case.

4          Now, Mr. Hately graduated from high school.

5  He's spent some time in the military abroad in Iraq and

6  while he was there, he had various technical devices

7  that kept him safe.  And he took an interest in those

8  things.  And when he left the military, he later came

9  back and he went to Blue Ridge Community College here in

10  Virginia and he pursued an IT profession.

11          And, so you will see later, he knows what

12  he's talking about because he's had a lot of experience

13  in this IT space.  So, that's Mr. Hately, obviously, an

14  intelligent person, right, IT, military.  He's a smart

15  guy.

16          Now, the defendant is Ms. Torrenzano.

17  Nicole Torrenzano is also a very smart person.  Ms.

18  Torrenzano works as a nurse at a hospital system in

19  Winchester, Virginia, and she is a very intelligent

20  person.  She has a college degree.  She is a capable

21  person.  Simple as that.

22          So, I don't want you to ever think that we

23  have anything particularly bad to say about Ms.

24  Torrenzano.  We think she's smart.  But in this

25  particular case, she did some things that she shouldn't

1  have done.

2          Okay, how do these two know each other?

3  Well, you probably guess, they knew each other in some

4  way, shape, or form.  These two met approximately 2011,

5  and they took a liking to one another.  They were

6  involved in a relationship for a brief period of time,

7  and you probably have guessed this by now, the

8  relationship didn't work out.

9          Well, why didn't the relationship work out?

10  We're going to demonstrate evidence that shows that Ms.

11  Torrenzano had an intimate sexual relationship with a

12  doctor that she worked with at Winchester Medical

13  Center.  Now, that doctor's name is Dr. Watts.  You're

14  going to hear his name quite a bit in this case, but

15  he's not going to show up in the courtroom today for a

16  variety of procedural reasons that we're not going to

17  bother you with today.

18          The intimate sexual relationship happened.

19  And, we can all guess what happened, Ms. Torrenzano and

20  Mr. Hately decided to part ways.  Okay, that's okay,

21  right.  Relationships happen.  Relationships break up.

22  You might have had the experiences in your own life.

23          Here's where things start to get a little

24  bit concerning.  The situation was that Mr. Hately and

25  Ms. Torrenzano wanted to part ways.

1          Mr. Tor -- Mr. Hately, excuse me, offered to
2    move her furniture out of the house, move her to a new
3    location.  He offered to get her cellphone number off of
4    his cellphone plan which he was paying for.  And what
5    happened was that he did those things.  Fine.
6          Right, relationship over.  Everyone goes
7    their separate ways.  We all find a new love.  No
8    problem.
9          For reasons that are unclear to us, Ms.
10   Torrenzano began her campaign of revenge against
11   Mr. Hately.  The first thing that she did was -- by the
12   way, how did she know how to do these things?  They were
13   in an intimate relationship, right.
14          Again, think about your own experiences.
15   You've probably had a situation where you shared a lot
16   of intimate details with a wife or a husband or a spouse
17   or a significant other.  Those people know a lot of
18   things about you.
19          My wife, man, I'd be in big trouble if she
20   ever left me, right.  So, hopefully that's not going to
21   happen.  But if it did, I'd be in trouble.  And I think
22   the situation was the same in this particular case.
23          So, what she did was, she took the personal
24   information that she had about Mr. Hately and she used
25   it to break into Mr. Hately's AT&T account.  She knew

1   which street he'd grown up on as a young person.  She
2   knew the first car he drove, all those questions that
3   you've probably seen when you log into your various
4   accounts, right, all those things.  You know, most of
5   the time, you're the only person that knows them.  But
6   in the particular case, Ms. Torrenzano knew them as
7   well.
8           Okay.  So she breaks into his AT&T account,
9   Mr. Hately figures it out.  He sees her later.  He says
10  stop doing that.  Okay, fine.  You know, she broke into
11  it.  She shouldn't have done it.  But, Mr. Hately said,
12  stop doing it and I'll let it go.  Done, right?
13          Well, it was done for a few months.  The
14  problem was in October of 2015, Dr. Watts makes another
15  appearance along with Ms. Torrenzano.  The evidence is
16  going to demonstrate to you that Dr. Watts and
17  Ms. Torrenzano were involved in a variety of text
18  messages, phone calls.  They were constantly staying in
19  touch with one another.
20          And on one night in October, they conspired
21  to break into Mr. Hately's accounts based on the
22  information that Ms. Torrenzano had.
23          Now, Dr. Watts wanted to get into the
24  account for reasons that were involved with his own
25  divorce proceeding.  I forgot to mention but I'll

1   mention it now.  Dr. Watts and his wife were not super
2   thrilled about Ms. Torrenzano and Dr. Watts having had
3   the sexual relationship.

4         Ms. Watts, her name was Audrey Watts, files
5   for divorce.  And now Dr. Watts is a defendant in that
6   case because he has been effectively sued for divorce by
7   the wife Audrey.

8         So at the point, Dr. Watts is involved in a
9   divorce case.  And he's interested in information in
10  Mr. Hately's e-mail account.  Ms. Torrenzano says, okay,
11  no problem.  I'm going to help you.

12        So, they work together.  There's a lot of
13  messages and phone calls that you're going to see and
14  they say, we're going to work together to break into
15  this e-mail account.  Ms. Torrenzano, we believe, did it
16  for revenge.  Dr. Watts did it for the advantages in his
17  divorce proceeding.

18        Now, remember on one hand, we have a very
19  capable, talented nurse with a college education.  She
20  knew it was wrong.  Dr. Watts, while not on trial here
21  today, he knew it was wrong.

22        MR. GREENBERG:  Your Honor, I want to
23  object.  He's blending into a closing argument.

24        THE COURT:  Right.  If you'd tell us what
25  the facts are going to be, what you're going to prove

1  about Mr. Hately.

2           And remember, we're not in Fairfax divorce

3  court.  This is a federal court, and we have the

4  Electronic Stored Communications Act.  If you would

5  address that, that would help.

6           MR. MENHART:  A fair point Your Honor has

7  made and I'll try to keep it specifically to the facts.

8  But our opinion is that the divorce played a role in Dr.

9  Watts trying to break into the e-mail account.  Let's

10  set that aside for now.

11           What matters is that the individuals gained

12  access to the account.  How?  Ms. Torrenzano was on the

13  phone with Dr. Watts, and she said, well, I can't -- I

14  don't know specifically what she said, but the

15  suggestion was that she could break into Mr. Hately's

16  e-mail account, change the password with her personal

17  information that she knew about Mr. Hately, and then she

18  would provide the password to Dr. Watts over the phone.

19  That's exactly what they did.  Dr. Watts breaks in and

20  they basically come to obtain all the information that

21  they want to obtain.

22           So, that's what happened in October.

23           You're eventually going to see quite a bit

24  of evidence demonstrating how we know that happened.

25  You're going to see timestamps.  You're going to see IP

1   addresses.  You're going to see geo-locations.  It's a
2   lot of pretty thick evidence I think you're going to
3   find pretty compelling.

4           Okay.  So, October comes and goes, right?
5   Now we're done, right?  She did a few bad things; no
6   reason to do anything further.  No.

7           In November of 2015, Ms. Torrenzano is at
8   her workplace at Winchester Medical Center.  She's
9   there.  She's logged into her computer.  She has her
10  user name on the IT network.  And she says, I'm going to
11  break into Mr. Hately's accounts again.  I've already
12  done it two times, but now I'm going to do it again.

13          So that's exactly what she does.  She goes
14  into the accounts yet again.  She obtains access to his
15  e-mail.  The results are going to be evidence about his
16  Facebook and LinkedIn accounts.  And she obtained access
17  again to his accounts.

18          Again, intelligent nurse.  She knows its
19  wrong.  She's still doing it.  It's this ongoing revenge
20  campaign that she has against Mr. Hately.

21          So, finally, at least to the best of our
22  knowledge, the loss is over, right.  The accesses have
23  happened, and Mr. Hately says okay, I have my IT
24  background.  I'm going to use it.  He conducts a serious
25  campaign to figure out specifically what happened.  He

1  uses a variety of tools and informations that are

2  publicly available.  But because he knows how to handle

3  it, he goes ahead and makes decisions -- excuse me, he

4  finds evidence that help him to come to the conclusion

5  it's likely that Ms. Torrenzano did what she did.  All

6  right.

7           Now, he takes that evidence and he goes to

8  the authorities, right.  He says okay, you know, it's

9  wrong.  She shouldn't have done it.  But, I'll just put

10 it in front of the authorities that are relevant in my

11 location.  This is the Frederick County Sheriff's Office

12 and eventually the Commonwealth Attorney got involved as

13 well.  And he brings all the evidence to them.  They

14 actually do some of their own research.

15          They send subpoenas out themselves.  There's

16 one in particular that you'll see from Comcast

17 demonstrating that there was, in fact, an IP address

18 that was corresponding to Dr. Watts.  That's evidence

19 that you'll see as well.

20          And, many different third parties will --

21 you will be presented with many different pieces of

22 evidence from third parties that will actually lead to

23 your seeing how his testimony is accurate.

24          So, who are those third parties?  Well, we

25 have records from Winchester Medical Center who is Ms.

1  Torrenzano's own employer.  We have records from the
2  Frederick County Sheriff's Office which we're going to
3  present.
4        That was -- in that particular case, they
5  investigated the complaint.  They sent out subpoenas and
6  they wrote written reports.  We're going to see those.
7  There's also information from the Commonwealth Attorney
8  who would have been the prosecutor if they had chosen to
9  bring criminal cases, criminal charges.  And, then
10  you're also going to see some records from Comcast and
11  AT&T.
12        So there are all these third parties.  None
13  of them have any dog in this fight.  But all of the
14  evidence that you're going to see from those third
15  parties is going to corroborate exactly what Mr. Hately
16  found when he did his research.
17        One thing in particular you're going to see
18  is that the Commonwealth Attorney who would have been
19  the prosecuting body decided that they were not going to
20  prosecute.  And they specifically said to Mr. Hately,
21  we're not going to prosecute.  So, here are your
22  options.  You can either do nothing or you can file your
23  own civil lawsuit.  That was the advice of the
24  Commonwealth Attorney.  We're not going to prosecute
25  this criminally, but we are saying that if you want any

1  type of justice here, you have to file a lawsuit.  Well,

2  here we are.

3          That's the reason that we're here.  But he

4  again gave her yet another opportunity to, you know,

5  just get out from behind this, you know, without having

6  to show up in a civil lawsuit write which is where we

7  are right now.  So he did everything that he possibly

8  could.  He told her to stop.  He went to the criminal

9  prosecution.  Both of those things didn't work.  And so

10 now, that's why we're here.

11          As we move forward, you're going to see all

12 this evidence, and we think that you're going to agree

13 that a smart person like Ms. Torrenzano does not

14 undertake these actions for any other reason than to

15 target the plaintiff, to undertake intentional actions

16 that she shouldn't have taken.  And that you know, she

17 had a goal.  She wanted to hurt him.  She wanted to help

18 herself.  We believe the evidence will present that.

19          And at the end of this entire case, you guys

20 are very lucky because you're not on a grand jury which

21 might be 30 days or something like that.  So we're only

22 talking a couple days.

23          At the end of this entire case, we are going

24 to ask you for a verdict.  This is a civil case.  He has

25 no other choice, right.  It has to be about the money

1  now because she didn't stop and the prosecution wouldn't

2  move forward.  So, that's important to understand.

3          We're going to ask you for a verdict

4  demonstrating to Ms. Torrenzano that we, as a society,

5  don't agree that these are actions that you should

6  undertake when you're in a position like she is, having

7  intimate knowledge of someone, knowing better and quite

8  frankly, being an educated smart member of society.

9  These aren't the type of things that we want to see.

10          So again, the evidence is going to show the

11  revenge.  She clearly wanted to target Mr. Hately.  It's

12  going to show the intent.  She knew exactly what she was

13  doing in every instance.  She had a certain

14  sophistication to her actions.

15          And then third, with your help, it's about

16  personal responsibility.  My strong suspicion is that

17  you, members of the jury, have not engaged in an ongoing

18  act of breaking into other people's e-mail accounts.

19  Most people aren't.

20          MR. GREENBERG:  Your Honor, it's not

21  inappropriate to put the jury in the position of --

22          THE COURT:  That's exactly right.  Objection

23  sustained.

24          MR. MENHART:  Let's go back to the verdict.

25  The verdict at the end of this case, we're going to ask

1   you to come to a verdict that is against Ms. Torrenzano,

2   in favor of Mr. Hately.  He's done everything he can to

3   this point, but this is the last chance for him to get

4   justice.  And so we're going to ask you to agree with

5   our side that this is the way justice needs to be meted

6   out in the particular instance.

7               Thank you very much.

8               THE COURT:  Thank you.

9               Defense counsel.

10              MR. GREENBERG:  Good afternoon.

11              THE JURORS:  Good afternoon.

12              MR. GREENBERG:  I represent Nicole

13   Torrenzano.

14              Not surprisingly, our evidence is otherwise.

15   And, so let's start with there is a lot that Mr. Menhart

16   just indicated to you that you should pay close

17   attention to, because I think there a lot of facts that

18   he alleges the Commonwealth Attorney advises, et cetera,

19   that I don't believe will be born out here by any of

20   testified.

21              Ultimately, what is at stake here is at

22   follows.  The first question is, did Nicole Torrenzano

23   violate the Stored Communications Act?  So, the question

24   is not simply did she read someone's e-mail.  But did

25   she violate the Stored Communications Act.

1   And, so what you have to find is whether the

2   e-mail was read.  And then, if it was read, was it in a

3   facility that stores communication for the purposes of

4   backup, so that the actual e-mail, if she read one, was

5   actually in a backup protected area, not just simply if

6   you go on someone's desk and that wouldn't violate the

7   act.

8   So the broad brush you heard is not an

9   accurate way of what has to be established by the

10  plaintiff in this case.

11  The other thing that I will tell you from

12  the word go is that there are no damages.  There are no

13  money damages in this case.

14  Mr. Hately was not damaged at all, at all,

15  not a single dollar.  The question you will decide if

16  you decide liability is the Court will instruct you on

17  punitive damages.  And your issue then will be to decide

18  if she knowingly committed this act, and if she did, did

19  she know it was against the law.

20  And then based on all the circumstances that

21  you will hear during the course of this trial, whether

22  you believe that there should be some punitive damages

23  awarded to Mr. Hately, not actual damages because the

24  Court's already determined there are no actual damages.

25  You should know that of the e-mails that he

1   alleged that were read -- and in his deposition he

2   wasn't even sure any of them were read -- you should

3   know that none of them were published.  None of them

4   were published.  None of them were used against him.

5   None of them were put out in social media to embarrass

6   him.  He can't show they were ever used in any kind of a

7   way.

8           His claim is simply this, if it's sustained

9   by you, that somebody read his e-mails and he didn't

10  like it.

11          Now, in the indication of the background, I

12  have a slightly different background.  My client, Nicole

13  Torrenzano is 29 years of age.  And Wade Hately, he's

14  30.  And the two of them got together when they were in

15  their late 20s.  And what you should also know, they

16  have two little girls together.  They will be five years

17  of age.  They're twins.  And they were raising their

18  daughters together.

19          And it is true that what happened, actually

20  after several years of living together, their

21  relationship started to fall apart, and Ms. Torrenzano,

22  as they mentioned, she started having a relationship

23  with one of the emergency room doctors.  And then what

24  they didn't tell you was that Mr. Hately started

25  sleeping with the doctor's wife.  So the whole Peyton

1  Place thing kind of evolves.

2          But what Mr. Hately also doesn't tell you is

3  that then what happens is, he starts arguing with

4  custody for four months.  When the parties separated,

5  they have 50/50 custody.  And Mr. Hately decided he

6  doesn't want that any more.  Speaking of punishment and

7  revenge, he decides that he wants to have full custody

8  of the two little girls.

9          MR. MENHART:  Your Honor, we're going to

10  object to the involvement of the custody issue.

11          MR. GREENBERG:  Your Honor, I think he put

12  up the entire revenge idea of what the reasons were of

13  Ms. Torrenzano.  I know --

14          THE COURT:  Let me do this.  If you would

15  come to sidebar for just a moment, that would help us

16  all.  Come to sidebar for just a moment.

17          (Thereupon, the following side-bar

18  conference was had.)

19          THE COURT:  Question one, are you admitting

20  that she accessed the e-mail?

21          MR. GREENBERG:  No.

22          THE COURT:  You just did.

23          MR. GREENBERG:  No, I'm saying if she did.

24          THE COURT:  You didn't say "if".  You said

25  she did.

 1          MR. GREENBERG:  Okay, that was --

 2          THE COURT:  The second question is -- the

 3   second question is, is the fact that the defendant was

 4   in a custody case a defense to a violation of the

 5   Electronic Stored Communications Act?

 6          MR. GREENBERG:  It explains two things about

 7   motivation.  It explains some of the motivations of her

 8   actions I just heard in opening statement.

 9          I mean, he was tried to charge her with

10   parental kidnapping after she was an hour late.  All the

11   statements of revenge that they brought out, they opened

12   the door to all of these other issues.  I just want to

13   show there's another way of looking at the very same set

14   of circumstances.

15          THE COURT:  My legal question is precise.

16   Is the fact that someone was in a custody dispute a

17   defense to Electronic Stored Communications Act claim?

18          MR. GREENBERG:  It might be.  It might be in

19   this case.

20          THE COURT:  Do you have a case that says

21   that?

22          MR. GREENBERG:  I don't have a case, Your

23   Honor.

24          THE COURT:  Okay.  I don't think it's a

25   defense.

```
 1              MR. GREENBERG:  But --
 2              THE COURT:  But, let me finish.
 3              MR. GREENBERG:  Yes, sir.
 4              THE COURT:  I understand what you want to
 5   do, and maybe there's a way to do it, but you can't do
 6   it that way.  I'm not going to have -- this is not
 7   Fairfax Circuit Court.  We're not going to relitigate
 8   the custody case or the reasons they separated.  I
 9   really don't think that that shows whether it was in a
10   violation of the Electronic Stored Communications Act.
11              If you'd laser focus on that, that would
12   help us.  And I think there are facts there you can
13   focus on.
14              MR. GREENBERG:  Your Honor, I agree with
15   you.  Let me say this about motivation.
16              THE COURT:  Sure.
17              MR. GREENBERG:  One of the reasons that
18   David Watts -- and he claims the two of them agreed to
19   conspired together to look at Mr. Hately's e-mails.
20   It's because of the fact that he was having a
21   relationship with her and that affected his custody.
22   Also the fact they had custody --
23              THE COURT:  Affected whose custody?  Just
24   listen to me, affected whose custody?
25              MR. GREENBERG:  No, affected the motivation
```

1  of whether it was our client that went ahead and looked

2  at these e-mails or David Watts who was also sued under

3  the exact same facts.

4         So if I can show through the custody what

5  evolved, if I show that David Watts had a reason to look

6  at the e-mails and he worked at the same hospital by the

7  way, then the jury has to decide whether it was my

8  client that went and looked at the e-mails or whether it

9  was David Watts who looked at the e-mails.

10         I have an opportunity to show that there was

11  a second person, and they sued David Watts with the

12  exact identical complaint.

13         THE COURT:  As I heard him say in opening

14  statement that there was a telephone call where Watts

15  and Ms. Torrenzano discussed her obtaining his password

16  and changing the account and giving it to Dr. Watts so

17  he could access the plaintiff's e-mail.

18         MR. GREENBERG:  Right, and he said she was

19  doing it for the purposes of revenge.  I don't know what

20  the revenge was, but that's what he said.  So can we get

21  motivation into it?

22         THE COURT:  I'm going to go back to the

23  original question.

24         MR. GREENBERG:  Yes, sir.

25         THE COURT:  Is the fact that someone is in a

1   contentious divorce give them the right under the

2   Electronic Stored Communications Act to go into the

3   e-mail without authorization?  Is that a defense?

4              MR. GREENBERG:  It might be a defense to us,

5   if it was someone else and not us.

6              THE COURT:  If you can do it without making

7   us have to litigate the custody case, I don't think it's

8   relevant.  And you just admitted that she had an affair

9   and he had an affair.  I don't think that really

10  matters.

11             MR. GREENBERG:  I don't either.

12             THE COURT:  The legal issue is what happened

13  on the days that the e-mail was accessed.  If you can

14  address that.  And --

15             MR. GREENBERG:  I agree, Your Honor, but can

16  I ask something?

17             THE COURT:  Yes.

18             MR. GREENBERG:  This is what I feel is

19  unfair.  I realize a lot of it is closing arguments

20  there.  But Mr. Menhart made it sounds like this is his

21  last day.  You're his last bastion.  You've got to give

22  it to her.  The Commonwealth Attorney wouldn't do it,

23  and the police wouldn't do, but you, ladies and

24  gentlemen --

25             THE COURT:  I was surprised you didn't

1   object to that about the Commonwealth Attorney.  How is

2   that relevant?  You didn't object to it.  Whether or not

3   it's relevant, I don't know.  That doesn't sound

4   relevant to me.

5          MR. GREENBERG:  I -- I try in opening

6   statement -- I've been taught for 30 years to give a

7   little bit of leeway.  I objected a couple times.

8          THE COURT:  The fact that there was a

9   criminal investigation had nothing to do with the civil

10   suit, does it, Mr. Greenberg?

11          MR. GREENBERG:  No, I don't think it does --

12          THE COURT:  But, you let it in.

13          MR. GREENBERG:  -- for motivation.  The

14   reason --

15          THE COURT:  I want to focus on opening

16   statement.  The objection that was made has to do with

17   can we get into the long drawn-out discussion about the

18   divorce and the custody case.

19          MR. GREENBERG:  I'm not going to be long and

20   drawn out.  I just want to point out when he lost the

21   custody case, this was the response.  He lost in

22   March -- in April, and in June he filed this case.  He

23   says it was other reasons.

24          THE COURT:  If you had said that --

25          MR. GREENBERG:  I'm trying to get to that.

1          THE COURT:  But you're trying to tell me all

2   about the history of the marriage and the divorce, the

3   non-marriage.  They were living together, and the

4   divorce.  This is not the Fairfax Circuit Court.  This

5   is federal court.

6          MR. GREENBERG:  Fair enough.  But there is

7   one piece of that that does matter.

8          THE COURT:  I'm listening.

9          MR. GREENBERG:  When they were together and

10  raising the children together, they used the common

11  password, her first name Nick and his name Wade and the

12  date they met, 918.  She didn't have to guess the

13  password.

14         THE COURT:  Is she going to testify to that?

15         MR. GREENBERG:  I don't know.

16         He can say that because I got it out of him

17  at the deposition.

18         THE COURT:  If you want to offer that in

19  evidence as what the evidence is going to show --

20         MR. GREENBERG:  That's what I'm trying to

21  do.

22         THE COURT:  What you're trying to do is

23  relitigate the divorce case.  I'm not going to let you.

24         MR. GREENBERG:  I'll take your advice.

25         THE COURT:  If you'd focus on the events

1  surrounding -- the events on that day when she talked to
2  the doctor.  And we know they were in an affair.  She
3  told him, here I can get the password and then, you
4  know, go from there.  But don't -- I'm not going to have
5  the divorce case relitigated.  You all understand that?
6            MR. MENHART:  Yes.
7            THE COURT:  When you say revenge, that has
8  to do with the custody, right?
9            MR. MENHART:  No, and this is an important
10 distinction.  We do not object to -- this is important
11 for you to understand.  We don't object to the
12 relationships being relevant.  But we do object to the
13 specific custody battle because that is not relevant.
14 That's -- that's the only distinction that we're saying
15 here.  He can bring up his relationship with Audrey
16 Watts.
17           THE COURT:  He wants to bring up that he
18 lost custody, that Mr. Hately lost custody and the next
19 day he filed a lawsuit.
20           MR. MENHART:  Again, it doesn't have
21 anything to do with the Stored Communications Act with
22 the relationship.
23           The allegations is that one of those
24 relationships led to the breaking in of e-mail.  So,
25 that's the difference.

1              MR. GREENBERG:  Your Honor, I have one other

2   question for you.  In the Seventh Circuit -- you know,

3   in the Seventh Circuit, one of the list of factors for

4   punitive damages is the relationship between the

5   parties, and that's a fact for the jury to consider.

6              If I talk about the conflict with custody

7   and that might -- that might be fair what they thought

8   for punitive damages.

9              THE COURT:  If you have evidence about that,

10  that's fine.  This is opening statement, not closing

11  argument.

12             MR. GREENBERG:  Okay, fair enough.

13             THE COURT:  And, I'm going to say again for

14  the fourth time.

15             MR. GREENBERG:  I'm in the --

16             THE COURT:  If you all try to relitigate the

17  divorce -- the custody case, I'm going to stop and jump

18  right in because I told you at sidebar not to do it.

19             MR. GREENBERG:  Okay.

20             THE COURT:  The fact that they don't get

21  along, they don't like each other, that's fine.  That

22  she won custody, he lost and three days later, he filed

23  the lawsuit, that's relevant.  You can say that.  But --

24             MR. GREENBERG:  Can I say --

25             THE COURT:  And also you can admit -- I

1     think maybe you didn't mean to admit.  It sound to me

2     you admitted she did it.  If she did it, that's fine.

3              MR. GREENBERG:  I don't care about that part

4     of it.

5              THE COURT:  Tell the jury whatever you want.

6     I can't try the case for you.  But I'm going to tell

7     you, I'm not going to relitigate the divorce case.

8              You understand?

9              MR. GREENBERG:  I am very clear.  I'll try

10    to truncate it because I was thinking -- and, you may

11    say this is too far gone or maybe you won't.  They also

12    tried to get a protective order.  The Court threw it

13    out.  He has been dogging all --

14             THE COURT:  All those things are not

15    relevant.  All those things are not relevant to this

16    case.

17             MR. MENHART:  You're right.

18             MR. GREENBERG:  You didn't --

19             THE COURT:  Hold on.  Hold on a second.

20             You can address me one at a time, but not

21    each other.

22             MR. GREENBERG:  You're right.  I'm sorry.

23             THE COURT:  I have no problem with lawyers

24    making objections.  And I assume you make an objection

25    about what you think is right, too.  It has nothing to

1   do with the case.

2              Are we narrow focused now?

3              MR. GREENBERG:  We are.

4              THE COURT:  Okay.  And you understand?

5   Everybody understands?

6              MR. MENHART:  Your Honor, crystal clear.

7   Crystal clear.

8              THE COURT:  Thank you.  All right.

9              (THEREUPON, side-bar conference was

10  concluded.)

11             THE COURT:  You may proceed.

12             MR. GREENBERG:  Thank you.

13             Ladies and gentlemen, as you can see, there

14  are certain procedures we have to follow through with

15  and which will be important I think for you as you go

16  through this evidence.

17             In short, when the parties lived together

18  before they separated, they used a common password.  And

19  the password was her first name, shortened to Nik, his

20  first name, shortened to Wade, and the day they met,

21  918.  NikWade918, that was their common password.  The

22  AT&T account, they also had had both their telephone

23  numbers on it.  So the statement about her going into

24  his AT&T account, actually it was an AT&T account with

25  both telephone numbers, her telephone number and his

1    telephone number.

2              When the parties started to dispute over the

3    issues of custody, they went to court.  Mr. Wade lost.

4              MR. MENHART:  Objection.

5              THE COURT:  Overruled.

6              MR. GREENBERG:  And when that happened, one

7    month later, he filed this lawsuit.  He's taken multiple

8    actions, you'll hear in the evidence to try thwart her

9    ability to see the children on a regular basis.

10             So --

11             THE COURT:  I think I just said this is not

12   a custody case.  And ladies and gentlemen, we're not

13   going to get caught up in the divorce case or custody

14   case.  That's not what this is about.  This is about the

15   Electronic Stored Communications Act, a federal statute.

16             MR. GREENBERG:  You will also learn that

17   besides the lawsuit that they have filed against Ms.

18   Torrenzano.  They filed the exact same lawsuit against

19   Dr. David Watts that's pending in this court at another

20   time.  And they've pled the exact same allegations.

21   They say it was him.  They say it was her.  They say --

22   you know, so you should know that that's out there as

23   well.

24             Their best care scenario, their best case

25   scenario is what they want to prove, as I said earlier,

1   is that they want to show that they believe that either

2   Nicole Torrenzano or Dr. David Watts used the common

3   password that she had and that they read an e-mail, some

4   e-mails that he had written to the person he was having

5   an affair with which was the doctor's wife.

6            Now, the Stored Communications Act, as I

7   said earlier, is a very specific act, unlike looking at

8   anyone's e-mails.  It's not just a matter of seeing an

9   e-mail.  It's about a specific way of looking at an

10   e-mail.

11            And again, the intentionality has to be that

12   the person who is looking at the e-mail, again, knows

13   they're going into a stored communication, and the

14   stored communication stores these e-mails as a matter of

15   backup.

16            You have to establish that Ms. Torrenzano

17   knew that, deliberately tried to access that backup.

18   And then, if you were to decide that you thought she was

19   liable of that, you then have to decide punitive

20   damages.  And to make that finding, the jury has to

21   determine that she knew it was unlawful, that what she

22   was doing was actually an unlawful act and she intended

23   to do that.

24            There is -- it is clear and I will submit to

25   you that no matter what evidence they put forward today,

1   you will not find that she intentionally went into the

2   stored communication that has backup e-mails in order to

3   look at them.

4           You will find without reservation that she

5   did not know -- she didn't do anything knowingly,

6   unlawful.

7           You will also -- I submit, find that there

8   was absolutely no reason to find her liable, nor should

9   you find that there's some reason to award monetary

10  damages.

11          I think that when you listen to all the

12  evidence, you'll find that the -- it's favorable to end

13  all litigation and allow these two people to go back to

14  just raising their two daughters that they have.

15          Thank you.

16          THE COURT:  All right.  Again, this case is

17  not about their two daughters.  It has nothing to do

18  with it whatsoever.  This has to do with whether Stored

19  Communications Act was violated.  And I'll explain to

20  you and explain to you in more detail what that is.

21          So let's not focus -- this is not a divorce

22  case.  This is not a custody case.  We don't have

23  jurisdiction of that.  We don't do that in federal

24  court.  Thank you.

25          You can move the podium, Mr. Hendrick.

1        Your first witness, Mr. Menhart.  We will

2   start for a few minutes and we'll stop at 1.

3        MR. MENHART:  Yes, we'd like to call Nicole

4   Torrenzano to the stand.

5        THE COURT:  Ms. Torrenzano, if you'd stand

6   over there and take the oath from the clerk, please.

7        THEREUPON, NICOLE TORRENZANO, having been

8   duly sworn, testified as follows:

9        THE WITNESS:  I do.

10        MR. HENDRICK:  You may be seated.

11                    DIRECT EXAMINATION

12   BY MR. MENHART:

13   Q.   Good morning, Ms. Torrenzano.  How are you?

14   A.   I'm well.  How are you?

15   Q.   Fine, thank you.

16        Ms. Torrenzano, I'd like to ask, in the spring of

17   2015, did you have a sexual relationship with Dr. David

18   Watts.

19        MR. BRADLEY:  Your Honor, objection on

20   relevant grounds.

21        THE COURT:  What's the relevance of it,

22   Mr. Menhart?

23        MR. MENHART:  The relevance is that the

24   allegations are that Ms. Torrenzano and Dr. Watts were

25   involved in accessing the e-mail account in October of

 1  2015.

 2          THE COURT:  You're trying to show the

 3  relationship between the parties?

 4          MR. MENHART:  Correct.

 5          THE COURT:  All right.  I think I can ask

 6  the question without referring to sex.  I think you can

 7  ask the question without referring to sex.

 8  BY MR. MENHART:

 9    Q.  Okay.  Ms. Torrenzano, did you have an intimate

10  relationship with Dr. Watts in the spring of 2015?

11          MR. BRADLEY:  I still object as to

12  relevance.  As far as the timing is concerned, I believe

13  the allegations in this case occurred in October and

14  November, and we're talking 6-7 months prior.

15          THE COURT:  Objection overruled.

16  BY MR. MENHART:

17    Q.  Ms. Torrenzano, in --

18          THE COURT:  She didn't answer the question.

19          THE WITNESS:  I did.

20  BY MR. MENHART:

21    Q.  Ms. Torrenzano, in October of 2015, were you on

22  the phone with Dr. Watts?

23    A.  I don't remember.

24    Q.  You don't remember?

25    A.  It was about two years ago.  I don't remember if

1    I was on the phone with him.  I remember I was in the

2    fall.

3        Q.  Well, when I asked you that during your

4    deposition, you pleaded the Fifth, didn't you?

5        A.  I don't remember.

6              MR. MENHART:  Your Honor, we would move to

7    admit the deposition of Nicole Torrenzano which has been

8    marked as Plaintiff's Exhibit 3.

9              MR. BRADLEY:  Your Honor, I -- I have an

10   objection to the admission of the exhibit in full.  I

11   would say for the Court that the question Mr. Menhart

12   just asked, to my memory, is not included anywhere in

13   that deposition.

14             THE COURT:  Well, first I think that your --

15   part of your objection is well taken, Mr. Bradley.

16             Mr. Menhart, under what theory would the

17   entire deposition be admissible?

18             MR. MENHART:  Well, we can call specific

19   attention to certain questions.  But --

20             THE COURT:  Oh, so do you mean to question

21   her -- impeach her with a prior question and answer?

22             MR. MENHART:  Yes, Your Honor, because --

23             THE COURT:  Well, what you have to do is

24   call attention to the deposition, to the date and page

25   number so opposing counsel knows what they are and ask

1    whatever question you have.

2              MR. MENHART:  Court's indulgence for one

3    second, please.

4    BY MR. MENHART:

5       Q.  Ms. Torrenzano, let's go back to your

6    relationship with Mr. Hately.

7       A.  Okay.

8       Q.  You two had a relationship for a while, correct?

9       A.  We did, correct.

10      Q.  And, when you left that relationship, was

11   Mr. Hately paying for your phone bill?

12      A.  We -- it depended on what month it was.

13   Depending on our finances, it depended on who paid for

14   the phone bill that month.

15             THE COURT:  Would you lean closer to the

16   microphone.

17             THE WITNESS:  I'm sorry.  Depending on the

18   finances.  We were both hourly.  So, it depended on who

19   made the amount of money that month and who paid for the

20   utilities or the rent or the phone bill.

21   BY MR. MENHART:

22      Q.  But, he paid a lot of bills for you, did he not?

23      A.  We split the bills.  There's -- not that he paid

24   more or I paid more.  It really just depended on the

25   month.

1    Q.    So, did you make specific payments to the

2    cellphone account?

3    A.    I don't remember what specific payments I made.

4    I'm sure I made one of them, though.

5    Q.    Did you write a check to AT&T?

6    A.    I don't remember if I wrote a check to AT&T.

7    Q.    Ms. Torrenzano, after your relationship with Dr.

8    Watts, did you continue to have communications with him?

9    A.    I work with him in the hospital.

10    Q.    But, did you have text messages with him?

11    A.    On an ongoing basis, no.

12    Q.    How about phone calls?

13    A.    No.

14    Q.    What were the phone numbers that he used when you

15    communicated with him?

16    A.    What's his specific phone number?

17    Q.    Yes.

18    A.    I don't know his specific phone number out of my

19    head.

20    Q.    Would it be in your deposition?

21    A.    It may be.

22    Q.    You'll have to excuse me as I fight with

23    voluminous stack of exhibits.

24          How about 540-667-1244?  Do you know that number?

25    A.    No.

1    Q.  Did you have a phone conversation at 2:02 a.m. on

2    October 13th with that number?

3            THE COURT:  Of what year?

4            MR. MENHART:  2015.

5            THE WITNESS:  I don't remember.  I don't

6    remember two years ago on the date.

7    BY MR. MENHART:

8    Q.  Ms. Torrenzano, I'm surprised you don't remember

9    a lot of things.  Why is that?

10           THE COURT:  If you have a question to ask,

11   ask your question.

12           MR. MENHART:  Withdrawn.

13   BY MR. MENHART:

14   Q.  How about 11:25 p.m. on Monday, October 12th, did

15   you have a phone conversation with 540-542-9086?

16   A.  I don't remember if that was a specific date

17   or --

18   Q.  About 102 minutes?

19   A.  I don't remember.

20   Q.  And then the one at 2 o'clock in the morning,

21   would have been about 113 minutes.

22           MR. BRADLEY:  Your Honor, object to the form

23   of the questions.  Assuming facts not in evidence.

24   BY MR. MENHART:

25   Q.  Did you have a phone conversation --

1        THE COURT:  Are you -- recite your

2   objection.

3        MR. MENHART:  I withdraw.

4        THE COURT:  You withdraw it, okay.

5   BY MR. MENHART:

6   Q.  Did you have a phone conversation on Tuesday,

7   October 13, 2015, at approximately 2 o'clock in the

8   morning that lasted for approximately 113 minutes?

9   A.  I don't remember if I had a phone conversation at

10  that time or that long.

11  Q.  Do you work at Winchester Medical Center?

12  A.  I do.

13  Q.  And, did you work at Winchester Medical Center in

14  early November, November 2, 2015?

15  A.  Yes, I currently still work there.

16  Q.  And what is your user ID there at your -- in your

17  IT department?

18  A.  My user ID?

19  Q.  Sure.

20  A.  N-T-O-R-R-E-N-Z.

21  Q.  Thank you.  Were you summoned for a deposition in

22  the Watts versus Watts divorce case?

23  A.  Yes.

24  Q.  Did you appear for that deposition?

25  A.  Yes.

1          MR. MENHART:  Your Honor, we'd like to

2    introduce that deposition as Plaintiff's Exhibit 9.

3          MR. BRADLEY:  Your Honor, I object to the

4    wholesale admission of the deposition and also on the

5    foundation throughout to the transcript itself at this

6    time.

7          THE COURT:  All right.

8          You want to respond?

9          MR. MENHART:  Our response is that we can

10   certainly talk about the specific deposition in lieu of

11   introducing the entire thing.  We wouldn't be opposed to

12   that.

13         MR. BRADLEY:  Your Honor, at this point,

14   Mr. Menhart can pose specific questions to Ms.

15   Torrenzano.  He can ask those questions.  But putting

16   the deposition into evidence all at once, I do object to

17   it.

18         THE COURT:  All right.  I sustain the

19   objection to the entire deposition being admitted.  If

20   you want to ask a specific questions about specific page

21   numbers and questions, you can do that after we have the

22   luncheon recess.

23         So, ladies and gentlemen, three things.

24   One, I previously told you not to do any research on the

25   case, not to discuss the case.  I'm allowing you to take

1   notes because notes might assist you in recalling the

2   testimony.  But bear in mind, you will not receive any

3   transcript of the trial during your deliberations.  And

4   the fact that a juror has something in his or her notes

5   does not mean it's accurate or entitled to greater

6   consideration than someone who has not taken any notes

7   at all because many people are perfectly capable of

8   recalling testimony without taking notes.

9           We're going to recess now.  So again, please

10  don't discuss the case.  Don't permit the case to be

11  discussed in your presence.  And leave your notes in the

12  jury deliberation room.  We'll resume at 2 o'clock.

13          Thank you.  You're free to go.

14          (Court recessed at 1:00 p.m. and reconvened

15          at 2:02 p.m.)

16          THE COURT:  Ms. Torrenzano, if you'd go back

17  to the stand, please.

18          Ready to bring the jury out?  Are you ready

19  to bring the jury out?

20          MR. GREENBERG:  Yes, we are.

21          THE COURT:  You may bring the jury out, Mr.

22  Hendrick.

23          MR. HENDRICK:  Yes, sir.

24          THE COURT:  You may be seated.  All right,

25  counsel, you may proceed.

1    BY MR. MENHART:

2       Q.   Ms. Torrenzano, would you like to admit to the

3    jury that you violated the Stored Communications Act?

4       A.   I didn't violate the Stored Communications Act.

5       Q.   You said you did not violate the Stored

6    Communications Act?

7       A.   Correct.

8       Q.   So, you previously testified you had a romantic

9    relationship with Dr. Watts, correct?

10      A.   Correct.

11      Q.   And, did you begin -- did you begin that

12   relationship when you were still living with the

13   plaintiff?

14            MR. BRADLEY:  Your Honor, again, I'm going

15   to object as to the relevancy of the question.

16            THE COURT:  What does that have to do the

17   Electronic Stored Communications Act?

18            MR. MENHART:  It has to do with our

19   allegations that it was revengeful in nature and that

20   she was --

21            THE COURT:  Objection sustained.

22   BY MR. MENHART:

23      Q.   When you had your romantic relationship with Dr.

24   Watts, did you hope that he would get divorced?

25            MR. BRADLEY:  Your Honor, I have an

1    objection as to the form of the question.  I don't

2    believe there's any evidence in the record that they

3    were ever married.

4             MR. MENHART:  That's not what the question

5    asked.

6             THE COURT:  It may -- it may escape you.  I

7    had the impression that there was no marriage.  Was

8    there a marriage?

9             MR. MENHART:  I'm asking -- I'm asking the

10   witness about the Dr. Watts' marriage, not hers.

11            THE COURT:  Okay.  I remind you, this is a

12   federal court.  We don't do domestic relations here.

13   This is not a divorce case.  Objection sustained.

14   BY MR. MENHART:

15   Q.  Given that you knew of the divorce proceedings,

16   did you have any interest in assisting Dr. Watts in

17   providing him information that might have made him more

18   successful in those proceedings?

19   A.  No.

20   Q.  Did you ever try to help him gain advantage in

21   his divorce proceedings?

22   A.  No.

23   Q.  Was your name on Mr. Hately's AT&T account at any

24   point?

25   A.  I don't know.  My phone number was.

1    Q.   The question is, was your name on the account?

2    A.   I don't know.

3    Q.   Were you -- was your name ever on any of his

4    e-mail accounts?

5    A.   I don't know if my name was on his e-mail

6    accounts.

7    Q.   Do you know what Mr. Hately's e-mail account at

8    the VCCS domain name was?

9    A.   Yes.

10   Q.   What was it?

11   A.   It's the one I e-mail him now, today.

12   Q.   What is it?

13   A.   PWH271.

14   Q.   Are those your initials?

15   A.   His initials.

16        THE COURT:  Is that an e-mail address?

17   PWH2 --

18        THE WITNESS:  PWH271 at his e-mail account,

19   I'm not -- VCCS.email.com, the e-mail account I e-mail

20   him with today.

21   BY MR. MENHART:

22   Q.   So, you previously testified in your deposition,

23   page 70 in this case that, you were pleading the Fifth

24   Amendment --

25        MR. BRADLEY:  Your Honor, I object to the

1    form of the question.

2              THE COURT:  All right.  What's your

3    objection to the form of the question?

4              MR. BRADLEY:  The question itself asserts

5    facts that aren't into evidence as to what Mr. Menhart

6    believed she previously testified to.

7              THE COURT:  Okay.  If you want to ask her a

8    question and see if she recalls the answer to it, that's

9    fine.  If you want to call her attention to a portion of

10   the deposition, you do that first, okay.

11   BY MR. MENHART:

12   Q.   Ms. Torrenzano, do you remember testifying about

13   Mr. Hately's AT&T account during your deposition?

14   A.   Yes.

15   Q.   Do you remember what your answer was when you

16   were faced with those question?

17   A.   I plead the Fifth.

18   Q.   Why did you do that?

19   A.   Because I was uncomfortable answering the

20   questions at the time, and I have the right to plead the

21   Fifth.

22   Q.   But you're not pleading the Fifth today?

23   A.   Correct.

24   Q.   What's changed?

25   A.   I'm comfortable answering these questions.

1    Q.   When was that deposition?

2    A.   February, March, I believe.

3    Q.   Did you have the same attorneys during that

4    deposition?

5    A.   Yes.

6    Q.   Are the attorney sitting at the table now the

7    same attorney you had then?

8    A.   Yes.

9    Q.   But nothing's changed?

10    A.   As far as -- I don't understand the question.

11    Q.   Sure.  You were saying -- you are saying that you

12    were less comfortable at that point.  And correct me if

13    I'm misrepresenting your testimony.  You're suggesting

14    you were less comfortable then, but you're more

15    comfortable now?

16    A.   Yes.

17    Q.   You just testified that you had the same

18    attorneys.  It was only a few months ago.  Why are you

19    more comfortable now than you were a few months ago?

20    A.   Because we've been in the case for longer and I'm

21    more comfortable with it.

22    Q.   What are you more comfortable with?

23    A.   The proceedings, how they go, the questions, the

24    case.

25              THE COURT:  If you'd move a little closer

1   up.  I'm having a little trouble hearing you.

2              THE WITNESS:  The proceedings, the case, the

3   questions, how it's run.  I'm just more comfortable

4   because there's been more time.

5   BY MR. MENHART:

6      Q.   Now, I don't want you to tell me anything your

7   attorney specifically told you, but weren't your

8   attorneys there to help you during the time of your

9   deposition?

10             MR. BRADLEY:  Your Honor, I object as to the

11  relevance of this line of questioning.

12             THE COURT:  Relevance?

13             MR. MENHART:  The issue --

14             THE COURT:  What does it tend to prove or

15  disprove?

16             MR. MENHART:  Sure, the relevance is that

17  the answer are certainly inconsistent based on recorded

18  testimony of only two months ago.  And we're trying to

19  figure out why these answers are so inconsistent.

20             MR. BRADLEY:  Your Honor, I don't think it's

21  exactly inconsistent.

22             THE COURT:  Well, I think you can ask

23  specific questions about her prior testimony in the

24  question today.  So the question is overruled.

25  BY MR. MENHART:

1      Q.   Is it your position that you knew the passwords

2    to Mr. Hately's accounts while you were in a

3    relationship?

4      A.   Yes, we shared the same password.

5      Q.   Is it your position that he had the same password

6    to every single one of his accounts?

7      A.   I don't know if it was every single one, but I

8    know we shared the same passwords for my accounts and

9    for his accounts.

10     Q.   Which accounts was the password the same?

11     A.   I believe the e-mail one was.  I believe the AT&T

12   one was.  I don't know what other accounts.

13     Q.   What about the LinkedIn account?

14     A.   I have no idea what his password is for his

15   LinkedIn account.

16     Q.   What about his Facebook account?

17     A.   I don't know his Facebook account.

18     Q.   So the password wasn't the same from the e-mail

19   account to the Facebook account, to the LinkedIn

20   account?

21     A.   I don't know if they're all the same or

22   different.

23     Q.   But your testimony was just that they were

24   different, that you didn't know?

25              MR. BRADLEY:  Your Honor, I object.  I think

1   that's mischaracterizing her testimony.  I believe she

2   said she did not know what the --

3          THE COURT:  Well, I prefer you not make

4   speaking objections, Mr. Bradley.  And secondly, if you

5   have an objection just tell me what it is.

6          All right.  Objection is leading --

7          MR. BRADLEY:  Asked and answered.

8          THE COURT:  Asked and answered, okay.

9   Sustained.

10  BY MR. MENHART:

11     Q.  Do you remember in your deposition testifying as

12  to his shared accounts a few months ago?

13     A.  What specific accounts?

14     Q.  Just generally, his specific accounts.  I can

15  pull up the specific page if you want me to.

16          MR. BRADLEY:  Your Honor, I have an

17  objection to the form of the question.

18          MR. MENHART:  Our position is that we're

19  purely clarifying what the deponent asked us to clarify.

20          THE COURT:  If you want to ask her a

21  question about a specific question that she was asked at

22  the deposition, now would be your time to do that.

23  BY MR. MENHART:

24     Q.  Do you remember answering the question "Did you

25  have shared accounts?" at your deposition two months

1   ago?

2      A.  No, I don't remember answering the question.

3             THE COURT:  You want to let her see it.

4   BY MR. MENHART:

5      Q.  Are you interested in reviewing it?  Would that

6   help to refresh your recollection?

7      A.  Sure.

8             MR. MENHART:  Okay.  Your Honor, we would

9   introduce Plaintiff's Exhibit No. 3 into the record.

10             THE COURT:  Let her see number three and

11  what page number you want her to look at.

12             MR. MENHART:  It would be page 56.  And the

13  page numbers are, of course, the court reporter's page

14  numbers.

15             MR. BRADLEY:  Your Honor, for the record, I

16  might have misheard.  Was Mr. Menhart entering the

17  exhibit into evidence or just --

18             THE COURT:  Right now he's asking her to

19  look at the document, Mr. Bradley.

20             THE WITNESS:  I'm sorry, what page?

21             MR. MENHART:  Page 56, actually the bottom

22  part of page 55 and then on page 56.

23             THE WITNESS:  Okay.  I see the question.

24  BY MR. MENHART:

25      Q.  Okay.  So at the bottom of page 55, the question

1   was, "Did you have shared accounts?"

2       A.   Yes, I pled the Fifth.

3       Q.   Uh-huh.  But that's not what you're doing today?

4       A.   I'm saying that we had shared accounts.

5       Q.   Referring to page 58, so the question was, "And

6   you testified that you had separate bank accounts".

7            Do you see that on the transcript?

8       A.   You asked me if I had my bank account in my name

9   and I said yes.

10      Q.   I disagree.  The question was, "And you

11  testified --"

12           THE COURT:  If you would give her a line and

13  page number, Mr. Menhart, that would help her.

14           MR. MENHART:  I did give her the page

15  number, page 58.

16           THE COURT:  There's a line number there

17  also.  There are several questions.

18  BY MR. MENHART:

19      Q.   Yes, the line number, the line number four.  And

20  I'll read it for you, "And you testified you had

21  separate bank accounts."  That's the question.

22      A.   I pled the Fifth.

23      Q.   Okay.

24      A.   Mr. Bradley objected and then said "I don't

25  believe she testified to that."

1      Q.   Thank you.  Page 65 of that deposition, line

2  number 19.  I asked the question, "Ms. Torrenzano, do

3  you recognize the e-mail address torrennm@gmail.com.  Do

4  you see that?

5      A.   Yes, I see that.

6      Q.   What was your response to that?

7      A.   I pled the Fifth on that as well.

8      Q.   Is that your e-mail address?

9      A.   Yes, that's my e-mail address.

10     Q.   Why would you have to plead the Fifth when asked

11 a question about your own e-mail address?

12     A.   I said I was uncomfortable --

13          MR. BRADLEY:  I object to the form of

14 question.  It asks for a legal conclusion on her part.

15          THE COURT:  Sustained.

16          THE WITNESS:  I felt uncomfortable answering

17 the --

18          THE COURT:  Excuse me.  Next question.  He's

19 going to ask you another question.

20          THE WITNESS:  Okay.

21 BY MR. MENHART:

22     Q.   Referring to paragraph -- page 68 of that

23 deposition, line 19.  "Question:  Back to you, Ms.

24 Torrenzano.  The e-mail account next listed on this page

25 next is PWH271@email.ECCS.EDU.  Do you recognize that

1   account?"  What was your answer to that?

2       A.   I pled the Fifth.

3       Q.   But you just testified that you knew what

4   Mr. Hately's e-mail address was a short time ago?

5       A.   It's not ECCS.  It's VCCS.

6       Q.   Right.  I think I'll represent for the

7   record that --

8            THE COURT:  No, you won't represent

9   anything.  Ask her whatever question you have.  Only

10  what she says is evidence.  What you say is not.

11  BY MR. MENHART:

12      Q.   Did you hear it as an "E" when it was presented

13  to you?

14      A.   I don't remember what I heard it as.

15           THE COURT:  What is his e-mail dress?

16           THE WITNESS:  PWH271@email.VCCS.EDU.

17           THE COURT:  Thank you, next question.

18  BY MR. MENHART:

19      Q.   On page 69, "Question:  Is 910-546-6379 your

20  phone number?"  Your attorney said "She's pleading the

21  Fifth."

22           Do you remember that testimony?

23      A.   That's right here.  Mr. Bradley said that I was

24  pleading the Fifth.

25      Q.   Is there any reason why you couldn't identify

1    your own telephone number during your deposition?

2              MR. BRADLEY:  Your Honor, I object to the

3    form of that question.

4              THE COURT:  Sustain.  If you want to ask her

5    a question about today, you ask her.  Go ahead.

6    BY MR. MENHART:

7      Q.  What is your phone number today?

8      A.  910-546-6379.

9      Q.  Is it the same number you were asked about at

10   your deposition a couple months ago?

11     A.  Yes.

12             MR. MENHART:  Your Honor, we would move to

13   have Exhibit Number 3 entered into evidence in its

14   entirety.

15             MR. BRADLEY:  Your Honor, I have an

16   objection to the transcript itself.  There still has

17   been no foundation.

18             Ms. Torrenzano's testimony is not in

19   evidence.  The wholesale admission of the entire

20   deposition at this point is still full of relevance

21   objections, and, it's -- I don't know that it's

22   necessary for the jury or that the foundation proper was

23   laid.

24             MR. MENHART:  Our response, Your Honor, is

25   that the individual testified to knowing the deposition,

1    being present at the deposition several months ago.  And

2    we just had several instances of the record being read

3    into -- excuse me, the transcript being read into the

4    record.  And for those reasons, we think it's proper and

5    should be admitted.

6              THE COURT:  All right.  What does it tend to

7    show, Mr. Menhart?

8              MR. MENHART:  We believe that it shows a

9    substantial amount of prior inconsistent testimony.

10             THE COURT:  Do you believe you've asked her

11   the questions that you thought were inconsistent?  Do

12   you have believe you've asked her about them?

13             MR. MENHART:  I have a lot of questions

14   about inconsistent testimony, but the question is

15   whether we want to go through them all or not.

16             THE COURT:  Well, the way this works is you

17   can't just come into court and offer a whole deposition

18   in evidence.

19             MR. MENHART:  I understand that.

20             THE COURT:  You can, if there's relevant

21   testimony there about -- which relates to the case

22   because she's an adverse party, it will be an admission.

23   But you have to have specific question.

24             So, I assume you have a list over there.

25   Whatever questions you have, this is your time.

1            MR. MENHART:  We do have a list of

2    questions.

3            THE COURT:  Then ask her now.

4            MR. MENHART:  We're going to have a lot of

5    fun talking about pleading the Fifth at this deposition.

6    Let's refer to page 69.

7            THE COURT:  Well, you can ask her about her

8    asking -- taking the Fifth.  And apparently she's now

9    answering questions, so you can ask her the questions

10   that you have as well, right?

11           MR. MENHART:  Yes, correct.  Thank you.

12   BY MR. MENHART:

13     Q.  All right, Ms. Torrenzano, let's refer now to

14   paragraph -- excuse me, page 70.  Who was your cellphone

15   carrier?

16     A.  When?

17     Q.  During the time of the deposition.

18     A.  AT&T.

19     Q.  Who is your cellphone carrier now?

20     A.  AT&T.

21     Q.  During your deposition, do you remember pleading

22   the Fifth when asked who your cellphone carrier was?

23     A.  Yes, on page 70.

24     Q.  Referring to page 86 -- before I ask you that,

25   let me ask you this question.  Are you aware that in the

1    Watts versus Watts proceeding there was an allegation

2    that defendant David Watts admitted adultery with Nicole

3    Marie Torrenzano in the Commonwealth of Virginia,

4    specifically including, but not limited to March 14,

5    2015, March 15th, 2015, March 25, 2016, and March 26,

6    2015?

7                 MR. BRADLEY:  I have an objection to the

8    form of the question and to the relevance of the

9    question.

10                THE COURT:  Did you enter an objection to

11   the form of question at the deposition?  I don't see one

12   here.  Did you?

13                MR. BRADLEY:  Which --

14                THE COURT:  What's your objection to the

15   form of question?

16                MR. BRADLEY:  In the deposition?

17                THE COURT:  Yes.

18                MR. BRADLEY:  No, Your Honor.

19                THE COURT:  Okay, and your objection now is

20   to the form of the question?

21                MR. BRADLEY:  The form of the question and

22   to relevance.

23                THE COURT:  Okay.  Relevance.

24                MR. MENHART:  Your Honor, the allegations

25   are that Ms. Torrenzano and Dr. Watts had a sexual

1  relationship and that was the impetus for the Stored

2  Communications Act violations that are being alleged.

3            THE COURT:  All right.  Objection overruled.

4  BY MR. MENHART:

5    Q.  When you were asked that question I just read to

6  you during your deposition, Mr. Bradley I quote said, "I

7  advise" -- I advice is what the transcript says, "my

8  client not to answer that question based on the Fifth

9  Amendment".

10           Do you remember that?

11   A.  Yes.

12   Q.  Did you provide any other answer at that time?

13   A.  No, I don't believe so.

14   Q.  Then your counsel said, "Because in Virginia,

15  adultery is a" --

16           THE COURT:  That's not necessary.  If you

17  want to ask her a question now, since she's answering

18  the questions, do you want to ask that question?

19  BY MR. MENHART:

20   Q.  Ms. Torrenzano, are you aware that in Virginia

21  adultery is a --

22           THE COURT:  No, I don't think you understand

23  my question.  If you have -- do you want to ask her the

24  question that you asked that she didn't answer before,

25  she appears to be answering questions now.  Do you want

1    to ask her that question?

2    BY MR. MENHART:

3       Q.   Ms. Torrenzano, are you aware --

4              THE COURT:  No, not that one.  The question

5    that's on page 86, line three.  Do you want to ask her

6    that question or not?

7              MR. MENHART:  I'm going to ask that question

8    right now.

9              THE COURT:  All right.  We don't need the

10   reference to the law right now, just the question.

11   BY MR. MENHART:

12      Q.   I'm asking you now, are you aware in the Watts

13   versus Watts proceeding, there is a document that says

14   quote, "defendant David Watts committed adultery with

15   Nicole Marie Torrenzano in the Commonwealth of Virginia,

16   specifically including, but not limited to, March 14,

17   2015, March 15, 2015, March 25, 2015, and March 26,

18   2015?

19      A.   I didn't know it was quoted in there, no.

20      Q.   Are the allegations that I just explained to you

21   accurate?

22              MR. BRADLEY:  Your Honor, it's a relevance

23   objection.

24              THE COURT:  Overruled.

25              THE WITNESS:  Can you ask the question one

1   more time?

2   BY MR. MENHART:

3       Q.  Sure.  I'm asking you, are these allegations

4   which I just referred to in your deposition transcript,

5   which I'm asking you about now, are these allegations

6   accurate?

7       A.  I don't know about the specific dates.  But the

8   allegations are accurate.

9       Q.  Which is that you had sexual intercourse with Dr.

10  Watts on 3 or 4 dates in March of 2015?

11      A.  If those -- I mean, I don't know what dates they

12  were.  But, yes, to answer your question, I don't know

13  if those were the dates, though.

14      Q.  But for purposes of your testimony, you agree

15  that there were 3 to 4 times when you had sexual

16  intercourse with Dr. Watts?

17      A.  I don't know the number, Mr. Menhart.  I don't

18  know.

19      Q.  Was it -- was it less than three?

20          THE COURT:  Does it matter if it was more

21  than one?  It doesn't.

22          Next question.

23  BY MR. MENHART:

24      Q.  Referring to page 92 of your deposition, you were

25  asked did you ever have -- have you had any phone

1   conversations with David Watts?

2              THE COURT:  Give her the line number and

3   page.

4              MR. MENHART:  It's line number eight.

5   BY MR. MENHART:

6       Q.   Do you remember answering that question?

7       A.   What's the question?

8              THE COURT:  What is your answer to the

9   question?

10             THE WITNESS:  I didn't hear the question.

11  I'm sorry.

12  BY MR. MENHART:

13      Q.   First let me ask this question.  Do you remember

14  being asked that question during the deposition?

15      A.   No, but I can see it here.

16      Q.   Okay.  Now, I'm asking you, have you ever had any

17  phone conversations with David Watts?

18      A.   Yes.

19      Q.   I asked on line 13, "At any time", and your

20  attorney, Mr. Bradley said "pleading the Fifth" and then

21  you follow up and say, "I'm pleading the Fifth".

22             Is that correct?

23      A.   Yes, it says I pled the Fifth and Mr. Bradley

24  said to plead the Fifth.

25      Q.   Then you agreed?

1    A.  Agreed with Mr. Bradley?

2    Q.  That's the question.

3    A.  Are you asking me if I agreed with Mr. Bradley to

4    take the Fifth?

5    Q.  Yes.

6    A.  Yes, I pled the Fifth.

7    Q.  Thank you.  Did you ever exchange any e-mails

8    with David Watts?

9    A.  No.

10   Q.  Referring to page 92 of your deposition, on line

11   17, you were asked, "Have you ever exchanged any e-mails

12   with Dr. Watts", and you said I'm pleading the Fifth.

13   A.  Correct.

14   Q.  You remember that testimony?

15   A.  Correct, I'm reading it, yes.

16   Q.  Did you ever exchange text messages with Dr.

17   Watts?

18   A.  Yes.

19   Q.  When did you first start exchanging text messages

20   with him?

21   A.  I don't know the specific timeframe, 2015 --

22   beginning of 2015.

23   Q.  Is that --

24   A.  I don't know the dates.

25   Q.  Is that January?

1      A.  Sure, beginning of January 2015, I don't know if

2  it was January or February, beginning of 2015.

3      Q.  When was the last text message you exchanged with

4  David Watts?

5      A.  I don't remember.

6      Q.  Was it last week?

7      A.  Months ago.  I don't remember the last time I

8  texted him.

9      Q.  Was it February of this year?

10     A.  I don't remember the date that I texted him last.

11     Q.  All right.  We'd next like to refer -- Ms.

12  Torrenzano, I'm going to introduce to you another

13  deposition transcript --

14     A.  Okay.

15     Q.  -- which has been marked as Plaintiff's

16  Exhibit 9.  And, we'd like that to be presented to you

17  now.

18          MR. MENHART:  Court's indulgence for just

19  one second.

20          MR. GREENBERG:  Your Honor, may I be excused

21  for a few minutes?

22          THE COURT:  Sure.

23  BY MR. MENHART:

24     Q.  Do you remember being called to testify by way of

25  a subpoena in the Watts versus Watts matter?

1    A.   I remember being deposed in the --

2    Q.   Do you remember if you ever received a subpoena?

3    A.   At the end of the deposition, I did, in the

4    office.

5    Q.   Let me ask the question this way.  Did you appear

6    for a deposition with the caption of Watts versus

7    Watts --

8    A.   Yes.

9    Q.   -- in March of 2016?

10   A.   Yes.

11   Q.   Referring to what's been marked as Plaintiff's

12   Exhibit 9, page 4, do you remember testifying that you

13   were employed as an emergency room nurse in Winchester

14   Medical Center?

15   A.   Yes.

16   Q.   Is that true today?

17   A.   Yes.

18   Q.   Referring to page 4 again, starting on line 23,

19   you were asked if you knew Dr. Watts.  Do you see that

20   testimony?

21   A.   Yes.

22   Q.   You testified -- I'll just represent to you that

23   you knew Dr. Watts -- you've lived with him?

24            MR. BRADLEY:  I have an objection to the

25   form of that question.

1                    MR. MENHART:  Withdrawn.

2      BY MR. MENHART:

3          Q.    Do you know Dr. Watts today?

4          A.    Yes.

5          Q.    How long have you known Dr. Watts?

6          A.    Since I've worked in the hospital for about four

7      years now.

8          Q.    So, when did you start?

9          A.    April 2013.

10         Q.    Was he already working there?

11         A.    I don't think so.

12         Q.    Do you remember where you first met him?

13         A.    In the emergency room where I worked.

14         Q.    And, so did you work with him from time to time?

15         A.    Occasionally, just depends where we're assigned.

16         Q.    Did you know his wife, Audrey Watts?

17         A.    I met her, yes.

18         Q.    How long have you known her now?

19         A.    Like 3 or 4 months after I met him.

20         Q.    And when you met Dr. Watts were you aware that he

21     was married?

22                    MR. BRADLEY:  Your Honor, I have an

23     objection as to the relevance at this point.  I think

24     this is overly cumulative.

25                    THE COURT:  Sustained.

1  BY MR. MENHART:

2    Q.  Did Dr. Watts ever purchase any gifts for you?

3         MR. BRADLEY:  Objection to relevance, Your

4  Honor.

5         THE COURT:  I'm sorry.  Would you all come

6  to sidebar for just a moment, please.

7         (Thereupon, the following side-bar

8  conference was had.)

9         THE COURT:  I want to remind you all that

10  there's a complaint in the case, and that this is not a

11  divorce case.  We don't do that here.

12         In the complaint you've set forth certain

13  allegations and you have certain evidence.  This is with

14  what's relevant.  Whether she had sex with him, what

15  number of times or where has nothing to do with the

16  Electronic Stored Communications Act.

17         The specific allegation you made about when

18  these acts occurred, I advise you to get to those now

19  since you called the defendant first and not the

20  plaintiff.  Okay?

21         MR. MENHART:  Got it.

22         (THEREUPON, side-bar conference was

23  concluded.)

24  BY MR. MENHART:

25    Q.  Ms. Torrenzano, did you ever change the password

1   on Mr. Hately's AT&T account?

2     A.   Did I ever change it?

3     Q.   Yes.

4     A.   Yes.

5     Q.   In or around October of 2015, did you ever change

6   the password for Mr. Hately's VCCS.EDU e-mail account?

7     A.   I don't remember.

8     Q.   In or around October or November of 2015, did you

9   ever change the password for Mr. Hately's Facebook

10  account?

11    A.   No.

12    Q.   In or around October to November of 2015, did you

13  ever change the password for Mr. Hately's LinkedIn

14  account?

15    A.   No.

16    Q.   In or around the same time period, did you ever

17  change the password for Mr. Hately's Google account?

18    A.   No.

19    Q.   During the same time period, did you ever access,

20  that is, log into Mr. Hately's LinkedIn account?

21    A.   No.

22    Q.   During around the same time period, did you ever

23  access Mr. Hately's Facebook account?

24    A.   No.

25    Q.   In or around the same time period, did you ever

1   access Mr. Hately's VCCS.EDU e-mail account?

2      A.   Yes, with our same password.

3      Q.   In or around October, November of 2015, did you

4   ever access Mr. Hately's Google account?

5      A.   I don't think so, no.

6      Q.   You don't think so?

7      A.   The Google account, no.

8           MR. MENHART:  Court's indulgence for one

9   second.

10  BY MR. MENHART:

11     Q.   You just testified that you accessed the e-mail

12  account.  Why did you access the e-mail account?

13     A.   There was some gossip going on at work, and I

14  knew Audrey Watts worked there.  And I assumed that Wade

15  and her were talking, so I wanted to find out what was

16  being said about me.  So I checked myself just to know

17  what I was walking into at work.

18     Q.   Okay.  So, that is the October period, correct?

19     A.   That summer, I don't know the --

20     Q.   You said the summer?

21     A.   The summer, from the summer, October, I'm not

22  sure the timeframe, but that mid 2015.

23     Q.   Okay.  And then what about November, what were

24  you doing in the e-mail account then?

25     A.   I was -- like I said, I was walking into work.  I

1    was hearing gossip about myself, and I wanted to see

2    what was being said about me, and just to make sure I

3    knew was -- to check myself when I walked into work.

4        Q.   So you accessed the accounts in both those

5    instances?

6        A.   Yep.

7        Q.   Did you have -- strike that.  Were you in a

8    relationship with Mr. Hately at the time you accessed

9    those accounts?

10       A.   Can you clarify the question?

11       Q.   Were you living -- strike the prior question.

12   Answer this question.

13            Were you living with Mr. Hately at the time you

14   accessed his e-mail accounts?

15       A.   No.

16       Q.   Were you and Mr. Hately sharing any home

17   together?

18       A.   No, we weren't living together.

19       Q.   When you accessed his account in October of 2015,

20   how did you check for the gossip that you testified you

21   were looking for?

22       A.   I read an e-mail, an e-mail between him and his

23   mom, and him and Audrey Watts.

24       Q.   What other e-mail?

25       A.   I don't know the con -- I don't know the specific

1  e-mails.

2      Q.  How did you know to look at that one e-mail?

3      A.  There wasn't one specific I pointed out, just him

4  and his mom and him and Audrey Watts.

5      Q.  When you logged into the account, how did you

6  know what communications you were looking for?

7      A.  I didn't really -- I just looked for Audrey --

8  Audrey's name.

9      Q.  So you had to look at the headers?

10      A.  Just when you open the account, just what's in

11  the in box.

12      Q.  But it's a list of many different e-mails when

13  you open the account.  Is that your testimony?

14      A.  Yes.

15      Q.  So, how many e-mails did you look through during

16  that time?

17      A.  Three or 4, maybe.

18      Q.  So, you opened up 3 or 4 specific e-mails?

19      A.  Yeah.

20      Q.  What about November?

21      A.  I don't remember.

22      Q.  But you remember you logged in?

23      A.  Probably around that same time.

24      Q.  And, you reviewed the headers of the e-mails?

25      A.  I don't remember.  I remember looking at 3 or 4

1  e-mails.  I don't know when or what time, date, whether

2  October, November.

3      Q.  But there were two separate instances, that was

4  your testimony?

5      A.  Yeah.

6      Q.  Do you remember being interviewed by any law

7  enforcement shortly after this happened.

8              MR. BRADLEY:  Objection, Your Honor,

9  relevance.

10             MR. MENHART:  The law enforcement

11  officers --

12             THE COURT:  Excuse me.

13             MR. MENHART:  I'm sorry.

14             THE COURT:  This is a lawsuit involving

15  Electronic Stored Communications Act.  How would it be

16  relevant whether she spoke to some police officer or the

17  Commonwealth Attorney?  What would it tend to show or

18  disprove in this case?

19             MR. MENHART:  The relevance is that one of

20  the Frederick County police officers was investigating

21  the claims made by Mr. Hately, and -- what we hope the

22  testimony will show is that Ms. Torrenzano was

23  interviewed in --

24             THE COURT:  All right.

25             MR. MENHART:  -- conjunction.

1        THE COURT:  Let me save you time.  Whatever

2  happened with the Frederick County police or the

3  Commonwealth Attorney is irrelevant.

4        Objection is sustained.

5        And ladies and gentlemen, you're not to

6  concern yourself with it.  We only want to focus on what

7  happened in this case, in this courtroom.

8        Thank you.

9        MR. MENHART:  Your Honor, we're prepared to

10  pass the witness.

11        THE COURT:  All right.

12                CROSS-EXAMINATION

13  BY MR. BRADLEY:

14  Q.  Good afternoon, Ms. Torrenzano.

15  A.  Good afternoon.

16  Q.  How, you said on your direct examination that

17  there was -- that you heard gossip at the hospital --

18  A.  Yes.

19  Q.  -- could you describe with more specificity what

20  you had heard at the hospital?

21  A.  I heard my information, my personal information,

22  my financial information, my medical information was

23  being shared in the observation units, one of the units.

24        MR. MENHART:  We're going to object.  This

25  is hearsay.

1        THE COURT:  You have to stand up and object,

2   Mr. Menhart.  And you have to do that before the witness

3   gives the answer.  That is hearsay.

4        Objection sustained.

5        MR. MENHART:  Thank you.

6   BY MR. BRADLEY:

7   Q.   Ms. Torrenzano, what information did you believe

8   would be in the e-mails between Mr. Hately and

9   Ms. Watts?

10  A.   Information regarding my personal medical

11  information, financial information, my personal life.

12  Q.   What was your goal by accessing the VCCS e-mail

13  account?

14  A.   Just to prepare myself when I walked into work to

15  know what people were going to say, just protect myself.

16  Q.   Did you download any e-mails?

17  A.   No.

18  Q.   Did you make copies of any e-mails?

19  A.   No.

20  Q.   Did you post any of the comments or any of the

21  contents of the e-mails on to any social media?

22  A.   No.

23  Q.   Did you send the e-mails to Mr. Hately?

24  A.   No.

25  Q.   Did you send the e-mails to Dr. Watts?

1     A.   No.

2     Q.   To your knowledge, did you have any reason to

3  believe that you had accessed a backup copy of an

4  e-mail?

5     A.   No.

6     Q.   In the fall of 2015, did you know that it could

7  potentially be unlawful to look at another person's

8  e-mail?

9     A.   No.

10    Q.   Was there a password on the e-mail account?

11    A.   Yes.

12    Q.   What was the password?

13    A.   Capital N-I-K, Wade, W-A-D-E, 918.

14    Q.   And, how did you know the password?

15    A.   Because that's the password that we shared.

16    Q.   And, you say "we", that's you and Mr. Hately?

17    A.   Correct.

18    Q.   Did Mr. Hately ever direct you to access his

19  e-mail?

20    A.   Yes.

21    Q.   Can you describe that to the jury?

22    A.   When Mr. Hately was at the community college

23  taking classes, sometimes he would ask me if he was at

24  work or somewhere, would ask me to get on his Internet

25  in his e-mail to send -- submit papers.

1    Q.   Did you have any intent to hurt Mr. Hately by

2    going on to his e-mail?

3    A.   No.

4    Q.   Did you have any intent to prevent Mr. Hately

5    from being able to look at his own e-mail?

6    A.   No.

7    Q.   Since the fall of 2015, have you had any access

8    to any of Mr. Hately's e-mail accounts?

9    A.   No.

10   Q.   Would it be fair to say that in the fall of 2015,

11   these few circumstances you described were the only

12   times that you accessed his e-mail account?

13   A.   Yes.

14   Q.   Now, you and Mr. Hately were involved with court

15   proceeding for a custody case?

16   A.   Yes.

17          MR. MENHART:  Objection, relevance.

18          MR. BRADLEY:  Your Honor, if I could make a

19   brief proffer.

20          THE COURT:  Well, I've already said we're

21   not going to have a re-litigation of the custody case,

22   the divorce case.  If you want to ask a question about

23   when it ended, when the lawsuits was filed, you can do

24   that.

25          MR. BRADLEY:  Actually if I may, Your Honor,

1    the reason I'm asking the question is more that the

2    e-mail in questions were given to Ms. Torrenzano in

3    discovery during the custody case.

4                THE WITNESS:  Yes.

5                MR. MENHART:  That's the reason for the line

6    of questioning.

7                MR. MENHART:  Same objection.

8                THE COURT:  I don't understand what this has

9    to do with whether she had to the right to go into his

10   e-mail.  Can you help me with that?

11               MR. BRADLEY:  Yes, Your Honor.  In the event

12   that the jury were to find that she accessed an e-mail

13   that was in backup storage and damages were at issue --

14               THE COURT:  Hold on.  Come to sidebar.  Come

15   to sidebar.

16               (Thereupon, the following side-bar

17   conference was had.)

18               THE COURT:  What was your initial question

19   to her?

20               MR. BRADLEY:  It was, if I remember

21   correctly, it was, were there court proceedings between

22   you and Mr. Hately about custody?  Until the Court -- my

23   follow-up question was going to be, did you exchange any

24   documents during those proceedings?

25               THE COURT:  Okay.  You remember earlier at

1    the sidebar, I asked Mr. Greenberg whether the fact that

2    there was a custody proceeding between these parties was

3    a defense to the Electronic Stored Communications Act?

4              MR. BRADLEY:  Yes.

5              THE COURT:  You remember him saying he

6    didn't think it was a defense?

7              MR. BRADLEY:  I don't believe it's a defense

8    either.  It's a mitigation of defense.

9              THE COURT:  Mitigation of what?

10             MR. BRADLEY:  Of damages to the extent the

11   jury is to decide -- if it gets to the jury, the

12   reprehensibility of the act or how much she should be

13   punished I think is relevant whether Mr. Hately gave her

14   these e-mails a few months ago.

15             THE COURT:  Oh, the e-mails that she

16   accessed?

17             MR. BRADLEY:  Yes, that's the testimony I

18   expect to elicit.

19             THE COURT:  Okay.  Your response?

20             MR. MENHART:  Our response is that whether

21   or not she was provided e-mails later by copy or

22   anything else doesn't have anything to do with whether

23   or not she accessed the account prior to what the

24   statute precludes.  So whether she gets copies of them

25   later or not, she didn't have copies at the time of the

1   access.  So again, it wouldn't have any effect on

2   damages in our opinion, and so, that's our position.

3            THE COURT:  Okay.  It is not admissible that

4   she saw something in discovery.  This has to do with

5   whether a person who has an e-mail account has the right

6   to privacy in documents stored in the Electronic Stored

7   Communications Act purview.  That's all it has to do

8   with.  It doesn't mitigate her damages, the fact she saw

9   it later.  I don't get it.  It doesn't mitigate her

10  damages in my judgment.  So if you have other questions

11  you want to ask her --

12           MR. BRADLEY:  About that specific issue?

13           THE COURT:  About --

14           MR. BRADLEY:  Well, I will tell the Court

15  given we're having this discussions right now, I intend

16  to go into other punitive damage issues such as her

17  finances, relationship between the parties.  I can keep

18  out the word custody if that's something the jury have a

19  problem with.

20           THE COURT:  You want to ask her where she

21  works, how much money she makes, what she has in the

22  bank?  What else?

23           MR. BRADLEY:  I was going to ask her about

24  the fact that Mr. Hately had filed a CPS proceeding

25  against her, a protective order against her, and that he

1  filed this lawsuit after he lost the custody case.

2        THE COURT:  Okay.  Everything you just said

3  about the CPS, that she -- that she won the custody

4  case, you can ask that.  You can ask about her job, and

5  what she makes, what she has in the bank.

6        Anything else?

7        MR. BRADLEY:  I believe those were the only

8  topics.

9        MR. GREENBERG:  You left out why she pled

10  the Fifth.  He went over that.

11        MR. BRADLEY:  That wasn't part of my notes,

12  Your Honor, and I --

13        THE COURT:  You all want to confer for a

14  second so we can resolve this now?

15        MR. BRADLEY:  Yes, Your Honor.

16        THE COURT:  You all can confer.

17        MR. BRADLEY:  Okay, Your Honor.

18  Mr. Greenberg was right.  He did talk about this.  So, I

19  was also going to have her explain the fact that she did

20  not take the Fifth Amendment when she was deposed

21  without counsel to go towards her knowledge of whether

22  or not it was an unlawful act.

23        THE COURT:  Have her state that when she

24  went to deposition, she didn't have counsel.  So she

25  didn't know that she had the right to take the Fifth

1  Amendment?  Is ignorance of the law a defense,

2  Mr. Bradley?

3          MR. BRADLEY:  It is to punitive damages.

4  That's our position.  I think I was talking to

5  Mr. Menhart that to award punitive damages, you have to

6  show a knowing violation which means knowledge that the

7  act is unlawful.

8          THE COURT:  So, then --

9          MR. GREENBERG:  Mr. Menhart cited a case

10  with those exact words just last night, 11 o'clock at

11  night, by the way.

12          THE COURT:  I don't know what you're talking

13  about.  But, is it your theory then that a person can

14  only be civilly liable if they know the specific statute

15  for which they might be violating?

16          MR. BRADLEY:  The jury can only award

17  punitive damages if they know their conduct is unlawful.

18          THE COURT:  Okay.

19          MR. BRADLEY:  Not necessarily that I knew

20  that I violated the Stored Communications Act.  I mean

21  it would be more of a drug violation.  You know you're

22  not supposed to have illegal drugs.  You don't have to

23  necessarily know precisely what drug it is.

24          MR. MENHART:  Our position is that these

25  are -- there's a couple of problems.  First, it's

1    completely irrelevant because the jury instructions --
2    and this is the law of the Fourth Circuit -- says
3    punitive damages depend on whether or not it's lawful,
4    period.  That's what it says.
5            So this whole introduction of all the other
6    issues and requirements and whole nine yards is just bad
7    law.  It's as simple as that.  So, that's the first
8    thing.
9            And then the second thing is that, you know,
10   in our opinion, it's purely a relevance problem.  You
11   know, the jury is deciding whether to award damages or
12   not.  They're going to choose what the number is and all
13   the other issues are not something taken into account by
14   a Fourth Circuit court.
15           THE COURT:  Mr. Bradley.
16           MR. BRADLEY:  Yes.
17           THE COURT:  Could I go into your bank
18   account and take your password?
19           MR. BRADLEY:  No, not without my
20   authorization.
21           THE COURT:  All right.  Do I need a law book
22   to tell me I can't do that, to tell me that it's against
23   the law?
24           MR. BRADLEY:  I understand that.
25           THE COURT:  My point is I don't think that

1    the witness needs to know it's against a particular law

2    to access someone's e-mail without permission where

3    there's a stored e-mail.  She says she went in there

4    looking for things.  So, it was on the server.  So we

5    know that.  I don't think she needs to have that kind of

6    knowledge.

7              So, I sustain the objection to whether she

8    knew the law.

9              When she took the Fifth Amendment at the

10   divorce deposition, that doesn't matter.  She's waived

11   it now.  And if you want to ask her why she waived it,

12   you can.  But it doesn't really, in my view, tend to

13   prove or disprove the truthfulness of her testimony.

14             That's one.  As it relates to what she

15   makes, how much she has in assets, those things are

16   always relevant on punitive damages because the jury

17   can't award an amount that she can't pay.

18             So do you have any other questions?  I think

19   I've covered --

20             MR. BRADLEY:  In my mind I want to make

21   sure.

22             THE COURT:  Take your time.

23             MR. BRADLEY:  So, I can ask her about the

24   fact that he filed this lawsuit after the custody case

25   was over?

1          THE COURT:  Right.  Unless -- and that she

2    won the custody case.

3          MR. BRADLEY:  And that she won the custody

4    case, and I can ask her about the finances?

5          THE COURT:  Uh-huh.

6          MR. BRADLEY:  And, what was the -- the

7    proffer of testimony.

8          MR. GREENBERG:  Your Honor, I know that

9    you -- the plaintiff keeps introducing evidence about

10   sexual relationships so as to show -- I don't know what

11   it's supposed to show.  But he --

12         THE COURT:  Well, he tried to show

13   relationship between the parties, between Dr. Watts and

14   Ms. Torrenzano.

15         MR. GREENBERG:  Does the Court find that the

16   relationship between Nicole and Wade is not relevant to

17   punitive damages?  Mr. Menhart keeps reading about the

18   Fourth Circuit opinion that didn't analyze the jury

19   instructions that he talked about the word punitive

20   damages.  I personally think he's off on that.  The

21   Seventh Circuit --

22         THE COURT:  You'll get a chance to argue the

23   jury instructions.

24         MR. GREENBERG:  I know, but the jury

25   instructions depend upon the evidence that we get in the

1    trial.  And one of the instructions we submitted to you

2    is the fact that the relationship between the parties

3    matters for the jury to decide what might be an

4    appropriate --

5              THE COURT:  That's already in evidence.  She

6    admitted she had a relationship with him.  There's no

7    secret about that.  What else?

8              MR. GREENBERG:  We'd like to show

9    Mr. Menhart -- that Wade Hately, he is constantly

10   calling the police.  I mean, he moved for protective

11   orders.  He accused her of kidnapping, and none of that

12   works.  It's not the custody case.  It's to show the

13   animus, the animus and the credibility, because she gets

14   up on the stand and she says, for example, that we

15   didn't -- we didn't share the password.  She's not

16   telling the truth.  And that he let her to go on the

17   e-mail account in college.  She's not telling the truth.

18   But we can show animus that he reported her repeatedly

19   and keeps getting shut down by the Court.

20             THE COURT:  So that means then we have to

21   have a hearing on whether or not it's proper to call

22   child protective services and how the Commonwealth

23   Attorney decided not to prosecute?

24             Those matters are not relevant.  If you want

25   to show that they don't -- they hate each other now, she

1    got custody of the kids.  Those questions as it relates

2    to credibility might be relevant, but not all the

3    details about he called the police; he called CPS.

4    Those things have nothing to do with this case from the

5    standpoint of credibility.  The animus is clear.  That's

6    separate.

7              MR. GREENBERG:  That doesn't go to

8    credibility you feel or your ruling --

9              THE COURT:  It goes to bias, but not all the

10   details of CPS.  No, we're not going to have a mini

11   trial on all those things.  I'm trying to -- this is not

12   a divorce case.  This is an Electronic Stored

13   Communications Act case.  You need to go back to Fairfax

14   Circuit Court with that.

15             MR. GREENBERG:  This is a broken down

16   custody case.  It spilled into your courtroom,

17   unfortunately.

18             THE COURT:  I understand.

19             MR. MENHART:  One side issue, based on the

20   Court's ruling, we have another witness that we expect

21   to call.  But, at this point, I don't know if we're

22   going to call her.  So it's just a question of whether

23   we can release her.

24             THE COURT:  You can release anybody you

25   want.  I can't tell you what to do.

1          MR. MENHART:  Okay.

2          THE COURT:  And I can't tell you who to

3    call.

4          MR. MENHART:  I understand.

5          MR. GREENBERG:  Thank you, Your Honor.

6          (THEREUPON, side-bar conference was

7    concluded.)

8          THE COURT:  You may proceed.

9    BY MR. BRADLEY:

10     Q.  Ms. Torrenzano, when did the custody case between

11   you and Mr. Hately occur?  If you can give me a general

12   timeline.

13     A.  December 2015 to May of 2016.

14     Q.  And, what did Mr. Hately ask the Court to award

15   him in the custody case?

16     A.  Full custody.

17     Q.  And, was Mr. Hately successful in his claim?

18     A.  No.

19     Q.  And, was this lawsuit filed after the custody

20   case was concluded?

21     A.  Yes.

22     Q.  Ms. Torrenzano, what's your current salary?

23     A.  59,000.

24     Q.  And you have two children?

25     A.  Yes.

1    Q.   Do you have an automobile?

2    A.   Yes.

3    Q.   And is there a loan against the automobile?

4    A.   Yes.

5    Q.   And what's the amount of the loan?

6    A.   About 3,500 left.

7    Q.   Do you have a checking account?

8    A.   Yes.

9    Q.   Can you tell the jury about -- to the best of

10   your recollection how much money is in the checking

11   account right now?

12   A.   Right now, about $500.

13   Q.   Do you have a savings account?

14   A.   Yes.

15   Q.   Can you tell the jury about how much money is in

16   the savings account as of today?

17   A.   Probably a hundred dollars.

18   Q.   Do you have a retirement account?

19   A.   Yes.

20   Q.   And is that with your work?

21   A.   Yes.

22   Q.   And about how much money is in the retirement

23   account?

24   A.   5,000.

25   Q.   Ms. Torrenzano, do you have any outstanding

1  debts?

2     A.  Yes.

3     Q.  And, briefly, could you list the persons or

4  entities that you owe money to.

5             THE COURT:  Just give us an amount.

6  BY MR. BRADLEY:

7     Q.  Ms. Torrenzano, if you could estimate the total

8  amount of debt that you have?

9     A.  I have about $75,000 in lawyers fees and about

10  $10,000 in credit cards.

11             MR. BRADLEY:  Your Honor, I have no further

12  questions.

13             THE COURT:  Thank you.

14                  REDIRECT EXAMINATION

15  BY MR. MENHART:

16     Q.  Ms. Torrenzano, you testified that Mr. Hately

17  gave you access to your (sic) accounts, correct?

18     A.  Access to his accounts?

19     Q.  Yes, his e-mail account.

20     A.  Yes.

21     Q.  You said that when you were in a relationship,

22  correct?

23     A.  Yes.

24     Q.  So, you weren't in a relationship when you

25  accessed his accounts in October and November of 2015?

1     A.   No, but he had given me prior authorization

2   before.

3     Q.   Was it your belief that that authorization would

4   last forever?

5     A.   I guess I didn't think it would last forever, no.

6     Q.   When you go to the movie theater, you pay $12 for

7   a ticket, can you stay there forever?

8          MR. BRADLEY:  Your Honor, I object to the

9   form of the question as being argumentative.

10         MR. MENHART:  Withdrawn.

11  BY MR. MENHART:

12    Q.   You said the custody battle -- the custody case

13  was filed in December of 2015?

14    A.   Yes.

15    Q.   So, that was just after the access to his

16  accounts?

17    A.   After we couldn't resolved with a mediator, yes.

18    Q.   But, you were -- in our opinion, unlawful access

19  to the account occurred just before you filed for

20  custody against him?

21    A.   I don't know the timeframe, but if it's October,

22  November, that would be before December.

23    Q.   Right, so just before.

24         You said you have $75,000 in attorney fees that

25  you owe?

1    A.   Yes.

2    Q.   Who do you owe that money to?

3    A.   To Greenberg Costle, and I owe them to family

4    members who I have loans taken out with.

5    Q.   You're not paying the loans directly, are you?

6    A.   Which ones?

7    Q.   The ones to Greenberg Costle that you just

8    testified about.

9    A.   Am I paying for them?

10   Q.   Let me clarify the question.  I'm asking you did

11   you write a check out of your own personal account to

12   Greenberg Costle to pay for the attorney fees?

13   A.   Yes, I have.

14   Q.   But you just testified you only had 59 -- excuse

15   me, that you only had $500 in your checking account?

16   A.   Correct.

17   Q.   So how are you writing a $75,000 check out of

18   your checking account to Greenberg Costle?

19   A.   I'm not.  I paid like with my tax return money

20   that I get back and large chunks of money that I receive

21   I pay to Greenberg Costle.

22   Q.   So you're having money come from other sources?

23   A.   Can you clarify the question?  I'm not

24   understanding what you're asking.

25   Q.   Sure.  I'm trying to get to the, in my view,

1    inconsistency between the $500 in your account and --

2              THE COURT:  I'm going to give you a chance

3    to argue the case at the end.  If you have a question,

4    now is your chance to ask the question.

5    BY MR. MENHART:

6      Q.  Strike the question.

7          Did you borrow money from your family members to

8    pay your attorney fees?

9      A.  Yes, on a loan I did.

10     Q.  Which family members?

11     A.  My brother, my father and my mother, I have a

12   loan out with all three of them.

13     Q.  What's your -- what's your brother's name?

14     A.  What's my brother's name?

15     Q.  Yes.

16     A.  Matthew.

17     Q.  Same last name as yours?

18     A.  Yes.

19     Q.  Torrenzano?

20     A.  Yes.

21     Q.  What's your mother's name?

22     A.  Suzanne.

23     Q.  Same last name as yours?

24     A.  No.

25     Q.  What's her last name?

1     A.   Nixon.

2     Q.   What's your father's name?

3     A.   James.

4     Q.   Same last name as yours?

5     A.   Yes.

6     Q.   What does your mother do?

7          MR. BRADLEY:  Your Honor, objection to

8    relevance.

9          THE COURT:  Sustained.

10         MR. MENHART:  Your Honor, our position on

11   that is that she's introduced evidence that her family

12   members are paying her attorney fees, and we believe

13   it's appropriate for us to discuss --

14         THE COURT:  If you would focus in on the

15   questions we discussed at sidebar, what her assets and

16   liabilities are, that would help me.

17         MR. MENHART:  Sure, that's what we're doing

18   here.

19         THE COURT:  No, asking her about what her

20   mother's name is, and what kind of work her mother does

21   it irrelevant.  Thank you.

22         MR. MENHART:  Your Honor, we just want to

23   make our position clear for the record.  I'm not arguing

24   with the Court.  What we're saying, what --

25         THE COURT:  I've ruled.

1           MR. MENHART:  Fair enough.

2           THE COURT:  If you have a question to ask,

3    now is your chance to ask your question.

4    BY MR. MENHART:

5      Q.   How much has your mother lent you?

6      A.   I don't know.  Off the top of my head, over

7    15,000, probably.

8      Q.   How much has your brother lent you?

9      A.   Same.  I can't say with my dad.  I don't know all

10   the exact figures, but they all lent me over $15,000.

11     Q.   Have any of these debts been recorded?

12     A.   What do you mean by recorded?

13     Q.   By recorded I mean, has there been a lien placed

14   on your car or any of your other assets?

15     A.   No, but I have a -- like an agreement with them,

16   like a signed agreement if that's what you're asking.

17     Q.   But, the signed agreement -- strike that.  When

18   did you last make a payment to any of your family

19   members for your attorney fees?

20     A.   A couple months ago to my brother.

21     Q.   How much did you pay?

22     A.   $50.

23     Q.   $50?

24     A.   Uh-huh.

25     Q.   How did your family members acquire the money

 1  that they're lending to you?

 2           MR. BRADLEY:  Objection to relevance, Your

 3  Honor.

 4           THE COURT:  Sustained.

 5  BY MR. MENHART:

 6    Q.  Isn't it true that we would have no idea of

 7  knowing at any time point in the future whether or not

 8  you'd ever make any of those payments back to your

 9  family members?

10           MR. BRADLEY:  Your Honor, I'm going to

11  object to the form of the question.  I think it's --

12           THE COURT:  Sustained.

13           MR. BRADLEY:  Thank you, Your Honor.

14  BY MR. MENHART:

15    Q.  How would we know if you'd ever fully repay those

16  loans?

17    A.  I'm not sure.

18    Q.  So, it's possible we wouldn't know?

19    A.  I guess if you asked, if -- I'm not sure.

20    Q.  But I can't ask you pass the next couple of days.

21    A.  I guess not.  If you didn't want to, no.

22    Q.  So those debts could be relieved at any point and

23  we'd never know?

24    A.  Sure.

25    Q.  Have you ever taken out any other loan from a

1  family member?

2  A.  Other than what I listed, no.

3  Q.  What are the terms of your loans?

4  A.  To start payment a year after the litigation with

5  Mr. Hately stops, depending on whenever that may be.

6  Q.  So what's your agreement with Matthew?

7  A.  I didn't hear you.  One more time.

8  Q.  Sure.  What is your specific loan agreement with

9  Matthew?

10  A.  I don't know the specific wording.  But I know I

11  have to pay them back about a year after continued

12  litigation with Mr. Hately ends.

13  Q.  And starting a year after litigation is over?

14  A.  Like the payment terms?

15  Q.  Yes.

16  A.  Yes.

17  Q.  And then you'd have to -- strike that question.

18        MR. MENHART:  Nothing further, Your Honor.

19        THE COURT:  You can step down.  Thank you

20  very much.

21        (Thereupon, the witness withdrew from the

22  stand.)

23        MR. MENHART:  Your Honor, the plaintiff

24  would next like to call Ms. Kelly Ashby to the stand,

25  please.

1              THE COURT:  All right.

2              THEREUPON, KELLY ASHBY, having been duly

3    sworn, testified as follows:

4              THE WITNESS:  I do.

5              MR. HENDRICK:  You may be seated.

6                     DIRECT EXAMINATION

7    BY MR. MENHART:

8        Q.  Good morning, Ms. Ashby.

9        A.  Good afternoon.

10       Q.  Good afternoon.  It's a better way to put it.

11   What is your occupation?

12       A.  I'm an attorney.

13       Q.  How long have you been an attorney?

14       A.  Seventeen years.

15       Q.  Where are you presently employed?

16       A.  I'm self employed.

17       Q.  Does -- do you have a specific title of your

18   office?

19       A.  It's the Law Office of Kelly C. Ashby, PC.

20       Q.  What kind of business do you conduct at your law

21   firm?

22       A.  I do domestic relations.

23       Q.  Did you represent Dr. Watts in his divorce

24   proceeding against Audrey Watts?

25       A.  I did.

1    Q.   When you drafted the pleadings in that case,

2    what -- how did you respond to the allegations in the

3    complaint?

4    A.   Which allegations?

5    Q.   Give me one second.  I'll point you out to an

6    exhibit.  This has been marked as Plaintiff's Exhibit 7.

7         Ms. Ashby, while you're looking at that, I'll

8    also refer to what is marked as Plaintiff's Exhibit 6.

9         Do you recognize what's marked as Plaintiff's

10   Exhibit Number 7?

11   A.   I do.

12   Q.   What is it?

13   A.   It is the answer that I filed on behalf of Dr.

14   Watts in the divorce case.

15   Q.   You drafted this document?

16   A.   I did.

17   Q.   And referring to paragraph number five, let's --

18   strike that.

19        Let's first refer to the complaint which has been

20   marked as Exhibit 6.  Is this Exhibit 6 a true and

21   correct copy of the complaint that was filed by Dr.

22   Watts against Audrey Watts?

23   A.   I honestly can't say.  I don't recall -- it looks

24   like a complaint that Mr. McGuire would file, but as far

25   as whether this is a true and accurate copy, I wouldn't

1   be able to say.

2       Q.   I will represent to you that --

3            MR. GREENBERG:  Your Honor, I object to his

4   representations.

5            MR. MENHART:  Withdrawn.

6            THE COURT:  You're not a witness,

7   Mr. Menhart.  Objection sustained.

8            MR. MENHART:  Withdrawn.

9   BY MR. MENHART:

10      Q.   Do you remember being issued a subpoena by our

11  law firm in this case?

12      A.   I do, yes.

13      Q.   Did you respond to the subpoena?

14      A.   I'm here.

15      Q.   Well, let me clarify the question.  You've

16  received two subpoenas.  I'm asking you about the first

17  subpoena which asked for a document production?

18      A.   Yes.

19      Q.   Do you remember that subpoena?

20      A.   Yes.

21      Q.   And what was the second subpoena, just to clarify

22  for the jury?

23      A.   To be a witness today.

24      Q.   Thank you.

25           Did you respond to that initial subpoena with

1    documents?

2        A.   I did.

3        Q.   Referring to Exhibit No. 6, the allegations are

4    that defendant is guilty of adultery --

5               MR. GREENBERG:  I object to him responding

6    to the allegations.  I don't think this is relevant.

7    I'm waiting for him to ask the question.

8               THE COURT:  All right.  Objection is

9    relevance.

10              MR. GREENBERG:  Yes.

11              THE COURT:  Your response?

12              MR. MENHART:  Our response is that we are

13   going to finish this testimony in a matter of moments,

14   and we're simply referring to Exhibit 6 for purposes of

15   asking about her testimony for Exhibit 7.

16              THE COURT:  Well, when the complaint was

17   filed, doesn't matter.  Objection sustained to that.

18              Do you have a question you want to ask in

19   relation to this case, Mr. Menhart?

20   BY MR. MENHART:

21       Q.   Referring to the answer that you filed,

22   Ms. Ashby, referring to paragraph number five, I'll

23   simply ask you this question.  In your defense of Dr.

24   Watts, did you plead the Fifth Amendment as to

25   allegations in the complaint?

1           MR. GREENBERG:  Your Honor, I object to

2    that.  I don't think it's relevant in the proceedings.

3    Not only is it a separate proceeding, if he took the

4    Fifth, he's not here to explain why for us to

5    cross-examine and it's not relevant to the proceedings.

6           THE COURT:  So, the objection is relevance

7    and all those other things are speaking objections, Mr.

8    Greenberg.

9           MR. GREENBERG:  Okay.

10          MR. MENHART:  Your Honor, the evidence is

11   purely being presented for purposes of demonstrating

12   that Dr. Watts --

13          THE COURT:  Hold on.  Demonstrating what?

14          What does it tend to prove or disprove

15   concerning the Electronic Stored Communications Act?

16   Can you address that question.

17          MR. MENHART:  Yes, we are introducing this

18   particular part of the document for purposes of

19   demonstrating that Dr. Watts pleaded the Fifth as to his

20   sexual relationship with Ms. Torrenzano.  And that is

21   the only reason that we're introducing it.

22          THE COURT:  That's the only question you're

23   going to ask.  All right.

24          Did you draft that response?

25          THE WITNESS:  Yes, I did, Your Honor.

1              THE COURT:  All right.
2    BY MR. MENHART:
3       Q.   And in that response, did you plead the Fifth
4    Amendment on behalf of Dr. Watts?
5              MR. GREENBERG:  Your Honor, that's my
6    objection.  First off, she's already testified about the
7    relationship.  I don't know how that is relevant --
8              THE COURT:  All right, objection overruled.
9              Did you write that?
10             THE WITNESS:  I did.
11             THE COURT:  Next question.
12             MR. MENHART:  We have no further questions,
13   Your Honor.
14             THE COURT:  Any questions, Mr. Greenberg?
15             MR. GREENBERG:  Your Honor, one moment.
16             One brief question.
17             THE COURT:  At the podium.
18             MR. GREENBERG:  Beg your pardon.
19                    CROSS-EXAMINATION
20   BY MR. GREENBERG:
21      Q.   In response to the subpoena that was issued to
22   you, did it ask for any correspondence, e-mail
23   correspondence of any kind between Ms. Torrenzano and
24   Dr. Watts?  You provided -- you said there was none?
25      A.   That is correct.

1          MR. GREENBERG:  That's all the questions I

2    have.

3          THE COURT:  May the witness be excused?

4          MR. MENHART:  Yes, the witness can be

5    excused.

6          THE COURT:  Thank you.  You're free to go.

7          (Thereupon, the witness withdrew from the

8    stand.)

9          MR. MENHART:  Your Honor, plaintiff next

10   calls plaintiff, Wade Hately, to the stand, please.

11         THEREUPON, PATRICK HATELY, having been duly

12   sworn, testified as follows:

13         THE WITNESS:  I do.

14         MR. HENDRICK:  You may be seated.

15         THE COURT:  You may proceed.

16              DIRECT EXAMINATION

17   BY MR. MENHART:

18   Q.   Good afternoon, Mr. Hately.

19   A.   Good afternoon.

20   Q.   Mr. Hately, what is your current occupation?

21   A.   I'm an information security analyst.

22   Q.   And where are you employed?

23   A.   I work for the INOVA Health System in Northern

24   Virginia.

25   Q.   How long have you been there?

1    A.   Since fall of 2013.

2    Q.   So, tell me a little bit about what you do at

3    your job.

4    A.   Sure.  So, my job entails kind of monitoring the

5    security of user access and privileges across our

6    network.

7         So, I mean, the -- the principle of like these

8    privileges is kind of the biggest thing that we apply to

9    our daily activities.  And that is something that we

10   kind of monitor on an identity or an individual user

11   account basis.

12   Q.   And, so what types of day-to-day activities would

13   you undertake in pursuit of your occupation?

14   A.   Sure.  Typically, we respond to, you know,

15   request for additional access or to limit access, some

16   audit request for -- um, like, if a user was -- or an

17   individual was removed from the organization but they

18   had information stored on their personal share, then the

19   manager would request access to that in the form of an

20   audit request and we would respond to that.

21        User right provisioning, which is basically

22   assigning rights and privileges to user accounts across

23   the network.

24   Q.   So, prior to your current position, where did you

25   grow up?

1    A.    I grew up in Colorado and Virginia, kind of a

2   blend, but Virginia, the last about ten.

3    Q.    Once you graduated from high school, what did you

4   do?

5    A.    I graduated in 2004.  And then I went into -- the

6   day after I graduated high school, I went into the

7   Marines.

8    Q.    What did you do in the Marine Corps?

9    A.    I was a motor transport operator and civil

10   affairs noncommissioned officer.

11    Q.    Where did you serve?

12    A.    I was deployed to Japan for six months and then I

13   was deployed to Iraq for a year.

14    Q.    During your time that you were deployed

15   internationally, what type of devices did you use?

16    A.    Um, so, typically, we'd have -- of course, I had

17   my truck when I was in Japan and I was with the firing

18   battery, so I'd have --

19           MR. GREENBERG:  I object.  I don't believe

20   this is relevant.  I don't know IT, but that's not the

21   question.

22           MR. MENHART:  Our position is that

23   Mr. Hately is going to testify as to why he chose an IT

24   background for purposes of his current and present

25   career.

1          THE COURT:  Objection sustained.

2    BY MR. MENHART:

3      Q.   So, after your military service, what did you do

4    next?

5      A.   Um, I got out and went to school, finished my

6    two-year degree.

7      Q.   Where you go to school?

8      A.   Blue Ridge Community College.  It's part of the

9    Virginia Community College system.

10     Q.   So, did you earn a degree?

11     A.   I did.

12     Q.   And what was the title the degree?

13     A.   It was my associates in arts and sciences.

14     Q.   And so that degree helps you get your current job

15   or did you have the position before that?

16     A.   So, my degree and my experience helped me get

17   my -- my experience pretty much and the certifications

18   that I hold helped me get my current position.  But kind

19   of getting into IT was --

20          THE COURT:  Excuse me.

21          THE WITNESS:  -- was also my --

22          THE COURT:  Excuse me.  I understand he has

23   a job.  We're now here in a lawsuit involving Electronic

24   Stored Communications Act.

25          Would you like to ask him questions about

1    that, Mr. Menhart?

2                MR. MENHART:  Yes, sir, I will.

3                THE COURT:  Thank you.

4    BY MR. MENHART:

5      Q.   All right, Mr. Hately, we're going to talk a

6    little bit about your subpoena with Ms. Torrenzano.

7      A.   Uh-huh.

8      Q.   So, in and around -- the period from 2011 to

9    2015, is that when you had some type of relationship

10   with Ms. Torrenzano?

11     A.   That's correct.

12     Q.   And, you shared a home with Ms. Torrenzano?

13     A.   Townhome, yes.

14     Q.   Shared a bed?

15     A.   Yes.

16     Q.   Did you share intimate details of each other's

17   lives with one another?

18     A.   Yeah, yeah.  I would say for the most part.

19     Q.   How did you handle the finances when you were in

20   the relationship with Ms. Torrenzano?

21     A.   We each kind of already had pretty existing, I

22   guess, requirements.  So like my cellphone account, I'm

23   set up to automatically pay that.  It was just an

24   automatic debit every month.  So it just came out every

25   single month.

1      Some of them we split.  Some of them I would pay

2   or she would pay.

3      Q.   So which accounts did you pay for exclusively?

4      A.   Um --

5           MR. GREENBERG:  Your Honor, I don't think

6   this is relevant to the Stored Communications Act.

7           MR. MENHART:  Our position is that there

8   will be evidence demonstrating that Ms. Torrenzano never

9   had any control over the accounts that she alleged to

10  have accessed.

11          THE COURT:  All right.  Well, again, I would

12  prefer to focus in on the allegations in the complaint.

13  If they have a utility bill, I'm sure that's something

14  they had, but it doesn't tend to prove or disprove

15  Electronic Stored Communications Act.  So the objection

16  is sustained.

17  BY MR. MENHART:

18     Q.   Did you maintain an AT&T account?

19     A.   Yes, I did.

20     Q.   Was Ms. Torrenzano's phone number associated with

21  that account?

22     A.   The phone number she has now?  Yes.

23     Q.   It was associated at the time of the

24  relationship?

25     A.   So that -- yes, so there was two phone numbers,

1    because I had my one and then I added another one to

2    that account, to like my account, a second line,

3    essentially, and then she just used the phone.

4        Q.   But the account, the AT&T, was always yours?

5        A.   Right.  I mean, it's even got -- the user ID for

6    it is like Hately 884201 or something like that.  I

7    don't know.

8        Q.   Did she ever pay for any services on that

9    account?

10       A.   No.

11       Q.   Did you ever ask her to?

12       A.   No, easier to kind of come out automatically.

13       Q.   But she was able to use her own cellphone?

14       A.   Yeah.  So, essentially, she could have gotten her

15   own cellphone account, but I had an extra -- I added a

16   line to mine.

17       Q.   That occurred --

18       A.   Yes, just something nice.

19       Q.   Did you ever give the defendant the password to

20   that account so that she could log on and see it online?

21       A.   No.

22       Q.   Did you ever give the defendant any of your

23   account passwords for any of your accounts?

24       A.   No.

25       Q.   Did you two ever share an e-mail account?

1    A.   No.

2    Q.   Did you two ever share a Facebook account?

3    A.   No.

4    Q.   Did you two ever share a LinkedIn account?

5    A.   No.

6    Q.   Based on your own personal knowledge, do you

7    typically see people sharing those types of accounts?

8              MR. GREENBERG:  Your Honor, I object.  I

9    don't think that's relevant to this.

10             THE COURT:  Sustained.

11   BY MR. MENHART:

12   Q.   Did Ms. Torrenzano ever have any kind of

13   authorization from you to access any of your accounts

14   anywhere?

15   A.   No.

16   Q.   What was the driving force behind the breakup

17   between you and Ms. Torrenzano?

18             THE COURT:  I'm sorry.

19             MR. MENHART:  The question --

20             THE COURT:  I said I don't want to hear

21   about a separation, a child custody.  That's not what

22   this is.  This is an Electronic Stored Communications

23   Act case.  I keep saying that.  I hope you all are

24   hearing me.

25             MR. MENHART:  Withdrawn.

1    BY MR. MENHART:

2        Q.   Okay.  What types of accounts do you have that

3    can be accessed by the Internet?

4        A.   I have a lot of accounts online.

5        Q.   Name one?

6        A.   Like my e-mail, all the ones that we've listed

7    here, e-mail, LinkedIn, my banking, my social media,

8    personal finance, you name it.

9        Q.   Where can you access the AT&T account on the

10   Internet?

11       A.   From anywhere.  That's got -- that's got a

12   connection to the Internet, whether it's a smart phone

13   or a laptop with an Internet connection.

14       Q.   How about the Facebook account?

15       A.   Same.  Yeah, from any device that can access the

16   Internet can get to it.

17       Q.   How about the LinkedIn account?

18       A.   Same thing, any device.

19       Q.   How about the VCCS account?

20       A.   Same.

21       Q.   What is the relationship between the VCCS account

22   and the Gmail account?

23       A.   It's the same thing.

24            MR. GREENBERG:  Your Honor, I'm going to

25   object.  I don't think he has personal knowledge.  No

1   foundation has been laid.

2              MR. MENHART:  The individual -- the witness

3   has knowledge as to --

4              THE COURT:  As to his own accounts?

5              MR. MENHART:  Correct.

6              THE COURT:  Are you asking about his

7   accounts?

8              MR. MENHART:  I'm asking him about his

9   accounts.

10             THE COURT:  All right.  Ask him the question

11  again, please.

12             MR. MENHART:  Sure.

13  BY MR. MENHART:

14     Q.  The question was, what is the relationship

15  between the VCCS and Gmail accounts?

16             MR. GREENBERG:  Your Honor, I object.  I

17  don't think he has knowledge between the college and the

18  Google account from firsthand knowledge.

19             MR. MENHART:  We're not asking him to

20  speculate as to what type of specific --

21             THE COURT:  What I'm not understanding is,

22  are you asking him about his own e-mail accounts or

23  somebody else's?

24             MR. MENHART:  I'm happy to repeat the

25  question.

1      Q.   What is the relationship between your VCCS and
2   Gmail accounts?
3           I change the word "the" to "your" for purposes of
4   those question.
5               THE COURT:  So the objection is overruled.
6   You can answer.
7               THE WITNESS:  It's the same.  So I have to
8   go to like Gmail.com to log into my school e-mail
9   account.
10  BY MR. MENHART:
11     Q.   What is the -- why do you have a Facebook
12  account?
13              MR. GREENBERG:  Your Honor, I don't think
14  that's relevant.
15              MR. MENHART:  Your Honor, the testimony is
16  going to demonstrate that Mr. -- well, I'm not going to
17  put words in his mouth, but the testimony is going to
18  testimony that Mr. Hately can perform certain actions
19  within the Facebook account and that's testimony that's
20  relevant to the allegations.
21              THE COURT:  All right, overruled.
22  BY MR. MENHART:
23     Q.   Please answer.
24     A.   So, I think the -- can you repeat the question
25  again?

1    Q.   Sure.  And I might have asked it a slightly
2  different way.  What is the point of having a Facebook
3  account?
4    A.   So, I can communicate with friends or family, you
5  know, post pictures, write comments and messages back
6  and forth, share events.
7    Q.   Have you ever exchanged any messages by Facebook?
8    A.   Yeah, there's a whole thing for that.  There's a
9  whole app for that.
10   Q.   Do you retain Facebook messages in your account?
11   A.   Yeah, I don't delete them.
12   Q.   So, if you receive a message in your Facebook
13  account, what can you do next?  What are the options?
14   A.   So, you can reply to it.  You can view it, reply
15  to it.  You can delete it.  Forward, I guess.  Maybe you
16  could forward.  I'm not sure, or just reply.
17   Q.   What is the purpose of your LinkedIn account?
18   A.   It's my professional, kind of networking account.
19  I use that to kind of keep in touch with recruiters and
20  former colleagues, that kind of stuff.
21   Q.   What types of activities can you performed if
22  you're logged into that account?
23   A.   Very similar to like Facebook.  You share events,
24  different stories that have been written, blogs or, you
25  know, you send messages back and forth.  Primarily I get

1  them from like recruiters.

2      Q.  What are your options as a user if you received a

3  LinkedIn message?

4      A.  You could reply right there, or you could get rid

5  of it and delete it.

6      Q.  Did you retain any messages in your LinkedIn

7  account?

8      A.  Yeah, I just leave them.  I just -- I don't

9  delete them.

10     Q.  What is the purpose of the VCCS account?

11         THE COURT:  Have him describe what that

12  account is.  And tell us what the address -- what

13  address is.

14  BY MR. MENHART:

15     Q.  Sure.  Let me strike the prior question.

16         Tell me the address of your VCCS e-mail account?

17     A.  The e-mail address is PWH271@email.VCCS.EDU.

18     Q.  And, what is the purpose of having that account?

19     A.  That's so I can communicate by e-mail to

20  essentially anybody else that has an e-mail account.

21     Q.  When you receive a message to that account, what

22  are the options available to you?

23     A.  So you can reply to it, forward, delete.  If you

24  delete them, I think it gets put in your trash for

25  30 days, and you can recall it back into the inbox.  But

1    I just for the most part leave it, unless I know it's
2    spam, then I just delete.
3        Q.   So, why do you leave certain messages in your
4    account?
5        A.   I mean, for reference later or to keep track.  I
6    mean like I get -- I pay like a lot of bills online and
7    I also go paperless billing for a lot of those.  So I
8    get receipts or statements in my e-mail, and so, I keep
9    track of those.  I mean, I guess I never know when I'd
10   need them in the future, but I don't delete them.  I
11   think they're important.
12       Q.   What about your sent e-mails, e-mails that you
13   sent to third parties?
14       A.   They're still there as being sent or having been
15   sent.  They don't get deleted or anything.  And I
16   don't -- I don't -- I wouldn't go delete an e-mail that
17   I send to somebody.  I don't know.
18       Q.   Based on your personal knowledge, not asking for
19   an expert opinion here, what is an e-mail?
20       A.   It's just an electronic form of mail.  I mean,
21   it's just -- so, it's like -- it's a way for me to
22   electronically communicate with somebody else over the
23   Internet.
24            Go ahead, I'm sorry.
25       Q.   It's okay.  Based on your personal knowledge, if

1  you draft an e-mail, and you click send --

2      A.   Uh-huh.

3      Q.   -- what would happen to that e-mail?

4      A.   Um, well, in short, it would get sent to the

5  recipient, but a copy's got to get stored somewhere.

6             MR. GREENBERG:  Your Honor, I'm going to

7  object to speculation of a copy stored somewhere.  I

8  mean, this is obvious to the jury that you click the

9  send button and it sends e-mails.  He wants to sneak in

10  extra testimony about --

11             THE COURT:  Why don't we do this.  Let's

12  take the afternoon recess now for 15 minutes.  Let the

13  jury go out.  We will remain in place for a moment.

14             You go out, 15-minute recess.  Thank you.

15  It may be a little bit more, but 15 minutes is about

16  what we're going to do.

17             (Jury excused from the courtroom.)

18             THE COURT:  All right.  You may be seated.

19             Your objection, Mr. Greenberg, was to this

20  general testimony about what e-mail does or not; is that

21  right?

22             MR. GREENBERG:  That's right.

23             THE COURT:  Okay.  Mr. Menhart, the

24  objection has to do with this witness's testimony in

25  general about what e-mail does or does not do.  I remind

1   you that this is a case that has been brought by your

2   complaint that has allegations in it.

3              And, his testimony about what e-mail does in

4   general doesn't matter.  If he wants to testify about

5   what happened with his e-mail that's relevant, that

6   happened in this case, that's what we should be focusing

7   in on.

8              Do you understand?

9              MR. MENHART:  I do, and my response is as

10  follows.  They are making allegations -- they're making

11  very -- trying to be polite when I call them technical

12  allegations -- as to what constitutes Stored

13  Communications Act, this, that, and the other things.

14             So from our perspective, we have to elicit

15  testimony that demonstrates that this e-mail is what it

16  is.  And so, that's --

17             THE COURT:  But you haven't done that.

18  You've been talking about what happens in general.  If

19  you ask him about his particular accounts and what

20  happened and what he did, that would be relevant.

21             But about what happens in e-mails generally

22  is not relevant.  Do you understand the difference?

23             MR. MENHART:  I understand.  So the question

24  I have for you is, if I ask him what happens when you

25  click send in your e-mail, is that going to be objected

 1   to?  I'm not asking for a particular opinion on this,

 2   but --

 3               THE COURT:  You are asking for legal advice.

 4   I can't --

 5               MR. MENHART:  I don't want to ask for legal

 6   advice.

 7               THE COURT:  I think you can ask him that

 8   question about sending an e-mail, what happens, you can

 9   ask him about this -- his accounts at issue in this

10   case.

11               MR. MENHART:  Okay.

12               THE COURT:  Do you understand, but not in

13   general.

14               MR. MENHART:  I think we -- I think we

15   understand each other.  I personally felt we were asking

16   specifically about his accounts, but I will make that

17   clear.

18               THE COURT:  It wasn't clear.  You were

19   asking about e-mails in general.  You asked about the

20   sent account, what happens when e-mails are written and

21   goes.  You have to ask him about accounts at issue in

22   this case only.

23               MR. MENHART:  Understood, understood.  Thank

24   you.

25               MR. GREENBERG:  Your Honor, we also say,

 1    though, that from my perspective, if I press the send

 2    button, I hope it gets to whoever I send it to.  And

 3    sometimes I get a response.  I know it made it there.

 4    That's my knowledge of it.

 5            But maybe -- Mr. Hately says I knows more

 6    than that.  I know it's broken up into pieces and gets

 7    sent through the Internet and ends up somewhere and

 8    another one gets stored over there.  It's that piece of

 9    it that requires extra testimony.

10            THE COURT:  I don't think he said that.  So

11    far, he's just talking about sending e-mail and what the

12    sent folder does and what's in the sent folder.

13            MR. GREENBERG:  He's talking about stored

14    copy.  He used that particular word and --

15            THE COURT:  What word would you prefer him

16    to use?

17            I'm not sure about you, but when I send an

18    e-mail, there's several folders.  One is called draft.

19    One is called inbox and one is called sent.  Do you have

20    those on your e-mail, too, Mr. Greenberg?

21            MR. GREENBERG:  Yes, sir, I do.

22            THE COURT:  And is a sent e-mail one that's

23    already been sent to Mr. Menhart but there's a copy in

24    your sent folder?  Is that what happens in your e-mail?

25            MR. GREENBERG:  I don't know if it's copied

1  or not.  I know it's sent and I know that --

2              THE COURT:  Well, then you --

3              MR. GREENBERG:  Same thing I said.  I can

4  only access.  That I know.

5              THE COURT:  Something you already sent you

6  can also access.

7              MR. GREENBERG:  I agree with that.

8              THE COURT:  Okay.  Well, then I'll let you

9  all ask the question that you think you should ask.  But

10  I want you to focus on this complaint.

11              This is not some academic exercise about the

12  animus between the parties or the divorce.  That is not

13  what this is.  They were not even married.

14              This is about Electronic Stored

15  Communications Act.  I keep repeating that.  And this

16  complaint and answer that you have.  That's what the

17  complaint is about, not all these other things.

18              We'll take a 15-minute recess.  Thank you.

19              (Court recessed at 3:33 p.m. and reconvened

20              at 3:50 p.m.)

21              THE COURT:  You can bring our jury out, Mr.

22  Hendrick.

23              Is that okay?  Bring the jury out.

24              MR. MENHART:  Yes, sir.

25              THE COURT:  You may be seated.

1              All right, counsel, you may proceed.

2   BY MR. MENHART:

3     Q.  So, Mr. Hately, when we were last on the record,

4   you were talking about your use of your VC --

5              MR. GREENBERG:  Your Honor, why doesn't he

6   just ask a question.

7              THE COURT:  If you would.  Sustained.

8   BY MR. MENHART:

9     Q.  Is the -- is your VCCS account used to send

10  e-mail communications on a typical basis?

11    A.  Yes.

12    Q.  Do you have that account to this day?

13    A.  I still do, yes.

14             THE COURT:  If you would now ask questions

15  about the account as it relates to this lawsuit, that

16  would help us, Mr. Menhart.

17  BY MR. MENHART:

18    Q.  When did you first become aware of -- well,

19  strike that.

20             How are e-mails retained in your VCCS account?

21    A.  They're saved.  They're saved in like the inbox

22  or the sent folder or the -- the spam ones are deleted,

23  that goes into the trash --

24    Q.  Go ahead.

25    A.  They're all saved.  They're all saved there.  I

 1    mean -- yeah.

 2        Q.   Who has control as to whether or not those

 3    e-mails are saved?

 4        A.   I do.  So, if I wanted to delete them, I could,

 5    but I don't.

 6        Q.   Who's authorized to access your AT&T account?

 7        A.   I am.

 8        Q.   Who else has been authorized to access that

 9    account?

10        A.   Nobody.

11        Q.   Who's authorized to access the USAA account?

12        A.   I am.

13        Q.   Who else has ever been authorized to access that

14    account?

15        A.   Nobody has.

16        Q.   Who is authorized to access the Facebook account?

17             MR. GREENBERG:  Your Honor, this has been

18    asked and answered.  He went through all four of those

19    accounts.  I recall his testimony.  No one but himself.

20    So asked and answered is the objection.

21             THE COURT:  All right, sustained.

22    BY MR. MENHART:

23        Q.   How is the AT&T account secured?

24        A.   Um, now, I have a password so it's password

25    protected and then --

1          THE COURT:  If you go back to the time

2    alleged in the lawsuit, how was it handled?

3          THE WITNESS:  Oh, it was a password,

4    password.

5          THE COURT:  Thank you.

6    BY MR. MENHART:

7    Q.   How was the USAA account secured?

8    A.   With a password.

9    Q.   How was the Facebook account secured?

10   A.   Password.

11   Q.   How was the LinkedIn account secured?

12   A.   A password.

13   Q.   How was the VCCS account secured?

14   A.   With a password.

15   Q.   Is the procedure for changing a password for any

16   of the accounts we just talked about substantially

17   different?

18   A.   Um, for the most part, they're the -- they're the

19   same.  You have to answer information -- you request to

20   reset the password.  You answer some personal

21   information about yourself and then some will let you

22   reset it right there.  Others will send a link to your

23   e-mail that's on file.  And you have to follow the link

24   from there out to go reset it.  And my AT&T one's like

25   that.

1    Q.   Is it possible to change your password on the

2    VCCS account without having first logged into the

3    account?

4    A.   Is -- say the question again.

5    Q.   Sure.  Would you be able to change the password

6    on your VCCS account without having first had access to

7    the account?

8    A.   Um --

9    Q.   Let me strike the question.

10        THE COURT:  If you would focus on the

11   complaint that you filed, Mr. Menhart, that would help

12   us greatly and not hypothetical questions.

13   BY MR. MENHART:

14   Q.   Was there ever a time when someone other than

15   yourself accessed any of the accounts we've been

16   discussing?

17   A.   Yes.

18   Q.   Let's take them in chronological order starting

19   with the earliest.

20   A.   Sure.

21   Q.   When was the first instance of an account that

22   you are aware of having been accessed?

23   A.   It was my cellphone account, my AT&T account.

24   That was like June or July.

25   Q.   So, tell me what happened in that instance.

1          THE COURT:  What year was that?

2          THE WITNESS:  Of 2015.

3          THE COURT:  Okay, thank you.

4    BY MR. MENHART:

5      Q.  Tell me the circumstances behind that.

6      A.  Um, so I was -- I had met with Ms. Torrenzano in

7    the parking lot.  And she had told me that she knew

8    everybody that I was talking to, how long I'd been

9    talking to them, when I had been talking to them.

10         And I said the only way you'd know that is if you

11   got into my account.  And, at the end, I was like, I

12   mean, it's not yours.  That's mine.  It's illegal to go

13   do that kind of stuff.

14         And then she said, well I used to be on the

15   account.  I said you were never on the account.  It was

16   never yours.  So, I was just like, just don't do it

17   again.

18     Q.  And, so -- strike that.  Tell me about the next

19   instance of an unauthorized access to one of the

20   accounts we've been talking about.

21     A.  When I noticed it?

22     Q.  Tell me when you believe it happened.

23     A.  Um, October 13th.

24     Q.  Is that 2015?

25     A.  That is 2015, yes.  Um, and that was in the early

 1   morning hours at like starting at 1:45 in the morning

 2   all the way through the next -- well, that day until

 3   about 3 o'clock.

 4       Q.  Mr. Hately, I'm going to introduce to you what

 5   has been marked as Plaintiff's Exhibit 10.

 6           So just procedurally, I'll let you and the jury

 7   know that we do intend to show some of these on the

 8   board.  So we'll try to make sure that everyone can see

 9   what we're talking about.

10           Mr. Hately, do you recognize this document?

11       A.  I do, yes.  Yes, I do.  It's a -- it's a dry

12   erase board, like a timeline I kind of put together with

13   the information I had with the events of that night, or

14   of October 13th.

15       Q.  Who created this diagram?

16       A.  I did this.

17       Q.  This is the true and correct copy of the diagram

18   as it was drawn on the board?

19       A.  Yes.

20           MR. MENHART:  Your Honor, we would move to

21   introduce Exhibit No. 10 into the record.

22           MR. GREENBERG:  Your Honor, I'm not sure

23   what this is.  Before we even -- I don't know what this

24   means at all.  He didn't even testify to this.

25           THE COURT:  I think that's what's getting

1   ready to happen.  I think he's going to testify about

2   it.  You have no objection to it because he wrote it,

3   right?  Is that what you just said?

4                  MR. GREENBERG:  No, I said --

5                  THE COURT:  Your objection is what?

6                  MR. GREENBERG:  My objection, Your Honor, is

7   that I'd like to hear the foundation of what it was,

8   what this purports to be before it goes into evidence,

9   because I don't know what this is at all.

10                  THE COURT:  Okay.  Tell -- ask him the

11  question generally.  Tell us what this is.  Lay a

12  foundation if you would, please, Mr. Hately -- I mean,

13  Mr. Menhart, sorry.

14  BY MR. MENHART:

15   Q.   Mr. Hately, tell me what this diagram represents.

16   A.   So, this -- this picture or document just of a

17  picture is a -- timeline, like an hourly timeline of

18  events as I've had them recorded.

19          So, you know, the top is what I believe Ms.

20  Torrenzano and Dr. Watts were on the phone.  The

21  102 minutes which is the equivalent to an hour and

22  42 minutes, it blocked off there.

23          And then you see -- it just spans across -- they

24  got back on the phone again, 113 minutes for two hours.

25  It's all the way up to 4:00 a.m., from, you know, one --

1    1:40, I guess, in the morning.

2         And then below is another kind of timeline.  And

3    this shows when -- like the first blue marker on there

4    was just 1:47 a.m., VCCS e-mail informing that password

5    was reset.

6         And 1:49 a.m., an iPhone is shown to reset the

7    password from.  And then it gives me the IP address

8    which I wrote down there.  And it shows iPhone

9    connected.  So it was successfully connected to the

10   account.

11   Q.  All right, thank you, Mr. Hately.

12        MR. MENHART:  Your Honor, we believe the

13   foundation is sufficient.  We move it be admitted into

14   evidence.

15        MR. GREENBERG:  Your Honor, I heard

16   Mr. Hately just said that all the hearsay he has through

17   other documents he's written on this board.  Like I just

18   said, I believe this was when Ms. Torrenzano and Dr.

19   Watts were on the phone, so I added those together.  And

20   I got a message from another server, and it said

21   something about -- and then, a password being reset.  He

22   writes that down.

23        So none of this is firsthand knowledge.

24   This is just what he's read from hearsay from other

25   sources, and he's reproduced it on to a white board that

1    they took a picture of and now wants to submit into

2    evidence.

3              MR. MENHART:  Your Honor, our position is

4    that -- and, to the extent that any specific part of

5    this document is demonstrated as hearsay, we can have

6    that discussion then.  But these are all pieces of

7    information that he was able to glean from his own

8    personal research.

9              And, so that research was what he performed

10   and then he created his own separate diagram indicating

11   his specific understanding as to information that he

12   collected on his own.

13             So, none of this is hearsay, per se,

14   because --

15             THE COURT:  Where --

16             MR. MENHART:  He wrote it down directly in

17   every single instance.

18             THE COURT:  Where was it collected from?

19             MR. MENHART:  The -- the -- well, I can ask

20   him.

21   BY MR. MENHART:

22   Q.  Mr. Hately, where -- how -- what was the

23   information by which you relied upon to create this

24   diagram?

25   A.  So, I got all these timestamps and IP addresses

 1   from my -- there's an activity log in my Google account,

 2   and it will show me the -- the type of device that

 3   connected.  It will also show me the timestamp for it,

 4   which I wrote down here, and the corresponding IP

 5   address from which that device connected.

 6        And it lays out the last ten.  So, I pulled down

 7   the last ten, found out, you know, I -- found out which

 8   one mine was, which IP address was mine and then these

 9   other ones are, you know, I wrote down as having not

10   belonged to me.

11        THE COURT:  All right.  I think I understand

12   what he just said, so the objection is overruled.  You

13   can cross-examine him about any aspects of it that you

14   think --

15        MR. GREENBERG:  Okay.

16        THE COURT:  -- need to be questioned.

17        Thank you.

18        MR. MENHART:  So, Your Honor, has it been

19   admitted into evidence?

20        THE COURT:  The document is received in

21   evidence.

22        MR. MENHART:  Thank you.  And with Your

23   Honor's permission we're going to display it on the

24   board for the jury.

25        THE COURT:  You can.

1  BY MR. MENHART:

2    Q.  Okay.  Mr. Hately, this is an important document

3  for us to sort of go through and understand what's

4  happening.  So, as soon as it gets displayed up on the

5  board.  The -- great.

6       Okay.  So, the jury now has an opportunity to see

7  this, and so I'd like to sort of walk with us through.

8  And I know you can make little annotations on the

9  screen.  It's not great, but if there's something in

10  particular that you want to point out, you have the

11  ability to do that.

12      Take us through this, and I guess what I would

13  ask for purposes of being efficient, you know, try to

14  give us the best overall relevant information, because I

15  know there's a lot of data here.

16           THE COURT:  Well, Mr. Menhart, the way it

17  has to be done is you can ask him to start with the top

18  line and you can ask specific questions.  But he can't

19  testify on a long narrative because that would not

20  allows us to ascertain if the testimony he proposed to

21  give is relevant or admissible.

22           MR. MENHART:  No problem.  That's what we'll

23  do.

24           THE COURT:  Thank you.

25  BY MR. MENHART:

1      Q.   So, at the very top corner of the document, it

2   says 10-13-15 incident.  What does that mean?

3      A.   This was the October 13th.  It was October 13th

4   at 1:47 a.m. is when I was notified that the password

5   had been reset.  And so, when I called it the 10-13

6   incident it's because it all started on October 13th.

7      Q.   Okay.  And, so looking sort of into the red text

8   which says 11:00 p.m., 10-12 for purposes of the record,

9   go through, say from the large vertical black line to

10  the point where maybe the squiggly black line is, it

11  would be about 2 or 3 inches to the right.  Tell us

12  what's going on during that time period.

13     A.   So this -- this was a phone conversation between

14  Ms. Torrenzano and Dr. Watts.  And then -- where the

15  cutoff there is when the phone call ended.  And then it

16  picks up again on the other side, kind of the blocked

17  off time there.  It says 113 minutes after 2:00 a.m.

18  There is a single call because they're -- there were two

19  phone numbers.  There was a 602 phone number which is

20  where he's originally from.  And then he also had a 540

21  number.

22          So, the purple, did I write -- so the purple

23  there is the 540 number and you can see just below that,

24  11:45 p.m. incoming call.  That's where it's from,

25  540 --

1          MR. GREENBERG:  I have a renewed objection.

2     Mr. Hately says he got the information from some Google

3     work that gave the information.  Now we heard him

4     testify that the 640 is a number that must be Dr.

5     Watts', that's where he's from.  I don't know if Google

6     would know that information.

7          And then he's testifying how long they're on

8     the telephone, who is on the telephone.  I have no idea

9     of the foundation of who was on the telephone or where

10    he got that information.

11         THE COURT:  I'll give you a chance to

12    cross-examine all those questions, Mr. Greenberg.

13         MR. GREENBERG:  Thank you.

14         THE WITNESS:  So then it continues on here

15    1:07 a.m. disconnected, picked up phone call again at --

16    excuse me, about 2:02.  It goes for two hours here, and

17    then it drops and then they pick back up for another

18    couple minutes until 4:03 a.m. is when, I guess, they

19    finally disconnected their call.

20         That's kind of the breakdown of the top

21    line.  And then I couldn't squeeze all of the below

22    information in the top one because it wouldn't be

23    readable.  So I just broke out a similar line, you know,

24    from 11:00 p.m. to 4:30 a.m., and trying to kind of

25    marry it up to the top as well as far as the timeline.

1  BY MR. MENHART:

2      Q.   And so, for purposes of this document, the lower

3  timeline would effectually be inserted into the top

4  line; is that fair?

5      A.   Yeah, it's kind of like laying on top of that

6  one, uh-huh, to show what was happening and when it was

7  happening.

8      Q.   And, so how were you able to pull this all

9  together?

10     A.   So, these are --

11          THE COURT:  It's not clear to me what the

12  second line is.  I don't know what the asterisk and 37

13  means.

14          THE WITNESS:  Um, 37 messages sent to -- and

15  the phone number there is the same phone number that

16  was -- that she had -- oops.  Oh, no.  Can we clear

17  that?

18  BY MR. MENHART:

19     Q.   We have a nice clear button over here.  There we

20  go.

21     A.   I mean, there were 37 messages, text messages

22  sent the night before, and they jumped on the phone at

23  11 o'clock until about 1:00 a.m., and then at 1:47 a.m.

24  is when my password gets reset and they start going into

25  my account.

1          THE COURT:  So 37 messages refers to text

2    messages?

3          THE WITNESS:  Yes, Your Honor.  That's text

4    messages.  And then, you know, none from 7:28 to 11:25

5    and then 11:25 is when the phone call picks up.  And

6    that's right there.

7    BY MR. MENHART:

8      Q.  And during this timeframe, there were numerous

9    accesses to your various accounts; is that correct?

10          MR. GREENBERG:  Objection, Your Honor.

11          THE COURT:  Sustained.  If he's going to go

12    through this, he has to go through it.  He has not gone

13    through the bottom line yet.  Go through the bottom

14    line.

15          THE WITNESS:  The bottom line, so, these are

16    all of -- so, in my Google activity log, there are

17    account activity.  It shows, like I said, the IP

18    address, the device type, and the timestamp of when that

19    event or that device connected.

20          So, here at 1:47 a.m. is when my account

21    was -- the password was changed.  And it show that it

22    came from an iPhone, and I have an android.

23          So then at 1:49 a.m., you know, the password

24    was reset and it gives me an IP address and shows like

25    it's successfully connected.  And then it connects again

1    at 1:54 a.m. from the exact same IP address.

2              Then, it looks like it stays connected all

3    the way until about here -- just draw this line -- which

4    is where another device.

5              THE COURT:  Here means what time?

6              THE WITNESS:  This is 3:12 a.m., and this is

7    where a MacBook running Safari 9.0 from the 67-163 IP

8    address connects.

9              So, you know, Ms. Torrenzano is on it from

10   an iPhone, but she's also on her phone talking to

11   somebody else.  And then, another laptop connects to my

12   account.  So --

13             THE COURT:  Where do you see that?

14             THE WITNESS:  So, she's on her iPhone

15   initially which is here.

16             THE COURT:  Which iPhone do you say is hers?

17             THE WITNESS:  The IP address right there,

18   166.170.31.201.

19             THE COURT:  All right.

20             THE WITNESS:  The same one connects there

21   again at 1:54 a.m., and then the next connection is the

22   MacBook right here.  Right here.

23             THE COURT:  So 3:12 a.m. on your chart, all

24   right.

25             THE WITNESS:  Yes, Your Honor.  So

1   3:12 a.m., and then, the same IP address here, 166.170.

2   I mean, it's the same one that's here.  It's here.  So

3   it's continually connecting throughout the night.  And

4   all the way until 4:30 a.m., it's the same IP address in

5   there for, you know, four hours.

6              And I don't know when this one was last

7   disconnected, but that one was in there at 3:12 a.m. and

8   I'm not aware Ms. Torrenzano has a MacBook.  She didn't

9   have one during our time together.

10  BY MR. MENHART:

11     Q.   What phone did Ms. Torrenzano own when you had a

12  relationship with her?

13     A.   It was an iPhone.  I think she still has the same

14  iPhone today.

15     Q.   Is there anything else about this document, for

16  purposes of the general overview that you'd like to

17  discuss now.

18              MR. GREENBERG:  Your Honor, that's not a

19  question.

20              MR. MENHART:  It's a --

21              MR. GREENBERG:  An open-ended narrative for

22  the witness.

23              THE COURT:  Sustained.

24              MR. MENHART:  I think we'll set this aside

25  for now and potentially come back to it.

1    Q.   Mr. Hately, what is an IP address?

2    A.   It's a unique identifier for devices that are

3   connected to a network.  So, if you have like all these

4   computers may have, I don't know -- they're just

5   screens.  But, computers in the network have a unique

6   location, and that's designated by IP address.

7              MR. GREENBERG:  Your Honor, he's not

8   admitted as an expert.  The jury all know what an IP

9   address is.  He doesn't need to explain it.  And if they

10   want to know, then an expert should be provided so we

11   can delve into what expert know of what an IP address

12   is.  He is being generic right now, but I think it's

13   expert testimony.

14              MR. MENHART:  Your Honor, our position it's

15   not expert testimony because he's speaking as to his

16   personal knowledge as to what an IP address is and it is

17   not.

18              THE COURT:  Is he reciting facts or an

19   opinion, Mr. Menhart?

20              MR. MENHART:  He is reciting the -- he's

21   reciting his personal knowledge as to what an IP address

22   is.

23              THE COURT:  All right.  I sustain the

24   objection to that question.

25   BY MR. MENHART:

1   Q.   Mr. Hately, I want you to refer now to

2   Exhibit 11.  Now, Exhibit 11 has a variety of materials

3   and I want us to go through them slowly but surely.

4   This first page is a -- with the yellow ruling upon it,

5   the yellow notebook page, what is this?

6   A.   This is -- this is more detailed.  This is

7   essentially the same thing as the lower bar in the white

8   board we just had.  But there's a little bit more detail

9   to some of the time stamped events there.  So like the

10  first one says that what -- which is the 1:49, you know,

11  I wrote down "per my Google sign in/security log-in or

12  security page", and I have an e-mail for that and

13  checked the activity information.

14       So it was all kind of documented in three places

15  there that an iPhone from that IP address at that time

16  reset my password.  Same thing with the 3:12 a.m. which

17  is the MacBook that be connects from that IP address

18  again.  That's per my activity information, which I kind

19  of went over earlier about.  And then I took a screen

20  shot of what time the McIntosh computer had last synced

21  with my account.

22       And then some -- and some notes here like on --

23  on the bottom, the iPhone was like, you know, was on

24  Safari.  You know, the -- the phone records, well, the

25  phone records for Ms. Torrenzano showed that she was

1    also transmitting like a lot of data during that time as

2    well.

3         So I believe that it was her on her iPhone

4    resetting the password from this IP address and she was

5    on her phone transferring data at essentially the exact

6    same time, all throughout the morning until 7 o'clock in

7    the morning.

8    Q.   So, this was something that you created

9    exclusively?

10   A.   This is -- I wrote this.

11   Q.   This is your handwriting?

12   A.   This is all mine.

13   Q.   Referring to the second page of that exhibit, it

14   says -- the document says "individual usage details for

15   Patrick Hately".  Tell me what this is.

16   A.   So, this is kind of like -- this shows my phone

17   calls to the 54 -- excuse me, 910-546-6379 which is Ms.

18   Torrenzano's phone number.  So this shows like all the

19   times that we talked on the phone.

20   Q.   Where did you -- where were you able to acquire

21   these records?

22   A.   This is from my AT&T account.

23   Q.   You logged into the password?  Excuse me, you

24   logged into the website?

25   A.   I did.

1      Q.   Entered your password?

2      A.   Un-huh, and it's there at the bottom.  It says,

3  you know, AT&T.com, you know, billing records, in the

4  URL down there.

5      Q.   Thank you.  Referring to the third page.  This

6  appears to be --

7           THE COURT:  Let him describe what it is.

8  BY MR. MENHART:

9      Q.   Please describe what it is.

10     A.   Sure.  So, this is -- this is essentially the --

11  the same as Exhibit 11 which is the white board drawing,

12  excuse me.

13     Q.   Is there any material difference between this

14  version and the other version?

15     A.   Um, no.  I just looked at it real quick.  Hang on

16  a second.  No, these are -- these are the same, same

17  thing.

18     Q.   Referring to the fourth page of this -- this

19  entire document --

20     A.   Okay.

21     Q.   -- tell me what this is.

22     A.   So, this is the -- like I talked about earlier,

23  the recent activity and from my Google account.  This is

24  what it looks like.  So, it tells me the access type,

25  like mobile, mobile, mobile, browser, and then it just

1   shows the location or IP address and then the date or

2   timestamp for that for that connection.

3          And then it also shows at the bottom, like, when

4   I was looking at this information what IP address was I

5   using, so you can kind of like, you know, which is

6   totally different than any of those.

7   Q.   And, how did you access this information?

8   A.   I'd have to go -- you get this from going into

9   your account.  And you go down to the bottom on the

10  right-hand side under "view details" and then it will

11  take you to a separate page where you can click on sign

12  in and security and you just follow it from there and it

13  will show you like the last ten log-ins or successful

14  log-ins to your account.

15  Q.   So you had to sign into your account --

16  A.   Exactly.

17  Q.   -- to access this?

18  A.   Uh-huh.

19  Q.   And it was a record that was available to you

20  when you signed in?

21  A.   Yes, right.

22  Q.   Refer to the next page which has 10/13 and then a

23  two, and then a circle.

24  A.   Uh-huh.

25  Q.   Tell me what this document is and how you

1  acquired it.

2      A.   Oh, this is a similar -- it was the same

3  essentially, as the one before.  It was just the recent

4  activity on my account.  And then again, like it shows

5  you know, what IP address that I was using and then the

6  access type on the left, the location and then the date

7  or timestamp on there.

8          I dog-eared -- I put a little sticky on one of

9  them.

10     Q.   And whose handwriting is on that sticky?

11     A.   That's mine.

12     Q.   And, what is the sticky designating?

13     A.   It shows that -- that this same IP address here

14 that was connecting to my account was also an IP address

15 that had connected to her Facebook account.

16     Q.   Referring to the next --

17         THE COURT:  Can you read the numbers out

18 loud for the record.

19         THE WITNESS:  Sure, so the numbers are for

20 that one, specifically, Your Honor?

21         THE COURT:  Yes.

22         THE WITNESS:  It's 166.164.0.189.

23         THE COURT:  Thank you.

24 BY MR. MENHART:

25     Q.   Referring to the next page, this has a title

1    "security-notifications" at the top.

2    A.    Uh-huh.

3    Q.    Are you looking at that page?

4    A.    Yes, I am.

5    Q.    Describe to me what's demonstrated in this page.

6    A.    All right.  So this shows three things, that

7    there was a new iPhone that had connected to my account.

8    It shows me when the password was changed which is at

9    2:00 a.m.  It shows that the iPhone connected at 1:49

10   and then it gives me like the IP address for that.

11         And then the one at the top says new Window

12   sign-in, and then that shows the -- that a new laptop,

13   other than the only one I have, and my phone had

14   connected to this -- to my account.

15         And this is from -- yeah, so it's from my recent

16   security events and my sign-in security page of my

17   Google account.

18   Q.    When did you access this page?

19   A.    Right afterwards, right after -- excuse me, the

20   13th and the 14th.  I was in it every day for almost a

21   week.  After the 13th.

22   Q.    Let's go to the next page.  I realize this is

23   largely blank, but this is a continuation of the prior

24   one.

25   A.    That's correct.  It's just totally blank, and

1    it's just a continuation of the last one.

2       Q.   Referring to the next page.

3       A.   Uh-huh.

4       Q.   It has the indicia Virginia Community College is

5    at the top.

6       A.   That's correct.

7       Q.   Do you see the page number I'm referring to?

8       A.   Yes, I do.

9       Q.   What's happening here?

10      A.   So, this is whenever you reset your password, you

11   get like a notification.  So it says, you know, the top

12   is just password reset, you know.  "We received a

13   request to reset your password for the PWH271 account.

14   If you did not request this, please contact the support

15   staff as soon as possible."

16          And this is at 1:47 a.m. on October 13th when the

17   iPhone is also logged in the recent security events as

18   having reset the password.

19      Q.   When you look at this exhibit, you are logged

20   into your VCCS account?

21      A.   Yeah, you'd have to be logged in to see this

22   notification.

23      Q.   Referring to the bottom of the page, what is that

24   you're at?

25      A.   So it says mail.Google.com and there's a lot more

1   notes.  It's forward slash mail, forward slash U.

2      Q.  I don't want you to read that URL into the

3   record.  Let's just look at the next page.

4      A.  Okay.

5      Q.  Can you tell me what's happening in this page?

6      A.  Yes, so this was -- this here is a notification

7   e-mail similar to the password reset that shows there

8   was a new sign in from an iPhone that was using Safari

9   as the browser which is like the browser for the iPhone.

10      It tells me, you know, your Google account,

11   PWH271 was just used to sign in from Safari on iPhone.

12   It tells me the account name below that and an iPhone

13   timestamp.  Then it goes over like, you know, if you

14   don't recognize this activity, you have to report this.

15   You know, we take security very seriously.

16      So, these are notifications like, of new

17   connections to my account that will send me a

18   notification just like, hey, we don't recognize this

19   device, you know.  Is everything okay?

20      Q.  And that happens as a matter of course?

21      A.  It's like automatic.

22      Q.  Referring to the next page, is this just a

23   continuation of the prior page?

24      A.  Yes, yes, that's correct.

25      Q.  Referring to the next page, tell me what's

1   happening here.

2       A.   This is the same thing as the one just before,

3   except for this is the new sign in for Chrome on a

4   Windows machine.  And, it's October 13th, but this is at

5   1:10 in the afternoon.  So the iPhone was at 1:47 a.m.,

6   and now this new laptop is at 1:10 p.m., the same day so

7   about 12 hours later.

8           And it has the same information there, you know,

9   your account, it gives the account name.  It shows the

10  device type, Windows timestamp, what kind of browser it

11  was using.  And then, you know, a note from Google like

12  why we're sending this notification to you.

13      Q.   Next page, just a continuation?

14      A.   Yes, that's correct.  It's page two, uh-huh.

15      Q.   What's happening in the next page?

16      A.   This is a -- e-mail also in my VCCS e-mail that

17  was sent from AT&T to me in my e-mail account.

18          And, it's got a temporary password in there.

19  Actually, it says -- the heading on it says "AT&T online

20  profile request".  And then there's a temporary password

21  in there.  It says your temporary password is, and this

22  is at -- on October 13th at 2:40 p.m., so about an hour

23  and a half after the new Windows computer had just

24  connected to the account.

25      Q.   And these texts and notifications are sent from

1    AT&T as a matter of course?

2    A.  Right.

3            MR. GREENBERG:  Your Honor, I object to

4    that.

5            THE COURT:  Sustained, sustained.

6    BY MR. MENHART:

7    Q.  What has been your experience with your AT&T

8    account when security events occur?

9    A.  So, for like resetting a password, you can

10   request a password reset.  There's a password reset

11   button there.  You put in your e-mail address and it

12   sends you -- sends you this temporary password to your

13   e-mail.  And then you just take that and use that and

14   reset the password.

15   Q.  The next page is just a continuation of that

16   prior page?

17   A.  Yes, that's correct.

18   Q.  What is happening in the next page?

19   A.  So, this is AT&T sending me another e-mail to

20   tell me that my password has been changed, and it says

21   your AT&T online password has been updated, you know.

22   "Dear Patrick, your password for" --

23           MR. GREENBERG:  I'm going to object to the

24   constant hearsay.  I know this is authenticating.

25   Rather than reading claims or documents, I don't know

1  whether they've been altered or not.

2        Some of them from the beginning seems

3  cumulative, but if he wants to put that in, the ones

4  he's read none of them are authenticated nor stored in

5  the record.  There's nothing showing that they come from

6  the college, from Google, from any of the sites he's

7  claiming.

8        MR. MENHART:  Your Honor, the plaintiff just

9  testified moments ago that this is a notice that he

10  received in his college e-mail address, and he's

11  testifying as to his personal knowledge of having

12  received this in the account in which he was logged

13  into.

14        THE COURT:  All right.  Objection is

15  overruled.

16  BY MR. MENHART:

17    Q.   So Mr. Hately, I believe we were on the e-mail

18  that's October 13, 2015, at 2:46 p.m.

19        Is that what you're looking at?

20    A.   Yes.

21    Q.   And so the next page is again a continuation

22  that's largely blank?

23    A.   Yes.  That's correct.

24    Q.   Okay.  What's happening in the next page?

25    A.   This is just a couple minutes later, October 13,

1  2015, at 2:55 p.m., but -- and then it looks like my
2  password was changed again.  And it's similar.  It's
3  almost identical to the one before, you know.  It says
4  the "from" address is AT&T online services, and then it
5  has their e-mail.  And then, "to" and then my PWH271
6  e-mail.  And then the body of it says your password has
7  been updated.  Your password for Hately884320 has been
8  updated which is the user ID for my AT&T account.
9      Q.   And the next page again is a continuation?
10     A.   Yes, that's correct.
11     Q.   Looking at the next page, what is this document?
12     A.   This is a screen shot of my laptop.
13     Q.   Who took this screen shot?
14     A.   I did from my laptop.
15     Q.   What is your understanding as to what's
16  designated on your computer screen in this screen shot?
17     A.   Well, this is in my recently used devices section
18  of my Gmail account, you know, my VCCS account.  And
19  this is the recently used devices page, you know.  It
20  shows the Windows machine which designates my current
21  device and then the name of it, where it's last been
22  connected to, what browser it's using.
23       So Google already recognizes this device as my
24  current device and a device it has connected in the
25  past.  And then my Note 4, my Samsung phone is just

1    below that.  So those are like my two devices that

2    connect to mine.

3       Q.  So, these were the two devices that were

4    authorized?

5       A.  Correct.

6       Q.  Referring to the next page.

7       A.  Uh-huh.  So, this one is the Windows machine that

8    connected later in the afternoon on the 13th.  Last sync

9    that says was 1:35 p.m.

10        And then it gave an IP address there of where it

11   was, and it's in Winchester.  It even has Google maps

12   pulled up and there's a dot in the middle of Winchester.

13        And it says right there, this is a new device.

14   If you don't recognize this, someone may have your

15   password.  We recommend you secure your account now.

16        And then at the very bottom of that, is the --

17   says a Mac -- Mac computer had connected.  And the last

18   time it was synced was at 3:28 a.m. which was

19   actually where I pointed out to earlier on the white

20   board.

21      Q.  On the white board, okay.  We will put that up

22   again in a second.

23        I think we're at the last page of this document.

24   Tell me what this is.

25      A.  So, this is the iPhone, and the question I guess

1   here tells me that this is the device that changed the

2   password, you know.  Here was the IP address that --

3   that it had.  And this kind of goes hand in hand with

4   the last sync time for that iPhone at that IP address in

5   my account activity information as well.  So it all just

6   kind of marries up together across the board.

7            MR. MENHART:  Your Honor, we'd move to have

8   Exhibit Number 11 entered into evidence.

9            THE COURT:  11 will be received subject to

10  cross-examination.

11  BY MR. MENHART:

12    Q.   Okay.  Mr. Hately, let's now refer to --

13            MR. MENHART:  Your Honor, we're going to put

14  up Exhibit 11 on the screen that's been admitted into

15  evidence.

16            THE COURT:  All right.

17  BY MR. MENHART:

18    Q.   Now, Mr. Hately, I know you went through this

19  entire document.  Now that it's been admitted, we've

20  created the foundation.  So now we're going to let the

21  jury see it.

22    A.   Okay.

23    Q.   And we're going to sort of go back and do it

24  again.  Okay.

25            MR. GREENBERG:  Judge, you're going to let

1   him go through all that evidence a second time?  I know

2   the jury has heard it and now that they have a chance to

3   see what you've admitted.  It seems cumulative to go

4   over that after 15 minutes of testimony again a second

5   time.  So, I'd say it's cumulative.

6                Asked and answered, that's my objection.

7                MR. MENHART:  Your Honor, if we hadn't had

8   an objection to the introduction of the exhibit we could

9   have displayed it the entire time.

10               THE COURT:  All right.  Objection overruled,

11  unless you have copies to give the jury to look at.

12               MR. MENHART:  Well, we don't have any copies

13  I must say.

14               THE COURT:  All right.  That's fine.  Go on.

15  BY MR. MENHART:

16   Q.  All right, Mr. Hately, we'll do this relatively

17  efficiently.

18   A.  Sure.

19   Q.  I'm going to shut my mouth, but we want the jury

20  to see it.  So, we're going to go through it relatively

21  quickly.  So, maybe we'll just scroll slowly but surely.

22               So this document you say was largely -- this was

23  largely cumulative of what we've seen already, correct?

24   A.  The white board, yeah, it just doesn't have --

25   Q.  Just for purposes of moving it along.  So, let's

1  look at the second page now.  And you said this was --

2  this was just, you know, relatively minimally important

3  for purposes of this exhibit.

4     A.  Right.

5     Q.  So we'll move on to the next page.  You said this

6  was largely a copy of the exhibit.

7     A.  The white board.

8     Q.  The white board that you've previously seen,

9  okay.  And this one, is a -- this one --

10     A.  So this --

11     Q.  You talked a little bit more in detail about it,

12  so potentially you can do here.

13     A.  Sure.  So, this is the activity information page.

14  So this shows like --

15           THE COURT:  Can that be zoomed so everybody

16  can see it?

17           MR. MENHART:  I'm not sure, Your Honor.  We

18  might have had a -- there you go.  We'll do the best we

19  can.

20     A.  Is that okay like that?

21     Q.  So, I apologize.  Basically, you had testified as

22  to what these IP addresses meant to you and what was

23  happening.  I guess, basically for the jury's purposes,

24  maybe you can do that again.

25     A.  Sure.  So here's the 1:49 a.m. from the

1  166.173.01201 which is a mobile device, which is an

2  iPhone.

3       And if you scroll up -- it's good right there.

4  So, same thing, here is the IP address here, here, here,

5  here, here, all the way from 1:40 until 4:30 in the

6  morning.

7       And then the other one, the MacBook, and these --

8  and, I believe it's an iPhone, because here, here, here,

9  mobile, mobile, mobile, mobile.  So, it's mobile device.

10  And then my recent security said that an iPhone changed

11  the password at 1:47 a.m., and that's right there.

12       And then the MacBook that connected at 3:28

13  initially connected at 3:12 a.m. and there's the IP

14  address for it.  There's the -- it's using Safari, but

15  it was using an intel-mac operating system.  So, it

16  wasn't using like a mobile version of a browser, so a

17  full version of an operating system.

18    Q.   So, each of these IP addresses that you just

19  pointed out designated devices that were not under your

20  control?

21    A.   Oh yes.  If you scroll to the bottom, actually,

22  it will tell you.  Keep going a little more, right here.

23  So, here it says this is what my computer is using and

24  there weren't even any that started with 108.

25    Q.   I'm just going to clarify something you just

1    said.

2        You said there weren't any with 108 but maybe at

3    the very top, it looks like there might have been one.

4        A.   Yeah, so that's like 11:30 a.m. is when I'm

5    coming back into -- when I'm kind of like regaining

6    control of my account.

7        Q.   So, basically that IP address is you effectively

8    regaining control right at that moment?

9        A.   Right, yeah, because I hadn't notice anything was

10   going on until I got a notification on my phone that my

11   password was out of date.  And I didn't really know what

12   was going on.  I was on my way to a dentist appointment,

13   so I just figure I'd work it out afterwards.

14       Q.   Those dentists will not wait.

15       A.   No.

16       Q.   Let's go to the next page.

17       A.   Okay.  So, this is, essentially, this is the same

18   thing.  It's another activity -- account activity

19   information.  It shows the same thing, access type.

20   Access type was mobile, the time it connected, where it

21   connected from.

22        So, essentially, the same thing.  And again at

23   the bottom -- and this was the one that was kind of

24   concerning because it says that -- the blue note there

25   says in -- ends FB data so in Nicole, Ms. Torrenzano's

1  Facebook data.  So, the same IP address that was

2  successfully connecting to her Facebook was also getting

3  into mine, into my e-mail account.

4      Q.  Let's go to the next page.  And again so the jury

5  can see what you're talking about, what's happening on

6  this page?

7      A.  So, this is the security notifications page.  At

8  the top, it shows the new Windows sign in, at 1 o'clock

9  in the afternoon.  And it gives you like the IP address

10  there, the general location of Winchester.  And then

11  just below that it says changed password.  It changed it

12  yesterday at 2:00 a.m.

13          So I'm looking at this.  It says 10-14.  Actually

14  at the very, very top left-hand corner, there's a date

15  10-14.  So the 10-13 incident was the day before.  So,

16  that's why it says yesterday at 2:00 a.m.

17          And then if you go down a little more, please.

18  There's the -- yes, so the new iPhone signed in, same

19  thing.  It gives you an IP address, time stamped device

20  type, so.

21      Q.  So, right in the middle of this page it says

22  changed password.

23      A.  Yes.

24      Q.  What does that mean?

25      A.  That means that somebody changed my pass -- my

1   password was changed for my account.  So they would have

2   had to gone through the steps of -- well, my e-mail is

3   different from the AT&T because I wouldn't be able to

4   send the link to myself in the e-mail that I don't have

5   access to reset the password for that account.

6        Q.  Did you change your password at 2 o'clock in the

7   morning on October 13th?

8        A.  No, no, I was sleeping.

9        Q.  Many of us are at 2 o'clock in the morning.

10       Let's go on to the second page.  Let's -- so, you

11  previously testified this page is basically a

12  continuation.  So we're just going to skip that one.

13       Let's go to the page with the Virginia Community

14  College at the top so the jury can see it.  Again, just

15  explain to the jury what's going on.

16       A.  So, this is just a print off of what the --

17            THE COURT:  If you'd zoom it, that would be

18  helpful.

19            THE WITNESS:  So, this is a print off of

20  what the e-mail notification is that I get when my

21  password is reset.

22  BY MR. MENHART:

23       Q.  Uh-huh.

24       A.  So, here it's October 13th at 1:47 a.m.  You

25  know, it's from the -- it's to my e-mail address right

1  there.  This is the do not reply -- sorry --

2  notification from the VCCS.EDU domain.  So, this is just

3  notification that your password was reset and at

4  1:47 a.m.

5  Q.  What happens when your password is -- let me

6  continue the question.  What happens when your password

7  is reset without your authorization?

8  A.  I get booted out of all my -- all my devices that

9  are connected to it would be essentially be kicked out,

10  because they would no longer have the right password to

11  get into the account.

12  So, like the -- the phone that -- the mail would

13  come to my smart phone would stop coming because I don't

14  have the right password, so I couldn't get into those

15  accounts.  The same thing with the laptop, you know, I

16  couldn't get in because I wouldn't have the right

17  password at that point.

18  Q.  Let's go on to the next page for the jury which

19  is the one that says new sign in from Safari on iPhone I

20  believe.

21  A.  Yes, new sign in from Safari on iPhone, just a

22  notification from Google to tell me that hey, someone --

23  like we don't recognize -- actually, if you scroll down

24  a little bit, it says, yes, so don't recognize this

25  activity.  You know, why are we sending you this?  You

1   know, review your recent -- recently used devices and

2   that's where I went to go get a lot of the other screen

3   shots that I took.

4           Then this is the same timestamp from -- that's in

5   the activity information.  That's in this e-mail.

6   It's -- it's all -- it's all over the place.

7       Q.  We'll just scroll pass that next page which you

8   previously testified was just an extension?

9       A.  Yes, continuation.

10      Q.  And we'll go to this e-mail, new sign from Chrome

11  on Windows, dated October 13, 2015, at 1:10.

12      A.  So, this is a new Windows device that I haven't

13  used to log into my account previously, which is why I

14  got the notification.

15          So, the same person that reset the password on

16  the iPhone would essentially be the one that would know

17  it and either has a laptop or provided it to somebody

18  else with a laptop that also got into the account.  But

19  my assumption is that it's probably the same person,

20  just doing it from a laptop.

21          So, this is the notification just like the

22  iPhone.  It's just designating it as a Windows device.

23  Now a laptop is connected, and this is at 1:10 p.m. on

24  the 13th.  And the iPhone was at 1:49 a.m. on the same

25  day, so about 12 hours later.

1    Q.  We'll scroll pass the next page.  We'll go to the

2  e-mail that says AT&T online profile request.

3    A.  This is -- so, this is another e-mail that came

4  in from AT&T later in the day on the 13th.  So the

5  Windows connected at 1:10.  This is 2:40 on the 13th,

6  2015, that a temporary password was requested.

7         And when you do that, they send you the temporary

8  password, but they send it to the e-mail that you have

9  on file.

10         So, same person that got into the e-mail now

11  would also receive the notification for the temporary

12  password for my AT&T account, so that they use it as

13  a -- a launching point, I guess you would say, to get

14  other passwords for other accounts.  And that's what

15  happened here.

16         So this temporary password was sent to the

17  e-mail.  And, then that temporary password was used to

18  reset my AT&T account to get in.

19    Q.  Let's scroll pass that next page --

20    A.  Sure.

21    Q.  -- which you testified which is an extension.

22  And we'll refer to this one.  It says October 13, 2015,

23  at 2:26 p.m.

24    A.  Right.

25    Q.  It says your AT&T password was updated.

1    A.   Right.  So this is the notification once the

2    password has been updated, it lets you know that we

3    reset it for -- and that's the name of the account.  So

4    that's like the user name, which is my last name and a

5    bunch of numbers.

6    Q.   Does that user name contain the word "Nicole"?

7    A.   It does not.

8    Q.   Or the name "Torrenzano"?

9    A.   No, it does not.

10   Q.   Is there anything else about this document that

11   given your prior testimony you want to present to the

12   jury now?

13            MR. GREENBERG:  Your Honor, I object.

14            THE COURT:  Sustain to the narrative

15   question.

16            MR. MENHART:  Withdrawn.

17   BY MR. MENHART:

18   Q.   Let's move on to the next page which is

19   October 13, 2015, at 2:55, the next substantive page.

20   A.   Yes.

21   Q.   Please just explain briefly to the jury what this

22   is.

23   A.   Again, that my password had been reset just

24   minutes later.  It's 2:55 p.m. on the same day, the 13th

25   of October, 2015.

1    Q.  Okay.  And, let's scroll down to the next

2  substantive page.  And we're looking at the screen shot

3  with the Windows portion.  That may or may not be able

4  to be resolved, so we'll tilt our head a little bit.

5            THE COURT:  That could be turn to landscape.

6  You might be able to see it.  Turn the view.  There you

7  go.

8            MR. MENHART:  Okay.

9            THE WITNESS:  So, this is the recently used

10  devices page.  If you scroll up a little bit, it says it

11  right at the top.  I don't know if you can see it.  Oh,

12  it says it right there.

13            This one's mine.  This is my laptop.  It

14  even tells me it's my current device.  And then it also

15  kind of lays out, you know, where I connect from here,

16  here, here, and here.

17            And also there's an -- if you scroll down

18  just a little bit, there's my -- my smart phone which is

19  the Samsung Galaxy Note 4.

20  BY MR. MENHART:

21    Q.  You don't own an iPhone?

22    A.  No, no.

23    Q.  What about the word Ironhide in the middle of the

24  page?

25    A.  That's the name of my laptop.  I named it that

1   from Transformers.

2       Q.   Okay.  So, if there's a Windows device that shows

3   up that doesn't have that name --

4       A.   Right, yeah.  So that -- I mean, not only does

5   that kind of uniquely identify my device, but you know,

6   others would as well.  And those were all areas that I

7   connect from for the house and work.

8       Q.   Let's scroll to the next substantive page which I

9   believe is the next page, and we'll get it oriented.

10  And just again explain to the jury what's happening

11  here.

12      A.   So, the recently used devices page is actually

13  very long, so I had to take it and like snip it.  So

14  this is like kind of like the next screen shot down.

15           So this is telling me that a Windows device,

16  which is a new devise, says this is a new device, if you

17  don't recognize it.  And that time actually matches up

18  with the time that the notification came in that said my

19  password had -- that the new device had connected.  And

20  it's not my laptop because it's not labeled you know,

21  Ironhide.

22           And so that kind of gives you the approximate

23  location, IP address there, and then the approximate

24  location of Winchester, Virginia.  Again, new device

25  signed in there.  This is a new device.  There's the

1    time of one -- sorry, 1:35.

2         And then the very bottom of that page, that shows

3    the MacBook that had connected, and that the timestamp

4    for that one is right there is 3:28 which matches up

5    with the IP addresses that are in my activity logs,

6    everything else.

7    Q.   And you don't own a MacBook, correct?

8    A.   No, I've never owned one.

9    Q.   And I believe we have one more page in this

10   document.  We'll scroll to that now.  And again, please

11   just explain to the jury what's happening here.

12   A.   Sure.  So, this is another screen shot of the

13   recently used devices page from my account.  And it even

14   tells me, like, here is the iPhone, when it was last

15   synchronized at 3 o'clock the same day.  So it was

16   about, I don't know, 15 hours later.

17        And then it tells me like this is the device, you

18   know, you've changed your password since this device is

19   added and this was taken after -- after the fact.

20        But then it tells me that IP address there, the

21   16617031201 which is the same one that was registered in

22   my account activity, which is the same one that's

23   registered for resetting the password.

24   Q.   Thank you, Mr. Hately.

25   A.   You're welcome.

1    Q.   Mr. Hately, I'm now presenting to you what has

2    been marked as Plaintiff's Exhibit Number 12.  Can you

3    please explain what this document represents?

4    A.   This is a month's statement from September 21st,

5    to October 20th of 2015 for Ms. Torrenzano's cellphone

6    account.  So this is like the billing record, like the

7    monthly statement that shows phone calls and text

8    messages and data sent and received, and all that stuff.

9    So it's like your monthly statement.

10   Q.   How did you acquire this document?

11   A.   Through discovery and -- and our other custody.

12   Q.   Another litigation?

13   A.   Yes, that's correct.

14        THE COURT:  Discovery means, ladies and

15   gentlemen, in lawsuits each side has a right to request

16   the other provide information and documents.  And it's a

17   part of the process for litigation.  So it's properly

18   acquired in that way.

19        All right, next question.

20   BY MR. MENHART:

21   Q.   So, turning to the second page, you testified

22   that this was the wireless account statement for Ms.

23   Torrenzano.

24   A.   This is her cellphone, yes, wireless account.

25   It's got her name, address, and below that it says

1   wireless statement, the charges, you know, how much it

2   costs, and then --

3        Q.   It has the AT&T logo on it?

4        A.   Yeah, it's got the AT&T logo on it.  It talks

5   about AT&T Next.  You can get a new phone for AT&T Next.

6        Q.   For phone records?

7        A.   Yeah, you could get a new phone, something -- I

8   don't know what they do, you know, manage your account.

9   You can -- tells you what -- it looks like the plan

10  details.  So maybe she has a mobile share value, five

11  gigabytes with rollover data, just that kind of stuff.

12           MR. MENHART:  Thank you.  Your Honor, we

13  would like to admit Hately Exhibit No. 12 into the

14  record.

15           MR. GREENBERG:  Your Honor, I have no

16  objection.

17           THE COURT:  12 will be received.

18  BY MR. MENHART:

19       Q.   Okay.  Mr. Hately, I'm operating without bates

20  numbers up here, so what I'll tell you is it's maybe --

21  well, actually we'll put it on the board for you.  And,

22  I'm going to point you to the records that were

23  designated for Monday, October 12th, and Tuesday

24  October 13, 2015.

25       A.   Uh-huh.  Should be page three, I think of 28 on

1   the -- oh, it's -- keep going.

2       Q.   It looks like it says page three of 28 at the top

3   right-hand corner.

4       A.   Right.  So this is one of 28 here.  There's three

5   of 28 right there.

6       Q.   Great.

7       A.   So, like this is the --

8       Q.   Are you -- I'm sorry, let me ask you a question.

9   You testified that Ms. Torrenzano -- these are Ms.

10  Torrenzano's phone records?

11      A.   Yes.

12      Q.   Is her name at the top of the page?

13      A.   Yes, it is.

14      Q.   Tell me about the records on Monday, October 12,

15  2015.

16      A.   The -- can you scroll down just a little bit

17  please?  Thank you.  So got them kind of tabbed there.

18          Monday, October 12th, which is right -- it's the

19  first tab at the top there.

20      Q.   Mr. Hately, you affixed those tabs to that

21  document, correct?

22      A.   I did.  I just put the tabs on there.  So,

23  that -- that night, Monday, you know, 10-12, October 12,

24  2015, at 11:25 p.m. there was an incoming call from that

25  9086 phone number, the 540 number.  And that was for

1   102 minutes, and that was actually on the white board.

2       Q.   That was Exhibit No. 10, I believe.

3       A.   Yes.  And then, there's a call from -- the

4   Phoenix, Arizona number which is Tuesday, 10-13.  Just

5   below that it says 2:02 a.m., Phoenix, Arizona, 602

6   number for a minute.  And then an incoming call from

7   that 9086 number again.  The Phoenix, Arizona, number is

8   Dr. Watts's.

9           So, that phone call went on for -- I lost my

10  highlighter, sorry -- 113 minutes which is also outlined

11  in the white board I drew up.

12          And then it disconnects and reconnects all

13  throughout the rest of the day there.  You know,

14  here's -- well, at 3:55 a.m. is when the last phone call

15  was which was actually on my white board as well.

16      Q.   So, you relied upon this document in creating

17  your white board?

18      A.   This is where I got the information to draw this

19  out.

20      Q.   This business record from AT&T?

21      A.   Yes, for the calls any ways and then I compared

22  that with everything we just -- we literally just went

23  over to map out the -- you know, when the password was

24  reset, from what IP address, da, da, da.  That's how I

25  built that whole thing.

1        So for -- and then on the 12th, I think there

2   was -- Your Honor asked about the 37 messages that were

3   starred there.  That's just later in her records which

4   is page 17 of 28.

5      Q.  Sure, we can go there now.  We'll put it up for

6   the jury.

7      A.  Okay, sure, sure, sure.  So, there's 602,

8   right -- right there at the bottom, 5:54 p.m.  If you

9   scroll down, it's going to pick up 13 -- there is it.

10  Tuesday, the 13th is there and those 37 messages were --

11  were -- I got from this area on the 12th, just before

12  Tuesday, 10-13 picks up.  This is 28 pages, essentially,

13  of text messages, phone calls to like this number.

14       And then afterwards, 10-13 during the time when

15  she had access to the account, Ms. Torrenzano had access

16  to the account, she was also texting him as well.

17       And then if you go to the data usage which is --

18  and I'll find it.  It's easier to -- I think it's 26.

19       Right.  So, page 26 of 28 in the -- oops,

20  there -- there it is.  And I wish I had my thing to

21  point out.

22       But, the October 13th incident started early in

23  the morning.  And you could see, Tuesday 10-13, of --

24  which is 2015 record, but there's, you know, 78,000

25  kilobytes, 29,000 kilobytes.  This is all data being

1   transferred to her iPhone during the time that my

2   password was reset and she was on the phone with

3   somebody else, and I'm getting notification that an

4   iPhone is resetting my password.

5       Q.   Based on your own personal knowledge, what are

6   you -- what would you tend to be doing if you had

7   78,000 kilobytes of data being transferred on your

8   account?

9              MR. GREENBERG:  Your Honor, object.

10             MR. MENHART:  Let me withdraw the question.

11  Let me withdraw it.

12      Q.   How many kilobytes is an e-mail typically?  Let

13  me strike that question.

14             How many kilobytes would one e-mail containing

15  ten lines of text be?

16             MR. GREENBERG:  Your Honor, I object.  He's

17  not an expert in the field, so.

18             THE COURT:  Sustain.

19             Ladies and gentlemen, we're going to stop

20  for the day.  Please do not discuss the case nor permit

21  the case to be discussed in your presence.

22             Again, don't do any research on the case.

23  Everything you need to know about the case will be

24  presented to you here in court.  Leave your notes in the

25  jury deliberation room.  We'll resume tomorrow at

1    10 o'clock.

2              Thank you.  You're free to leave.

3              (Jury excused at 5:00 p.m.)

4              THE COURT:  Anything else we need to take up

5    tonight?  We're in recess until tomorrow, 10 o'clock.

6              (Proceedings concluded at 5:00 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3              I, Renecia Wilson, an official court

4      reporter for the United State District Court of

5      Virginia, Alexandria Division, do hereby certify that I

6      reported by machine shorthand, in my official capacity,

7      the proceedings had upon the trial in the case of

8      Patrick Hately vs. Nicole Torrenzano.

9              I further certify that I was authorized and

10     did report by stenotype the proceedings and evidence in

11     said trial, and that the foregoing pages, numbered 1 to

12     259, inclusive, constitute the official transcript of

13     said proceedings as taken from my shorthand notes.

14             IN WITNESS WHEREOF, I have hereto

15     subscribed my name this  24th  day of  July , 2017.

16

17                              _____/s/_____
                                Renecia Wilson, RMR, CRR
18                              Official Court Reporter

19

20

21

22

23

24

25