IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

PATRICK HATELY,                    )
                                   )
            Plaintiff,             )      16-cv-1143
                                   )
      VS.                          )      June 6, 2017
                                   )
NICOLE TORRENZANO,                 )
                                   )
            Defendant.             )
_____)


TRIAL


BEFORE:      THE HONORABLE GERALD BRUCE LEE
             UNITED STATES DISTRICT JUDGE


APPEARANCES:

  FOR THE PLAINTIFF: LEXERO LAW
                     BY: ERIC MENHART, ESQ.
                     ROBINSON LAW SERVICES
                     BY: WILLIAM P. ROBINSON, III

  FOR THE DEFENDANT: GREENBERG COSTLE PC
                     BY: CARY S. GREENBERG, ESQ.
                         TIMOTHY R. BRADLEY, ESQ.


                     ---


OFFICIAL COURT REPORTER: RENECIA A. SMITH-WILSON,RMR,CRR
                         U.S. District Court
                         401 Courthouse Square,5th Floor
                         Alexandria, VA  22314
                         (703)501-1580

## INDEX

| | | |
|---|---|---|
| RULE 50 MOTION | 108 | |
| JURY INSTRUCTION CONFERENCE | 123 | |
| JURY INSTRUCTIONS | 171 | |
| CLOSING BY PLAINTIFF | 189 | 217 |
| CLOSING BY DEFENSE | 206 | |

| WITNESSES | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| P. Hately | 7 | 80 | 104 |

---

2          (Thereupon, the following was heard in open

3   court at 10:02 a.m.)

4          THE CLERK:  Civil action 16-1143, Patrick

5   Hately versus Nicole Torrenzano.

6          Counsel, please note your appearances for

7   the record.

8          MR. GREENBERG:  Your Honor, Cary Greenberg

9   and Tim Bradley on behalf of Nicole Torrenzano who is

10  present as well as our counsel.

11         THE COURT:  Good morning.

12         MR. BRADLEY:  Good morning, Your Honor.

13  Timothy Bradley on behalf of Ms. Torrenzano.

14         THE COURT:  Good morning.

15         MR. GREENBERG:  Good morning, Your Honor.

16  Eric Menhart on behalf of the plaintiff, Patrick Hately.

17         THE COURT:  Good morning.

18         MR. ROBINSON:  Good morning, Your Honor.

19  William Robinson on behalf of Mr. Patrick Hately.

20         THE COURT:  Good morning.

21         MS. EGAN:  Good morning, Your Honor, Colleen

22  Egan on behalf of the plaintiff, Patrick Hately.

23         THE COURT:  Good morning.

24         Good morning, Mr. Hately.

25         MR. HATELY:  Good morning.

1          MR. GREENBERG:  Your Honor, one brief matter
2    I might bring to your attention.
3          THE COURT:  Yes.
4          MR. GREENBERG:  Your Honor, yesterday you
5    overruled several of any objections with regard to
6    hearsay with regard to an exhibit that Mr. Hately had
7    manufactured on his own.  I know you allowed it to be
8    published to the jury, and subsequently, the second
9    exhibit as well.
10          THE COURT:  Which document are you talking
11    about?
12          MR. GREENBERG:  I believe it was 10 and 11,
13    but --
14          THE COURT:  The chart?
15          MR. GREENBERG:  Yes.
16          THE COURT:  Okay.
17          MR. GREENBERG:  Yes, the chart.  And Your
18    Honor, I realize that after -- although I objected on
19    the hearsay grounds repeatedly and I know the Court
20    denied that, I'm asking the Court to revisit one part of
21    that ruling, if it would, which is the fact that
22    Mr. Hately had the right, I believe, given the Court's
23    ruling to testify that there was an IP address, whatever
24    that address was that he saw in his account.  I think he
25    further identified that that wasn't his idea -- his IP

1   address.

2           But I don't understand -- there is no basis,

3   and I don't even know if he's correct about it, so we

4   can't even cross-examine it, whether or not the IP

5   address that he then decided was Ms. Torrenzano's to her

6   iPhone or to Dr. Watts', or some computer he had.  And

7   then he gave another IP address that he said was to

8   another location, there is no way that -- I don't even

9   know if that's true, but we can't --

10          THE COURT:  I told you I would let you

11  cross-examine him about those questions.

12          MR. GREENBERG:  Well, I realize that, but

13  all he can just do is say that was his independent

14  research.  It still gets in front of the jury and I'm

15  left to, what I think is speculation on his behalf.  And

16  I don't have a witness that actually said that's true

17  and accurate.

18          So my question to the Court is to revisit

19  just that piece and direct the jury that that part of it

20  where he said he knows what the IP address is for

21  someone else without any foundation not being

22  considered.

23          THE COURT:  I will let you cross-examine.

24          MR. GREENBERG:  Yes, sir.  Thank you for

25  considering it, Judge.

1            THE COURT:  You can bring our jury out.

2            MR. HENDRICK:  Yes, sir.

3            THE COURT:  Just a second, Mr. Hendrick.

4  The chart that you're referring to that was derived from

5  Google records that was prepared by Mr. Hately was

6  admitted as non-hearsay because it reflects a record of

7  his computer service.  And the chart that he drew is

8  admissible under Federal Rule of Evidence 1006.

9            Thank you.

10            (Jury present at 10:06 a.m.)

11            THE COURT:  You may be seated.

12            Mr. Hendrick, if you would close the blinds,

13  please.

14            MR. HENDRICK:  Yes, sir.

15            THE COURT:  Thank you.

16            Good morning, ladies and gentlemen.

17            THE JURORS:  Good morning.

18            THE COURT:  Good morning, Mr. Hately.

19            Good morning, Ms. Torrenzano.

20            MS. TORRENZANO:  Good morning.

21            THE COURT:  Counsel, ready to proceed?

22            MR. MENHART:  Yes, sir.

23            MR. GREENBERG:  Yes, sir.

24            THE COURT:  All right.

25            MR. MENHART:  Your Honor, we're going to

1    have Patrick Hately take the stand again.

2              THE COURT:  All right.

3                    DIRECT EXAMINATION

4    BY MR. MENHART:

5        Q.   Good morning, Mr. Hately.

6        A.   Good morning, Mr. Menhart.

7        Q.   I'm now showing to you Exhibit No. 13.

8        A.   Okay.

9        Q.   Do you recognize this exhibit?

10       A.   Yes, I do.

11       Q.   Please explain what this exhibit is.

12       A.   This is a screen shot from my computer that shows

13   what my IP address is when I looked it up at the same

14   time --

15              MR. GREENBERG:  I object to this as hearsay.

16   What this is is an example -- I understand he did the

17   Google research and what he trying to do is admit the

18   results of that research.

19              THE COURT:  And your objection is what?

20              MR. GREENBERG:  That everything he found,

21   the search terms is hearsay.  This is just what he

22   decided was the results.  We have no independent way of

23   knowing if this is true and accurate.  It has to be

24   considered by the jury as true and accurate.

25              THE COURT:  All right.

1          MR. MENHART:  Your Honor, our response to

2    that is that Mr. Hately testified that he created this

3    document.  It's clear from the face of the document what

4    is being displayed.  And to the extent that there was

5    any type of technical objection to this, the defendant

6    certainly had an opportunity to present an expert

7    witness, but none has been designated.

8          THE COURT:  Are you offering expert

9    testimony or are you offering factual evidence?

10         MR. MENHART:  We're not offering expert

11   testimony.

12         THE COURT:  All right.

13         MR. MENHART:  But neither are they.

14         MR. GREENBERG:  Your Honor, this is -- as I

15   said, Your Honor, this is -- this is just -- this is

16   complete hearsay for him to go on to Google, download

17   the things he would like to have and put it in front of

18   the jury.  And we object to this for all sorts of --

19         THE COURT:  So you're not challenging the

20   authenticity of it.  You're just challenging the fact

21   that he did it?

22         MR. GREENBERG:  I'm also challenging the

23   authenticity, because I don't know if he modified this.

24   What -- when we --

25         THE COURT:  All right.  I'll tell you what,

1  as I said earlier, I'll let you cross-examine.

2  Objection overruled.  Go ahead.

3              MR. MENHART:  Thank you, Your Honor.

4              Your Honor, we would like to formally have

5  this Exhibit No. 13 admitted into evidence.

6              THE COURT:  All right.  Give me a little bit

7  of background when he did this and what it reflects.

8  BY MR. MENHART:

9      Q.  Mr. Hately, please tell me a little bit about

10  when this was created and explain to me what the

11  information represents in your personal point of view?

12     A.  Sure.  So, the -- it's kind of divided in half.

13  The left-hand side is the same screen shot of the

14  security -- the recently used devices.  So it's the same

15  screen shot showing Ms. Torrenzano's iPhone, the same IP

16  address that's in the previous activity logs.

17             And then on the right-hand side, you know, it

18  shows what my public IP address is, which also matches

19  what the Google account activity information has at the

20  bottom of it which we'd -- which we talked about before.

21             So, it's kind of showing the comparison between

22  what mine is and then the iPhone that changed the

23  password.

24     Q.  Thank you, again.

25             MR. MENHART:  Your Honor, again we would

1  offer Exhibit 13 into evidence.

2            THE COURT:  Received over objection.

3            MR. MENHART:  Okay, we'd like to now display

4  this to the jury.

5            THE COURT:  All right.

6            MR. MENHART:  And we'd get that pulled up

7  for the jury right now.  All right.

8  BY MR. MENHART:

9    Q.  So, Mr. Hately, again now the jury can see the

10  document.  Please explain and point out the specific

11  portions you were just discussing a moment ago.

12    A.  Sure.  So, this is the same 108 IP address that

13  was in my Google account activity information.  At the

14  bottom where it says this is what your IP address is.

15            And then this is also -- it's the screen shot of

16  Ms. Torrenzano's iPhone that if you scroll down just a

17  little bit, also shows the IP address here, the

18  16617031201, so it matches exactly what's in my Google

19  account information for the IP addresses that's in there

20  connected to my e-mail.

21    Q.  What do the differences between the IP addresses

22  mean to you?

23    A.  The difference here is that one is -- what

24  belongs to me when I'm at home on my laptop which is

25  where I took this.  And I -- it wouldn't have -- I mean,

1   I wouldn't have this 166171 if I had the 108.44 because

2   you can't have two IP addresses.

3               MR. GREENBERG:  Your Honor, I object to

4   that.  I don't know if he can have two or not.

5               THE COURT:  Sustained.

6   BY MR. MENHART:

7     Q.  Mr. Hately, how -- why did you just testify that

8   one device can't have two IP addresses?

9               MR. GREENBERG:  Your Honor, I object.  It

10  was sustained.

11              THE COURT:  Sustained.

12  BY MR. MENHART:

13    Q.  Referring to Exhibit 14, please --

14    A.  Okay.

15    Q.  -- do you recognize this document, Mr. Hately?

16    A.  I do.  Yes, this is a screen shot from my

17  cellphone, from my Samsung phone, the android one that

18  shows on -- this is the e-mail I got from when Ms.

19  Torrenzano went into my account in November and reset

20  the password for it.

21              MR. GREENBERG:  Your Honor, I object to him

22  adding additional "went into the account".  He is

23  describing nothing about Nicole Torrenzano.  So, if he's

24  describing this document --

25              THE COURT:  Did Ms. Torrenzano testify that

1  she reset his password, Mr. Greenberg?  Did she testify

2  to that earlier?

3           MR. GREENBERG:  She did say on one date.

4           THE COURT:  Okay, thank you.  Thank you very

5  much.  I thought that's what she said.

6           Next question.

7           MR. MENHART:  Your Honor, would --

8  BY MR. MENHART:

9     Q.  What was the date -- strike that.  Did you

10  personally take this screen shot?

11    A.  I did.  Right on the phone.

12    Q.  What was the date of the screen shot?

13    A.  November 3rd.

14           MR. MENHART:  Your Honor, we would ask that

15  Exhibit Number 14 be admitted into evidence.

16           THE COURT:  Received.

17  BY MR. MENHART:

18    Q.  Please refer to Exhibit No. 15.  Do you recognize

19  this document, Mr. Hately?

20    A.  Yes, I do.

21    Q.  Can you please tell me what this represents.

22    A.  This is a history of connections into my Facebook

23  account.  It shows the date, the time, the IP address,

24  what kind of browser, details like that, this is the

25  security information page.

P. Hately - Direct                                    13

1      Q.   And --

2               MR. GREENBERG:  Your Honor, so, okay, Your

3      Honor, again, I don't know what this means.  So, there's

4      nothing --

5               THE COURT:  I'm going to give you a chance

6      to cross-examine.

7               MR. GREENBERG:  But, Your Honor --

8               THE COURT:  Let me finish.  Let me finish.

9               MR. GREENBERG:  Sure.

10               THE COURT:  I understand your objection.

11      This is a machine-produced document, and you are

12      entitled to cross-examine him about it.  If you are able

13      to establish that it's reliable, that's fine.

14               I don't know how you would authenticate

15      something from a computer in any event, other than to

16      type in the machine, here is what the machine produced.

17      You can certainly cross-examine him about that.

18               MR. GREENBERG:  Your Honor, but if I could

19      comment on that.  I agree with you that I understand

20      that this is a machine produced.  But, what the

21      information, whether this is what Facebook provides,

22      what it means, whether that can be altered or him

23      explaining what Facebook does or why, he doesn't have

24      any firsthand knowledge of that.

25               The jury can look at this.  But -- the fact

1    that it's a spit out of a machine doesn't mean we know

2    what the parameters were, why it was being provided, why

3    Facebook --

4              THE COURT:  You can certainly ask him all

5    those questions, Mr. Greenberg.

6              MR. GREENBERG:  Yes, sir.

7              MR. MENHART:  Your Honor, we would ask that

8    Exhibit No. 15 be entered into evidence.

9              THE COURT:  Well, tell me about their

10   admissibility, Mr. Menhart.

11             MR. MENHART:  Excuse me.

12             THE COURT:  What is your theory of

13   admissibility for this document?

14             MR. MENHART:  The theory of admissibility is

15   that Mr. Hately went into his own personal Facebook

16   account.  He utilized a service provided by Facebook,

17   which is in the designated security tab on the left-hand

18   side of the document.  And Mr. Hately will testify as to

19   what some of the security logs mean to him.

20             THE COURT:  Come to sidebar, please.

21             (Thereupon, the following side-bar

22   conference was had.)

23             THE COURT:  Mr. Menhart, is this from

24   Facebook?

25             MR. MENHART:  Yes, sir.

P. Hately - Direct                                            15

1                THE COURT:  Is this case now about Facebook,
2    or is it about e-mail?
3                MR. MENHART:  Well, Facebook is, by the
4    definition of Stored Communication Act, it is an
5    electronic communications service provider.
6                Now, whether it is or not, even if we set
7    that aside, what it does demonstrate that -- it does
8    demonstrate and he'll testify to this that there are
9    specific instances in his Facebook security log that are
10   consistent with other instances of the unauthorized
11   accesses of his e-mail accounts.  So, we believe it's
12   relevant on both of those grounds.
13               THE COURT:  All right.  And, how will he
14   show that they were unauthorized access on this
15   document?
16               MR. MENHART:  Sure, no problem.  And it's a
17   somewhat voluminous document, but by the time you scroll
18   down quite a bit, and we will do that, you'll be able to
19   see specific logs that were provided by Facebook which
20   demonstrate some of the IP addresses and how the
21   password was reset on that account at the same time that
22   he previously testified the password had been reset on
23   the e-mail accounts.
24               THE COURT:  All right.  And, are the IP
25   addresses similar to those shown earlier?

1           MR. MENHART:  Yes.

2           THE COURT:  Okay.  Your objection?

3           MR. GREENBERG:  Your Honor, first of all,

4    I'm not sure that they're the same IP addresses.

5           Secondly, I would point out this goes

6    through a date that's -- into May of 2016, well outside

7    the realm of what we're -- what was litigated today.

8           I don't agree that the Facebook account is a

9    facility of a stored communication and that that wasn't

10   part of -- in the summary judgment motion as we narrowed

11   the issues between the parties.

12          We've talked about an e-mail account and her

13   AT&T.  I know that she admitted to that.  She did not

14   admit to Facebook.  In fact, she specifically denied it.

15          There was no information to establish a

16   Facebook.  And then to explain what this means, I think

17   we need someone from Facebook.  I don't know what the

18   expert would say.  Let me tell you what this means?

19   This means this is what happened from Facebook?  Where

20   is --

21          THE COURT:  Right here, it says "password

22   change".  I mean, you don't need an expert to read that

23   "password change" on that document.  And your question

24   is whether the IP address matches any device held by

25   Ms. Torrenzano or Dr. Watts?

1           MR. GREENBERG:  That's one of the issues,

2   and for him to explain what all that means.

3           THE COURT:  All right.

4           MR. GREENBERG:  I think --

5           MR. MENHART:  Our response is they can

6   cross-examine this.

7           THE COURT:  Well, do we need to have all

8   these other things?  You only referred to 2 or 3 items.

9           MR. MENHART:  Well, we wanted to -- we

10  wanted to produce the entire document.  So, you know,

11  and that's the reason we've done this.  But we're not

12  going to go through every single log.  I can represent

13  that to you right now.

14          THE COURT:  Well, why don't we do this.  Why

15  don't you go directly to the ones you want to focus on.

16          MR. MENHART:  Okay.

17          THE COURT:  I'm going to admit the document.

18  I think this is a machine-generated document.  It has

19  conditional reliability, and I'll admit it under the --

20  not exactly a business record, is it?

21          MR. MENHART:  Well, we would disagree with

22  that, Your Honor, because they are records that were

23  created by a Facebook computer as a regular course of

24  business.  And you can see each and every instance --

25          MR. GREENBERG:  How do you know that?

 1              MR. MENHART:  Well, I'll tell you --

 2              THE COURT:  Only one person can talk at a

 3    time, and address your comments to me.

 4              MR. MENHART:  And you can see that each and

 5    every one of these records is being created on the date

 6    and time that the event is happening on the machine.

 7              THE COURT:  All right.  I'll admit it as a

 8    machine-generated, computer-generated report and allow

 9    defendant to cross-examine, and your objections are

10    preserved.

11              Thank you.

12              MR. MENHART:  Thank you.

13              MR. GREENBERG:  Your Honor, is he going to

14    be limited to these three pages or --

15              THE COURT:  I've asked him to focus on those

16    pages, but he's going to offer the whole thing.  And if

17    you -- because he wants the jury to see that.  This is

18    not just 2 or 3 pages.  It's the whole thing.  All

19    right.

20              MR. MENHART:  I'll represent right now we're

21    only going to talk about these specific instances.

22              THE COURT:  That's what I want you to do.

23    Okay.

24              (THEREUPON, side-bar conference was

25    concluded.)

1              THE COURT:  You may proceed.

2              MR. MENHART:  Your Honor, we would ask that

3    Exhibit No. 15 be admitted into evidence.

4              THE COURT:  I just admitted it at sidebar.

5    It's admitted in evidence.

6              MR. MENHART:  Thank you.

7    BY MR. MENHART:

8       Q.  Mr. Hately, for purposes of this document, we're

9    going to first display it to the jury, just the top

10   page.  And then I want to keep that top page shown just

11   to sort of -- for you to talk about it and then we're

12   going to go to a specific page, okay.  So, we'll go

13   ahead and display the top page, please.

14          Okay.  So, the jury's now seeing this.  Explain

15   what this document is.

16      A.  This is the security of my Facebook account.  So

17   it shows like all of the devices and the sessions that

18   were created and connected to my account.  It shows the

19   IP address for each one.  It shows the date that it was

20   created on each one.  And then it will show you, also --

21   if I can get this thing -- what kind of device was

22   there.  So, there's my Samsung right there and here it

23   is again.

24      Q.  Okay, thank you.  Now what we're going to do is

25   we're going to keep that, just that one page displayed

1   for now.

2       A.   Okay.

3       Q.   But I'd like you to look at the printed version

4   of the document.  And, I want to scroll to -- what's

5   been bates numbered at 2170, I believe.  I realize the

6   pass -- the bates numbers are a little bit out of whack

7   here, but there is a specific page that has a log in at

8   the bottom and password change from -- second from the

9   bottom.

10      A.   Uh-huh.

11      Q.   Do you see that one?

12      A.   I do see it, yes.

13      Q.   Okay.  So, what we're going to do is we're going

14  to take this page off of the display, and then we're

15  going to scroll to that page.

16      A.   Okay.

17      Q.   And then, we're going to display that page.

18      A.   Okay.

19      Q.   Okay, Mr. Hately, we're going to put this up for

20  the jury.  Now that it's up, let's work from the bottom

21  of the page --

22      A.   Sure.

23      Q.   -- up as you explained to the jury what this

24  document is demonstrating.

25      A.   So, it's got the same information, just kind of

1  broken into different events.  So, here's a log-in, and

2  then here is where, um, Ms. Torrenzano had reset the

3  password.

4          MR. GREENBERG:  Your Honor, I object to

5  that.  That's not what this document says.  It --

6          THE COURT:  Its says password change.  It

7  doesn't say Ms. Torrenzano changed the password.

8          THE WITNESS:  I understand, Your Honor.

9          THE COURT:  Objection sustained.

10  BY MR. MENHART:

11      Q.  So, you were saying it says password change?

12      A.  So it says password changed and then it shows the

13  IP address and then, again, an iPhone right there.  Here

14  is where it was enrolled into the account.  So it

15  connected to the account, same iPhone, same IP address,

16  all the way up here and here -- and I keep messing that

17  up.

18          So, the same IP address here, here, here.  And

19  then you can see where essentially, since I didn't have

20  the right password any more on my phone, I was kicked

21  out but my phone tried to get back in.  You can see

22  where it starts to try right here, the IP address and

23  the time.  So 12:35 in the morning.

24          But, because I didn't have the right password

25  because I didn't -- because it was changed, I didn't

1  have it on my phone any more.  It kept kicking me out.

2  It kept denying me.

3           MR. GREENBERG:  Your Honor, again, is this

4  something the document shows "kicked out", or is he

5  describing more as part of the embellishment?

6           THE COURT:  What's your objection?

7           MR. GREENBERG:  It's not part of the

8  document.

9           THE COURT:  All right, sustained.

10 BY MR. MENHART:

11    Q.  Mr. Hately, was -- was your phone able to access

12 your Facebook account on or around November 3rd at

13 12:35?

14    A.  No.

15           MR. GREENBERG:  Your Honor, I -- is he

16 basing that based on the documents?

17           MR. MENHART:  It was --

18           THE COURT:  I thought he just testified to

19 it.

20           MR. MENHART:  It was an independent

21 question.  It was not referring to the document at all.

22           THE COURT:  Objection overruled.

23 BY MR. MENHART:

24    Q.  As you scroll up from the document effectively --

25    A.  Uh-huh.

P. Hately - Direct                                                    23

1     Q.   -- strike that.

2          Please refer now to Exhibit No. 16.  Do you

3     recognize this document, Mr. Hately?

4     A.   Yes, I do.  These are --

5               THE COURT:  Just a second.  What is it?

6               THE WITNESS:  These are sticky notes with --

7               THE COURT:  These are your sticky notes?

8               THE WITNESS:  These are my sticky notes.

9     That's my handwriting.

10              THE COURT:  All right.

11              THE WITNESS:  And this is kind of -- I use

12    these for reference when I was kind of also building

13    that white board.  So it's got the same in timestamps,

14    but it's more of like who was doing what.

15              And then, it kind of -- it also has like,

16    you know, the iPhone IP address, my Windows IP address,

17    or my laptop IP address, my mobile IP addresses which

18    are for my cellphone, and then kind of also when these

19    first accessed -- when like the Mac first accessed the

20    account.

21              MR. MENHART:  Your Honor, we would move

22    Exhibit 16 into evidence.

23              MR. GREENBERG:  Your Honor --

24              THE COURT:  I'm going to withhold on this

25    one.  I sustain the objection to this one.  Next

1   question.

2             I'm withholding because this is just a

3   summary of something that he wrote.  And, this is just

4   his summary of what he wrote.

5             Next question.

6   BY MR. MENHART:

7      Q.   When did you -- when did you create this

8   document?

9      A.   After I had gotten all of the information from

10  the Google account, security information, the IP address

11  logs which we talked about earlier, that's when I came

12  back and kind of wrote this.  This is like a kind of

13  high level view of the detail that I got from those

14  documents.

15     Q.   Please refer to document number 17, Plaintiff's

16  Exhibit 17.

17     A.   Uh-huh.

18     Q.   Can you please identify this document?

19     A.   The front first page here, or the entire thing?

20     Q.   Yes, well, start with the first page, please.

21     A.   Sure.  So, this is another screen -- account

22  information download that I got from my e-mail account.

23  It shows the same thing, the access type, you know,

24  whether it was a mobile device or whether it was a

25  computer and then the IP address, and then the timestamp

1   on the right-hand side on the column.  And again it

2   shows like the 108.44 IP address which it says this

3   computer is using address IP 108.44 which is mine.

4       Q.   What about the second page?

5       A.   So, this is the -- this is the time after it.

6   So, I took two -- because you can only see like the last

7   ten account -- account activity timestamp.

8            So, I waited a little bit and I took another

9   screen shot of the next ten.  And this goes actually

10  from 11:30 a.m. on the 13th, to 11 -- excuse me, 3:54 on

11  the 13th.

12           And this has the same thing.  It's the account --

13  account activity page.  It's got the access type,

14  whether it was a browser or a computer or a mobile

15  device.  Then it has the IP addresses listed and mine is

16  in there now because I'm starting to get back into these

17  accounts and then the date and timestamp on the right.

18      Q.   Tell me about the third page.

19      A.   Sure.  This is a lookup for the IP addresses that

20  were listed.  That's the screen shot of what -- print

21  off of what you would get when you go search for on the

22  Internet what the IP address is or whatever IP address

23  you put in there.

24      Q.   Is this a screen shot you created?  Let me strike

25  that question.

1        Which website did you go to?

2   A.   When I used mine, I went to infosniper.net.

3   Q.   And, once you went there, what did you do?

4   A.   There is a search bar where you can put in the IP

5   address and I put in the numbers and clicked search.

6   And it gave me like a geo-location of that IP address.

7   It also showed me the provider.  It also showed me kind

8   of who it belongs to.

9        So, it gives you a little more detail, latitude,

10  longitude, and that kind of stuff, but --

11            THE COURT:  Where does it say who it belongs

12  to?  I see a handwritten notation.  Where does it say

13  the name of the person who holds that account?

14            THE WITNESS:  That's on the infosniper.net,

15  Your Honor.

16            THE COURT:  A name is on here?  On 2280,

17  where is the name?

18            THE WITNESS:  This is -- this is who is --

19            THE COURT:  I'm asking where is the name

20  that you handwrote at the top of this?  Does that name

21  appear on this document?

22            THE WITNESS:  Can you say the question

23  again, Your Honor, I'm sorry.

24            THE COURT:  I'm looking at page 2280.

25            THE WITNESS:  Yes.

 1                 THE COURT:  At the top, there's a

 2    handwritten notation that you wrote, I suspect or

 3    someone wrote it.  I'm asking can you show me where that

 4    name appears on this page.

 5                 THE WITNESS:  It doesn't appear on this

 6    page.

 7                 THE COURT:  All right.  Next question.

 8    BY MR. MENHART:

 9        Q.  Mr. Hately, I wrote at the bottom -- do you see

10    the bottom URL I guess I'm referring to 2281 at this

11    point.  Do you see the URL that's down there?

12        A.  Yes, I do.

13        Q.  Do you recognize that URL?

14        A.  At the very, very bottom?

15        Q.  Yes.

16        A.  No.

17        Q.  I realize it's cut off a little bit.

18        A.  It looks like CG -- you want me to say that?

19    Cgcounter.com.

20                 MR. GREENBERG:  He asked did you recognize

21    it and he said no.

22                 THE COURT:  Asked and answered.  Objection

23    sustained.

24    BY MR. MENHART:

25        Q.  Are there other who-is styles of research tools

P. Hately - Direct                                                28

1   available online?

2      A.   Right, this is just a tool to look up IP

3   addresses.  The one I use is, yeah, the infosniper.net.

4            MR. GREENBERG:  Your Honor, objection.  Is

5   he testifying now as an expert?

6            THE COURT:  Sustained.

7   BY MR. MENHART:

8      Q.   Referring to page 2282, do you recognize that

9   Mr. Hately?

10     A.   I do see it, yes.

11     Q.   Okay.  Tell me what this document represents.

12     A.   This is similar to the one before.  It's just got

13  another IP address in for the search bar.

14     Q.   And what is that IP address?

15     A.   It's 166.170.31.201.

16     Q.   Were you aware of that IP address?

17     A.   I think I wrote it.

18            MR. GREENBERG:  Your Honor, I don't -- are

19  you aware?  Did he look it up and know who it is?  I

20  don't know --

21            THE COURT:  Sustained.

22  BY MR. MENHART:

23     Q.   All right.  Let's move to Exhibit 18.  Do you see

24  that, Mr. Hately?

25     A.   I do.

1    Q.   Can you please tell me what this document

2    represents.

3    A.   This is a screen shot from my cellphone of the

4    notifications for my Facebook account.

5    Q.   You took this screen shot?

6    A.   I did, yes.

7    Q.   When did you take this screen shot?

8    A.   I got a notification on my phone that said that

9    you know, someone was trying to access my account, you

10   know, check your notifications.  So I came in and

11   checked these and this is what I saw.  You know,

12   these -- it says unrecognized device recently attempted

13   to access your account.  Let us know if it was you.

14   Q.   Thank you.

15            MR. MENHART:  Your Honor, we would offer

16   Exhibit No. 18 into evidence.

17            MR. GREENBERG:  Your Honor, object, on the

18   grounds of authenticity and hearsay.  But I don't think

19   it's tied to Ms. Torrenzano and just --

20            THE REPORTER:  I'm sorry.

21            MR. GREENBERG:  I'm sorry.  We agree that it

22   reflects -- this is sort of admitted in the prior

23   exhibit the Judge allowed.  It's just cumulative.

24            THE COURT:  All right.  Objection overruled.

25   18 will be received.

1   BY MR. MENHART:

2       Q.   Okay.  We're going to go ahead and put this up on

3   the screen for the jury --

4       A.   Sure.

5       Q.   -- Mr. Hately.  So, I realize you just laid a

6   foundation, but explain to the jury what this is.

7       A.   This is the screen shot from my phone, the time

8   it's up here, 12:36 a.m.  And then here it shows that,

9   you know, an unrecognized device tried to access your

10  account.  And that is the same time when I looked at my

11  security logs for the Facebook account which was here

12  earlier.  That shows when the password was changed.

13      Q.   Referring to the second page.

14      A.   Uh-huh.

15      Q.   -- this -- please explain to the jury what this

16  is.

17      A.   So, I was going through, and this is another

18  screen shot from my phone, um, that showed that, um, you

19  know, log-in near Winchester, Virginia, United States

20  from mobile Safari on IOS8 today at 1:30 a.m.  And, it's

21  just notifying me that this isn't a device that we

22  recognize.  It's just kind of informative, telling me

23  like what's going on because I don't have an iPhone.

24      Q.   And then the third page of this document, we'll

25  just display to the jury, and I think we'll move on.

1    Okay, please refer to Exhibit Number 19.

2        A.   Okay.

3        Q.   Do you recognize this document?

4        A.   Yes, I do.

5        Q.   Please tell me what it is.

6        A.   Okay.  So, this is -- a screen shot from

7    November 3rd, um, or the November 3rd incident from my

8    laptop, um.  And it's again, in the recently used

9    devices page of my Google account.  Um, it shows windows

10   machine and then it says like current device which is my

11   laptop, and then it has, you know, my Samsung Note 4.

12   And then it has another laptop, another Windows device

13   in there, um, that says it was connected at -- on

14   November 3rd at 12:53 a.m..

15            MR. MENHART:  Your Honor, we would move

16   Exhibit Number 19 into evidence.

17            THE COURT:  Received.

18   BY MR. MENHART:

19       Q.   We're going to display it for the jury.

20       A.   Okay.

21       Q.   And again, please, make sure that the jury

22   understands what the document is.

23       A.   Can I go ahead?

24       Q.   Yes.

25       A.   So, this is again, the same recently used devices

1   page, that shows where you know, I took the screen shot

2   from this device here, the first one at the top.  I

3   can't draw on there.  And then the next one down, it

4   says Samsung Galaxy Note 4 which is my cellphone.  And

5   the other device, which doesn't belong to me is a

6   Windows computer.  And it says it was connected

7   November 3rd, at 12:53 a.m.  And then it gives you the

8   locations, Winchester, Virginia.

9        Q.   Do you know anyone in Winchester, Virginia?

10       A.   I know Ms. Torrenzano worked -- lives in

11  Winchester, Virginia.

12       Q.   Let's do Exhibit No. 20.  We will take the one

13  off the screen and we'll ask you, Mr. Hately, to refer

14  to Exhibit No. 20.

15            Briefly describe what is happening here.

16       A.   Okay.  So, this is again another screen shot from

17  my laptop.  It's under the recently used devices page of

18  my account.  It shows kind of an expanded details of you

19  know, where it says Windows current device and then they

20  kind of expanded that down so you could see the name.

21  It's got Ironhide on there as the name, the browser, the

22  locations I used at that.

23            And the Windows device, which is not mine, shows

24  when it was -- you know, last synced at 8:21 p.m., and

25  then the browser it was using, the location it was used

1  from which is Winchester, Virginia.  And then the two at

2  the bottom, it still got my Note 4 on there, my Samsung

3  phone.  And then it still has the iPhone down there as

4  having connected October 13th -- the last connection was

5  October 13th at 3 o'clock in the afternoon.  It holds on

6  to that for 30 days.

7          MR. MENHART:  Your Honor, we would move

8  Exhibit No. 20 into evidence.

9          MR. GREENBERG:  Your Honor, I don't object

10 to that exhibit.

11         THE COURT:  Exhibit 20 will be received.

12 BY MR. MENHART:

13   Q.  Okay.  Let's again display for the jury

14 relatively quickly.

15   A.  So, again, the -- it's from the recently used

16 devices page, shows my current device.  There's the name

17 of it, um, the locations I used it from, the browser

18 type, and then the other Windows device here.  Um, it

19 shows where it was last synced at 8:21 p.m., the browser

20 it was using, and then the location it was used from.

21 And these are the two.  That's my phone, and that's the

22 iPhone.

23         Um, then this is -- you know, this is after I got

24 the notification that -- get that off there -- that my

25 password was reset for this account here at 8:15 and

1    then this device connected at 8:21 p.m.

2        Q.   Thank you.  Please refer to Exhibit No. 21.

3    We'll go ahead and take that prior one off the screen

4    and have you refer to the paper version of 21.  Can you

5    just briefly describe what this is.

6        A.   Sure.  So, this is a screen shot from a laptop

7    where I've got the left-hand side has the browser page

8    of the recent security events from my account and the

9    right-hand side shows the -- recent activity log, the

10   same as the browser, the IP address, the date and time.

11        On the left-hand side, the recent security

12   events, it shows me that the event was a changed

13   password.  It logged it at yesterday at 8:31 p.m., which

14   this was taken on November 3rd, so it was the night of

15   November 2nd at 8:30 p.m.

16        Q.   And you took this screen shot?

17        A.   And I took the screen shot from my laptop.

18             MR. MENHART:  Your Honor, we'd move that

19   this be admitted into evidence as Exhibit No. 21.

20             MR. GREENBERG:  Your Honor, I'm going to

21   object to this one.  It's -- on the left side of this

22   looks like Mr. Hately's telephone number and his own IP

23   address.  I don't see how this is tied up to the other

24   events.  I know Ms. Torrenzano says in October she

25   looked at the e-mail, but this doesn't have anything to

1   do with that.

2          MR. MENHART:  Your Honor, our response to

3   that is that the witness just testified as to the

4   authenticity and that the information is relevant to the

5   jury.

6          THE COURT:  Whose telephone number is that?

7   Whose telephone phone number is that?

8          THE WITNESS:  That's mine, Your Honor,

9   because I added the telephone number to my account.  So

10  it's an event.  So, it's just displayed there below the

11  password change.

12         THE COURT:  All right.  Objection overruled.

13  The document will be received.

14         MR. MENHART:  We'll go ahead and display it

15  on the board.

16         THE COURT:  21.

17  BY MR. MENHART:

18     Q.  Okay.  And, again, now, you just did this, please

19  explain to the jury.

20     A.  So, again, recent security events page shows when

21  the password was changed the night before.  And that's

22  what we're talking about.  I added my phone to my

23  account.

24         And then this is the same over here.  The recent

25  activity which shows the browser, the IP address, and

1    the date and time stamped.  And then at the bottom of

2    that page, if you scroll down just a little bit --

3        Q.   I think that's all we have.

4        A.   Okay.  Okay.  So, then these IP addresses here,

5    192, right here, these ones are the ones that also

6    showed up as having accessed my Facebook account.

7        Q.   Did you change your password on the date

8    displayed in this document?

9        A.   No, I did not change my password here.

10       Q.   Please refer to Exhibit No. 22.  Can you briefly

11   describe what's going on in this case --

12       A.   Sure.

13       Q.   -- in this document?

14       A.   So, the -- in the previous exhibit on the

15   right-hand side was the recent account activity

16   information, but the bottom was cut off.  So this is

17   just the full-page version of it.  So you can see all

18   the way down to the bottom.

19            Also it shows, again, you know, activity on the

20   account, browser type, location, date and time, shows my

21   IP address at the bottom.

22       Q.   Please go to the second page.  I believe you

23   previously testified about this, but can you please

24   explain what is happening in this.

25       A.   So, this is a screen shot from infosniper.net.

1    So when I put in the 192.77.126.50 IP address, it gave

2    me the geo-location, the provider, the host name, time

3    zone, city, state.

4              MR. GREENBERG:  Your Honor, I'm going to

5    object to this on this ground.  There is no scientific

6    evidence as to the geo-zone, and what he is now

7    testifying this document purports to indicate.  I

8    understand you let him with the Facebook as a business

9    record.  But now he's explaining the geo-zones and we

10   can't verify it for truth and accuracy.

11             MR. MENHART:  Your Honor, our response to

12   that is that the witness will testify that these

13   services are readily available on the Internet and that

14   they can be accessed by any member of the public.  And

15   that they are -- well, my suspicion is that he will

16   testify in his experience, they are reliable.

17             THE COURT:  So, if it's on the Internet, it

18   must be true; is that right?

19             MR. MENHART:  I'm sorry.

20             THE COURT:  If it's on the Internet, it must

21   be true?

22             MR. MENHART:  Your Honor, that's not

23   entirely what I would say.  But, I think that in this

24   particular instance, the individual would be able to

25   testify as to this very specific part of the Internet

1   and his experience with it.

2                THE COURT:  All right.  I'm going to sustain

3   the objection to that.  There may be pages in here that

4   might be admissible, but you'll have to show me.

5                MR. MENHART:  Okay.

6   BY MR. MENHART:

7   Q.   Mr. Hately, let's concentrate on -- Your Honor,

8   just to clarify, your ruling was as to the infosniper

9   screen shots?

10               THE COURT:  I'm looking at all these

11  documents -- the exhibit number you're referring to is

12  Exhibit 22?

13               MR. MENHART:  Yes.

14               THE COURT:  All right.  And the pages he was

15  just referring to have the match, right, page 1-1.

16               MR. MENHART:  Yeah.  So it says basically,

17  page 1-1.  At the bottom left-hand portion, it says

18  infosniper.net.

19               THE COURT:  All right.  I'll sustain the

20  objection to his description of what they are.  These

21  documents show whatever they show.  Okay.

22               MR. MENHART:  Okay.

23  BY MR. MENHART:

24  Q.   So --

25               THE COURT:  He can tell us about geo

1   positioning and all those things.

2   BY MR. MENHART:

3       Q.   So, Mr. Hately, the Court has ruled we can't put

4   this into evidence.  So I'm going to ask you to tell me

5   your experience with this particular site and what it

6   means to you.

7               MR. GREENBERG:  Your Honor --

8               THE COURT:  Sustained.

9   BY MR. MENHART:

10      Q.   All right.  We're going to move to the fifth page

11  of this document.  Can you please tell me what this is?

12      A.   You said the fifth page, right?

13      Q.   Yes, I represent to you that it's the one with

14  Nicky Torrenzano's name on the top.

15      A.   Okay.  So, this is Ms. Torrenzano's security

16  account information from her Facebook.  So it's the same

17  as mine where it had like, you know, my picture, and

18  then the name and then the active sessions and all the

19  account activity.  But, it's just for Ms. Torrenzano.

20      Q.   How did you acquire this document?

21      A.   Through discovery in our custody proceeding --

22  or -- yeah, through discovery.

23      Q.   And that's a lawful procedure for this?

24               MR. GREENBERG:  Your Honor, I object.  He

25  can't respond to that.

 1          THE COURT:  He doesn't have to respond to

 2   that.  Sustained.

 3   BY MR. MENHART:

 4      Q.  Okay.

 5          THE COURT:  You got it through discovery.

 6   Next question.

 7   BY MR. MENHART:

 8      Q.  Looking about three pages beyond, you have a

 9   couple sticky tabs on there.

10      A.  Okay.

11      Q.  Can you please tell me what is being designated

12   here?

13      A.  Um, so, this is the same -- so, it's -- it shows

14   a log-in for Ms. Torrenzano's account from the exact

15   same IP address that was used to get in -- that was

16   logged in my account activity information.

17          MR. GREENBERG:  Your Honor, I object.  I

18   think -- I object to the document where it says

19   before --

20          THE COURT:  I'm sorry.  Speak clearly.

21          MR. GREENBERG:  Sorry.

22          THE COURT:  Speak clearly.

23          MR. GREENBERG:  Yes.  I object to him

24   explaining what this means in relation to the other

25   pieces of evidence.

1             If he wants to say what this evidence is, if

2   he says this is an IP address and over my objection to

3   the document itself, I understand that.  But for him to

4   opine, though, that this address and then what that

5   means is beyond what he should be allowed to testify to.

6             THE COURT:  Your response.

7             MR. MENHART:  Our response is that this is a

8   document that he lawfully acquired.  He had the right to

9   review it, and he took his personal knowledge in

10  identifying one IP address from one document to one IP

11  address to another document.  That's all completely

12  within his own personal spier of knowledge.

13            THE COURT:  All right.  The objection's

14  overruled.

15  BY MR. MENHART:

16    Q.  Okay.  So, then the next page, Mr. Hately --

17  Court's indulgence for one second.  All right.  So, the

18  next document has your name -- do you see the document

19  I'm referring to?  It has your name on the top?

20    A.  I do.  It does have my name.

21    Q.  So, tell me what this document is.

22    A.  So, this is just like the other account activity

23  information for my Facebook accounts, the security

24  events, the log-ins, when the password was changed, um,

25  you know, all that stuff.  But, it's just for -- for my

1   Facebook account.  And it was taken earlier than the

2   previous one.

3        Q.  Referring to the very last page of this document,

4   you have a sticky note.

5        A.  Right.

6        Q.  What's happening there?

7        A.  So, at the top it says password change.  And then

8   it says, Tuesday, the 3rd of November at 12:30 a.m. or

9   12:30 in the morning, from the IP address, the

10  192.77.126.8 which is the same one that got into my

11  e-mail account or that showed up in my e-mail account,

12  which is the same one that was Ms. Torrenzano's.

13              MR. MENHART:  Your Honor, to be clear, what

14  we're trying to do here, we're looking --

15              THE COURT:  I understand what you're trying

16  to do.

17              MR. MENHART:  I want -- I'm sorry to

18  interrupt.

19              THE COURT:  What is your request?

20              MR. MENHART:  The request is that we would

21  like to admit into evidence, and I'll show you, counsel,

22  we want to start with this page, counsel.  And we're

23  going to start with this page through the end which is

24  the one that has Ms. Torrenzano's name at the top and

25  that's all of this document that we're trying to admit.

1          MR. GREENBERG:  Your Honor, I understand

2    what Mr. Menhart is trying to say.  He'd like to redact

3    the exhibit to show two Facebook pages, and I've noted

4    my objection before.

5          MR. MENHART:  To clarify, it is not just two

6    pages.  It's the first the -- from the one with Ms.

7    Torrenzano's name on the top all the way to the end.

8          MR. GREENBERG:  I understood that's what you

9    wanted.

10          MR. MENHART:  Okay, fair enough.

11          THE COURT:  And, the other page with the tab

12    on it for Mr. Hately's account and his picture on the

13    front, you're offering those three things?

14          MR. MENHART:  Yes, that's right, his picture

15    of his kids and then because --

16          THE COURT:  Just the password change page

17    that's tabbed, 4-49?

18          MR. MENHART:  Yes, that's correct.  I

19    mean -- whatever Your Honor thinks is best, but we

20    submit that the -- all of this -- the quote, unquote

21    Facebook record in this particular case should be

22    properly admitted.

23          THE COURT:  I'll admit just the pages tabbed

24    that you all refer to and we can discuss this after the

25    break.  Thank you.

1        MR. MENHART:  Okay.  So, Your Honor, just to

2    be make sure I know what we can display to the jury,

3    you're saying only the tabbed pages, correct.

4        THE COURT:  The tab page and the page with

5    the photograph on it, I think those are the pages you're

6    trying to refer to, aren't you, that show what the

7    address was?

8        MR. MENHART:  And I just want to be careful

9    here because we would submit from the page that has Ms.

10   Torrenzano's name and her picture all the way to the end

11   of the existing Exhibit 21 as it appears in the trial

12   binder.

13       THE COURT:  Oh, I see what you're saying,

14   okay.  Let me just hand you this and you can tell me

15   back -- you all can look at this and tell me this is

16   what you're trying to offer into evidence and that way I

17   can be clear.

18           It's only being offered by defendant, not

19   the plaintiff.

20       MR. GREENBERG:  Your Honor, may I confer

21   with Mr. Menhart?

22       THE COURT:  Say again.

23       MR. GREENBERG:  May I speak directly --

24       THE COURT:  Sure, sure.

25           (Off the record discussion)

1            MR. MENHART:  Thank you.

2   BY MR. MENHART:

3     Q.   So, Your Honor, we will formally move to admit as

4   redacted Exhibit No. 21 -- 22, excuse me, the pages

5   which you just presented to counsel.

6            THE COURT:  All right.  Thank you very much.

7            MR. MENHART:  Thank you.

8            THE COURT:  They will be received over

9   objection.

10           MR. MENHART:  I appreciate the

11  clarification.  Okay.

12           Your Honor, we were trying to be very

13  careful for the jury.  I think we've done it.  We're

14  going to go ahead and display this document now to the

15  jury, the part that's been admitted.

16           THE COURT:  All right.

17  BY MR. MENHART:

18    Q.   Okay.  Mr. Hately, we had a lot of fun with

19  evidence, but now I'd like you to please testify as to

20  what this is, please.

21    A.   Okay, sure.  So, this is just like my security

22  information from my Facebook account.  It's for Ms.

23  Torrenzano's.  So, it shows like her picture, her name,

24  the account status, changes, like -- and then the

25  account activity which, I don't know if you can -- if

1   that's too small to see.  But it will show you -- there

2   we go, if we scroll down just a little bit, please.

3          So -- and then it will show you, you know, a date

4   and time, a location -- you know, IP address, and then

5   you know, what kind of device, iPhone, iPhone.

6          Le me get that off there.

7   Q.   And then referring to the -- there's a couple of

8   green tabs on the fourth page of this document that was

9   admitted.

10   A.   Okay.

11   Q.   Can you please tell the jury what those

12   represent.

13   A.   Sure.  So, if you scroll down just one -- there

14   you go right there.  That's the last one.

15          So, this showed that from on October 17th of

16   2015, from the same IP address that I was talking about

17   earlier, had logged into Ms. Torrenzano's account.

18          MR. GREENBERG:  Your Honor, I object to the

19   content of the evidence, because the IP addresses we see

20   don't match that on the first document.  So he can say

21   this IP logged in.  I can understand that.  That's what

22   he testified to.  But to compare to other points of

23   evidence, I think that would be for argument for the

24   jury to determine.

25          MR. MENHART:  Your Honor, our -- please let

1    us respond to that.  The counsel is misrepresenting the

2    document.  Because there is a specific IP address that

3    does match up.

4            THE COURT:  Well, I'll let the jury be the

5    judge of that.  I overruled the objection.

6    BY MR. MENHART:

7    Q.  I believe you were testifying about the tabs.

8    Please go ahead.

9    A.  Sure.  So, there's the 182.  And then if you

10   scroll up, there it says web session terminated, gives

11   the time, and the date, November 3rd at 12:27 a.m. from

12   that IP address.  And then the next log-in to her

13   account wasn't -- is the next one up and it wasn't until

14   like two days later.

15   Q.  So, looking at that third green tab --

16   A.  Okay.

17   Q.  -- what is that IP address?

18   A.  This one is 192.77.126.8.

19   Q.  And that's on Ms. Torrenzano's Facebook records?

20   A.  And that is on hers, yes.

21   Q.  Please refer to the very last page of this

22   exhibit.

23   A.  Okay.

24   Q.  What is that IP address?

25   A.  It's 192.77.126.8.  It's the same.

P. Hately - Direct                                              48

1    Q.   Is that the same IP address?

2    A.   Yes.

3    Q.   Let's refer to Exhibit 23.  Have you seen this

4    document before?

5    A.   Yes, I have.

6    Q.   What is this document?

7    A.   Um, this is a subpoena request for documents from

8    Winchester Medical Center.

9    Q.   Who issued this subpoena?

10   A.   I'm sorry.

11   Q.   Who issued this subpoena?

12   A.   You did.

13            MR. GREENBERG:  I don't think it's at all

14   relevant that he issued the subpoena for documents.

15            THE COURT:  Sustained.  I think what you're

16   trying to do is move 25, aren't you?

17            MR. MENHART:  I'm sorry, Your Honor.

18            THE COURT:  Aren't you trying to move

19   Plaintiff's 25?

20            MR. MENHART:  Well, we were moving -- well,

21   we wanted to -- we wanted to create a foundation for

22   number 25, yes, Your Honor.

23            THE COURT:  If you'd just go to 25, then we

24   can take it up.

25            MR. MENHART:  We're going to do that right

P. Hately - Direct                                              49

1   now.

2              Actually, we're going to go to 24 first.

3              THE COURT:  You don't need 24.  Go right to

4   25.

5              MR. MENHART:  I'm sorry, Your Honor.

6              THE COURT:  Go right to 25.

7              MR. MENHART:  Okay.

8              We're going to skip 24 and go right to 25,

9   Mr. Hately.  Okay.

10  BY MR. MENHART:

11      Q.  Do you recognize this document?

12      A.  Yes, I do.

13      Q.  What is this document?

14      A.  Um, it's -- well, at the top it says

15  certification of domestic records of regularly conducted

16  activity.  Then it's got pursuant to Federal Rules of

17  Evidence, and then a number.

18      Q.  What --

19              MR. GREENBERG:  Your Honor, I -- he's just

20  simply reading the certificate 90211.  I don't think

21  that's necessary.

22              THE COURT:  All right.

23              MR. MENHART:  We're comfortable withdrawing

24  the witness's testimony on the first page of this

25  document.  Let's move to the second page.  I think we

 1   can all agree on that.

 2       Q.   Okay.  What is this document?

 3       A.   This is an audit of web traffic for user account.

 4   Um, and, the user account that it was for was --

 5              MR. GREENBERG:  Your Honor, I think he needs

 6   to lay a foundation because I don't think he has

 7   anything to do with this document.  The screen shot,

 8   either the research on the Internet, I think it's from a

 9   different custodian of records entirely, and we're going

10   to go with this in a moment, 902, and I have an

11   objection to that.  But I think we should get to that

12   point.

13              THE COURT:  All right.  Let me ask the jury

14   to step out for a few minutes.  Let me take this matter

15   up with counsel.  Thank you.

16              (Jury excused at 11:02 a.m.)

17              THE COURT:  You can have a seat, Mr. Hately.

18   What's your objection, Mr. Greenberg?  I'm listening.

19              MR. GREENBERG:  The documents that the

20   plaintiff seeks to introduce at this time are documents

21   that are purportedly from Valley Health Medical Records.

22   They're documents that purportedly Valley Health Medical

23   Records held in their custody based on a software

24   program created by Cisco Corporation.  It has nothing to

25   do with Mr. Hately.  Mr. Hately had nothing to do with

1  it at all, except that his lawyer subpoenaed the

2  records.

3         The code allows, under certain

4  circumstances, for such records to come in and be

5  self-authenticating if they comply with certain

6  conditions of Federal 90211 which also involve 8036.

7         In particular, under the fourth paragraph of

8  this particular certification, it says the records were

9  one, and this says "created at the time of the

10 occurrence of the events set forth therein by a person

11 of knowledge of said event or shortly thereafter".  That

12 would be in compliant with 8036.

13        Or two, "created at the time of the

14 transmission of the information therein from a person

15 with knowledge of the information or shortly

16 thereafter".  That would also be compliant with 8036.

17        In the particular document, or three,

18 "received at the time of the occurrence of the event set

19 forth therein or shortly thereafter and

20 contemporaneously incorporated into company records.

21 That is not compliant with 8036.  That does not have --

22 8036 does not provide for introduction of evidence based

23 on that particular statement.  So the Court would have

24 to guess which one of the three apply.

25        I would also invite the Court to look at a

1  case that I have.  This case is from the Eastern

2  District of Virginia.  It was from District Court Judge

3  Payne, and the Judge said that for there be

4  trustworthiness, there should be some indicia in the

5  certification that the custodian of record has

6  sufficiently knowledge of what the information is that

7  they're actually recording.

8            Now, in this particular case, what I

9  understand, I submit to the Court, is that the document

10  as is submitted is a software product created by Cisco

11  Corporation.  And so basically, the idea is that the

12  custodian of records -- I don't know how they do it.

13  They don't talk about how they rely upon it.  They don't

14  talk about how they keep it.

15            There is no information whatsoever about

16  this document that would show its inherent

17  trustworthiness as far as coming from Valley Health

18  Hospital.

19            THE COURT:  Where do you think it came from?

20  What is your position on that?

21            MR. GREENBERG:  I don't mean that it came

22  from Valley Health.  You know, I misspoke.  It came from

23  there, but it wasn't originated, relied upon or that

24  they do anything to show its trustworthiness or actually

25  scientific why it's relevant.  This is not just --

P. Hately - Direct                                              53

1                THE COURT:  I'm sorry.

2                MR. GREENBERG:  Yes, sir.

3                THE COURT:  The issue of business records

4     has nothing to do with relevance.  Your challenging the

5     authenticity of the document?  What are you challenging?

6                MR. GREENBERG:  I am challenging the

7     authenticity of the document as they're trying to put it

8     under 90211.

9                THE COURT:  Okay.

10               MR. GREENBERG:  And to be very clear, I'm

11    also challenging that even the scientific reliability of

12    what the document may purport to indicate when there's

13    nobody in court that can explain why that information

14    would be correct on any level.

15               Usually the custodian of record would

16    provide some authentication, not only the records, but

17    the actual aspects of what they do so that we know it's

18    inherently credible information.  And that's what Judge

19    Payne found in the similar circumstance under 90211.

20               And I would also provide that to the Court's

21    opinion -- the Court's attention to take a look at why

22    we think that this is not -- this doesn't -- this

23    doesn't allow the plaintiff to bypass the otherwise

24    needed requirement to have a qualified witness testify

25    to the -- to the -- why these records should be

1    accepted.

2                 THE COURT:  All right.  I'm happy to have a

3    copy of your case.  Do you have a copy for opposing

4    counsel?

5                 MR. GREENBERG:  I hope that I do.

6                 THE COURT:  And if you'd point me to the

7    page you're referring to, that would be very helpful and

8    opposing counsel as well.

9                 MR. GREENBERG:  Your Honor, I know we made

10   several copies, but since I keep it -- can I show Mr.

11   Menhart?

12                THE COURT:  I want you to give him a copy of

13   it case so he can read it.

14                MR. GREENBERG:  I understand, Your Honor.

15   What I'm saying is Mr. Bradley had a hard time finding

16   that.  We made three copies.

17                THE COURT:  All right, take your time.

18                MR. GREENBERG:  Thank you, Judge.

19   Appreciate the time.

20                Your Honor, we have highlighted the one --

21   the sections that we rely upon.

22                THE COURT:  All right.

23                MR. GREENBERG:  Thank you.

24                MR. MENHART:  Your Honor, unfortunately, I'm

25   going to have to object to this case.  I'm getting an

1   unhighlighted copy, and this is the first time I've seen

2   it.  He could have filed a trial brief.  He didn't.

3            THE COURT:  I'm sorry.  I can't hear you

4   sitting down.  What did you say?

5            MR. MENHART:  Yes.  Let me state a couple

6   objections for the record.

7            First, this is the first I've seen it.  They

8   didn't file a trial brief; we did.  We filed a trial

9   brief, quite frankly, that has law contrary to this.  I

10  assume because I haven't been provided with the case so

11  far, so that is the -- that's the initial objection, I

12  guess.

13           THE COURT:  All right.  Well, my experience

14  has been in trial sometimes issues come up and lawyers

15  present cases, Mr. Menhart.

16           Do you have a copy for Mr. Menhart that is

17  highlighted, Mr. Greenberg?  If you don't you can give

18  him my highlighted copy.

19           MR. GREENBERG:  If I have a

20  highlighted copy, Your Honor?

21           THE COURT:  Yes, let him see what you're

22  referring to so he doesn't have to go hunting around in

23  the opinion for it.

24           MR. BRADLEY:  Your Honor, if I may be

25  excused just briefly?

1           THE COURT:  Sure, absolutely.  As long as it

2    leaves one lawyer in the courtroom.

3           Now, I don't have a copy of the opinion.

4           MR. GREENBERG:  I realize it, Your Honor.

5    I'm just waiting at the podium for when you --

6           THE COURT:  Okay.  Finish reading it.  Have

7    you read it?

8           MR. MENHART:  I read it.

9           THE COURT:  All right, fine.

10           MR. GREENBERG:  Your Honor, I also have a

11    copy that I've given to Mr. Menhart of the rule of --

12    the Rule of Evidence 902 that relies on 11, that relies

13    on the certification.  I have one more point that I'd

14    raise as well as to why it should not be admitted.

15           THE COURT:  Just one second, one second.

16           Have you had a chance to review it, Mr.

17    Menhart?

18           MR. MENHART:  Yes, I have, Your Honor.

19           THE COURT:  All right.  What's your

20    response?

21           MR. MENHART:  Your Honor, our response is

22    quite frankly relatively simple.  There is a clear

23    certification which was submitted by agreement with

24    opposing counsel that was before this Court last

25    Thursday.  And, this was specifically provided -- we

1   were produced with this document on two separate

2   occasions; first, with a letterhead of the attorney

3   representing this group, and then secondly we were

4   presented with a second document with the exact same

5   records, and it included a pretty formal-looking

6   certification of the domestic records of regularly

7   conducted activity.

8            And this certification meets the

9   requirements of every federal rule of evidence to a T,

10  each and every document -- excuse me.  Each and every

11  paragraph says indisputable, the declarant is a record

12  custodian or other qualified persons.

13           Number two, these are -- they specifically

14  referred to the records and then the bates numbers are

15  exactly what they placed on the records that they're

16  referring to.

17           They've explained that they are originals

18  and then they literally used the terms that you find in

19  the Federal Rules of Evidence in saying they were

20  created at the time.  They were created with the

21  trans -- you know, with the transmission.  And then they

22  were received at the proper time as well.

23           And then finally they stated the records

24  were kept in the course of regularly-conducted business

25  activity.  And the records were made within the regular

1    course of business activity.

2            So even on the face of this certification,

3    the document is appropriate.

4            Now, setting that aside for a second, just

5    look at the document.  It's very clear from the face of

6    the document that it has clear designations of business

7    records.  It has the Cisco loco at the top right-hand

8    corner.  It has the specific URL by which the record is

9    being pulled from.  It has copyright notices from Cisco.

10           THE COURT:  What do you mean by URL?  What

11   are you referring to?

12           MR. MENHART:  Sure, the uniform resource

13   locater, which would be the web address.  So I'm looking

14   just below the Cisco logo at the top right-hand part of

15   the page and it says SMA-2-Valley Health link.com.

16           So on the face of the document, it's very

17   clear that this is a Cisco report that is run on this

18   URL.  And then, you know, there's a variety of other

19   independent -- excuse me, variety of other indicia of

20   reliability.

21           For example, you can see the title web

22   tracking.  You can see the name of the -- the software

23   program.  It's called the content security management

24   appliance which is just above the words web tracking.

25           Then, beneath the words web tracking, it

 1    says search criteria, user, client, IP.  And they're
 2    specifically looking for the documents that were
 3    requested in that subpoena which we were about to
 4    present to the Court.
 5              So -- and then, sure enough, everything that
 6    you see in that header shows up in the report.  And each
 7    line of this report.  It has a date.  It has very
 8    specific computer-generated records.  And, again on two
 9    separate occasions in duplicate from this same party
10    with two different instances of reliability.
11              And so for those reasons, we believe that
12    this document should be admitted into evidence.
13              THE COURT:  All right.
14              MR. GREENBERG:  I believe Mr. Menhart
15    misspoke when he indicated it was by agreement of
16    counsel because there was no agreement whatsoever.  When
17    we --
18              THE COURT:  Absolutely no agreement.  I'm
19    clear on that.
20              MR. MENHART:  Your Honor -- I'm sorry.  Can
21    I briefly address that just to clarify the record.  It
22    was an agreement between myself and the third party
23    counsel, not Mr. --
24              THE COURT:  Yes, that had nothing to do with
25    Ms. Torrenzano's counsel.  It had nothing to do with

P. Hately - Direct                                        60

1   that.

2              MR. MENHART:  Just wanted to make sure it

3   was clear for the record.

4              MR. GREENBERG:  When we were in court last

5   Thursday --

6              THE COURT:  Well, just focus on what the

7   issue.  The issue here is --

8              MR. GREENBERG:  Well, the issue is this part

9   here.  Your Honor, it's not compliant.  I know that Mr.

10  Menhart at least it's clear to him, I suppose, because

11  he says it is, that this is Cisco that was run on this

12  particular SMA Valley Health link and what this all

13  means is clear to him when he runs the URLs and what the

14  request must have been.  It's not clear to me.  It's not

15  self evident to me.

16             Now, as far as the custodian of records are

17  concerned, they provided them Tuesday for the first

18  time, this 90211.  Not only is it not compliant with the

19  federal rules because it doesn't establish, according to

20  the Eastern District of Virginia, it's reliability that

21  the custodian knows how it was created and have anything

22  to do with the actual making of the record, this -- this

23  certificate is void on its face because it doesn't

24  comport with Section 806.

25             More importantly, so we even tried to

1   understand this better.  We received this on Thursday
2   for the first time, and since --
3           THE COURT:  Is this the first time you've
4   seen the records, Mr. Greenberg?
5           MR. GREENBERG:  No, the records were
6   produced, um, with 1,000 plus records in a batch of
7   discovery at one time, yes, that's true.
8           THE COURT:  Back in January or February,
9   right?
10          MR. GREENBERG:  I don't know when we
11  received it, Judge.  I don't know the answer to that.
12  And I'm not saying -- I wouldn't say it was the eve of
13  trial.  I would absolutely agree with that.
14          THE COURT:  So, it's not a surprise to you
15  that these records existed.  They were produced to you,
16  correct?
17          MR. GREENBERG:  Your Honor, what is not a
18  surprise --
19          THE COURT:  I want you to answer my
20  question.  These were produced during discovery, right?
21          MR. GREENBERG:  They were.
22          THE COURT:  Okay, go ahead.
23          MR. GREENBERG:  It's not about surprises.
24  It was about preparation, Your Honor, if you don't mind
25  me saying.  Because what we didn't do, though, is

1   there -- if you remember the only witness that was ever

2   called that was going to be was the lawyer, Mr. Baugher,

3   for these particular records.  So we didn't -- I mean,

4   there was no expert designations, so we didn't know

5   how -- quite frankly, didn't think they could get this

6   into evidence.  I mean, I could be wrong about that, but

7   the bottom line is, we didn't -- we didn't think this

8   record was coming into evidence.  We didn't believe that

9   they -- there was a foundation for them.  We didn't

10  brief they had the proper -- well, not even the proper,

11  they didn't have a witness.  We didn't know what the

12  witness would be.

13          And then when we did get the 902

14  certification, we tried to get a hold of Eric Lider

15  (phonetics) and it turned out he was on vacation from

16  Thursday through today.  We even tried to get his

17  cellphone over the weekend so we could understand as a

18  custodian, why this would be custodian records of Valley

19  Health Hospital.

20          So it seems to me it's just not appropriate

21  from the evidentiary perspective to take information

22  from a software program, download them to a hospital

23  that has nothing to do with their creation, knows

24  nothing about them, but they stick them in a drawer, I

25  guess.

1                And I'm not even sure about that, because
2    number three, part of the certification is not
3    compliant.  And then it makes its way into a federal
4    courtroom.
5                Now, Mr. Hately is going to sit here and
6    explain to the jury what all this must mean, besides the
7    fact that he's not an expert.  It's not compliant.
8                THE COURT:  So, your objection is twofold.
9    First is that in your view, the certification is
10   insufficient under the Federal Rules of Evidence.
11               MR. GREENBERG:  That's correct.
12               THE COURT:  And the second that this witness
13   should not be testifying on what the documents mean.
14               MR. GREENBERG:  That's correct.
15               THE COURT:  All right.  Thank you.
16               MR. GREENBERG:  Thank you, Judge.
17               THE COURT:  This matter is before the Court
18   on the defendant's objection to the admissibility of
19   documents contained in Plaintiff's Exhibit 25.  And it
20   is twofold.
21               First, the objection is whether the
22   certification of domestic records of regularly conducted
23   activity pursuant to Federal Rules of Evidence 90211 is
24   sufficient to meet the requirements of the rule.
25               And the case cited by defense counsel,

1    Infineon, I-N-F-I-N-E-O-N Technologies, AG, 348 F.Supp.

2    2d, 698, Eastern District of Virginia, Richmond Division

3    2004 from Judge Payne.

4                 In my view, having reviewed the

5    certification and the documents themselves, I find that

6    the objection will be overruled because I think the

7    certification of domestic records is sufficient to meet

8    the requirements of the rule demonstrate that this is a

9    business record.

10                I note that in looking at the actual

11   production of the contents security management appliance

12   web tracking of the end Torrenz, T-O-R-R-E-N-Z user, it

13   shows log-ins of various types on various dates.

14                And this is a computer generated report.

15   Now, maybe it's necessary to offer a person that can go

16   down inside of the code of a software to demonstrate how

17   record reports are generated, but I think that

18   authenticity has been shown sufficiently through the

19   statement of the litigation analyst Eric Lider, who is

20   the records custodian or qualified person who offered

21   the declaration.

22                And the document themselves are

23   authenticated because they demonstrate when the report

24   is made at the bottom.  It says March 30, 2016.  It also

25   has the Torrenz name at the top of it.  And it's SMA2

1  Valley Health link.com.  And it shows dates and times.
2  And this is a report that is machine generated.
3           I think this is more than sufficient for
4  purposes of authenticity.  And I think that the
5  certification is more than sufficient for admissibility.
6           The objection to paragraph 4-3 that defense
7  counsel makes that was not received at the time of the
8  occurrence of the event set forth or shortly thereafter
9  or contemporaneously incorporated in the company records
10 is not well taken because this computer generated report
11 reflects dates and times with precision.  And it
12 reflects actions captured by the computer.
13           So, for those reasons, the document will be
14 admitted.
15           As it relates to the question of whether or
16 not this witness can testify to what these documents
17 say, I will sustain the objection.  He can't proffer
18 that this document is independently admissible as a
19 business record, and I will leave it to the parties to,
20 in their arguments, I suspect, closing arguments, or
21 examination of witnesses to point out whatever pages
22 that they think are important for the jury to refer to.
23           So, to be clear, I'm overruling the
24 objection on the grounds just stated.
25           Thank you very much.  Let's take the morning

1    recess now for 15 minutes and come back and bring the
2    jury back.
3              Tell the jury we'll take our morning recess
4    for 15 minutes.  Thank you.
5              MR. HENDRICK:  Yes, sir.
6              (Court recessed at 11:25 a.m. and reconvened
7              at 11:42 a.m.)
8              THE COURT:  You can bring our jury out, Mr.
9    Hendrick.  Thank you.
10             MR. HENDRICK:  Yes, sir.
11             THE COURT:  Mr. Hately, you can come back to
12   the stand.
13             You may be seated.
14             All right, counsel, you may proceed.
15             MR. MENHART:  Your Honor, we would like to
16   display the document that was just entered into evidence
17   to the jury for a brief moment just so that the jury can
18   see it and then we'll move on with the testimony.
19             THE COURT:  All right.  Why don't you start
20   with the page after the certification.
21             MR. MENHART:  Okay.  So, let's start with
22   the page after the certification.
23             THE COURT:  Exhibit 25.
24             MR. MENHART:  Yes.
25             THE COURT:  Can you all see the document?

1   They can't see it.  The actual documents themselves will

2   be presented to the jury for deliberation, so you'll

3   have a chance to look at them in more detail.

4                  MR. MENHART:  Okay.  So, I think this

5   document has been seen by the jury, and so we're going

6   to go ahead and move on.

7                  THE COURT:  No, they haven't seen it.  They

8   can't see it from there.  The back row jurors can't see

9   it.

10                 MR. MENHART:  You mean the text?

11                 THE COURT:  Yes.

12                 MR. MENHART:  That is probably correct.

13  That is a very small text of document.  But for purposes

14  of the trial, let's go ahead and take that out right

15  now.  Take that off of the screen and then we'll

16  continue with the testimony.

17  BY MR. MENHART:

18     Q.  Mr. Hately, I'm now representing to you or excuse

19  me, I'm now directing you to Exhibit 26.  I'll represent

20  to you and the Court this is not a well-formatted

21  document.

22                 But, you recognize this document?

23     A.  Yes, I do.

24     Q.  What is this document?

25     A.  This is -- these are just all the e-mails that

1   were in my account at the time it was accessed on
2   October 13th.
3       Q.   And these were the best that you had retained in
4   your account?
5       A.   Right, these are messages in my account.  So,
6   it's two and from, the subject line, you know, the date.
7       Q.   And they were accessible to you at the time?
8       A.   Yes.
9       Q.   Were there electronic communications stored in
10  your Facebook account during the time of these breaches?
11             MR. GREENBERG:  Your Honor, I object to the
12  phrase -- that particular phrase.
13             THE COURT:  Sustained.
14  BY MR. MENHART:
15      Q.   Did you maintain any other accounts where you
16  maintained electronic messages?
17      A.   Yes, my Facebook account had messages in it.
18      Q.   Any others?
19      A.   My e-mail account.
20      Q.   Any others?
21      A.   Um, my LinkedIn account had messages in there as
22  well.
23      Q.   Why were these messages in your respective
24  accounts?
25      A.   Because they were sent to me.

 1    Q.  We'd like to move Exhibit No. 26 into evidence.

 2              THE COURT:  Received.

 3              MR. MENHART:  And we'll display it very

 4    briefly for the jury.

 5    BY MR. MENHART:

 6    Q.  Okay, Mr. Hately, let's go ahead and we'll move

 7    on with the testimony.  The jury will be able to review

 8    that in more detail later.

 9         What did you do after you became aware of the

10    breaches, the unauthorized accesses, I should say?

11    A.  Um, I -- I tried to find out, you know, what was

12    going on.  And then I reported it to the local police.

13    Q.  And, who did you report the incident --

14              THE COURT:  Excuse me.  Come to sidebar for

15    just a second.

16              (Thereupon, the following side-bar

17    conference was had.)

18              THE COURT:  Tell me what you're getting

19    ready to do.

20              MR. MENHART:  Sure.  The evidence we're

21    going to present here relates to investigations that the

22    Frederick County Sheriff's Office undertook in response

23    to his concerns about these breaches.

24              And the reason it's relevant for this case

25    is that we are going to have within that document

1   production from the sheriff's office records from

2   Comcast.  And Comcast has records of the breaches that

3   we alleged to have occurred between Ms. Torrenzano and

4   Dr. Watts on the phone with her and the evidence from

5   Comcast is identical to our allegations as to when Ms.

6   Torrenzano and Dr. Watts were on the phone together.

7   That's the purpose of this.

8               THE COURT:  I want to make sure I understand

9   what you're doing.  So first, you're trying to offer

10  evidence from the Commonwealth Attorney's Office --

11              MR. MENHART:  Correct.

12              THE COURT:  -- about investigations they

13  conducted, right?

14              MR. MENHART:  Yes.

15              THE COURT:  And they're not here?

16              MR. MENHART:  Well, let me clarify that.

17  The Commonwealth Attorney's Office and the sheriff's

18  office, right, were working in conjunction, so sort of

19  both had --

20              THE COURT:  Did you subpoena those agencies

21  here?

22              MR. MENHART:  They're not, but we believe we

23  have records that are admissible under the rules that

24  would demonstrate what records they had, and that's all

25  we're representing right now.

P. Hately - Direct                                     71

1               THE COURT:  So then, you want to offer

2     records from police and the sheriff who are not here

3     about documents they got from Comcast that are in their

4     file and Comcast is not here?

5               MR. MENHART:  That's correct.  And just for

6     purposes of the record, we believe that these -- these

7     are all business records and would be admissible under

8     the rule.  And I understand where this is going and so,

9     maybe it makes sense for us to put it on the record and

10    then we can move on.  But we do think this is relevant.

11              THE COURT:  What does it tend to prove or

12    disprove that there was an investigation?

13              MR. MENHART:  The -- the purpose of the

14    investigation, and it's very limited, let me make that

15    clear.

16              THE COURT:  Listen to my question.  What

17    does it tend to proof about the Stored Communication Act

18    that an investigation was conducted by the police and

19    the sheriffs?

20              MR. MENHART:  We're purely showing that they

21    themselves requested records and then they received

22    records, and that they used the -- and they put those

23    records in their files.  Business records from Comcast

24    in their own files, and then that file has one document.

25    And if Your Honor wants we can put just the one

P. Hately - Direct                                        72

1   document.

2            THE COURT:  I think I understand.  Okay.

3   What's your position?

4            MR. GREENBERG:  Your Honor, I don't think he

5   answered the question because I didn't hear what it

6   proves or disproves, except for the fact they asked for

7   information and received information.

8            So I don't think it proves anything.

9   Therefore I submit it is irrelevant.  The witnesses

10  aren't here.  The business records exception doesn't

11  provide for records of records of records.  And quite

12  frankly, Cisco's records they are looking to include are

13  actually from David Watts . Their contention is access

14  has nothing to do with Nicole Torrenzano, except as all

15  we would argue is that she may have been on the phone

16  with him at the time he did.

17           So, I think it's extrinsic.  It's not

18  relevant and the -- the Court excluded those witnesses.

19  And they're not present today.

20           MR. MENHART:  And that's not --

21           THE COURT:  Do you have a right to

22  cross-examine the witnesses from Comcast?

23           MR. GREENBERG:  Yes, I do.

24           THE COURT:  Is there an objection you have

25  about that, too?

1          MR. GREENBERG:  I do.  I have an objection

2     to cross-examine -- the cross-examination of the witness

3     at Comcast.

4          THE COURT:  First, whatever investigation is

5     conducted is irrelevant.  It does not tend to prove or

6     disprove the allegations in the complaint.

7          Second, under 403, it's highly prejudicial

8     to offer testimony about an investigation conducted and

9     there is no investigator on the stand.  It's not

10    relevant, and the record you seek to offer into evidence

11    from Comcast, Comcast is not here, and it would be

12    double or triple hearsay.

13         So the objection is hearsay.  Move on, so

14    those exhibits, I believe it's 20 -- 27, 28, 29, 30, are

15    excluded.

16         (THEREUPON, side-bar conference was

17    concluded.)

18         THE COURT:  Objection sustained.

19    BY MR. MENHART:

20    Q.   Okay, Mr. Hately, so, you testified --

21         THE COURT:  Wait until you see the clerk sit

22    down.  That's your sign.

23    BY MR. MENHART:

24    Q.   You testified that you had taken certain actions

25    after the breach.  What I'm going to represent to you

 1   right now is that -- I want you to talk generally about

 2   the actions that you undertook without necessarily

 3   naming specific individuals.  But, what I'm interested

 4   in knowing about, I'm trying to be careful here, is the

 5   time and effort and energy that you undertook.

 6       A.   Sure.

 7       Q.   Okay.  So, just in your personal knowledge and to

 8   the extent possible for this, I want you to try to

 9   please not name names or specific places you went.

10            Does that make sense?

11       A.   Sure, sure.

12       Q.   Okay.  So, can you please tell me generally what

13   you did after the breaches?

14       A.   Uh-huh.  So, I did go and -- I had called my

15   service provider for my phone account, for my bank

16   account.  I don't think there's one for my social

17   network account.

18            But, I tried to get as much information from the

19   account as I could to see if I could trace what had

20   actually happened or what accounts were really gotten

21   into.

22            And so -- and I did kind of put them on watch as

23   well, that, you know, what was going on.

24       Q.   How many hours would you say that you spent on

25   that?

 1     A.   Um, for the October 13th or the November 3rd
 2   incident, for cumulative?
 3     Q.   I would say for purposes of this line of
 4   questioning, you can keep it cumulative, sure.
 5     A.   Um, 20 hours.
 6     Q.   Did anybody write you a check for that time?
 7               MR. GREENBERG:  Objection.
 8               THE WITNESS:  No.
 9               THE COURT:  Sustained.
10   BY MR. MENHART:
11     Q.   Did this take time away from your job?
12               MR. GREENBERG:  Your Honor, actually, I
13   don't understand the relevance of this.
14               THE COURT:  Sustained.
15               MR. MENHART:  Your Honor, if I can address
16   that.  The --
17               THE COURT:  I thought we did already in a
18   hearing outside of the presence of the jury in court.
19   Didn't we address that before?
20               MR. MENHART:  In my opinion, we didn't,
21   and --
22               THE COURT:  Okay, then come to sidebar.
23               (Thereupon, the following side-bar
24   conference was had.)
25               THE COURT:  I'm listening.

1          MR. MENHART:  I would be extremely brief.

2          THE COURT:  You don't have to be brief, just

3   tell me your point.

4          MR. MENHART:  What we're trying to do here,

5   the defendant has introduced evidence concerning her --

6   regarding information that will be relevant to damages

7   and what we're trying to demonstrate right now, we're

8   trying to demonstrate that he spent time, effort, money,

9   in responding to this.

10         I understand there are no -- no specific

11  damages outside of cumulative damages.  We understand

12  that.  But we do think that the time and effort and

13  energy demonstrate that there was harm that was

14  undertaken in -- from his perspective.  That's -- that's

15  what we're trying to do.

16         THE COURT:  So your view then is, in this

17  case, where a person conducts an investigation, and they

18  hired a lawyer, that those are damages?

19         MR. MENHART:  I'm going to need you to

20  repeat that for me, I apologize.

21         THE COURT:  Your argument that the time a

22  person spent investigating a claim and bringing it to

23  court and hiring a lawyer are damages?

24         MR. MENHART:  No, that's not true.  The --

25         THE COURT:  They're not, exactly.

P. Hately - Direct                                          77

1              MR. MENHART:  They are -- well, they are

2    damages, but not for purposes of this case, fair enough.

3    Let's call -- I'll withdraw.  That will solve the

4    problem.

5              THE COURT:  Well, you can persist in your

6    objection if you want, but I think I've already ruled.

7    You don't have any damages that qualify for Electronic

8    Stored Communication Act.  I ruled on that on the

9    motions hearing.

10             MR. MENHART:  We understand each other.  You

11   win, so --

12             MR. GREENBERG:  I'm not saying anything if

13   you withdraw.

14             (THEREUPON, side-bar conference was

15   concluded.).

16             THE COURT:  Remember, see the clerk

17   standing.  Don't start talking until you see her sit

18   down.  That lets you know when the court reporter is

19   ready.

20             MR. MENHART:  I'm going to wait until the

21   fifth time you tell me that.  At that time, I'm

22   definitely going to --

23             THE COURT:  That's all right.  I'm happy to

24   do it 7 or 8 times.  I'll remind you each time you do

25   it.

1      MR. MENHART:  I appreciate that.

2      THE COURT:  Thank you.

3      MR. MENHART:  I'll do better next time, I

4  think.

5  BY MR. MENHART:

6      Q.  All right, Mr. Hately, I'm going to point you to

7  Exhibit 31.

8      THE COURT:  Okay.  You recognize that

9  document?

10      THE WITNESS:  I do, yes.

11  BY MR. MENHART:

12      Q.  Can you tell me what this document represents?

13      A.  This is an e-mail that I sent -- well, it's a --

14  it's a chain of e-mails --

15      MR. GREENBERG:  Your Honor, may I pose an

16  objection.  This -- besides this being hearsay because

17  it's an e-mail back and forth with a witness the Court

18  excluded as part of a hearing we had previously.

19      MR. MENHART:  This witness was not excluded.

20      THE COURT:  Yes, he was.  He is not here any

21  way, and it's a communication between someone who is not

22  present in the court to be cross-examined and the

23  plaintiff and is being offered for the truth of the

24  matter asserted.

25      What exception to the hearsay rule would you

1   say, Mr. Menhart?

2           MR. MENHART:  Well, we believe that the

3   e-mail address near the top of the page, comma Carol K

4   at BRCC.EDU designates the individual that sent it

5   because there was a specific domain name along with the

6   name.  Furthermore --

7           THE COURT:  Which one of the 24 exceptions

8   to the hearsay rule is that?  Of the 24 exceptions, pick

9   one.

10          MR. MENHART:  Let me answer the question by

11  pointing you to another part of the document --

12          THE COURT:  If you would answer the question

13  with respect to the rules of evidence that would help

14  me.

15          MR. MENHART:  We believe that this can get

16  in as a business record.

17          THE COURT:  All right.  Objection sustained.

18  BY MR. MENHART:

19      Q.   Mr. Hately, did you have any communications that

20  you remember from after -- strike that.  Referring to

21  Exhibit Number 33 --

22      A.   Okay.

23      Q.   -- do you recognize this document?

24      A.   Yes, I do.

25      Q.   And what is this document?

1    A.   Um, this shows the history for my e-mail account,

2    the password changes, times, dates.

3            MR. GREENBERG:  Your Honor, I'm going to

4    object to this.  Again, this is an e-mail back and forth

5    to the witness who is not presented to cross-examine and

6    the testimony before the jury and some attachment of the

7    work that he may or may not have done, I'm not sure.

8            MR. MENHART:  Your Honor, the document is

9    the -- containing e-mail to a business record attachment

10   that is attached to the e-mail.

11           The e-mail indicates that it is from --

12           THE COURT:  I know what it says.  But it

13   doesn't qualify as a business record under the rules.

14   Objection sustained.

15           MR. MENHART:  Your Honor, does that refer to

16   the final page of the document as well?

17           THE COURT:  All the exhibit.

18           MR. MENHART:  Court's indulgence for a

19   moment.  We'll pass the witness, Your Honor.

20                      CROSS-EXAMINATION

21   BY MR. GREENBERG:

22   Q.   Good afternoon, Mr. Hately.

23   A.   Good afternoon.

24   Q.   Mr. Hately, at one point in the direct

25   examination, your counsel asked you if you knew any one

1   in Winchester, Virginia, and you said you knew Nicole

2   Torrenzano.  But you know many more people in

3   Winchester, Virginia, besides Nicole Torrenzano,

4   correct?

5       A.  Not many more, no.  I know very few people in

6   Winchester.

7       Q.  You have done a lot of testifying about IP

8   addresses, about which IP addresses were in there.  But,

9   you don't know exactly which IP address belongs to any

10  one person actually, do you?

11          You speculate that one IP address may be Ms.

12  Torrenzano and another one Dr. Watts, but you don't

13  really know?

14      A.  What's the question?

15      Q.  You don't know.  You don't know.  I mean, you're

16  aware of the fact each time someone uses a device,

17  there's a different IP address that will pop up

18  depending on the wifi they're located at.  So you don't

19  really know which IP addresses.

20              THE COURT:  That's three are four questions.

21  Can you ask one question at a time?

22  BY MR. GREENBERG:

23      Q.  Yes.  You don't know really who the owner of the

24  particular IP -- who was using something based on the IP

25  address?

1    A.  Can you say your question again.  You don't know

2    who is using the device?

3    Q.  You don't know who is using the device from --

4    even though there's an IP address located.

5    A.  Well, that would depend.

6    Q.  So, you don't know?  You might be able to find

7    out, but you wouldn't necessarily know?

8    A.  If they're publicly available IP addresses, you

9    can look it up on the Internet.  Private are normally

10   reassigned, but these are all public IP addresses.

11   Q.  If right now, I pulled out my cellphone and the

12   Court allowed me on the wifi here and I went into one of

13   your accounts, the IP address would be the courthouse.

14           MR. MENHART:  Objection, objection, calls

15   for speculation.

16           MR. GREENBERG:  Would that call for

17   speculation?

18           THE COURT:  Sustained.  You're asking for

19   his opinion about things?

20           MR. GREENBERG:  No, I'm -- well, he

21   testified a lot about -- okay.

22   BY MR. GREENBERG:

23   Q.  So, for example, it's possible, that on your

24   Facebook account, Audrey Watts could have been accessing

25   it?

1          MR. MENHART:  Objection, calls for

2   speculation.

3          THE COURT:  Sustained.

4          MR. GREENBERG:  Your Honor, it's not that he

5   knew -- I thought he knew it was only one possibility.

6   That's what he's leading the jury to believe.

7          THE COURT:  If you would address evidentiary

8   rules that would help me.  I'll give you a chance to

9   argue the case at the end, Mr. Greenberg.

10          MR. GREENBERG:  Yes, I'm sorry.

11   BY MR. GREENBERG:

12   Q.  What -- your testimony is, for example, when you

13   put in one of your exhibits, you -- you know that an IP

14   address at 192771268 went into your account, correct,

15   that's what you put in one of the exhibits.

16   A.  That's correct.

17   Q.  That's correct.  You don't really know what

18   location that was or who was using it?

19   A.  I looked it up online.

20   Q.  But you don't know who it was that was there at

21   that moment using the device?

22   A.  Well --

23   Q.  You don't know?

24   A.  The other -- well, I do know, though.

25   Q.  So, that --

1          THE COURT:  Make sure you understand his

2    question.  His question is can you tell us from looking

3    at the IP address who is behind the computer screen?

4          THE WITNESS:  No.

5          THE COURT:  All right, next question.

6    BY MR. GREENBERG:

7    Q.  Now, you had provided information on a diagram

8    that you displayed to the jury showing that in your --

9    showing, in your mind, or, in your belief, that Nicole

10   Torrenzano and Dr. Watts were communicating on the

11   phone.  Correct?

12   A.  Which document was it?  It was the phone records?

13   Q.  Yes, from October 12th and October 14th, I

14   believe, you showed both the phone records and I believe

15   you also had a white board with information on a

16   timeline.  Do you recall that?

17   A.  I do recall that.

18   Q.  And it was your view when you composed that that

19   they were on the telephone talking to one another?

20   A.  That's correct.

21   Q.  And, you also mentioned they had 37 text messages

22   between each other.  You had that, I think, in the

23   little scribble on the left-hand side, you were counting

24   the text messages.

25   A.  That's correct.

1     Q.   You don't know what they were texting about?  You

2   don't know what they were talking about?

3     A.   No.

4     Q.   It might have been nothing to do whatsoever.  It

5   might have been a problem that they had or a patient.

6   You don't know?

7             THE COURT:  That's three questions.  If

8   you'd ask one question at a time, it would be helpful to

9   us.

10   BY MR. GREENBERG:

11     Q.   Okay.  You don't know what they were talking

12   about, do you?

13     A.   No.

14     Q.   You don't know what they were texting about, do

15   you?

16     A.   No.

17     Q.   And although a computer may have entered into

18   your e-mail, you don't know how long anybody sat there?

19   You don't have an indication from any screen shots that

20   showed how long the device was connected, correct?

21     A.   What's the question?

22     Q.   You don't know how long the device was connected,

23   correct?

24     A.   Well, actually, the -- you have the initial

25   access.

1    Q.   Do you have the screen shot that shows how long
2    the device was connected?
3    A.   Well, the white board has about half of it.
4    Q.   Do you have a screen shot that shows how long the
5    device was connected?
6              MR. MENHART:  Objection, asked and answered.
7              MR. GREENBERG:  Did he answer it, Your
8    Honor?
9              THE COURT:  Well, I don't want to comment on
10   the evidence, Mr. Greenberg, but the objection is
11   overruled.
12             THE WITNESS:  Can you ask your question
13   again.  I'm sorry.
14   BY MR. GREENBERG:
15   Q.   The question is, do you have a screen shot that
16   tells you how long a device was connected?
17   A.   The devices that we're talking about here, right?
18   Q.   Yes.
19   A.   No, not the full length of time.
20   Q.   Okay.  Now, you showed in it a -- you showed
21   information about Ms. Torrenzano's cellphone records
22   and -- is that correct?  Right?  You have her cellphone
23   records?
24   A.   I showed -- yes, her cellphone records, right.
25   Q.   And in one of the exhibits, you kind of put a

P. Hately - Cross                                                87

1    sticky note, a little arrow where you were trying to

2    show she was using the data plan in the AT&T phone

3    system, correct?

4        A.   Right.

5        Q.   And, you showed that there were like 78, I guess

6    kilobytes or --

7        A.   Well, there was a lot of them, but the first one

8    was 78,000.

9        Q.   And did you notice that two days before that,

10   there was also 78,000?

11       A.   I think I saw that on there, yeah.

12       Q.   You don't think she was on your computer that

13   day, though?

14       A.   No, because she hadn't reset the password yet.

15       Q.   The other time, that same volume was on for

16   whatever she was doing with her phone that had nothing

17   to do with you?

18       A.   What was the question?

19       Q.   There were other times she was on her phone where

20   the same volume of data was being used by Ms. Torrenzano

21   that had nothing to do with you?

22       A.   Yes.

23       Q.   And you don't know that she downloaded anything

24   from your computer, you don't have any indication of

25   that at all?

1    A.   No, I don't have -- yeah, I don't -- that she
2   downloaded anything?  No.
3    Q.   In fact, when I asked you in deposition, you
4   don't know if she ever read an e-mail of yours?
5    A.   I think that she just said that.
6    Q.   She did say it.
7    A.   Okay.
8    Q.   But you didn't know that until yesterday,
9   correct?
10   A.   Well, I -- no, I had --
11   Q.   You had suspicions.
12   A.   Yeah, very strong suspicions.
13   Q.   But you didn't know.  You didn't know if even one
14  of the e-mails was ever read?
15   A.   Um, that's correct.
16   Q.   Okay.  In July of 2015, you confronted Nicole
17  Torrenzano because she had went into the AT&T account,
18  your cellphone account, correct?
19   A.   I didn't confront her, no.
20   Q.   You don't like the word confront?
21   A.   Actually, I didn't say anything about it at all.
22  She brought it up.
23   Q.   She brought it up.  Did you prefer that you had a
24  conversation with her about it?
25   A.   That would be fine.

1    Q.   Okay.

2    A.   But, I didn't -- the conversation didn't start

3    because I initiated it.  I mean, it was Ms. Torrenzano

4    that initiated the conversation about getting into my

5    AT&T account and that's when I said, well, you know,

6    that's illegal.  You shouldn't do it.

7    Q.   And she disagreed with you.  She felt that she

8    had equal rights to look at the AT&T account because her

9    cellphone number was teetered to it?

10   A.   It wasn't teetered to it.

11   Q.   But she believed that?

12   A.   I don't know what she believed.

13   Q.   But she told you.  In the deposition, she said

14   that she thought she had the right to go --

15            MR. MENHART:  Objection, hearsay.

16            THE COURT:  Sustained.

17            THE WITNESS:  Can you repeat the question,

18   please.

19            THE COURT:  The objection was sustained.

20   He's going to ask you a new question.

21            THE WITNESS:  Sorry.

22   BY MR. GREENBERG:

23   Q.   You decided after you saw that she went into your

24   account that you need to change the password to the AT&T

25   account, correct?

1      A.   When --

2      Q.   The AT&T account in July, she said something

3  about a password.  You went and found out that she went

4  into the account.  You told her -- did you change the

5  password?

6      A.   I did, yeah, I did.

7      Q.   You did change the password.  And you told the

8  jury you've never given a password to her.

9      A.   That's right.

10     Q.   But the password, was it nickwade918?

11     A.   I believe so.  I mean, I changed it.  So, I don't

12  know.

13     Q.   And, do you believe that she guessed that?  She

14  just guessed that you would use your name and her name

15  and the date you met, September 18th, she just guessed

16  the fact that you might have that password?

17     A.   I believe she guessed it, yeah.

18     Q.   She guessed it.  Now, didn't you also say that

19  you do IT work at INOVA, correct?

20     A.   Yes, I do.

21     Q.   And part of what you do have to do -- have you

22  ever tried to do something to make sure that your

23  password and your security settings were changed?  You

24  changed them to make sure somebody couldn't come in or

25  out?  I take it you've done that, right?  You've changed

1  your passwords?  You've changed your own passwords

2  before, have you not?

3      A.   I have, uh-huh.

4      Q.   And I think what you said -- you said in this

5  particular case, nickwade, did you have what's called

6  camel?  I think that's the term you used, camel, being

7  that some letters would be tall, capitalized and some

8  would be small.  Is that true?

9      A.   What's your question?

10     Q.   For the nickwade password, it wasn't just

11 nickwade918.  It was nickwade with certain capitals and

12 certain small letters?

13     A.   No, I don't think that it was -- I think the

14 first letter was capital.

15     Q.   But, do you use that designation, the camel

16 designation?

17     A.   Well, technically, camel case would be like the

18 first letters upper case and the next letter is lower

19 case, you know, just like, a camel.

20     Q.   Correct.  And did she guess that, too?  Was she

21 able to guess that was your password that you did the

22 camel?

23     A.   That may have been more difficult if I did it,

24 but I hadn't done it for that.

25     Q.   How do you think she was able to change the

P. Hately - Cross

1  password to get into the account?

2        MR. MENHART:  Objection, calls for

3  speculation.

4        THE COURT:  Sustained.

5  BY MR. GREENBERG:

6   Q.  Did she know your security settings?

7        MR. MENHART:  Objection, calls for

8  speculation.

9        THE COURT:  Are you asking him what he

10  thinks she did?

11        MR. GREENBERG:  I'm asking whether she knew.

12  I would presume the next question is that --

13        THE COURT:  So you're asking him to tell you

14  what she was thinking?

15        MR. GREENBERG:  No, what she knew based on

16  what he may have told her is what I'm trying to, Judge.

17  But the way you're asking, I know where you're going

18  with that.

19        Can I rephrase the question?

20        THE COURT:  No. (Laughter).

21        Of course you can.  Objection sustained.

22  BY MR. GREENBERG:

23   Q.  So, did you tell Ms. Torrenzano your security

24  settings?

25   A.  No.

1    Q.   Did you have security settings?

2    A.   I guess -- security settings are pretty vague.  I

3  mean perhaps you could clarify.

4    Q.   So, for example, if you want to reset your

5  password, maybe they asked you what your first car was;

6  who your first teacher was, that kind of question?

7    A.   So, like my password reminders, kind of?

8    Q.   No, to reset a password, Mr. Hately.

9    A.   Unique information about me?

10   Q.   To reset the password, that's what you would do,

11  correct?  Didn't you have to do that?  Didn't you have

12  to reset your password?  Have you reset your password

13  before?

14        THE COURT:  That was like four questions.

15  If you would ask one question at a time, that would help

16  us.

17  BY MR. GREENBERG:

18   Q.   Did you reset your password before?

19   A.   Yes, I have.

20   Q.   And when you did that, did you go to those

21  settings that I just mentioned in order to get that to

22  happen?

23   A.   For some they're set up that way, for others

24  they're not.  Are you talking about -- which one you're

25  talking about?

1    Q.   How about your college account?

2    A.   That one -- that one has -- we had to put in, you

3    know, what high school you went to, um, what street you

4    grew up on.  I don't remember the exact questions, but

5    they're -- they're pretty standard like across.

6    Q.   You -- of course, you don't have to set the truth

7    in those settings, right.  You don't have to admit what

8    college you went to or high school or street you lived

9    on.  You don't have to do that, do you?  There's no like

10   independent verification that it be correct?

11   A.   That would defeat the purpose of having it there,

12   though.

13   Q.   So, you might use settings like your first

14   college was Cumberland, but you said it's a corvette.

15   So nobody would know to guess the Camero, correct?

16   A.   Yeah, but then what -- I know it as a Camero.  So

17   if I go to reset it and I keep putting Camero, it's not

18   going to let me into the account.

19   Q.   It might confuse you?

20   A.   Well, yeah exactly, you know, because I don't

21   remember it being a corvette, because it wasn't.  It

22   would have been a Camero.

23   Q.   So that's the reason after you changed the

24   password, you think maybe Ms. Torrenzano was able to get

25   in again?  Was it your testimony she tried to get into

1   the AT&T more than one time?

2       A.   After July, after I reset it, she -- you know,

3   she told me that -- I said, well you won't be able to

4   get back in now.  And she said yeah, because you reset

5   the password, and I said, well, yeah.

6       Q.   And then she never did?

7       A.   Never did what?

8       Q.   She never got in again?

9       A.   No, she did in October.

10      Q.   So, how did she do that?  Did she do it because

11  she knew your security settings?

12           MR. MENHART:  Objection, calls for

13  speculation.

14           THE COURT:  Those are also two questions.

15  Sustained.

16  BY MR. GREENBERG:

17      Q.   Did you change your security settings?

18      A.   Security settings, you mean like --

19      Q.   The questions.

20      A.   The questions.  I don't remember.

21      Q.   Did you believe that the way she was able to get

22  into your password because she knew your security

23  settings?

24      A.   Yeah, yeah, that she knew that information about

25  me.

1     Q.   So, you believed that she reset the password in

2     July, looked at this account that she thought -- and

3     then, you -- but you didn't change any of that?  You

4     didn't change anything to make it -- your account more

5     secure?

6     A.   I did.  I changed the password.

7     Q.   But you knew -- she -- she had already changed

8     the password, right, using the security settings?  So

9     there was no other way to do it?

10    A.   Right.

11    Q.   So, then you changed it to a new password,

12    correct?

13    A.   Correct.

14    Q.   I think your new password might have been like

15    what?  You started using "to infinity" and a series of

16    numbers after it?

17    A.   Uh-huh.

18    Q.   And special characters, like ME and plus signs,

19    right?

20    A.   Correct.

21    Q.   And, I guess this is a segue.  Was Nicky --

22    nickwade918 the password for your e-mail account at the

23    college?

24    A.   I don't remember.

25    Q.   Could have been?

 1    A.   It could have been.

 2              MR. MENHART:  Objection, calls for

 3    speculation.

 4              THE COURT:  Sustained.

 5    BY MR. GREENBERG:

 6    Q.   Is it true that you had papers that were due at

 7    the -- at the college at the time you asked Ms.

 8    Torrenzano to download something for you so she could

 9    print it and give it to you so you could turn it in like

10    an assignment?

11    A.   No.

12    Q.   Are you confident of that?

13    A.   I used to write her papers for her nursing

14    program.

15    Q.   Is that -- that's a response to you know that she

16    never printed anything for you?

17    A.   Yeah.  I mean, she would never do -- I mean, no.

18    Q.   She wouldn't print?  She wouldn't know how to use

19    the print button?

20    A.   I don't think she has a printer.

21    Q.   Is it because she's not very technological savvy?

22              THE COURT:  Is that a question?

23              MR. GREENBERG:  Yes, it is, Your Honor.

24              MR. MENHART:  Objection, relevance.

25              THE COURT:  Sustained.

P. Hately - Cross

1  BY MR. GREENBERG:

2    Q.  You don't know that anything was read on your

3  Facebook account, either, correct?  You don't have any

4  indication of anything being read or any information

5  particularly being seen in your Facebook account?

6    A.  Like -- what like?

7    Q.  Like what, I don't know.

8    A.  I don't know.

9    Q.  Okay.  Um, now, you heard Ms. Torrenzano testify

10  that she believed somebody was giving personal

11  information about her to people in the hospital setting.

12  Was that you?

13    A.  The only person I know that works at Winchester

14  Medical Center is Ms. Torrenzano.

15    Q.  Doesn't Dr. Watts work at Winchester Medical

16  Center?

17    A.  I don't know him, though.

18    Q.  How about Audrey Watts?  I thought she worked at

19  Winchester Medical Center.

20    A.  Not that I know of.

21    Q.  You know her because you were having a sexual

22  relationship with her, right?

23          MR. MENHART:  Objection, relevance.

24          THE COURT:  Sustained.

25          MR. GREENBERG:  Your Honor, it's not

1   relevant that he was having a --

2            THE COURT:  Tell me what it tends to prove

3   or disprove about the Electronic Stored Communication

4   Act.  Nothing.

5            Move on.

6   BY MR. GREENBERG:

7     Q.  Well, isn't it your belief that David Watts

8   also -- don't you have a lawsuit against David Watts as

9   well?

10           MR. MENHART:  Objection, relevance.

11           THE COURT:  Sustained.

12           MR. GREENBERG:  Your Honor, I don't

13  understand.  They're trying to show.

14           THE COURT:  Excuse me.

15           MR. GREENBERG:  I'm asking.

16           THE COURT:  Excuse me.  I asked you to give

17  me rules of evidence.

18           MR. GREENBERG:  Yes.

19           THE COURT:  And I said many times I'm going

20  to let you argue the case at the end.  But I'm not going

21  to let you all engage in irrelevant discussions about

22  things that do not matter.

23           And I've said ten times to this jury, this

24  is not a divorce case.  They were never married.  This

25  is not relevant.  All we're focused on is the Electronic

1    Stored Communication Act.

2              It's obviously these parties have their own

3    feelings about each other.  But you have to weigh the

4    credibility of all the witnesses.

5              MR. GREENBERG:  Your Honor, may I just -- so

6    just, Your Honor, I thought this would go to the witness

7    bias and conflicts in evidence.  I understand -- but --

8              THE COURT:  Whether he had sex with somebody

9    or not doesn't show bias, Mr. Greenberg.  It has nothing

10   to do with his relationship with Ms. Torrenzano.

11             Next question.

12   BY MR. GREENBERG:

13   Q.  Some of the times you think your -- the last time

14   you were concerned that Ms. Torrenzano looked at your

15   account was in November 2015?

16   A.  That's the last time that I'm aware of.

17   Q.  And, you decided to pursue this after you loss

18   your custody case, I think it was in March of 2016?

19             MR. MENHART:  Objection, relevance.

20             THE COURT:  Overruled.

21             THE WITNESS:  I wouldn't say -- I wouldn't

22   say it like losing custody.  I mean, essentially, I

23   have --

24   BY MR. GREENBERG:

25   Q.  Let me make sure your timing, though.  Was your

1   timing after the custody case concluded?

2       A.  It was.

3       Q.  Uh-huh.  And you've reported to the authorities

4   on many occasions for slights you think she's done

5   wrong?

6               THE COURT:  Objection sustained.  We're not

7   here about a custody case.

8           Next question.

9               MR. GREENBERG:  Sorry, Your Honor.  I didn't

10  mean to do that.

11              Court's indulgence.  I didn't mean to go so

12  slow.  I'm trying to go pass the questions you wouldn't

13  like, so.

14  BY MR. GREENBERG:

15      Q.  When you had reset your password, was it -- I

16  guess it took you a couple steps to have to go back into

17  your own account.  That is, you received indication your

18  password had been changed, correct?

19      A.  When are you talking about, July, October, or

20  November?

21      Q.  Any of the three.

22      A.  Okay.  What was the question again?

23      Q.  Each -- when you had to reset your password, what

24  happened as you go back into your account and you would

25  put in your security settings and that would get you

1    back into access.

2        A.   I'm not sure I understand.  Can you clarify the

3    question?

4        Q.   When you had reset your passwords, the procedure

5    was that you had answered the security question, and

6    then, you would get a new password, correct?

7        A.   So, I guess -- so I didn't reset the password and

8    then reset the security questions.  I would answer the

9    security questions and then I would be able to reset the

10   password.

11       Q.   And when you reset the password, you would gain

12   access once again?

13       A.   Right.

14       Q.   Did you do Google research to find out how you

15   could use anything regarding this particular set of

16   circumstances in your custody case?

17               MR. MENHART:  Objection, relevance.

18               THE COURT:  Sustained.

19               MR. GREENBERG:  Court's indulgence.

20   BY MR. GREENBERG:

21       Q.   Mr. Hately, the -- out of all the information

22   that you've provided to the jury today and yesterday,

23   they all resolve around the access to your account in

24   October 12 or 13th and November 2nd or 3rd, correct?

25               MR. MENHART:  Objection, this wasn't part of

1    the prior testimony.

2                THE COURT:  Sustained.

3    BY MR. GREENBERG:

4    Q.   The dates that this all involve are -- what are

5    the dates?  Is it the 2nd or the 13th of October?  Not

6    the 2nd, the 13th of October, one of the dates that you

7    allege are -- that you actually admitted that she went

8    into the account, correct?

9    A.   So, you're asking what are the dates for the

10   incidents?

11   Q.   I'm saying one of them is the 13th of October.

12   Do you agree with that?

13   A.   For what?  I mean, I call it the October 13th

14   incident, but that's because like --

15   Q.   Fine, October 13th incident is one of them.  The

16   other one is November 2nd incident?

17   A.   I call it November 3rd because that's when I

18   found out about it.

19   Q.   November 3rd, that's fine, right.  And then you

20   have a third incident?

21   A.   Well, the -- July of 2015.

22   Q.   Perfect, and any others or that's it?

23   A.   Those are all that I'm aware of.

24                MR. GREENBERG:  Thank you.  That's it,

25   Judge.

1                    REDIRECT EXAMINATION

2    BY MR. MENHART:

3      Q.   Mr. Hately, you previously testified that you

4    didn't know a specific individual behind an IP address.

5    What information can you acquire about any IP address

6    that you would find?

7      A.   Well, you can -- depending on what kind it is --

8               MR. GREENBERG:  Your Honor --

9               THE COURT:  Let's focus on this case, not

10   any academic exercise.

11              MR. GREENBERG:  I object.  If I ask the

12   question about IP and he asked about an opinion, it's

13   clearly going to the opinion.  So it should be the same

14   thing.  I didn't go into that testimony.

15              The Court -- I didn't go into that.  I think

16   it's objectionable.  He's not qualified to testify.

17              MR. MENHART:  The defense counsel just asked

18   him moments ago about what he could identify with an IP

19   address, and the witness testified --

20              THE COURT:  You want to ask him a question

21   about this case or just IP addresses in general?

22              MR. MENHART:  I'm just following what

23   defense counsel asked him about, and the defense counsel

24   asked him --

25              THE COURT:  Did you hear what I just asked

1  you?

2           MR. MENHART:  I heard what you said, so I'm

3  just asking about this case, Your Honor.

4           THE COURT:  Well, then ask him about this

5  case, not some academic exercise.

6  BY MR. MENHART:

7      Q.  When you -- when you came to become aware of an

8  IP address that you suspected to be accessing one of

9  your accounts, what could you find out about that IP

10 address at that moment?

11     A.  Well, you could find out the IP address.  You can

12 find out the time.  Um, you can find out what type of

13 device.

14          THE COURT:  We've already seen testimony

15 about this case.  What you're testifying to is just in

16 general.  Objection sustained.

17 BY MR. MENHART:

18     Q.  Are you personally aware of any tools where you

19 can look up an IP address on the Internet to determine

20 where that geo -- that IP address is geo-located?

21          MR. GREENBERG:  Your Honor, that's expert

22 opinion.

23          THE COURT:  Sustained.

24 BY MR. MENHART:

25     Q.  Counsel asked you about the length of time that

1   certain IP addresses were connected to your account.

2         Does your prior testimony -- what part of your

3   prior testimony would you point to that helps you

4   address that question?

5              MR. GREENBERG:  Your Honor, that has been

6   asked and answered.  If he has to --

7              THE COURT:  Sustained.

8   BY MR. MENHART:

9    Q.  Is it possible to download something from an

10  account without having access to it first?

11             MR. GREENBERG:  Your Honor, that --

12             THE WITNESS:  No.

13             THE COURT:  Your objection is?

14             MR. GREENBERG:  That's expert testimony.

15             THE COURT:  Sustained.

16  BY MR. MENHART:

17   Q.  I'm going to ask a different question.  We'll see

18  what Judge Lee says.

19        Can you download something from your VCCS.EDU

20  account, any type of content in it without first having

21  access to the account.

22   A.  No, you need to have access first.

23             MR. GREENBERG:  Your Honor, I object.  I

24  think it's expert testimony.  Some people can.

25             THE COURT:  General questions --

1           MR. MENHART:  Well, Your Honor --

2           THE COURT:  Let me finish.  I listened to

3  you.

4           General questions that call for opinion

5  would require an expert.  This witness is a fact

6  witness.

7           Objection sustained.

8  BY MR. MENHART:

9    Q.  Mr. Hately, what was your first car?

10          MR. GREENBERG:  Your Honor, I --

11          THE WITNESS:  Ford Ranger.

12          MR. GREENBERG:  I object to the relevance of

13  that.  I don't know that that matters.

14          THE COURT:  Sustained.

15  BY MR. MENHART:

16    Q.  Why did you not file this lawsuit until after

17  your custody case was completed?

18    A.  I thought it was a lot to do both cases at the

19  same time.  And, I wanted one to be complete before we

20  moved on to the next one.

21          MR. MENHART:  No further questions.

22          THE COURT:  You can step down, sir.  Thank

23  you.

24          (Thereupon, the witness withdrew from the

25  stand.)

1   MR. MENHART:  At this point, the plaintiff

2   would rest, Your Honor.

3   THE COURT:  All right, plaintiff rests.

4   MR. GREENBERG:  Your Honor, may I -- we have

5   a short time to contemplate whether or not we want to do

6   a Rule 50?

7   THE COURT:  I'm sure you've thought about

8   that before now, Mr. Greenberg.  I'm ready to hear it.

9   MR. GREENBERG:  You want to have it in front

10  of the jury, Your Honor?

11  THE COURT:  Do you have one?  I'll send the

12  jury out.

13  MR. GREENBERG:  I do have one.

14  THE COURT:  All right, ladies and gentlemen

15  if you'd go out.  I'll take up a matter outside the

16  hearing of the jury with counsel.

17  (Jury excused at 12:33 p.m.)

18  THE COURT:  You may be seated.

19  MR. GREENBERG:  Your Honor, I have a case

20  and I realize I don't know that Mr. --

21  THE COURT:  Tell me what the issue is of

22  your motion, Mr. Greenberg.

23  MR. GREENBERG:  The issue of my motion, Your

24  Honor, is I don't believe there has been demonstrated as

25  a matter of evidence that any of the access went to a

1   remote that -- that went into a facility that stores

2   communication for the purposes of backup.  I don't think

3   there's any evidence whatsoever that there was a stored

4   communication that Ms. Torrenzano went into.

5           I understand that she may have looked at his

6   e-mails as they were part of a college account.  She

7   admitted to that.  There is no statement whatsoever of

8   their being -- that such e-mails were in a stored

9   capacity, even stored irrespective of being for backup

10  purposes.

11          I believe that the law is clear that the

12  burden on the plaintiff in the Stored Communications Act

13  is to show that somebody accessed a facility that stores

14  communications for the purposes of backup.

15          I have a case that I think is instructive.

16  It is a case from the Supreme Court of South Carolina.

17  It, oddly enough, has almost identical facts.  It's a

18  broken down domestic case where they were looking at one

19  another's e-mails.  And the Court goes through all the

20  findings of Stored Communications Act and finds that the

21  fact that one of the spouses or the ex-spouses looked at

22  the other one's e-mail account was not sufficient to

23  support a finding of the Stored Communications Act.

24          I recognize it's not binding on this Court

25  as a federal court, but the Supreme Court of South

1  Carolina went through it.  It may be instructive and the

2  Court may want to consider that and the rationale behind

3  it as the facts are nearly identical to the facts that

4  we have in this case.

5            That -- that's the essence of my motion.

6            THE COURT:  That's your motion?  Is that it?

7  I'm happy to read the case.

8            MR. GREENBERG:  I also have -- Your Honor, I

9  would also point out to you that -- thank you.

10           The second part of my argument would be that

11  under the act of which the plaintiff proceeds, there's a

12  requirement that under the definition of electronic

13  communication means any transfer of signals, signal

14  writings, et cetera from a system that affects

15  interstate or foreign customers.

16           I don't believe there's any evidence

17  introduced during the course of the proceedings today or

18  yesterday at all that would indicate that any facility

19  that may have been accessed affects interstate or

20  foreign commerce.

21           Those are my two points, Your Honor.

22           THE COURT:  All right.  Do you have a copy

23  of the case that you referred to for counsel or for me?

24           MR. GREENBERG:  Yes, I do.

25           THE COURT:  If you would pass them up.

1   Thank you.

2           I'm ready.

3           MR. MENHART:   Your Honor, we have two

4   responses to this.

5           First, as counsel properly noted, this

6   case -- while I haven't reviewed every minute -- every

7   word of it, it not been supplied before this minute, the

8   law is simply not binding.   It's South Carolina law.

9           The Fourth Circuit has quite a bit of law

10  that is supporting our position which is that the e-mail

11  communications that -- that web-based e-mail

12  communications accounts which all of these are LinkedIn,

13  Facebook, the VCCS account, those would all be under the

14  definition of the act.

15          As to the second point, and if the Court

16  would like me to read the case and address it in more

17  detail after the break, I'm happy to do that.

18          As to the second fact, we believe that the

19  Court can take judicial notice of adjudicated facts

20  under rule -- Federal Rules of Evidence 201 that

21  Facebook and LinkedIn are multiple national brands, and

22  that folks have those accounts all across the country.

23          And, then the VCCS account it's relatively

24  clear from Exhibit 26 that Mr. Hately is having a

25  variety of communications with people across the

country.

So, we believe that on its face demonstrates that there is interstate commerce at play here. So, that would be our response.

MR. GREENBERG: Your Honor, can I briefly respond to the last point?

THE COURT: You can.

MR. GREENBERG: Thank you.

MR. GREENBERG: Your Honor, I don't believe there's any evidence about a LinkedIn e-mail that was ever received, obtained, that would -- in contemplation of act. Nor when Mr. Hately was asked that he said he had any idea that anyone looked at any of his e-mails or communications in Facebook.

So, he also said --

THE COURT: Is it required that someone read e-mail in someone else's account to be in violation of the Stored Communications Act, Mr. Greenberg?

MR. GREENBERG: I submit that it is, and I'll tell the Court why I believe that.

THE COURT: You have a case that says that or is this just your belief?

MR. GREENBERG: No, no, there are cases that say that. It's not just my belief. I'm not the authority here.

1    THE COURT:  Okay.  Well, you're the lawyer.
2  So, if you have a case that you want to call the judge's
3  attention to, now is your time.
4    This case has been pending for more than a
5  year.  I assuming you all did all the research on it,
6  right?
7    MR. GREENBERG:  Your Honor, I have -- let me
8  ask -- I know enough to answer the Court's question
9  first and then I'd like to embellish the answer with, I
10  think, additional facts which I think is appropriate.
11    THE COURT:  All right.
12    MR. GREENBERG:  Your Honor, I don't have
13  with me, which is, I'm sorry, I -- I'm aware of the fact
14  and I will submit to the Court because I believe this
15  may have been from you, Judge Lee, that there is a
16  question about whether the Stored Communications Act
17  applies to e-mails that have been read but still pending
18  transmission or already opened.
19    And there is case law about whether or not
20  where it is -- if it's pending transmission but hasn't
21  been opened yet, then it's part of the stored
22  communication.
23    All that begs the fact that there must have
24  been someone reading a communication.  If access alone
25  was enough, then the Fourth Circuit, the Eighth Circuit,

1    the Ninth Circuit, nobody would have to figure out
2    whether the e-mail in question was pending transmission
3    because it would be irrelevant.
4         Once you demonstrate that the defendant
5    accessed the facility, whether he obtained an e-mail or
6    not, then it wouldn't make a difference.  You see, the
7    access was the critical point and then, that would be
8    the end of the conclusion.
9         But, the Courts -- and the Fourth Circuit I
10   know hasn't weighed in on that, but the Court recognized
11   it to be an open question.  Does it matter whether or
12   not the e-mail has yet been read?
13        Now, there's no evidence here that any of
14   the e-mails she read were pending that transmission.
15   There is just no evidence of that.
16        So I would submit to you, that yes, they
17   have to -- they do have to establish that something was
18   obtained.  I would also point out to you that the
19   complaint filed in this case only talks about obtaining
20   e-mails.  There are several parts of the statute, but if
21   you look at the complaint here, the complaint does not
22   talk about any other aspect of the statute except
23   obtaining electronic communications.
24        And so what we were put on notice for and
25   what we're defending against is the obtaining of

1    electronic communication.  And then the question is

2    while such is in the system, while it is in the system

3    for the purposes of backup -- for backup purposes.

4    Sorry to be inartful there.

5              THE COURT:  All right.  Do you have a copy

6    of the complaint handy?

7              MR. GREENBERG:  Yes, sir, I do.

8              THE COURT:  Okay.  Your reference to e-mail,

9    I suspect, is from paragraphs 33 and 34, which refer to

10   plaintiff's Gmail account.  That's probably what you're

11   referring to, and I understand why you would say that.

12             And then, in paragraphs 19 and 20, there's

13   an allegation that on October 13, 2015, both defendant

14   and that's single but should be defendants, plural,

15   hacked into several more of plaintiff's accounts,

16   including USA Banking, AT&T personal cellphone, and

17   plaintiff's school account which is powered by Google

18   mail.

19             I'm looking at document number 21.

20             MR. GREENBERG:  Yes.

21             THE COURT:  Page three of 18, paragraph 19

22   and 20.  So, your statement is all e-mail I think is a

23   little bit -- the allegation refer to that.  And when we

24   will go to the causes of action, the causes of action

25   incorporate the paragraphs I just referred to.

1            Now, let me take a look at the actual

2    complaint's cause of action under Stored Communications

3    Act.  Let's see if there's any reference to -- it does

4    refer to e-mails in paragraphs 87, 88, 89, and 90.

5            So, it's all basically e-mail for this

6    count.  So, you've accurately recorded that, just

7    e-mail.

8            So, as I understand your argument and I want

9    to make sure I have it right, it's just the argument

10   that we have heard and seen briefed several times and

11   that is whether an e-mail remaining on an e-mail server

12   like Gmail, that's been opened or unopened, is stored

13   first for backup within the meaning of the Electronic

14   Stored Communications Act.

15           That's an open question.  There have been

16   two different lines of authority.  One that agrees with

17   you and one that agrees with the plaintiff.

18           Is there a Fourth Circuit case that says one

19   way or the other about e-mail, Mr. Greenberg?

20           MR. GREENBERG:  No, not that I'm aware of,

21   Your Honor, but I would say this.

22           THE COURT:  I'm listening.

23           MR. GREENBERG:  I would say, though, that my

24   argument is a step higher because it's also about the

25   evidence in this particular case.

1            In another case where the same arguments

2     were made, though, they had a witness that came and

3     testified, an expert witness, about what it meant to

4     have eight different copies so that one would be stored

5     for communications.

6            It is true that we've made this argument

7     before under 12(b)(6) motion.  We made arguments that

8     they fail to state a claim because we did not think

9     that which is true.

10           But now our claim is based on law but also

11    on the facts of this particular case, because no expert

12    and no one has testified anything about backup storage.

13           We have no information that there was a

14    facility that she accessed at the time she accessed the

15    e-mail in question was in a stored -- was there for

16    backup purposes, not just stored, but stored for backup

17    purposes.

18           So, it's incumbent upon the plaintiff not

19    just have -- I mean, there may be an open question of

20    law but also the facts.  So here I would say it's two

21    points.  There isn't the fact to support it and then as

22    you point out, Your Honor, that also the fact that I

23    think the law may be in equipoise.

24           The Eighth Circuit clearly does not favor

25    it.  Even the Ninth Circuit has a footnote that if it's

1   in remote storage it's not sufficient for backup

2   purposes.

3               But we don't even have the next part.  We

4   don't have anything about backup here, so it's both

5   factual and --

6               THE COURT:  What does backup mean to you,

7   Mr. Greenberg?

8               MR. GREENBERG:  Well, Your Honor, when I was

9   in the court before with you, you said to me that the --

10  this court every Friday of some day, I don't know what

11  day it is, backs up its server and then sends it over

12  to, I think Louisiana, somewhere in Louisiana.  And

13  that's where the records are kept for the courthouse

14  here.

15              And so that would be backup.  If I -- if I

16  received an e-mail, and if that e-mail -- and then, I

17  decided or even if I get a letter.  If I get a letter

18  from another lawyer --

19              THE COURT:  Let's focus on e-mails.  Just

20  focus on e-mails.

21              MR. GREENBERG:  Okay.  Well, what I'm giving

22  you is examples.  I guess I'm going old school to

23  backup.

24              So if I take a letter and I Xerox it, I take

25  a copy.  I have a second copy.  That's my backup copy.

1   Or even if I scanned it and put in up in the server, I

2   have my copy and I have my backup copy.

3                    So, for example, Mr. Hately's testimony, he

4   says that he has an e-mail in his account.  He says he

5   presses the send button and if you look it doesn't

6   delete.  Now, he sent it to somebody, but it's sitting

7   there.

8                    Now, is it there for backup purposes or is

9   it just there?  So, the backup --

10                   THE COURT:  What does "just there" mean,

11  because --

12                   MR. GREENBERG:  Well, maybe it's stored.

13                   THE COURT:  Let me focus my question.

14                   MR. GREENBERG:  Okay.

15                   THE COURT:  My question has to do with the

16  sent folder.  And let's not act like we don't know what

17  e-mail is.  There's an inbox and there's a sent folder.

18                   MR. GREENBERG:  Yes, sir.

19                   THE COURT:  What is -- how would you

20  characterize e-mail in a sent folder, Mr. Greenberg?

21                   MR. GREENBERG:  I would characterize you

22  still have a copy of it.  You don't have a backup copy,

23  but you have a copy.  And if you delete --

24                   THE COURT:  You have a copy of it?

25                   MR. GREENBERG:  That's correct.

1          THE COURT:  All right.  And so the copy has
2    been retained because you made a judgment that every
3    e-mail you send out should be stored in the sent folder;
4    isn't that right?
5          MR. GREENBERG:  Well, I didn't know if I
6    made -- Your Honor, I don't know that I made a decision,
7    but I didn't delete it.
8          THE COURT:  You didn't delete it.
9          MR. GREENBERG:  Fair enough, fair enough.
10   But that's not a backup copy.
11         THE COURT:  What is it then?
12         MR. GREENBERG:  It's just a copy.  It's just
13   something I have.  It's like having a --
14         THE COURT:  It's just a copy.  I got it.
15   Thank you.
16         Your response?  I think I understand your
17   position.
18         Let me do this.  I'm going to deny the
19   motion under Rule 50.  We'll see what the jury does.
20   And, if I have to write an opinion about e-mail stored
21   on a sent folder in a Gmail account or just stored on a
22   server remote Gmail or Facebook, I'll issue a written
23   opinion.
24         But as it stands right now, I'm going to
25   deny the motion.

1        As it relates to interstate commerce, I

2  don't think there's any question whatsoever about the

3  evidence of Facebook being interstate.  There's no

4  question that AT&T is interstate, and there's no

5  question in my mind about Gmail being Internet.  So the

6  motion is denied.

7        Ready to bring the jury back?  We get them

8  back for ten minutes and take a recess at 1.

9        (Jury present at 12:48 p.m.)

10       THE COURT:  You may be seated.  Thank you

11 for your patience, ladies and gentlemen.

12       The plaintiff has rested.

13       Defense?

14       MR. GREENBERG:  Your Honor, we have no

15 evidence to provide.

16       THE COURT:  Defense rests?

17       MR. GREENBERG:  Defense rests.

18       THE COURT:  All right, thank you.

19       Ladies and gentlemen, we're going to take a

20 recess now for lunch from now until -- I'll make the

21 time 2:30.  That will allow me time, hopefully, to get

22 the jury instructions done.  If it's not exactly at

23 2:30, understand it's me working with the lawyers on the

24 instructions.  And I'll have to take the time to do

25 that.

1             As I promised, I will give you written a
2     copy of the instructions.
3             So remember my previous recommendation --
4     previous admonishments, not that you've done anything
5     wrong, but my previous instructions which is not to
6     discuss the case.  Don't make -- permit the case to be
7     discussed in your presence.  Leave your notes in the
8     jury deliberation room and we'll come back at 2:30.
9             Thank you.
10            (Jury excused at 12:50 p.m.)
11            THE COURT:  Have you all talked about
12    instructions and maybe ten minutes or so will give me
13    enough time to look over what we have.
14            MR. GREENBERG:  Your Honor, we've gone back
15    and forth with the ones we've agreed upon should have
16    some changes.
17            MR. MENHART:  I think based on what
18    happened, we can have discussions and make some
19    decisions.
20            THE COURT:  Are there any disputed
21    instructions for me to decide?
22            MR. GREENBERG:  There were as of yesterday
23    morning.
24            THE COURT:  Well, how much time do you need
25    to take them up?  I can take a 10 or 15 minutes break.

1  We can come back and knock them out now?

2           MR. MENHART:  For plaintiff's perspective

3  that works.

4           MR. GREENBERG:  Sure.

5           THE COURT:  Okay.  15 minutes and we'll come

6  back and knock out these instructions.  Thank you.

7           MR. GREENBERG:  Okay.

8           (Court recessed at 12:50 p.m. and reconvened

9  at 1:07 p.m.)

10           THE COURT:  Counsel, you may remain standing

11  or seated during this part of the presentation.  It

12  would be helpful if you keep your voices up or use the

13  microphone because that might help the court reporter

14  reach what we're doing.

15           The way I intent to approach this may not be

16  exactly in order.  And the way I have them are -- start

17  with the verdict form proposed by the plaintiff and the

18  defendants.

19           I don't think we need an interrogatory

20  verdict form.  So, I'm not prepared to give one unless

21  somebody still feels strongly about it.  I don't see why

22  we need an interrogatory verdict form.

23           MR. GREENBERG:  Your Honor, may I ask what

24  the Court's --

25           THE COURT:  I'm proposing to use a plain

1  vanilla verdict form that says, "Do you find by the

2  preponderance of the evidence that defendant violated

3  the Stored Communications Act" and then a separate

4  inquiry about whether or not punitive damages are

5  appropriate.

6           MR. GREENBERG:  I agree with that, instead

7  of having the whole.

8           MR. MENHART:  That's fine.

9           THE COURT:  All right.  There are a number

10 of joint instructions, and I think the one that should

11 be removed are the use of interrogatories, plaintiff's

12 JO2.

13          MR. GREENBERG:  Use of interrogatories, we

14 agree to remove that.

15          THE COURT:  There are -- no interrogatories

16 were used.

17          JO9 having to do with testimony of a law

18 enforcement official, remove that.

19          MR. GREENBERG:  Yes.

20          THE COURT:  PA, general preliminary

21 instruction about how the Court's going to -- jury

22 should consider the evidence, I think I did that using

23 my own form of instructions so I will take that out.  We

24 won't need that.

25          Going over to PB, jury questions, which

1   allows the jury to submit questions.  I don't do that,

2   so that was not done in the trial.  So we don't need

3   that.  Any objection?

4             MR. MENHART:  No objection, Your Honor.

5             MR. GREENBERG:  No.

6             THE COURT:  All right.  I know that there

7   was an objection to plaintiff's C which is impeachment

8   of witnesses because of inconsistent statements.  It

9   appears to be a pattern instruction from the Eleventh

10  Circuit.  I'm not sure what the objection could be of

11  the defendant to that.

12            MR. GREENBERG:  Your Honor, I recognize it

13  is a valid state of law.  And I suppose our argument is

14  that there is nothing that was -- nothing actually

15  provided in as an inconsistent statement.

16            Mr. Menhart, I'm sure, will try to disagree

17  with that, not try, but will disagree with that.

18            THE COURT:  That wasn't -- also, there was a

19  couple questions that Ms. Torrenzano was asked, and her

20  answers at the deposition were different than the

21  answers she gave in court.

22            MR. GREENBERG:  Your Honor, if you think

23  that was based on the facts, I don't object.

24            THE COURT:  All right.  Then, plaintiff's C

25  will be given.

1           The next one is adverse inference from

2   invocation of the privilege against self-incrimination.

3   And I recognize that I have two different competing

4   instructions.

5           Apparently the defendant has prepared his

6   instruction using *Greenwald versus United States*, a 1957

7   case, and *Empress Casino*, a Seventh Circuit 2016 case.

8           And the plaintiff has used the -- it looks

9   like the New York pattern jury instruction and also

10  language from the *Baxter* case from the U.S. Supreme

11  Court, 1976 and the *ePlus* case.

12          I'm inclined to --

13          MR. GREENBERG:  Your Honor, may I make a

14  point before you --

15          THE COURT:  Yes.

16          MR. GREENBERG:  Your Honor, we'd like to

17  submit that we, at that point, our client may have been

18  taking the Fifth Amendment.  So this procedure before

19  the jury should she have taken the Fifth, and I think

20  whether an inference should or shouldn't be instructive

21  would make sense.

22          It's our position now that neither of those

23  instructions should be given because in this proceeding,

24  she didn't take the Fifth.  So, they may use that as

25  inconsistent statement if that's what it is that she

1    took it before.  But because she didn't take it in front

2    of the jury, we would say there's no reason to give an

3    inference that she -- a negative reference she once took

4    the Fifth.

5              I don't know that that clouds the evidence

6    of what she provided before the jury today.  So I would

7    submit that neither of them be given.  I'm aware of the

8    one that Mr. Menhart put in, the strongest possible

9    inference.  I don't know what that does as far as

10   credibility over and above what she testified to, but it

11   seems to me that if you look at the whole, you have that

12   covered by an inconsistent statement and the credibility

13   of the witnesses, and you've mentioned a couple points

14   that she may have made that are inconsistent during her

15   testimony.

16             But it just seems inappropriate, unduly

17   prejudicial to her at this point to also add that maybe

18   there should be inference taken that she ever decided to

19   take the Fifth.

20             THE COURT:  All right.

21             MR. MENHART:  The record reflects in the

22   deposition testimony that she took the Fifth Amendment

23   and that was read into the record.  So for purposes of

24   this trial, I mean, that's in front of the jury.  So, we

25   believe that instruction should be given.

1          THE COURT:  What aspects of the Fifth

2     Amendment do you recall she took, Mr. Menhart?

3          MR. MENHART:  She took a -- she took the

4     Fifth Amendment, I assume, on many many different things

5     in her deposition, among other things, you know.  And

6     the Court didn't allow this, but her prior relationship

7     with Dr. Watts, but also some things that were in our

8     opinion questionable about her own phone number, for

9     example.

10          So, you know, those are the types of things

11     that came up in the deposition and that was being in

12     front of the jury as to the record of this case in this

13     specific proceedings.  So, that's why we believe it

14     should still be given.

15          THE COURT:  All right.  Well, let me say

16     that a witness has a right to invoke the Fifth Amendment

17     in a civil case any time they think they should.  And

18     they are ill advised to start selectively answering

19     questions that bear on the Fifth Amendment because that

20     might result in the waiver.

21          So it's completely understandable that she

22     would take the Fifth Amendment as to every single

23     question asked.  That might be good practice to do that.

24          I'm concerned about whether there's a reason

25     to have it in this case where she answered questions.

1   But your point is that she did not answer questions at

2   the deposition.

3           MR. MENHART:  Correct, and that was part of

4   the record in this specific trial.

5           THE COURT:  Well, I have problems with your

6   answer about the strongest inference against the person

7   invoking the privilege and evidentiary issue during the

8   trial.  And so, what I'll do is this.  There was --

9   there were questions asked of Ms. Torrenzano in

10  deposition where she asserted the Fifth Amendment.  And

11  then, here, in trial, she gave her own answers.  And,

12  there's no way for the plaintiff now to contradict what

13  evidence she gave here in court for the first time.

14          So, she did in my view assert the Fifth

15  Amendment in connection with the case because the

16  deposition is a part of the case.

17          I will not give the plaintiff's instruction

18  because I think that it does not state the law.  And I

19  think the defendant's statement -- defendant's 19 more

20  accurately reflects the law, and I'll give defendant's

21  19.

22          MR. GREENBERG:  Thank you, Your Honor.

23          THE COURT:  Do you maintain the objection to

24  preponderance of the evidence, Mr. Greenberg?  It's jury

25  instruction E.  It looks like it's a plain forward --

1          MR. GREENBERG:  Your Honor, if you would, it

2    may help you just to -- I think -- well, that one,

3    because we were offering defendant's 4 and they have

4    plaintiff's E, and if you look at the two you can decide

5    which one would be more appropriate.

6          I think -- I didn't notice, you had --

7          THE COURT:  Defendant's 4?

8          MR. GREENBERG:  Yes, sir.

9          And, you edited it, actually because we had

10   two other -- which was --

11         THE COURT:  I have defendant's 4.

12         MR. GREENBERG:  -- kind.

13         THE COURT:  I think that the plaintiff's

14   instruction on preponderance of the evidence is more

15   fulsome than the defendant's.  So I will give

16   plaintiff's E and deny defendant's 4.

17         MR. GREENBERG:  Your Honor, may I just say

18   one part about our instruction that may be considered

19   also adding to theirs which is that we also put in this

20   fact that the defendant does not have a burden to

21   disprove plaintiff's claims.  We have no burden coming

22   forward.  I want to make sure it's clear it's not who

23   has the best story, but whether they've proven their

24   case.

25         THE COURT:  Well, I think the first

1  paragraph states that the plaintiff has to prove its

2  claim.  So, it's not necessary to say what the defendant

3  doesn't have to prove anything.  That's what the

4  instructions says.

5              MR. GREENBERG:  Yes.

6              THE COURT:  So I'm not going to give

7  defendant's 4.  Thank you.

8              MR. GREENBERG:  Thank you.

9              MR. MENHART:  Your Honor --

10             THE COURT:  Yes.

11             MR. MENHART:  Just to clarify, you said you

12  were going to give the plaintiff's PE?

13             THE COURT:  Plaintiff's PE, exactly and deny

14  defendant's 4.

15             MR. MENHART:  Just for the record, on the

16  first line of that instruction, there is one typo that

17  says plaintiff Patrick, which we bring that to the

18  Court's attention and we remove the area.

19             THE COURT:  Plaintiff's Patrick Hately,

20  that's what it says in my copy.

21             MR. MENHART:  Well, things are fine.

22             THE COURT:  I think that's right.  Okay.

23  The next one I have that there's an objection is

24  plaintiff's F, and this has to do with --

25             MR. GREENBERG:  Your Honor.

1          THE COURT:  -- punitive damages.

2          MR. GREENBERG:  Your Honor, we have no

3    objection to plaintiff's F.

4          THE COURT:  All right.  Plaintiff's F will

5    be given.

6          MR. GREENBERG:  Oh, wait.

7          Your Honor, this is not the one for -- we

8    thought this was, too, but this is not about punitive

9    damages.

10         THE COURT:  Oh, it's about damages in

11   general?

12         MR. GREENBERG:  Yes, sir.

13         THE COURT:  Okay.  So, we -- do you have an

14   instruction on punitive damages, Mr. Menhart?

15         MR. MENHART:  Yes, we do.

16         THE COURT:  All right.  Let's put

17   plaintiff's F aside, put aside for right now.  We may

18   not need it.

19         So, the next one apparently is plaintiff's

20   G, which is the Stored Communications Act elements and I

21   think that there are multiple instructions on the

22   elements.

23         MR. GREENBERG:  Your Honor, may I --

24         THE COURT:  Yes.

25         MR. GREENBERG:  With regard to plaintiff's

1   G, if you also look at plaintiff's H which I think G is

2   just a small part of what is -- full instructions.  And

3   then, if you agree with that, then I would ask that the

4   Court look at defendant's nine, and then you could

5   decide -- rule which one you think is appropriate.

6              I'm not sure whether plaintiff's PG adds to

7   the element of construction.

8              THE COURT:  All right.

9              MR. MENHART:  Your Honor, we can withdraw

10  our PG.

11             THE COURT:  All right, PG is withdrawn.

12             So, now we're looking at plaintiff's H and

13  defendant's nine.

14             MR. GREENBERG:  Yes, sir.

15             MR. MENHART:  Your Honor --

16             THE COURT:  Yes.

17             MR. MENHART:  -- just make something

18  perfectly clear.  We took this -- we took these elements

19  that appear in here directly out of Your Honor's order

20  on the motion for summary judgment.  And, we provided

21  the same references that Your Honor did in that

22  document.

23             So -- and then our other point is that we

24  believe that jury instruction D9 as a fourth element.

25  I.e., instead of the three elements that the Court

1    identifies in the motion for summary judgment order, the
2    defendant's instruction creates a fourth element.  And
3    we think that's an improper construction of the law and
4    for that reason our instruction should be adopted.
5              MR. GREENBERG:  May I respond to that?
6              THE COURT:  Yes, please.
7              MR. GREENBERG:  Your Honor, I think that
8    when the Court is ruling on the motion for summary
9    judgment, it's ruling in terms of law of issue for
10   the --
11             THE REPORTER:  I'm sorry.  You need to speak
12   up.
13             MR. GREENBERG:  You want me to start again?
14   I'm sorry.
15             Your Honor, it is our contention that when
16   the Court ruled on the summary judgment motion, it was
17   making a ruling of law based on the arguments then
18   submitted by the parties, but wasn't fashioning an
19   element instruction for the purposes of a jury
20   instruction and the elements of the law which is
21   completely different.
22             I think the Fourth Circuit has even noted
23   that the fact that a statement is made in the Fourth
24   Circuit holding doesn't mean it's appropriate to be a
25   jury instruction.

1          Now, you can use that.  It can be evidence.
2   It could be -- certainly support a crafted jury
3   instruction.  But in this case, for Mr. Menhart, which I
4   think he suggests to make it determinative, I disagree.
5   And we gave you instruction that we think properly sets
6   forth all of the elements of the Stored Communications
7   Act.
8          THE COURT:  Your citation is just to the
9   statute, correct?
10          MR. GREENBERG:  Yes, that's correct.
11          THE COURT:  And the citation that plaintiff
12   has given me is Sand and Siffert Model Jury Instructions
13   Section 65.06 which I cited in the order, correct?
14          MR. GREENBERG:  Which --
15          THE COURT:  Which I cited in my order.
16          MR. GREENBERG:  I don't remember, Judge.
17   I'll accept that if you say you did, then you did.
18          THE COURT:  Well, I think I did.  But let
19   me -- I can pull the order up.
20          MR. MENHART:  Your Honor, I know with a lot
21   of confidence that you did, because we pulled it right
22   out of it.
23          THE COURT:  Did I cite the Sand and Siffert
24   instructions?
25          MR. MENHART:  You cited the instruction in

1   your order.

2           MR. GREENBERG:  You cited this as an

3   instruction?

4           THE COURT:  I cited the instruction in the

5   opinion.  But let -- if you have a question about it,

6   let's find the order.  I have the order in my trial

7   notebook and see if I cited it or not.

8           MR. MENHART:  Your Honor, we can represent

9   to the Court it's on page 12 of docket number 91.

10          THE COURT:  Thank you.

11          Well, for some reason, it won't come up on

12  my copy of it.  My trial notebook doesn't have a page

13  12.  It doesn't have page 12.

14          MR. GREENBERG:  You need page 12?

15          THE COURT:  I do.  If I could see page 12 it

16  would help me.

17          Yes, I cited Sand and Siffert Model Jury

18  Instruction 65.06.  All right, you can give it back.

19          So, here's what I'm going to do.

20          MR. GREENBERG:  Can I make two points?

21          THE COURT:  Yes, you can.

22          MR. GREENBERG:  Firstly, you cited that jury

23  instruction just as far as the second element.  So

24  again, I don't know that the Court was considering at

25  that point making it a full jury instruction.

1          I don't disagree if you cited that, that the

2   Sand Model Jury Instruction 65.06 has the first elements

3   that the Court set forward.

4          The other issue -- we did break ours up in

5   just using the statute a hundred percent.  So it's no

6   different.

7          But, one of the differences, as the Court

8   noted during our Rule 50 motion is that the arguments

9   and you cited it just from the paragraphs was for the

10  obtaining and looking at the stored communications.  But

11  when the Court made the decision for summary judgment,

12  you also included the possibility of altering or

13  preventing access which wasn't part of the complaint.

14         And so, if you do choose over -- if you do

15  choose the defendant's proposed instruction over ours,

16  I'd ask you to at least strike the words that are in

17  addition to what was alleged in the complaint and leave

18  it to only the e-mails that we were -- that they were

19  sued upon.

20         THE COURT:  So, you're requesting that I

21  strike out "or altered or prevented access to"?

22         MR. GREENBERG:  Yes.

23         THE COURT:  But the "prevented access to"

24  would apply if he was locked out of his e-mail because

25  the password had been changed, wouldn't it?

1          MR. GREENBERG:  But he didn't allege that in

2    the complaint.

3          THE COURT:  He testified that he --

4          MR. GREENBERG:  He did testify.  I'm just

5    saying he didn't allege it in the complaint.  That's

6    very specific.  And the Court went over the complaint

7    and found that it was only the e-mails.

8          So, I'm just simply responding that they

9    made a complaint --

10         THE COURT:  Hold on, hold on.

11         MR. GREENBERG:  All right, okay.

12         THE COURT:  I'm going to look at the amended

13   complaint.

14         MR. GREENBERG:  Your Honor, I'd just like to

15   cite the Court to the relevant paragraphs.  It is

16   paragraphs 86, 87, and 88 and those that follow.

17         THE COURT:  Paragraph 42 alleges that Ms.

18   Torrenzano deleted notification e-mails sent by

19   plaintiff's account whenever a new device connects to

20   his account.  That might be an alteration.

21         MR. GREENBERG:  There is no evidence of

22   that.

23         THE COURT:  Your response, Mr. Menhart,

24   concerning alteration or preventing -- prevention

25         MR. MENHART:  Sure, our response --

1    THE COURT:  -- in the complaint.

2    MR. MENHART:  Our response would be

3  that first and foremost, to the extent that there was

4  any type of objection here, it should have been made at

5  trial, because there was quite a bit of testimony

6  related to the changing of the passwords, the alteration

7  of the accounts, et cetera, et cetera.  So we think the

8  objection is waived in the first place.

9    The second thing this is literally a -- the

10  jury instruction that's given, there's no question that

11  the complaint clearly sets out a claim under Stored

12  Communications Act.  And all this instruction is doing

13  is saying, here's what you have to prove under the

14  Stored Communications Act.

15    And so then what we did was, we went to

16  trial here, and we presented testimony that would be

17  consistent with proving a claim under the Stored

18  Communications Act.

19    So, even -- it's all very consistent and

20  there's no surprises here.  And for all those reasons,

21  we think our instruction is appropriate.

22    THE COURT:  All right.  I'm going to give

23  plaintiff's exhibit -- I mean, plaintiff's instruction H

24  which is Sand and Siffert 65.06.

25    Defendant's nine will be denied.

1    MR. GREENBERG:  Your Honor, you're going to

2    amend it or I take it the answer is no?

3    THE COURT:  No, I'm not going to amend it.

4    I'm going to refuse it.  I'm giving plaintiff's

5    instruction.  Thank you.

6    Now, going to P1, and I understand defendant

7    has a number of objections to it, and I think that the

8    way to resolve this is to use the definitions that are

9    in the code and not add any additional verbiage to them,

10   as oppose to number three, electronic communications and

11   the Court can give the full definition of electronic

12   communication and the same for electronic storage.  I'm

13   talking about PI.  Thank you.

14   MR. GREENBERG:  And we also would actually

15   look at -- I think what the defendant offered was

16   separate instructions broken down, beginning at

17   defendant's 11.  So for a bit of cross reference --

18   THE COURT:  And, the s defendant's 11, is

19   that exact copy of the statute?

20   MR. BRADLEY:  Your Honor, I can answer that.

21   We -- we actually had a separate instruction for each

22   definition.

23   THE COURT:  My question was with respect to

24   D11, is that a verbatim statement of the definition

25   given in the statute?

1          MR. BRADLEY:  Yes, Your Honor.  The only

2   changes that were made from the statute, I think when we

3   actually agreed with Mr. Menhart, was we had taken out

4   the language about "electronic communication does not

5   mean" and then I think it listed wire.

6          THE COURT:  So, to answer my question, so

7   D11 this is an exact statement of the statute?

8          MR. BRADLEY:  Yes.

9          THE COURT:  All right.  So if I give an

10  exact statement of the statute, then we're all in

11  agreement.  Is that right?

12         MR. BRADLEY:  Yes.

13         MR. GREENBERG:  Yes.

14         THE COURT:  So, I'll do that for electronic

15  communication.  I'll do that for electronic storage, and

16  as it relates to the state of mind -- let's see here.

17         MR. MENHART:  I'm sorry.  You said you were

18  going to give D11 and E12?

19         THE COURT:  No.  Right now, I'm on PI.

20         MR. MENHART:  Thank you.

21         THE COURT:  And I said I was going to

22  give -- are you asking about the instruction we just

23  did, the earlier one?

24         MR. MENHART:  No, I'm looking and I

25  apologize if I'm confused here.

1            THE COURT:  That's all right.

2            MR. MENHART:  But I'm looking at PI.

3            THE COURT:  Which is definitions from the

4    statute.

5            MR. MENHART:  Correct.

6            THE COURT:  And I'm saying, I'm going to

7    give the statutory definition.

8            MR. MENHART:  Right, we agree on that.

9            THE COURT:  Okay.

10            MR. MENHART:  And the question is are you

11    using the defendant's instructions in place of PI?

12            THE COURT:  Yes.

13            MR. MENHART:  Okay, thank you.

14            THE COURT:  But I'm only doing it to the

15    extent that they conform to the statute.  I'm just going

16    to copy the statute.

17            MR. MENHART:  And we agree.

18            THE COURT:  Now, as it relates to state of

19    mind which is 5 and 6, I guess my question is whether

20    these are statutory definitions or is this verbiage that

21    you've written, Mr. Menhart?

22            MR. MENHART:  My representation to you, Your

23    Honor, would be that I cannot remember the specific

24    language that we did other than we have our citations.

25            THE COURT:  Okay.

1          MR. MENHART:  To the -- and again, this is

2     a -- this is a Fourth Circuit case, and it does site the

3     Sanford.  And it cites to the House Report as well.  So

4     that is the representation I'm comfortable making right

5     now.

6          THE COURT:  Okay.  The statute doesn't

7     define willful or intentional.  But, they have general

8     meaning in the law.  And I can use the general

9     instruction from just a civil knowing intentional state

10    of mind.  That might be sufficient under the statute,

11    because the statute says "Any violation of this chapter

12    which the conduct constituting the violation is engaged

13    in with a knowing and intentional state of mind made in

14    a civil action for personal recovery" -- so I could use

15    the statutory language, "knowing or intentional state of

16    mind".

17          MR. MENHART:  We don't object to that, Your

18    Honor.

19          THE COURT:  Yes.

20          MR. GREENBERG:  What I would also ask the

21    Court to consider is if you look at the jury instruction

22    D18, which is willful intentional.

23          THE COURT:  D18, hold on.

24          MR. GREENBERG:  Yes.

25          THE COURT:  Okay.

1       MR. GREENBERG:  And, I ask the Court to

2   consider the fact that there may be a different mindset

3   for the violation of the act versus the award of

4   punitive damages.

5       I know the word "knowing" is used in the

6   statute, and I know that the word "willful intention" --

7   the Court would agree that there's a difference there as

8   used for punitive damages purposes.

9       So, I think there has to be two separate

10   instructions to know that they're two different

11   mindsets.  You have to have a mindset to violate the act

12   and some aspect of the mindset that would make punitive

13   appropriate.

14       THE COURT:  Well, my impression is the

15   statute says if the violation is willful or intentional,

16   the Court may impose punitive damages.  So willful and

17   intentional --

18       MR. GREENBERG:  Have to be more than

19   knowing.

20       THE COURT:  Well, I don't see anything in

21   the statute that creates a higher burden of proof, do

22   you?

23       MR. GREENBERG:  Well, I will admit --

24       THE COURT:  Those are different words to me,

25   but I don't see -- the burden of proof could either be

preponderance of the evidence or clear and convincing.
I don't see anything here about burden of proof, do you?

          MR. GREENBERG:  I do not.  But let me, if I
might -- but I don't understand then.  Is if -- if the
knowing and willful violation of the statute was all
that were required, then I don't know why they have an
if clause.  They should simply say "then one could award
punitive damages".  But it goes on to say if you find
this, and if you then find that it was willful and
intentionally, then you may also award punitive.  That
suggests a higher burden.  Otherwise it wouldn't be an
if clause.

          THE COURT:  Well, if Congress intended a
higher burden, they would have put it in the statute.
So I'm not willing to infer a higher burden --

          MR. GREENBERG:  I think they did by using
the word -- I'm sorry, Your Honor.  I didn't mean to
interrupt you.

          THE COURT:  That's all right.  Go ahead.

          MR. GREENBERG:  I think they did by using
the word "willfully" and "intentionally" versus
"knowingly" and "willfully".

          I think the word "intentionally", I know we
argued this at sidebar, means the knowledge that you're
violating the law.

1          Now, just to give the Court -- I know you
2    said ignorance of the law is no excuse, which is usually
3    true --
4          THE COURT:  Always true in federal court.
5          MR. GREENBERG:  Well, I'll give an example
6    in the structuring statute.
7          THE COURT:  No, we don't need to go to
8    structuring statute.  Just focus on this case.
9          MR. GREENBERG:  I know, but that --
10         THE COURT:  Let me finish.  Let me finish.
11         One of the question is a reasonable
12   expectation of privacy.  So the question is, if you have
13   e-mail that's password protected, is it your view that's
14   public information or is it private?  Does the person
15   who holds the account have a reasonable expectation of
16   privacy that only those persons who have been provided
17   the password have access to it?
18         I think it answers itself in the question.
19   So I'm not going to argue with you about it.  What I'm
20   going to do is this.  My judgment is that the standard
21   of proof is still the preponderance of the evidence.  I
22   don't have anything that says otherwise.
23         MR. GREENBERG:  I'm not suggesting
24   otherwise, Your Honor.  I'm not suggesting about the
25   preponderance of the evidence.  I'm talking about the

1  knowing and willful nature.

2        The preponderance of the evidence is defined

3  that you knowingly and willfully committed the act by

4  preponderance of the evidence.

5        And then, it further is you willfully and

6  intentionally violate the act for purposes of then

7  applying punitive damages.  It doesn't change

8  preponderance of the evidence.

9        THE COURT:  Okay.  Two district courts have

10 interpreted willfully and intentionally to mean that the

11 defendant knew her conduct was unlawful.  What's your

12 position on that, that she knew her conduct was

13 unlawful?

14        MR. GREENBERG:  Your Honor, I'm sorry.  I

15 didn't hit the microphone.  I didn't hear what you said.

16        THE COURT:  Let me say it again.  Two

17 district courts have interpreted the words "willful" or

18 "intentional violation" to mean the defendant knew her

19 conduct was unlawful.  What is your position on that?

20        MR. GREENBERG:  I think it's correct.

21        THE COURT:  Okay.  Then, I'm going to use

22 the definition that's in the statute for element five of

23 knowing and intentional state of mind.  That will be

24 five.

25        And for element six, I'm going to use the

1    language that "willful or intentional violation means

2    that the defendant knew her conduct was unlawful".  That

3    will be element six of the definitions on P1 that I will

4    give.  And either side doesn't have to agree with that

5    but that's what I'm going to do.

6              And I think you both persist in your

7    objections; is that right?  For the record, you both

8    persist in your objections?

9              MR. GREENBERG:  Yes.

10             MR. MENHART:  Yes, we do.

11             THE COURT:  Okay.

12             Now, D11 is just the same about electronic

13   communication service which I think we just addressed by

14   saying we use the statute of the definition of

15   electronic communication.

16             So that would be refused because we already

17   have it, and we're going to use the statute.

18             All right.  You with me on D12?

19             MR. MENHART:  Yes.

20             THE COURT:  Since I'm using the statutory

21   definition, I'm going to give this -- this appears to be

22   the statute that the defendant has cited.

23             Didn't you cite the statute, the full

24   statute?

25             MR. BRADLEY:  This is --

1        THE COURT:  D12.

2        MR. BRADLEY:  For D12, this is not the

3   entire definition.  This is actually something that we

4   had discussed.  We took it out, because my memory is

5   that at the end of foreign commerce, it says, but

6   electronic communications does not include.  And then

7   there was a list of other wire communications, and that

8   don't apply to this case.  So we took out the

9   exceptions.

10       THE COURT:  All right.  Is D12 acceptable to

11   you, Mr. Menhart?

12       MR. MENHART:  Yes, we don't have -- we don't

13   have a major objection to that.  I think it was

14   primarily objected to because we had our PI.  And now

15   that has been resolved, I think we are fine.

16       THE COURT:  So, D12 can be given?

17       MR. MENHART:  I accepted counsel's

18   representation if that's what happened.

19       THE COURT:  Okay.

20       MR. MENHART:  I don't have an issue and I

21   don't have a reason to doubt that right now.

22       THE COURT:  All right.  And so, we don't

23   need the same repeat of it in D14, do we?

24       MR. BRADLEY:  Your Honor, electronic

25   communications system and electronic communication

1   service, actually --

2           THE COURT:  They are two different things.

3           MR. BRADLEY:  They are two definitions, yes.

4           THE COURT:  All right.  I can give -- unless

5   you have an objection, Mr. Menhart, D14 which appears to

6   be a copy of the statute as well on electronics

7   communications system as opposed to electronic

8   communications, the word system.

9           MR. MENHART:  To the extent that's the exact

10  definition of the statute, we don't object.

11          THE COURT:  All right.  I think it is.  But

12  if it's not, those are the words I'm going to use.

13  Unless there's some reason to change it, you should

14  assume I'm going to do that.

15          Now, P, plaintiff's J.

16          Why do we need those sub-elements, Mr.

17  Menhart, 1 and 2?

18          MR. MENHART:  These are -- and these again

19  are outside circuits.  You know, they're demonstrating

20  what they want to see happen in these instances.  So,

21  that's why we put them in.

22          And we think that this -- in addition, it

23  creates a clear line of analysis for the jury to

24  undertake.  So, that's why this is our instruction, our

25  proposed instruction.

1          THE COURT:  I'm listening.

2          MR. GREENBERG:  Your Honor, I'm trying

3   to --- I'm sorry.

4          THE COURT:  Take your time, PJ.

5          MR. GREENBERG:  I have the PJ, and I have --

6   I'm just trying to see where -- since usually we

7   disagree, we had our own independent instruction.  I

8   want to make sure I did that together.  I believe that

9   that's D13.

10          Your Honor, I -- this particular -- this

11  particular instruction as I read it is almost -- is

12  almost a directed verdict with subparagraph two in it.

13  Because if I understand this finding instruction, it's

14  not just saying they have to find that the elements, but

15  it looks like it says if you find that he didn't -- that

16  she went into and then he said that he left a copy of an

17  e-mail in his e-mail box, you shall then find that he's

18  established this case.

19          And I don't know -- we during a Rule 50, we

20  argue that wasn't true.  And of course we'll leave that

21  to the jury to decide.

22          But, this would be, in my mind, especially,

23  paragraph -- sub two.  Number one I don't think matters

24  because there was no information about that.  There was

25  no testimony about whether or not the defendant did or

1    didn't open any of his e-mails.  So there was zero

2    testimony about that.  I don't know why we would put

3    that in there as a finding.  I don't know that we need

4    this finding.

5              But we have -- we have, I think, I guess,

6    our simplified version was jury instruction D14.

7              THE COURT:  D14 or D13?  I think you meant

8    D13, didn't you?

9              MR. GREENBERG:  I beg your pardon, Your

10   Honor.  I did mean that.

11             THE COURT:  And, the statute used the words

12   "for purposes of backup protection of such

13   communications"?  Does the statute use those languages?

14             MR. GREENBERG:  Yes, it does specifically

15   say that.

16             THE COURT:  Okay.

17             MR. MENHART:  Our response to that, Your

18   Honor, simply that we are -- we have provided additional

19   background on -- you know, and we have the citations to

20   it.  We've provided additional background how other

21   courts have interpreted that.  So, you know, that's our

22   position.  We understand that this -- I don't think we

23   dispute the definition of electronic storage.

24             THE COURT:  All right.  I'm going to give

25   D3 -- D13 which appears to be the statute and refuse to

 1   give plaintiff's J.

 2            The problem with plaintiff's J is that

 3   either or judgment and the statute doesn't have such

 4   detail.  And I understand you're trying to address the

 5   case law, and I'm not sure that there was any testimony

 6   about plaintiff opening or not opening his own e-mail

 7   or -- well, there was testimony that the e-mail --

 8   that -- his testimony that his e-mail and his bank

 9   statements remained on his e-mail for purposes of

10   background after he paid his bill.  He did testify to

11   that.

12            And I think that that's in the facts.  I

13   don't think I need to direct the jury to that.  So, I'll

14   give D13.

15            PK.

16            MR. GREENBERG:  Your Honor, I believe PK is

17   redundant.  I believe that the Court's already laid out

18   the elements and what -- what the preponderance of the

19   evidence is.

20            THE COURT:  It is a duplicate, isn't it,

21   Mr. Menhart?

22            MR. MENHART:  I'm comfortable withdrawing

23   it, Your Honor.

24            THE COURT:  Withdrawn.

25            Now, punitive damages, plaintiff's L, like

1   law and D17.  All right.  I do think that looking at and

2   comparing the two instructions, the plaintiff's

3   instruction which appears to be very similar to the

4   statute and the case law, the defendant's instruction,

5   the first paragraph is unnecessary, it seems to me about

6   whether the Court has determined he has suffered no

7   actual damages.

8            The more detailed instruction on punitive

9   damages from the defendant thereafter does set forth

10   some of the elements that the Court -- the jury is to

11   consider in whether or not to award punitive damages and

12   the amount that they should award and the factors A

13   through F.

14            It appears to be Seventh Circuit pattern

15   instruction modified.

16            Mr. Menhart, should I tell the jury about

17   these ways to evaluate punitive damages and how to set

18   them?

19            MR. MENHART:  Your Honor, we believe our

20   position is that the -- both counsel will be able to

21   address the issue of damages during closing arguments.

22            The jury has the ability to come to their

23   own conclusions as to what damages are appropriate.

24   And, the plaintiff's jury instruction L very clearly

25   cites to the statute and cites to good law and Fourth

1   Circuit which is the *Van Heusen* case.

2         So we believe -- and, in addition to those

3   points, we do think that there's a concern that using

4   Seventh Circuit pattern jury instructions with a Fourth

5   Circuit case does create a potential conflict.

6         So, because we cite the statute and we cite

7   the Fourth Circuit case, we believe that's more

8   appropriate.

9         THE COURT:  All right.  Well, I appreciate

10   that.  I'm going to give the first paragraph of

11   plaintiff's L, take out the first paragraph of

12   defendant's 17 and give the reminder of defendant's 17

13   because the elements A through F are the elements the

14   Court -- the jury's to consider to determine whether to

15   award punitive damages so that the Court can assess how

16   the punitive damages was made under the *BMW* case of the

17   United States.

18         I'm talking about the *BMW* case, because you

19   can't just have an award of punitive damages that

20   doesn't take into account the factors of A through F.

21         Now, the next I have is plaintiff's M like

22   man and defendant's 18.  I don't see any basis to use a

23   Veterans Administration case for punitive damages, and I

24   don't see any reason to add another instruction on

25   punitive damages from plaintiff's M if I'm giving the

1    one I've just described.

2              So, my plan is to refuse plaintiff's M and

3    defendant's 18, refuse them both.

4              It appears the defendant's 1, which has to

5    do with exhibit being admitted for limited purpose, the

6    plaintiff had an objection to it, but I'm not sure I

7    know what the objection is.

8              MR. MENHART:  I guess our position is that I

9    don't think anything was -- I don't think anything was

10   admitted for a limited purpose, as I remember.  We had

11   one that was --

12             THE COURT:  Well, the impeachment evidence,

13   because it was a party would be admissible.  So you're

14   saying there's no evidence that qualifies.

15             What you do think, Mr. Greenberg?

16             MR. GREENBERG:  I'm sorry.  I was looking

17   over the instruction nine and made a record, number 18,

18   you already addressed and the previous one --

19             THE COURT:  Right.

20             MR. GREENBERG:  -- I wasn't caught up, and I

21   beg your pardon.

22             THE COURT:  Take your time and look at

23   number defendant's 1.

24             MR. GREENBERG:  Defendant's 1.

25             THE COURT:  The question is whether anything

1    was admitted for a limited purpose.  I'm not sure

2    anything was.

3              MR. GREENBERG:  Your Honor, I think it's not

4    necessary to have defendant's 1.

5              THE COURT:  All right.  Well, we'll withdraw

6    defendant's 1 -- refuse defendant's 1 since you offered

7    it.

8              And, defendant's 2, I think we already have

9    that in the credibility of the witness instruction.

10   Plaintiff's A, I think, the same thing.  But you can

11   take a look at it, defendant's 2.  It appears to be

12   duplicate of plaintiff's A about credibility of

13   witnesses to me.

14             MR. BRADLEY:  Your Honor, my memory of this

15   was that plaintiff's A was a preliminary instruction

16   that the Court might have given some of it --

17             THE COURT:  Is there a credibility of

18   witnesses instruction here?

19             MR. BRADLEY:  Not a separate one.  I

20   think --

21             THE COURT:  Not a separate one?

22             MR. BRADLEY:  No, I think it was part of

23   plaintiff's A, but plaintiff's A also had some

24   preliminary instructions in it.

25             THE COURT:  All right.  Well, we should use

1    plaintiff's A, the extra for plaintiff's A that talks

2    about credibility of witnesses.  I think that might be

3    the way to do it.  But we don't need additional

4    instruction.  This will be the instruction on the

5    credibility of witnesses unless you all see something

6    else.

7                    MR. MENHART:  Your Honor, I would just point

8    out to the Court that it looks like J5, jury instruction

9    J5 has the credibility of witness.

10                   Do you guys disagree with me?

11                   THE COURT:  No, J5 is credibility of the

12   witnesses.

13                   So, we have it here, don't we?

14                   MR. GREENBERG:  Yes, sir.  Is that the joint

15   agreed one?

16                   MR. MENHART:  It was joint.

17                   THE COURT:  It's a joint instruction, okay.

18   So we'll give J5 and refuse defendant's 2.

19                   Defendant's 4 is a preponderance of the

20   evidence which I think we've already talked about.

21   Didn't we do that already?

22                   MR. BRADLEY:  Yes.

23                   THE COURT:  All right.  So, we'll refuse

24   defendant's 4.  We talked about burden of proof,

25   preponderance of the evidence.

1        Clear and convincing evidence is not a part
2   of the statute.
3        And, defendant's 5 appears to be again a
4   duplicate of plaintiff's A, about two types of evidence.
5   Is that right?  Let's take a look at defendant's 5.
6   Yeah, defendant's 5 and plaintiff's A.  They're not
7   exactly the same.
8        MR. MENHART:  Your Honor, I guess for
9   purposes of just -- we wouldn't object to it being
10  admitted.
11       THE COURT:  All right.  We'll give
12  defendant's -- defendant's 7.  I don't think we need
13  defendant's 7.  The fact that the lawsuit was filed,
14  there's still a burden of proof that they have to meet.
15  The fact that the lawsuit was filed doesn't prove
16  anything.  You want defendant's 7?
17       MR. GREENBERG:  Your Honor, Court's
18  indulgence one moment, please.
19       Your Honor, I would like defendant's 7.
20       THE COURT:  All right.  Objection to seven?
21       MR. MENHART:  Your Honor, our objection is
22  exactly what the Court just stated which is that there
23  is a clear demonstration of the requirements or to
24  prevail at trial.  And that instruction was comfortably
25  already given.  We would strike it because it's

1   duplicative.

2         THE COURT:  All right.  I'm going to give

3   defendant's 7.  I'll give it.

4         Defendant's 8.

5         MR. GREENBERG:  Your Honor, if I might.

6         THE COURT:  Yes.

7         MR. GREENBERG:  What happened is, this is

8   where I'm confused.  So initially, Mr. Menhart proposed

9   general preliminary instructions which he gave -- the

10  Court would give to the jury before they sat down at the

11  beginning of the trial.

12        We gave instructions because, Your Honor, in

13  our -- any way, it would be instructed at the close of

14  the trial at the close of evidence like they are now.

15  So when you're going back and forth, so that's why we

16  stopped looking at A.

17        And then, when Mr. Hines came out, we agreed

18  that those were no longer relevant in a way because they

19  were moot, because the preliminary instructions were

20  whatever the Court gave.  And now, we have the closing

21  instructions.

22        We're going back and forth.  I don't know

23  that there would be a disagreement as long as -- my

24  instructions were credibility of witnesses,

25  circumstantial evidence, you know, what is or isn't

1    evidence, like that.

2              So, that's what we're doing.  We're giving

3    the same instruction basically because they were post

4    close of trial.

5              THE COURT:  All right.  Do you persist in

6    your objection to defendant's 8?

7              MR. MENHART:  We just think it's primarily

8    duplicative, but we're not going to object to it.

9              THE COURT:  All right.  I'll give

10   defendant's 8.

11             Defendant's 9, let me go back to plaintiff's

12   H here.  We've already dealt with this, I think.

13             MR. GREENBERG:  You have, Your Honor.

14             THE COURT:  So, we don't need to give --

15   defendant's 10 will be refused.

16             I think defendant's 11 we've already

17   covered.

18             MR. GREENBERG:  What did you do with

19   defendant's 10?

20             THE COURT:  I'm sorry.

21             MR. GREENBERG:  Defendant's 10?

22             THE COURT:  Defendant 10 will be refused.

23             MR. GREENBERG:  Refused?

24             THE COURT:  Yes, we've already covered about

25   elements of the Electronic Stored Communications Act.

1          MR. GREENBERG:  Your Honor, I think you've
2     already gone through 11 and 12, I believe.
3          THE COURT:  If you persist with 10, tell me
4     what your reasoning is.
5          MR. GREENBERG:  Well, Your Honor, it sets
6     down -- it sets forth the law and the burden's on the
7     plaintiff and not on the defendant.  It basically says
8     if you find electronic communication was not stored for
9     backup protection, then you should basically find the
10    defendant is not liable.
11         And just directly, it tells the jury that
12    that's one of the elements and what they're supposed to
13    do depending upon the finding.
14         Sorry, I should stand.
15         THE COURT:  All right.  I think I've
16    addressed this issue before and I'll say it again.  I
17    don't -- I may address it post trial, if necessary, but
18    this is an open question about whether electronic
19    communication stored on an remote e-mail server falls
20    within the purview of the act.
21         And my judgment for right now is that I'm
22    just going to leave it with the statutory words, backup
23    protection, and not make any particular judgment right
24    now because I know there's a circuit conflict on this
25    question, and it's a factual question.

1                   So, 10 is refused.  11 -- D11, objection to

2     D11?

3                   MR. GREENBERG:  Your Honor, I think you may

4     have gone over these.  These are the elements --

5                   THE COURT:  Oh, that's the elements 11, 12,

6     13.  So, we've covered all these.  So these will be

7     refused.  We've already covered them.

8                   MR. GREENBERG:  You may have accepted some

9     of them.

10                  THE COURT:  Well, I mean we're using the

11    statutory words.  That's what I agreed to earlier.  So,

12    if the -- if these conform to the statute, I'll use

13    them.  If they don't, I won't.  Hopefully that makes

14    sense.

15                  MR. GREENBERG:  The only thing we modified

16    on 13 you can use the exact statutory words.  It doesn't

17    include certain signals that --

18                  THE REPORTER:  I'm sorry.

19                  THE COURT:  You can come to the podium, too.

20    It might make it helpful.

21                  MR. GREENBERG:  We modified one of the -- we

22    modified -- the parties jointly modified one of the

23    definitions to redact information that's just not

24    relevant to the case, for example.

25                  THE COURT:  Altered or prevented --

1          MR. GREENBERG:  No, it wasn't that part.  It
2    was what kind of signals.  It indicates what kind of
3    signals and stored communication, but it is --
4          THE COURT:  I see.
5          MR. GREENBERG:  -- it doesn't include like a
6    pager or tone and they have four of them.  It's just
7    completely irrelevant to our proceedings.
8          In fact, it was the plaintiff that asked
9    that we would redact it and we agreed.  So, just FYI.
10          THE COURT:  So, you should use D13, is that
11    what you're saying?  You all agreed to D13?
12          MR. BRADLEY:  Yes.
13          MR. GREENBERG:  Yes, yes, that's correct.
14          THE COURT:  All right, D13 will be given.
15          D14 I believe is the same; is that right, to
16    give 14?
17          MR. GREENBERG:  Yes, it's a statement of the
18    statute.
19          THE COURT:  Well, do we even need D15 now?
20          MR. GREENBERG:  Your Honor, I would submit
21    that we do.  D15 is a question of whether or not there's
22    conspiracy liability.
23          So that if independently, if they were to
24    decide that Dr. Watts was on the -- was the one who was
25    accessing the e-mail, that is not Nicole Torrenzano's

1  responsibility.  She is only liable in a civil setting

2  under this statute for her own conduct.

3          And so I think if they conflated it at

4  times, I would like the jury to be clear that what they

5  have to decide is whether she violated the act.  And her

6  violation would be her access, nothing else.

7          THE COURT:  Mr. Menhart.

8          MR. MENHART:  Your Honor, our position on

9  this one is that it's prejudicial.  It effectively is

10  making an argument in the jury instruction that she

11  didn't access on -- in the October time period.

12          Furthermore, there is no cited jury

13  instruction whatsoever.  And, the question is the

14  secondary liability really isn't part of the jury at

15  all.  There is no allegation of secondary liability

16  against Ms. Torrenzano.

17          THE COURT:  All right.  I'm going to sustain

18  the objection to defendant's 15.  There's actually not a

19  conspiracy claim left.  So -- and there's no evidence

20  about what Dr. Watts did or did not do other than

21  plaintiff's testimony.

22          Looking at defendant's 17, I think we've

23  already talked about punitive damages in defendant's 17.

24  I refused defendant's 18 earlier.

25          MR. GREENBERG:  You noted our objection on

1    17, the fact that we believe that we should be -- the
2    jury should be informed you made the finding there was
3    no award of actual damages.

4            And the reason that we would submit that
5    that's an important part of the punitive damages is
6    because there is substantial case law that indicates
7    that one, that the jury should decide the issue of
8    punitives based on the amount of actual damages.  And so
9    if there's zero, they should know that.

10           THE COURT:  Thank you for saying that, but
11   I'm not going to do it because the Fourth Circuit has
12   said a person can recover under the act for punitive
13   damages without actual damages, which would suggest to
14   me it's not necessary to have actual damages.

15           MR. GREENBERG:  Your Honor, I agree with
16   that.  And if I misspoke what I meant to say is that I
17   agree that that's the law.  But then when deciding what
18   to award in punitive damages, one of the factors are to
19   look at what the actual damages were.

20           So they might decide with zero actual
21   damages, a thousand in punitives.  If the real actual
22   damage were a hundred thousand, then 200,000.  But
23   there's a correlation --

24           THE COURT:  Would you show me in part of 17
25   a list of factors A through F.  I don't see the amount

1   of compensatory damages, do you?

2          MR. GREENBERG:  Excuse me one second.

3          Your Honor, F --

4          THE COURT:  It says actual harm.

5          MR. GREENBERG:  That's right.  Well, actual

6   damages.  Maybe harm was the wrong word.

7          THE COURT:  Well, I'm not going to give

8   defendant's -- I've already told you I'm going to give

9   the punitive damages instruction, so 17 will be refused

10  for the reasons I stated earlier.

11         And 19, let's look at 19.

12         MR. GREENBERG:  You've actually given 17.

13         THE COURT:  I'm giving parts of 17, but I'm

14  not giving the part about -- I've determined that he had

15  no damages.  I'm not doing that.

16         And 19 is -- we've already covered that on

17  Fifth Amendment.  So that's refused.

18         I believe I've now covered all the

19  instructions.

20         MR. GREENBERG:  I don't think you refused

21  that.  I think you were granting defendant's.

22         THE COURT:  Well, I've granted -- am I

23  granting this one or a different one?  I thought I was

24  granting --

25         MR. GREENBERG:  You said 19.

1          THE COURT:  I'm granting 19, sorry.

2          I believe I've covered all the instructions

3  now, have I?

4          MR. GREENBERG:  You have.  Your Honor, would

5  it be inappropriate to go through a list, so write down

6  and make sure I have them right.

7          THE COURT:  You can certainly do that with

8  my law clerk.

9          What I'm going to do is have my law clerk

10  now start crashing the board and putting the

11  instructions together so we can all look them over and

12  organize them.  We may or may not be able get to the

13  jury today.  It depends on how long it takes to get them

14  organized.

15          So, what I'll do is take a recess.  Let --

16  weren't you all taking notes while we were going through

17  this right now?

18          MR. GREENBERG:  I was, but when you said 19

19  was not, I wanted to make sure I get it right, too.

20          THE COURT:  What I'm going to do is I'm

21  going to put them together for you, and you can look

22  them over.  Okay.  But I'm not going to spend the time

23  now to have you --

24          MR. GREENBERG:  Sure enough.

25          THE COURT:  -- take notes.  I mean, you have

1   two lawyers there, and --

2               MR. GREENBERG:  Yes, sir, I understand.

3               THE COURT:  Okay.  All right.  So, we'll

4   recess until we have the draft instructions available,

5   and we will come back with a draft for you soon.

6               I'll let the law clerk bring it out so you

7   all can look them over.  And if there are any objections

8   that remain, we will come back.  I think it's going to

9   take at least 45 minutes, if not longer.

10              MR. GREENBERG:  Like to eat or --

11              THE COURT:  Exactly, exactly.  So it's 2:08

12  now.  Let's come back at 3:15.  Does that sound --

13  that's almost an hour.  All right.  Thank you.

14              (Court recessed at 2:08 p.m. and reconvened

15              at 3:38 p.m.)

16              THE COURT:  Counsel, you've had a chance to

17  review the instructions?

18              MR. MENHART:  Yes, sir.

19              MR. GREENBERG:  Yes, Your Honor.

20              THE COURT:  And everything's resolved?

21              MR. GREENBERG:  I think so.

22              THE COURT:  All right.  I think I can read

23  the instructions now, and each of you might end up with

24  about 30 minutes for argument.  Would that be

25  sufficient?

1          MR. MENHART:  Your Honor, for plaintiff, we

2  can certainly try to be as quick as we possibly can.

3          THE COURT:  I'm not trying to rush you.  How

4  much time do you think you need?

5          MR. MENHART:  We're concerned -- we're

6  concerned that it might be close.  We would do the very

7  best we could.  I guess I would say to the Court, I

8  think it's probably going to be 15 to 20 minutes.

9          THE COURT:  All you need is 15 to

10  20 minutes?

11          MR. MENHART:  Right, but you're saying

12  30 minutes total between us or just for us?

13          THE COURT:  I was saying 30 minutes each

14  side.  Does that work?

15          MR. GREENBERG:  I agree.

16          THE COURT:  I think I can read the

17  instructions now in less than 20 minutes, hopefully, and

18  then you all would have the case.

19          Now, that means 30 minutes total for

20  plaintiff, not 30 plus 10.  You understand?

21          MR. MENHART:  We understand.

22          MR. GREENBERG:  Would they return at all

23  today or would you release them to come back tomorrow

24  morning?

25          THE COURT:  Come back tomorrow.  I don't

1  make them stay pass 5 o'clock.  I told them I'd stop at

2  5, and I stop at 5.

3             Mr. Hendrick, I need you to bring the podium

4  out so they can face the jury for closing argument.

5             MR. HENDRICK:  Yes, sir.

6             MR. MENHART:  Your Honor, could I raise one

7  issue.  Mr. Robinson has an appearance tomorrow in

8  Arlington Circuit Court.

9             THE COURT:  He doesn't need to be here for

10  deliberations.  That's fine.  You can be excused.

11             MR. MENHART:  We appreciate that.  Thank

12  you.

13             THE COURT:  All set?

14             You can bring our jury out, Mr. Hendrick.

15             MR. HENDRICK:  Yes, sir.

16             THE COURT:  You may be seated.  Thank you

17  for your patience, ladies and gentlemen.

18             You've heard all the evidence you're going

19  to hear in connection with the case.  And now it's my

20  duty to instruct you on the law which will govern your

21  deliberations.

22             I will read the instructions to you, and

23  you'll be provided with a written copy of the

24  instructions along with all the exhibits that have been

25  admitted into evidence for your consideration.

1        Members of the jury, it is my duty and

2   responsibility to instruct you on the law you are to

3   apply to this case.

4        The law contained in these instructions are

5   the only law you may follow.  It is your duty to follow

6   what I instruct you the law is, regardless of any

7   opinion you might have as to what the law ought to be.

8        If I've given you the impression during the

9   trial that I favor either party, you must disregard that

10   impression.  If I've given you the impression during the

11   trial that I have an opinion about the facts of this

12   case, you must disregard that impression.

13        You are the sole judges of the facts of this

14   case.  Other than my instructions to you on the law, you

15   should disregard anything I may have said or done in

16   arriving at your verdict, except for any instructions or

17   ruling I may have made.

18        You should consider all the instructions

19   about the law as a whole and regard each instruction in

20   light of the others without isolating a particular

21   statement or paragraph.

22        The testimony of the witnesses and other

23   exhibits introduced by the parties constitute evidence.

24   The statements of the lawyers are not evidence.  They're

25   only arguments.

1    It is important for you to distinguish
2  between the arguments of the lawyers and the evidence on
3  which those arguments rest.  What the lawyers say or do
4  is not evidence.  You may, however, consider the
5  arguments the lawyers make in light of the evidence that
6  has been admitted and determine whether the evidence
7  admitted during this trial supports the legal arguments.
8    You must determine the facts from all the
9  testimony you've heard and the other evidence as
10  submitted.  You are the judges of the facts.  But in
11  finding those facts, you must apply the law as I
12  instruct you.
13    You are required by law to decide the case
14  in a fair, impartial and unbiased manner based entirely
15  on the law and on the evidence presented to you in the
16  courtroom.
17    You may not be influenced by passion,
18  prejudice or sympathy you might have for the plaintiff
19  or the defendant in arriving at your verdict.
20    It is my duty to instruct you on the rules
21  of law you must use in deciding this case.  When I
22  finish reading these to you, you will go to the jury
23  room to begin your deliberations and discussions of the
24  case.
25    Your decision must be based only on the

evidence presented here.  You must not be influenced in
any way by either sympathy for or prejudice against
anyone.  You must follow the law as I explain it, even
if you do not agree with the law, and you must follow
all of my instructions as a whole.  You must not single
out or disregard any instructions on the law.

In this case, it is the responsibility of
the plaintiff, Mr. Patrick Hately, to prove every
essential part of his claim by a preponderance of the
evidence.  This is sometimes called the burden of proof
or the burden of persuasion.

A preponderance of the evidence simply means
an amount of evidence that is enough to persuade you
that plaintiff's claim is more likely true than not
true.  If the proof fails to establish any essential
part of a claim or contention by a preponderance of the
evidence, you should find against the plaintiff.

In deciding whether any fact has been proved
by the preponderance of the evidence, you may consider
the testimony of all the witnesses, regardless of who
may have called them, all the exhibits received in
evidence, regardless of who may have produced them.

If the proof fails to establish any
essential part of the plaintiff's claim by a
preponderance of the evidence, you should find for the

1   defendant, Ms. Nicole Torrenzano, as to that claim.

2           The plaintiff has the burden of proving this

3   case by what's called a preponderance of the evidence.

4   This means the plaintiff must prove that in light of all

5   the evidence what he claims is more likely true than not

6   true.

7           So, if you could put these -- the evidence

8   favoring the plaintiff and the evidence favoring the

9   defendant on opposite sides of balancing scales,

10  plaintiff needs to make the scales tip to his side.

11          To decide whether any fact has been proved

12  by a preponderance of the evidence, you may, unless I

13  instruct you otherwise, consider all the testimony of

14  the witnesses, regardless of who may have called them

15  and all the exhibits that the Court allowed, regardless

16  of who may have produced them.

17          After considering all the evidence, if you

18  decide by -- if you decide a claim or fact is more

19  likely true than not, then the claim or fact has been

20  proved by a preponderance of the evidence.

21          In order to prove that the defendant,

22  Ms. Nicole Torrenzano, committed a violation of 18 U.S.

23  Code 2701(a) of the Stored Communications Act, the

24  plaintiff, Mr. Hately, must prove three essential

25  elements which are, one, plaintiff must prove that

without authorization, the defendant, Ms. Nicole
Torrenzano, accessed a system through which electronic
communication service is provided or accessed a system
through which electronic communication service is
provided with authorization but exceeded that authority
in accessing the information in question.

Two, second, the plaintiff, Mr. Hately, must
prove that the defendant, Ms. Nicole Torrenzano,
obtained or altered or prevented access to a wire or
electronic communication while it was in electronic
storage in such system.

And third, the plaintiff, Mr. Hately, must
prove that defendant, Nicole Torrenzano, acted with a
knowing or an intentional state of mind.

The term electronic storages means, A, any
temporary, intermediate storage of a wire or electronic
communication incidental to the electronic transmission
thereof, and B, any -- let me start over.

B, any storage of such communication by an
electronic communication service for the purposes of
backup protection of such communication.

Electronic storage means storage of
electronic communication by an electronic communication
service for the purposes of backup protection of such
communication.

1    A person acts with an intentional state of

2  mind as to her conduct or the result of her conduct if

3  such conduct or result is her conscious objective.

4    A common means to describe conduct as

5  intentional or to say that one causes the result

6  knowingly or intentionally is to say that it is done or

7  accomplished on purpose.

8    The term intentional is not meant to connote

9  the existence of a motive.  The term intentional state

10  of mind does not require that the actor understand the

11  legal significance of her conduct or that the act have a

12  specific intent to violent the law.

13    A person acts knowingly as to her conduct if

14  she was aware of the nature of the conduct, aware of or

15  possessing a firm belief in the existence of the

16  requisite circumstances, and awareness of or a firm

17  belief about the substantial certainty of the result.

18    Electronic communications service means any

19  service which provides to users thereof the ability to

20  send or receive electronic communications.

21    Electronic communications means any transfer

22  of signs, signals, writings, images, sounds, data, or

23  intelligence of any nature, transmitted in whole or in

24  part by a wire, radio, electromagnetic, photoelectronic,

25  photooptical system that affects interstate or foreign

1  commerce.

2          Electronic communication system means any

3  wire, radio, electromagnetic, photooptical or

4  photoelectronic facilities for the transmission of wire

5  or electronic communications and any computer facilities

6  or related electronic equipment for the electronic

7  storage of such communications.

8          When I say -- when I say you must consider

9  all the evidence, I don't mean you must accept all the

10  evidence as true or accurate.  You should decide whether

11  you believe what each witness had to say and how

12  important that testimony was.

13          In making that decision, you may believe or

14  disbelieve any witness in whole or in part.

15          The number of witnesses testifying

16  concerning a particular point doesn't necessarily

17  matter.

18          To decide whether you believe any witness, I

19  suggest you ask yourself a few questions.  Did the

20  witness impress you as one who was telling the truth?

21  Did the witness have any particular reason not to tell

22  the truth?  Did the witness have a personal interest in

23  the outcome of the case?  Did the witness seem to have a

24  good memory?  Did the witness have the opportunity and

25  ability to accurately observe the things about which he

1  or she testified?  Did the witness appear to understand

2  the questions clearly and answer them directly?  Did the

3  witness's testimony differ from the other testimony of

4  the witnesses of other -- did the witness's testimony

5  differ from other testimony or other evidence?

6          Certain things are not to be considered as

7  evidence.  I will list them for you.

8          First, if I told you to disregard any

9  testimony or exhibits or struck any testimony or

10  exhibits from the record, such testimony or exhibits are

11  not evidence and must not be considered.

12          Second, anything you might have seen or

13  heard outside of the courtroom is not evidence and must

14  be entirely disregarded.

15          Third, questions and objections or comments

16  by the lawyers are not evidence.

17          Lawyers have a duty to object when they

18  believe a question is improper.  You should not be

19  influenced by any objection and you should not infer

20  from my rulings that I have any view as to how you

21  should decide the case.

22          Fourth, the lawyers' opening statements and

23  closing arguments are not evidence.

24          Their purpose is to discuss the issues and

25  the evidence.  If the evidence as you remember it

1  differs from what the lawyers said, your memory is what

2  counts.

3           You should also ask yourself whether there

4  was evidence that a witness testified falsely about an

5  important fact.  And ask whether there was evidence that

6  at some other time, a witness said or did something or

7  didn't say or do something that was different from the

8  testimony the witness gave during this trial.

9           But, keep in mind that a simple mistake

10  doesn't mean the witness wasn't telling the truth as he

11  or she remembers it.  People naturally tend to forget

12  some things or remember them inaccurately.  So if a

13  witness misstated something, you must decide whether it

14  was because of innocent lapse in memory or an

15  intentional deception.  The significance of your

16  decision may depend upon whether the misstatement is

17  about an important fact or non-important detail.

18           The evidence you are to consider consists of

19  the testimony of the witnesses, the documents and other

20  exhibits admitted into evidence and any fair inferences

21  and reasonable conclusions you can draw from the facts

22  and circumstances that have been proven.

23           Generally speaking there are two types of

24  evidence.  One is direct evidence, such as the testimony

25  of an eyewitness.  The other is indirect or

1   circumstantial evidence.  Circumstantial evidence is

2   evidence that proves a fact from which you can logically

3   conclude another fact exists.

4            As a general rule, the law makes no

5   distinction between direct and circumstantial evidence.

6   It simply requires you to find the facts from the

7   preponderance of all the evidence, both direct and

8   circumstantial.

9            A deposition is a witness's sworn testimony

10  that is taken before trial.  During the deposition, a

11  witness is under oath and swears to tell the truth and

12  the lawyers for each party may ask questions.  A court

13  reporter is present and records the questions and

14  answers.

15           Deposition testimony is entitled to the same

16  consideration as live testimony.  And you must judge it

17  in the same way as if the witness was testifying in

18  court.

19           In the event that a person declines to

20  answer a question based upon the Fifth Amendment to the

21  Constitution privilege, you may infer that that person's

22  answer to that question would have incriminated him or

23  her.  You're not required to draw this inference.

24           The Fifth Amendment privilege not to testify

25  is not only a privilege for those who are guilt, but it

1    serves to protect the innocence who may be insnared in
2    ambiguous circumstances.
3               The fact that a person brought a lawsuit and
4    is in court seeking damages creates no inference that
5    the person is entitled to a judgment.  Anyone may make a
6    claim and file a lawsuit.  The act of making a claim in
7    a lawsuit by itself does not in any way tend to
8    establish the claim and it is not evidence.
9               If you find any violation of the Stored
10   Communications Act by the defendant, Nicole Torrenzano,
11   was willful or intentional, then you may award punitive
12   damages.
13              The purposes of punitive damages is to
14   punish a defendant for her wrongful conduct and to deter
15   similar misconduct by the defendant and others in the
16   future.
17              If however you find in favor of the
18   plaintiff and you find the defendant willfully or
19   intentionally violated the Stored Communications Act,
20   you may, but are not required, to award punitive damages
21   against the defendant, Ms. Torrenzano.
22              The plaintiff, Mr. Hately, has the burden of
23   proving that punitive damages should be awarded.  The
24   fact that I'm giving you this instruction does not mean
25   you must award punitive damages or that I have any

opinion about whether the defendant, Ms. Torrenzano,
violated the Stored Communications Act or that I have an
opinion of whether you should award punitive damages.
This decision is up to your discretion.

In determining if plaintiff has proved that
punitive damages are appropriate, you should consider
the following.  The purpose of punitive damages is to
punish and deter, not to compensate the plaintiff.

Punitive damages serve to punish a defendant
for willful or intentional conduct, and by doing so, to
deter others from engaging in similar conduct in the
future.

You're not required to award punitive
damages.  If you find that punitive damages are
appropriate, then you must use sound reason in setting
the amount of those damages, and your decision should
not reflect bias, prejudice or sympathy toward either
party.

In determining the amount, if any, of
punitive damages, you should consider the following
factors:  A, the reprehensibility of the defendant's
conduct; B, the impact of the defendant's conduct on the
plaintiff; C, the relationship between the plaintiff and
the defendant; D, the likelihood that the defendant
would repeat the conduct if an award of punitive damages

1   is not made; E, the defendant's financial circumstances

2   and F, the relationship of any award of punitive damages

3   to the amount of the actual harm the plaintiff suffered.

4           If you decide for the defendant, Ms. Nicole

5   Torrenzano, on the question of liability, then you

6   should not consider the question of damages.

7           Of course, the fact that I've given you

8   instructions concerning the issue of punitive damages

9   should not be interpreted in any way as an indication

10  that I believe plaintiff should or should not prevail in

11  this case.

12          Your verdict must be unanimous.  In other

13  words, you must all agree to it.  Your deliberations are

14  secret and you'll never have to explain your verdict to

15  anyone.  Each of you must decide the case for yourself,

16  but only after fully considering the evidence with your

17  fellow jurors.

18          So, you must discuss the case with one other

19  and try to reach an agreement.  While you're discussing

20  the case, do not hesitate to reexamine your own opinion

21  and change your mind if you become convinced that you're

22  wrong.  But don't give up your honest belief just

23  because others think differently or because you simply

24  want to get the case over with.

25          Remember that in a very real way, you're

judges, judges of the facts.  Your only interest is to seek the truth from the evidence in the case.

When you get to the jury room, the first act of business should be to choose one of your members to act as your foreperson.  The foreperson will direct your deliberations and speak for you here in court.

You'll receive a verdict form that have questions you have to answer.  Take the verdict form with you to the jury room.  When you've all agreed on the verdict, your foreperson must fill in the form, sign it and date it.  Then you return it to the courtroom.

If you wish to communicate with the judge at any time, any member of the jury panel or the jury foreperson can write down your message or question and give it to the court security officer.  The court security officer will then bring it to me, and I'll respond as promptly as I can either in writing or bringing you back to the courtroom.

Please understand that I may have to talk to the lawyers and parties before I respond to your question.  So you should be patient to -- as you await my response.

But I caution you not to tell me or anyone how many jurors voted one way or the other at that time. That type of information remains in the jury room and

1   should not be shared with anyone, including me, in your

2   note or question.

3              You'll now note from the oath about to be

4   taken by the court security officer that he, too, is

5   forbidden to discuss the case with you in any way.

6              Mr. Hendrick, if you would take the oath,

7   please.

8              MR. HENDRICK:  Yes, sir.

9              THE COURT:  Do you swear or affirm you'll

10  keep this jury -- oh, you have it?

11             THE CLERK:   You shall keep this jury

12  together and not have any communications with them

13  yourself not permit any other person to converse or have

14  any communication with them touching this trial and

15  causing them to appear in court.

16             MR. HENDRICK:  I shall.

17             THE CLERK:  Thank you.

18             THE COURT:  Just one second.

19             Mr. Hines, do you have something you want me

20  to see?

21             MR. HINES:  Yes, Your Honor.

22             THE COURT:  Can you hand it to me?

23             MR. HINES:  I can.  I need to copy -- I

24  can't hand it to you this second.  It's electronic.

25             THE COURT:  Okay.

1              Ladies and gentlemen, if you'd step out for

2    just a moment, please.

3              (Jury excused.)

4              THE COURT:  So, apparently, the instructions

5    don't have a definition of willful or intentional.

6              Do you have one?

7              MR. HINES:  Yes.

8              THE COURT:  Can you get it for me?

9              MR. HINES:  Yes.

10             THE COURT:  You all can have a seat.

11             Okay, I see it.  Let's write this down so we

12   will have that as the instruction.

13             Willful -- I'm giving it to you all now,

14   counsel -- or intentional -- let me know when you've

15   written that down.

16             The words willful or intentional -- I want

17   you to write this down what I'm telling you now.

18             MR. GREENBERG:  It's willful (inaudible).

19             THE REPORTER:  I'm sorry.  I can't hear you.

20             THE COURT:  Where are you referring to?

21   What page are you referring to?  What instruction are

22   you referring to?

23             MR. GREENBERG:  You had that on your

24   instruction, part 15, I'm guessing is when he took the

25   changes.  He said that must have been deleted that by

1   accident.  So, I saw that one issued from the Court.

2                   THE COURT:  Hand it to me.  I don't have it.

3   I don't have it in front of me.  He must have left it

4   out.  So, let me see.  Is that it?

5                   MR. HINES:  That's it.

6                   MR. GREENBERG:  We did receive that, Your

7   Honor.

8                   THE COURT:  Okay.  All right.  Is that it?

9   To read willful intentional.  That's all we need to do?

10                   MR. GREENBERG:  That's what you had

11  proposed.  If you want to do more than that, that's fine

12  with me.

13                   THE COURT:  Okay.  We can bring the jury

14  back then, Mr. Hendrick.

15                   MR. HENDRICK:  Yes, sir.

16                   MR. GREENBERG:  It has to do with the

17  computer damages.  Just leave it open up.

18                   THE COURT:  Well, they would get the written

19  instructions.  It will be where it belongs.

20                   You may be seated.

21                   Additionally, ladies and gentlemen, the

22  words willful or intentional means that the defendant,

23  Ms. Nicole Torrenzano, knew her conduct was unlawful.

24                   I've given both sides about 30 minutes for

25  argument.  I think what we will come close to stopping

1   right at 5 o'clock.

2           Let me have plaintiff's counsel go first.

3   And are you doing all 30 or is it 20 and 10?  What are

4   you doing?

5           MR. MENHART:  Well, I don't want to make any

6   promises.  I think it will be less than 30.

7           THE COURT:  All right.  But, in other words,

8   you don't want rebuttal?

9           MR. MENHART:  As far as -- yes, let me

10  reserve five minutes for rebuttal.

11          THE COURT:  Okay.  The clerk will keep track

12  of time, and you'll have to knowledge her when she shows

13  you the time cards.

14          MR. MENHART:  Good afternoon.  The one

15  negative to closing arguments is that things change

16  during the course of the day and so the computer is here

17  now compared to when I first talked to you the other

18  day.

19          So, what we're going to talk about here is

20  couple different things.  First we're talking about what

21  we saw and we actually have a little bit of evidence on

22  the screen, and then we're going to talk about damages.

23  So those two separate sections we're going to talk

24  about, and I suspect counsel will do the same thing.

25          So the first thing I want to talk about,

1   what did we see here the last couple days?  We've seen
2   first from the defendant, Ms. Torrenzano.  You saw her.
3   She did take the stand.  We saw in our humble opinion a
4   lot of the inconsistent testimony.  She had a deposition
5   about two months ago.  She pled the Fifth as to many
6   meaningful things.  And she pled the Fifth as to her
7   phone number.

8           They made the decision she should appear in
9   court, in open court to address you.  Our position is
10  that they made that decision because they didn't have a
11  choice.  The evidence was so strong.  They knew that
12  their best chance was to have her get up on the stand,
13  do the best she could, because quite frankly, it wasn't
14  going to go well.  And we think that's what happened.

15          So, you saw in the deposition, she pleaded
16  the Fifth, okay.  That's her right.  But two months ago,
17  with the exact same counsel, she said she was less
18  comfortable then.  She's more comfortable now.

19          It's a little huff and tough for us to take
20  into account and believe, frankly.  These are the same
21  counsel, same individual.  So, keep that in mind as well
22  as you think about this.

23          Third, she's outright admitted to what we
24  are alleging in our complaint.  She got on the stand and
25  she said, I accessed his accounts.

1     So, quite frankly, you can probably finish
2  your inquiry right there.  When the defendant says they
3  did it, it's usually good indication that they did it.
4  So, we do accept her testimony on that point.  So, as
5  far as liability, I think you can take that testimony,
6  and you can be done with the first question as to
7  liability because we think that that is unequivocally
8  sufficient evidence, even if you take nothing else,
9  because that shows that she is liable for her actions.
10     You also saw that, you know, she received
11  that they had authorized access in what, November, 2015,
12  right?  But she hadn't been with Mr. Hately in a
13  relationship for what, 6 months, 7 months, 8 months?
14     You know, you can't go into a movie theater,
15  pay $12 for a ticket, enjoy your movie and then stay
16  there for the next 30 days, right?  You're not longer
17  authorized to be in the space.  That's what happened
18  here.
19     This whole suggestion that she had some type
20  of authorization is very difficult to take.  She also
21  had motive.  We saw in both October and November, she
22  had specific motive.
23     In October, her motive was to help Dr. Watts
24  in his divorce proceeding.  In November, it was she was
25  breaching accounts right before the custody case was

1    filed between the parties.

2              So, the timing made perfect sense as to what

3    her motives were, what she was trying to accomplish.

4              All right.  So we saw the defendant.  Our

5    opinion is she didn't do a very good job on the stand.

6    Obviously you can come up with your own decision on

7    that.

8              What did we see from the plaintiff,

9    Mr. Hately?  From the very beginning, we have tried to

10   earn your trust.  We told you from the very beginning,

11   this is what we're going to show you.  We've showed

12   basically all of that.  Judge Lee said certain things

13   couldn't come in, and that's his right as the judge in

14   the case.  But we've done everything we possibly could

15   to present the evidence that we thought would be

16   relevant.  And we talked about quite a bit of the

17   evidence.

18             We had Ms. Ashby.  She was here for a short

19   period of time, I admit to that, but she was there.  And

20   she testified that Dr. Watts also took the Fifth as to

21   the relationship with Ms. Torrenzano and that goes back

22   to the 2015 period.

23             We also saw quite a bit of testimony from

24   Mr. Hately.  There's an argument that was made that

25   there were too many IP addresses in the testimony that

1   we presented.  We had IP addresses.  We had phone

2   records.  He testified as to having gone to, you know,

3   geo-location services.  We didn't get some of that into

4   evidence.

5          But all of that information was front and

6   center.  He testified as to every little thing that he

7   did.  And the one thing in particular he did was he

8   talked about his white board, right.

9          So, the white board, and that's in evidence

10  and you'll have an opportunity to look at that.  You can

11  see literally minute by minute what is happening.  He

12  pieces it altogether.  It's quite frankly a pretty

13  impressive piece of work in my opinion.  So, that's what

14  we saw from Mr. Hately.

15         Now, what happened on October 13th?  Well,

16  it was in the dead of the night, wasn't it?  You know,

17  Ms. Torrenzano, she thought it was okay.  Why didn't she

18  just walk right up into her local computer and log right

19  in and do everything she wanted to do?  Well, because

20  she and Dr. Watts had decided that they needed to go

21  ahead, call each other up on the phone.  You've seen

22  those phone records.  They made a specific plan to be on

23  the phone at the same time to access the accounts at the

24  same time.  They knew exactly what they were doing and

25  they had to take certain steps to undertake this

1    process, right.  She didn't just trip on the sidewalk.

2    You know what I mean?

3              So that's something to keep in mind here.

4    How -- why did, you know, she do these things and what

5    was -- what was going through her mind, right?

6              Well, she had to call up Dr. Watts, make a

7    decision with him, schedule the time, get back on the

8    phone, then you had to make a variety of other actions.

9    And each and every one of those points you could stop,

10   right.  She could have not accessed his account after

11   she talked to Dr. Watts.  She could have not changed the

12   password on his account as she did, many, many, many

13   opportunities and that doesn't count for the times, for

14   example, the July period where she was going to break

15   into the AT&T account like she did, right.  So many

16   steps had to be undertaken and she knew what she was

17   doing in every single instance.  So, that was October.

18             What did we see in November?  Well, we saw

19   just today that there was the Facebook account records,

20   the security account records, right.  He had some of

21   that information from a prior litigation with her name

22   on it.  There was some information with his name on it.

23   And, what do we see?  The IP addresses matched up

24   perfectly.  That same device was in both accounts,

25   right.

1          How does that happen?  Well, when the same
2  device are in both accounts, that's what you're going to
3  see happened there.
4          We're going to put something on the board
5  for you right now.  And this is procedurally a little
6  bit tricky, so we're going to do that right now.  We
7  want to put something on the board and we want to go
8  through it in a little bit of detail.
9          Now, this document that's about to come up
10  on the board is from Winchester Medical Center.  This is
11  her employer.  The employer keeps records.  They know
12  exactly what each individual is doing in their own
13  account.
14          You guys probably know from your own
15  experience when you go into your workplace, you have a
16  particular user name, you log in.  And then obviously
17  you employer is making sure you don't go to Facebook or
18  whatever it is you're not supposed to be doing, right?
19          Now, what happened in this particular
20  instance is this is in evidence, okay.  So you'll have
21  an opportunity to see this later.  But Judge Lee ruled
22  that he was going to admit this document into evidence,
23  but he wasn't going to allow the plaintiff to testify
24  about it.  So that's why you're hearing from me now, and
25  that's why this has been handled a little bit

1    differently than what we had done with some of the other

2    documents, okay, just so you understand that.

3              So this very first -- so we're going to --

4    Colleen is going to scroll down to the bottom and we're

5    going to point some parts out to you.

6              Your Honor, procedurally, would it be

7    possible for me to go to the large screen?  Would it be

8    possible for me go to the large screen?

9              THE COURT:  Yes, if you know how to do it.

10             MR. MENHART:  I'm just going to point while

11   she scrolls.

12             THE COURT:  Oh, I see what you're asking.

13   You can't mark it from where you are.  What are you

14   trying to show?  Which -- are you trying to deal with a

15   particular --

16             MR. MENHART:  I don't want to get -- I'm

17   trying to point out particular logs in this document.

18             THE COURT:  Go ahead.  You can walk over

19   here.

20             MR. MENHART:  I'm going --

21             THE COURT:  What page number is that on of

22   the document so the jury can find it.  What?

23             MS. EGAN:  26.

24             THE COURT:  26, okay.  Go ahead.

25             MR. MENHART:  I'm going to be over here in a

1    very non-threatening manner, I hope.

2                   Down here, this first, at the very bottom of

3    this page you can see here --

4                   THE COURT:  What date is that and time it

5    shows?

6                   MR. MENHART:  Yes, Your Honor.  It's

7    November 2nd.  The date and time is November 2nd, 2015,

8    at 20:12:43, okay.  And you can see here this is

9    Ms. Torrenzano's log-in at Winchester Medical Center.

10                  MR. GREENBERG:  Your Honor, I object to

11   that.  He can say what it says, and the jury can see for

12   itself, but there's no testimony about who logged in.

13                  THE COURT:  There's no testimony about what

14   a log-in is?

15                  MR. GREENBERG:  What her log-in is.  There

16   is no testimony about her log-in.

17                  THE COURT:  I'll give you a chance to argue

18   that.  Objection overruled.

19                  MR. MENHART:  We will represent to you that

20   we believe that the user name N-T-O-R-R-E-N-Z was

21   reasonably referred to when they --

22                  THE REPORTER:  Can you speak up a little

23   louder?

24                  THE COURT:  We can't hear you.  You know

25   what, this is not going to work.

1           MR. MENHART:  Not going to work, all right.

2           THE COURT:  Get a copy of the document.  You

3    can refer to it and then tell us which item you're

4    referring to.  And the jury will be able to take notes.

5    And the defense counsel can't see you.

6           Is that as large as you can blow it up?

7           MS. EGAN:  No.

8           THE COURT:  Well, why don't you go big on

9    the one he's trying to show and not the whole page.

10          MR. MENHART:  Ladies and gentlemen, we

11   appreciate your indulgence.  This is a high degree of

12   difficulty, closing argument.

13          So what we're going to do, you should still

14   be able to see on the screen.  I'm going to refer to

15   this written document here, okay.  And we appreciate

16   that the font is not particularly big, so we've done the

17   best we can here.  Okay, we again appreciate your

18   indulgence.

19          So, we're looking there at the very last

20   portion, November 2, 2015, 20:12:43 and there's a log

21   that says Gmail under the user name, NTorrenz.  And this

22   user name I'll represent to you right now and you'll see

23   this in evidence.  This is the same user name that

24   appears throughout the document, okay.  There's no other

25   user name on this document.

1        You can see here there's a log on
2   November 2nd that goes to Gmail.  Well, you've also seen
3   from Mr. Hately, he has a Gmail account.  He believes it
4   was accessed on November 2nd from her workplace.  That
5   was his testimony.  What do we see here?  We see the
6   records for -- from Ms. Torrenzano's employer.  So
7   there's the Gmail account, right.
8        We're going to work our way up a little bit.
9   You'll see and we're still in November 2nd, you'll see
10  2015 206.  What is that?  Again, there's a
11  mail.Google.com URL in there.  Okay.  We move the next
12  out.  There's a Google hangout.
13       Our contention is now she's in the Google
14  account.  She's in the Google account.  She can do
15  whatever she wants now.
16       We're going to scroll a little further up,
17  and what do we see about the middle of the page,
18  November 2nd, 2015, 2027, what do we see there?  We see
19  references to LinkedIn.  A little bit further up the
20  page, timestamp, 202727 another reference to Gmail.
21       Again, the next line up, another reference
22  to Gmail, another reference to Gmail, and just keeps
23  going all the way up.  So I'm going to go one page
24  back -- excuse me.  At the very top of the page, you can
25  see there's that Facebook account.  She's accessing his

1    account from her workplace at Facebook.  And we've seen

2    testimony and exhibits that have been admitted,

3    demonstrating that she was in the Facebook account as

4    well.

5              On the -- so, I've gone back one page.  We

6    should be on page 18 now.  And you can see sort of at

7    the bottom of the page, Google, Google, Google all the

8    way up.  There's Facebook again in the middle of the

9    page.  There's Gmail again in the middle of the page.

10   Google, Google, Google, again, working my way all the

11   way up the page, you're seeing more and more of these

12   instances accessing the account.

13             And I appreciate your indulgence.  And on

14   the next page, page 17, you see even more references to

15   the Google plus location, right.  Moving back to page

16   16, more Google.  Moving back to page 15, there's a

17   Facebook URL, same date, right.

18             November 3rd date, middle of the night.

19             MS. EGAN:  May I approach counsel, Your

20   Honor.

21             THE COURT:  All right.

22             MR. MENHART:  I'm going to give you a quick

23   tip about practicing law.  Always have a good associate

24   attorney to help you when you need help.

25             Referring back to page 17, you'll see on

1    November 2nd, 2015, 215135 mail.email.VCCS.EDU, allowed

2    same user name, right.

3            What does that tell us about what we've seen

4    from Mr. Hately?  It tells us that everything he said is

5    exactly correct.  These aren't these records.  These are

6    the records of the employer.  He didn't have anything to

7    do with creating things.  He didn't have anything to do

8    with keeping track of them.

9            So there she is accessing the account, the

10   e-mail account that he testified he retained messages.

11           So those are the things that you guys -- I'm

12   going to spare you going through every single page of

13   this document.  Please go through the URL.  Get a feel

14   for what's there, what isn't there.  See if you see some

15   of these URLs that you would expect to see based on what

16   Mr. Hately has told you during his testimony.

17           I think you're going to find if you take the

18   time to do that, that you're going to see a lot of

19   information about what he -- what he said that she did,

20   and you're going to find that it's relatively

21   consistent.

22           All right, we're going to take that off the

23   screen.  Okay.  Thank you.  That's how long I've gone so

24   far.  No?

25           THE CLERK:  No, this is what you have left.

1          MR. MENHART:  Okay, I'll go faster.

2          You've seen all the evidence.  Let me state

3    very briefly.  Preponderance of the evidence means

4    51 percent.  Judge Lee just gave you that instruction,

5    okay.

6          We think this evidence shows a hundred

7    percent.  But even if you think it's 99 or 98 percent,

8    we've met that standard.  That's the way we feel.

9          So, we are going to ask that you enter a

10   verdict in favor of the plaintiff.  Okay.

11         Now, listen up.  If you don't hear anything

12   I say the rest of today or anything else that I've said,

13   hear this now.  If you don't award damages, she wins the

14   case.  Okay.  I'm going to say it again.  If you don't

15   award damages, she wins the case.

16         Our system relies on money as, you know, the

17   quote unquote, punishment for bad acts.  That's the way

18   the system works, right.  We can't, you know, we can't

19   smack people with a wet noodle or whatever the case may

20   be.  This is the way the system works.

21         If you don't award damages, she wins the

22   case, okay.  So make sure you understand that when you

23   go back to the jury room.

24         Now, what type of damages should you award?

25   We -- I'm going to tell you right now -- I'm going to

1  tell you what I ask and I'm going to tell you how we got

2  there, okay.

3             The range should be $25,000 to $75,000,

4  okay.  Maybe you think that range is way high; maybe you

5  think it's way low.  I'll tell you how I got there.

6  There is a case that happened in this courthouse, not in

7  front of Judge Lee but in this courthouse, that involved

8  the jury, that involved a Stored Communications Act

9  case --

10            MR. GREENBERG:  Your Honor, he's not going

11  to actually bring in a verdict of another case.  That

12  would be inappropriate.

13            THE COURT:  Sustained.

14            MR. MENHART:  We will tell you that we have

15  done our research, and we believe that the amount that

16  we're asking you for is justified.  I'm going to put it

17  to you that way.  We believe that the amount that we're

18  asking for is justified.

19            And, we have the right to ask for more than

20  this.  Okay.  We do.  We could ask as much as we wanted,

21  but we are trying to be honest with you.  We tried to

22  earn your trust.  We're trying to do it now.  That range

23  is where we think the damages should come in, okay.  You

24  guys have the final decision on that, but that's your

25  decision to make.  That's the range that we think you

1   should be in.

2          Now, let me tell you very briefly.  Ms.

3   Torrenzano, she's smart.  There's no question or doubt

4   about it.  Right.  Look how sophisticated she was in

5   breaking into the accounts.  She knows what she's doing.

6   She's a smart person.  She's employed.  She's a nurse.

7          If I had to choose one profession where I

8   was absolutely sure I would be employed for the rest of

9   my life, I would choose nursing, right.  That's my

10   personal opinion.  Take it for what it is.

11          But, these things are not -- you know,

12   Mr. Greenberg is going to come up and tell you she's

13   completely poor, right, I'll let him make his argument,

14   but she has resources, right.  She has her family

15   members.  They've been very supportive of her in that.

16   They've lent her money.  She has resources.  She has

17   smarts.  She has a job.  She has assets and she has the

18   ability to be responsible for her acts.  She's not

19   incapable of responsibility for her acts.  Keep that in

20   mind as you consider damages.

21          One more thing on this.  If you issue

22   damages in a judgment, that is not something that you

23   have to write a check for when you walk out of the

24   courthouse today, right.  It takes years --

25          MR. GREENBERG:  Is that appropriate?  I've

```
 1   never talk about collection aspect of -- this is the
 2   second thing.  I don't like the impression he's leaving.
 3   That's totally inappropriate.  Many cases there are zero
 4   verdict, and, you know --
 5              MR. MENHART:  We're going --
 6              THE COURT:  I prefer not to have speaking
 7   objections.  I'll give you a chance to argue the case.
 8   But I sustain the objection.
 9              If you want to tell them what you request,
10   how you calculate it, that's fine.  But you can't
11   compare it to other cases.  You have to focus on damages
12   that Mr. Hately asserts and damages of the type that I
13   instructed the jury about.
14              MR. MENHART:  We will say this, the range
15   that we just provided broken down by, say, a day, or a
16   week, or a month, is not a lot of money.  Let's put it
17   to you that way, okay.  So, she has the ability to pay.
18   She should pay.  And we will leave it at that for
19   purposes of the damages, okay.
20              Now, I have one more thing I want to say.
21   Attorneys represent a variety of clients, right.  I
22   represent Mr. Hately with a lot of pride.  I think he's
23   done the right thing.  He's done --
24              MR. GREENBERG:  Your Honor, he can't insert
25   his personal opinion in this.
```

1              THE COURT:  Sustained.

2              MR. MENHART:  I will thank you all very much

3    for giving me your time and attention today.  I want to

4    thank you again for your service.  I hope you've enjoyed

5    the experience.  And I again ask you to enter a verdict

6    for Mr. Hately in this matter.  Thank you.

7              MR. GREENBERG:  Your Honor, may I?

8              THE COURT:  Yes, I'm waiting for you.

9              MR. GREENBERG:  Thank you.

10             Good afternoon.  So, it is my -- I submit to

11   you that Ms. Torrenzano has not violated the Stored

12   Communications Act.  I heard that Mr. Menhart just said

13   to you that because of the fact that she made the

14   admission that was the end of it.  You should decide

15   liability right then and there and move on to the next

16   phase.  And yet he didn't move on.

17             Directly after saying to you it was an

18   open-and-shut case, that the mere fact that she

19   mentioned on the stand, admitted on the stand that she

20   went to his e-mail, he then went on to show you all the

21   exhibits and tell you what you should look at to

22   continue to prove to you what happened.

23             If he was sure that it was a violation of

24   the Stored Communications Act, that really would have

25   ended it.  The reason it didn't is because that isn't

the only evidence that you need to consider.

The statutes said that if somebody looks at your e-mail, that's a violation and they should then -- the question is should there be an award, that would be the end of it.

It would be like if someone said if you were assault and battered, if somebody hit you in the face, then you can collect damages.  If they said, if somebody hit you in the face and you're standing on the VDOT property, you can collect damages, then you must also show that first you were hit in the face and second that you were standing on VDOT property.

The evidence that you've not heard here today, what they have failed to introduce is any evidence about the Stored Communications Act.

The reasons that you eight people are sitting in a federal courtroom and not in a domestic relations court in Fairfax Count or a juvenile courtroom is because this is an act of Congress.

MR. MENHART:  Objection.

THE COURT:  What's your objection?

MR. MENHART:  You said we weren't trying a divorce case.

THE COURT:  He just said we were not.  Objection overruled.

1          MR. GREENBERG:  This is an act of Congress.
2    And what they decided is when you come into a federal
3    courtroom, the question is the Stored Communications
4    Act.  What has to be demonstrated is that somebody
5    looked at an e-mail communication while it was in a
6    certain type of storage.  That is, at a facility that it
7    was stored for the purposes of backup.  You have not
8    heard one single note of evidence to suggest that that
9    exists.
10          You might have your own individual opinion.
11   You might have your own belief even based on your own
12   training and experience.  But as you know, you have to
13   base your opinion on the evidence that they put forward
14   today in front of you here in this courtroom.
15          And they have neglected.  They do not have
16   the evidence to establish that she looked at a
17   communication while it was stored for backup purposes.
18          Now, what does backup mean?  What does
19   backup mean?  So, for example, if I receive something
20   and I have a piece of paper and I decide I might -- if
21   something happens to it, I want to make sure I have the
22   ability to go and look at it again, I would submit to
23   you that's a backup copy.
24          If there's a server somewhere, if there's a
25   server, cloud computing, and you decide at the end of

1    every week you're going to take whatever is in your
2    business and then you put it on a little backup storage
3    and you put it somewhere, Congress made a special law
4    about the backup properties and somebody going into the
5    backup facility.
6              But, you don't have that evidence.  What you
7    have is a different type of evidence.  And that's really
8    a crucial distinction.
9              Now, the essence of the cases you heard kind
10   of boils it down from this idea of a federal case and
11   then as you heard it goes down to two people living
12   together, two 20-year old people living together with
13   two children.  They're five years of age.  They get into
14   a custody battle.
15             Unfortunately, people don't always act --
16   you don't take their likeness.  You don't take their
17   best likeness during the course of a dispute whether
18   it's in a divorce, which I know they weren't married, or
19   in custody, because people don't always act right.
20             I don't suggest to you that it is morally
21   correct for someone to look at someone else's e-mail.  I
22   don't say that you should condone that.  That's not the
23   question before you whether that's right or wrong.
24             One of the other issues is whether she knew
25   it was unlawful.  Now when she was first called to

1   testify in the deposition, the first thing she did she
2   told all.  She didn't know there was even a possibility
3   of, as the Judge instructs you, the ambiguity that some
4   people start to take the Fifth because they don't
5   understand their situation any longer.
6          But the Fifth Amendment is not just for when
7   you're wrong, but when you're innocent and you're
8   uncertain of where you are and what you should do.
9          She told you she did not think it was
10  unlawful.  I'm sure she didn't think it was right.  I'm
11  sure that we will all agree that if we looked at our
12  spouses, our sisters, our brothers, our children's
13  e-mail when we're making sure they're not doing the
14  wrong thing in life -- maybe there's an exception for
15  parents, quite frankly.
16         But if you look at all that, we might not
17  think it was the right thing to do, but we wouldn't know
18  it was unlawful.  We don't have one indicia, for
19  example, that indicates Nicole Torrenzano has ever
20  committed a crime or has the kind of character that she
21  would do something knowingly unlawful.
22         So, that's the other aspect of the statute.
23  Knowing.  Intentional.  Willful.  You can't stumble into
24  it.  You can't negligently do this and then end up in a
25  federal courtroom where a jury is deciding whether or

1   not basically to change your life.

2          You can't stumble.  You can't -- it's not a

3   negative thing.  You have to be knowing.  It has to be

4   willful.  It has to be intentional.  And it would have

5   to be willful, knowing and intentional if you went on to

6   a server or some place that had stored communications

7   and you looked at some of that information knowing you

8   was in backup.  You have to know that.  She didn't know

9   that.

10          And then, to be sanctioned for punitive

11   damages, you have to know that it was unlawful.  Because

12   punitive damages are such a significant thing in society

13   that we do to somebody, we want to do it to people that

14   are walking around committing basically a crime.  They

15   know what they're doing is wrong and unlawful.

16          She didn't know that.  There's no evidence

17   of that.

18          One of the other aspects, too, I would tell

19   you is, I know that Mr. Menhart has indicated that

20   Mr. Hately, who, I'm sure he's not a bad guy.  I don't

21   know why he so litigious.  I can't understand why he

22   would want to bring the mother of his children into this

23   courtroom nearly two years later after she read an

24   e-mail.

25          For one -- because, even during the year,

where nothing happened, from November until the time
that he files the lawsuit sometime in September of 2016,
nothing surfaces.  In fact, he even told you on the
stand he wasn't even certain that she ever read any of
the e-mails until she testified about it.

It didn't come out in social setting.  There
was no information that was used to embrace him.  There
wasn't -- or to harass him or to challenge him.  It
wasn't given to anybody.  Nothing happened with the
evidence in any way, shape or form.  I don't know what
would cause him to want to basically, financially,
devastate her, to bring her to a court well over a year
later.  I don't understand it.

Well, I know he lost the custody, but I just
can't imagine that would be the impetus.

I tell you about -- I tell you about that
factor because when the Judge read you the jury
instructions about punitive damages, to the degree that
it would ever be appropriate and I submit that it
wouldn't be.  It's not about Mr. Menhart winning.  He
said that three times.  He doesn't win.  It's not about
a win.  It's about what right and fair to do under the
law with the facts and the law.  That's what the
question is here.

So, the first question is the

1   reprehensibility if we look at damages, if you went

2   pass, as I submit you shouldn't, that you knowingly did

3   an unlawful act, then the reprehensibility of the

4   defendant's conduct, again, she doesn't show the e-mails

5   to anybody.  She doesn't give them to anybody.

6            And, he doesn't even know that she read what

7   she read until yesterday in the courtroom.

8            Then, there's the question of the

9   relationship between the plaintiff and the defendant.

10  Two people, with two children, both of them not making

11  much money.  She makes $58,000 a year, emergency room

12  nurse.  I have to imagine she has some capacity for

13  caring for others.

14           And we see a litigation.  We see that

15  they're fighting with each other.  There's -- you heard

16  the Peyton Place affairs that are going on.  Those

17  relationships don't suggest punitive damages.

18           The likelihood that the defendant would

19  repeat the conduct, she hasn't in nearly two years.  We

20  know that, we have a track record.  We can see that.  We

21  don't even have to speculate or guess.

22           The defendant's financial condition.  So,

23  she's an emergency room nurse.  She makes, I don't know,

24  55, $59,000 per year.  She is well in debt.  She has

25  $500 in the bank.  She owes thousands of dollars, quite

1  frankly, for all the litigation that occurred, to her
2  family members.  Why?  Why?
3          And then the last thing is the relationship
4  of the award of punitive damages, the amount of actual
5  harm suffered by the plaintiff.  Zero.  In this case,
6  zero.
7          The Judge -- you'll see there's no
8  instruction asking you to locate damages or decide
9  damages.  The damages are not here.  Punitives are
10  punishment.  Damages, he has none.  He has none.
11  There's no instruction asking you to find for damages.
12          So, you have -- that's one instruction I ask
13  you to put your attention toward.
14          I ask you to also point out the fact that
15  because someone brings a lawsuit doesn't make them
16  right.
17          I want to go back for a moment about the
18  Stored Communications Act because it's so important that
19  you look to the instructions.  You decide if it's clear
20  to you that there's no escapable conclusion.  Well, if
21  it's clear to you by the preponderance of the evidence,
22  I submit there's no evidence at all that the elements
23  have been established.
24          I want to comment a little on the evidence,
25  but I'm loath to do it because I don't think the fact

1    that she admits she looked at the e-mails matters what's
2    in there.  But it's funny, because some of it seems like
3    magical thinking.  She has a Gmail account.  She has a
4    Facebook account.  You know that.

5           So she looked on some of the last -- the one
6    exhibit that they decided to publish during the closing
7    argument.  You'll notice if you look it says Facebook
8    and says blocked.  Actually, they don't allow in any
9    hospital setting for the employees to look at Facebook.

10          So she couldn't be on Facebook in that
11   particular way, her own or his or anyone else.  And
12   you'll see if you look at the last couple pages of that
13   exhibit, you'll see it was blocked.

14          I tell you that because some of what has
15   been offered, because he's got his own prism on, is just
16   wrong.  She goes into her own Gmail account.  She goes
17   into her own Facebook account.

18          But I suppose at the end of the day, it
19   seems to me that regardless of what I might submit,
20   there is a little bit of smoke and mirrors.  It doesn't
21   matter because she didn't look in the account.

22          So I don't know why they spent so much time
23   on that, given her statement, I don't know why they
24   didn't spend time and explain to you the fact about --
25   that not bringing -- I don't know why they didn't bring

1    evidence into this courtroom before you to show you why
2    they violated the Stored Communications Act.  Why they
3    didn't show you why this isn't a mom and pop domestic
4    case of one person looking at someone else's e-mail.
5    That's not enough, because we're in a federal court.
6    And as the Judge admonished us repeatedly through these
7    proceedings, the Judge kept saying stick with the Stored
8    Communications Act.
9            How -- what is the remote server?  He didn't
10   say that, but I'm saying.  What is the remote server?
11   How she gets on it?  Where's the facility with the
12   stored communications?  Where is the expert testimony to
13   tell us, to tell you, so you can make this finding what
14   the facility is with the Stored Communications Act, that
15   this particular communication she read was in that
16   setting and stored and that it was for the purposes of
17   backup.  Where is that evidence?  And the answer is,
18   it's just not here.
19           So, although I tell you about punitive
20   damages, I don't think that it was unlawful so I don't
21   believe you should award punitive damages.  I submit to
22   you, ladies and gentlemen, you don't have to get to
23   that.  You don't have to get to that because there's no
24   liability under the facts as submitted in this case as
25   it applies to this law.  There is no liability.

1    Finally, I'd like to say this.  The
2  plaintiff has the burden of proof.  That's why they go
3  first when they put on the evidence.  That's why they go
4  first in the closing argument.  And when I sit down, Mr.
5  Menhart is going to stand up and he's going to say more
6  things to you because they have the burden of going
7  forward always.  It's not about who has a better story.
8    Ms. Torrenzano needs to produce no evidence.
9  It's their burden.  It's always their burden.  If they
10  don't have the evidence, you can feel satisfied it's not
11  about who you like or don't like.  You can fold your
12  arms and say we did our job.  We can't go forward
13  because you don't have the evidence.
14    And because it's their burden, they get to
15  speak last when I sit down.  Because psychologically,
16  there is an idea of primacy and recency.  We remember
17  best what we hear first and what we hear last.
18    So I won't have a chance to stand up again
19  and refute what I believe I would disagree with Mr.
20  Menhart.  So I'm asking you to consider the arguments
21  that we would raise to Mr. Menhart because he has the
22  last chance to speak.
23    Thank you, ladies and gentlemen.
24    MR. MENHART:  The advantage is to go last,
25  but there's also an advantage to them in that this is

1 going to be extremely brief.

2          Counsel just said to you she did not give

3 the e-mails to anyone.  Yes, she did it.  She gave them

4 to Dr. Watts.  It was literally half of the case.

5          Second, zero harm.  I'm not going to say

6 anything other than look where we are, look where we're

7 standing, look who's sitting in this room.

8          Finally, not knowing whether it was unlawful

9 or not.  You will have to make the factual determination

10 as to whether Ms. Torrenzano indisputably smart,

11 confident, capable did not know what she was doing was

12 wrong or unlawful or whatever you want to call it.

13          Again, we would ask that you please issue a

14 verdict on behalf of Mr. Hately.

15          Thank you.

16          THE COURT:  Ladies and gentlemen, you've

17 heard all the evidence, heard the instructions of the

18 Court and now the arguments of counsel.  It is now your

19 duty to deliberate and arrive at a unanimous verdict.

20          Give us a few moments and we will send back

21 to you the jury instructions in writing along with all

22 the exhibits that have been admitted for your

23 consideration.

24          Given the hour, we're going to stop at 5

25 unless you all decide you want to stay longer.  My

1    preference is to stop at 5 and for you to resume

2    tomorrow.  And you can decide if you want to come a

3    little earlier tomorrow or just let us know.

4              So we ask you to retire now and return a

5    unanimous verdict and give us a little time to get the

6    things back.  All right.  Thank you.

7              (Jury excused at 4:39 p.m.)

8              THE COURT:  All right, counsel, before I

9    leave the courtroom, I want you to look at all the

10   exhibits to make sure what's been admitted in evidence

11   is what should be presented to the jury.  And you need

12   to sign my little form saying that you've reviewed the

13   exhibits and you're sure what's going back is what

14   should go back.

15             We will be back in a few minutes with the

16   instructions for you to look over one final time before

17   they go back to the jury room.

18             We stand in recess until the jury returns a

19   verdict.

20             Thank you.

21             (Court recessed at 4:39 p.m. and reconvened

22             at 5:23 p.m.)

23             THE COURT:  You can bring the jury out, Mr.

24   Hendrick.

25             MR. HENDRICK:  Yes, sir.

1        THE COURT:  You may be seated.  Ladies and
2  gentlemen, I apologize for keeping you an additional
3  23 minutes.  I have no excuse.  And I have no reason, so
4  I ask you to accept my apology.
5        Tomorrow what time would you all like to
6  come back?  Is 10 o'clock acceptable or would do you
7  want to come earlier than 10.
8        THE JUROR:  We would like to at nine-ish.
9  We don't want to start no later than 9:30.
10        THE COURT:  That's fine.  When you come back
11  tomorrow, remember not to begin your deliberations until
12  all the jurors are in the room.  And if anyone has to
13  step out during your deliberations to use the restroom
14  or something like that, wait until everyone is present
15  so that everyone can participate in the deliberations.
16        Remember as I said to you before, please do
17  not discuss the case.  Don't permit the case to be
18  discussed in your presence.  Don't do any research on
19  the case and leave your notes in the jury deliberation
20  room.
21        We'll resume tomorrow at nine-ish or 9:30 at
22  the latest.  You're free to leave.  I'm sorry.  Hold on
23  one second.
24        Oh, is there a juror who has to leave
25  tomorrow?  Okay.  Thank you very much.  You're recess

1   today.  You can leave.  Thank you very much.

2                (Jury excused at 5:25 p.m.)

3                THE COURT:  Have you all resolved the

4   exhibits to go back?

5                MR. GREENBERG:  We have signed off.

6                THE COURT:  All right.  Then, if you would

7   like to look over the notebooks before they go back,

8   you're welcome to stay to do that.  If not, you can come

9   back tomorrow at 9:30-ish or at least have one person

10  from each side come back so you'll be able to be reached

11  by phone if the jury has a question or the verdict is

12  reach.

13               So if you all would let Mr. Hendrick know.

14  Give us your cellphone numbers where we can reach you.

15               MR. GREENBERG:  Is it possible -- initially

16  Mr. Menhart and I had put in a request to, if at all

17  possible, have electronics and then we submitted the

18  certification, the inquiry.  Can we also have the right

19  to put our cellphone on it?  We can walk around and have

20  the bailiff call us -- the marshal --

21               THE COURT:  You would like to have

22  permission to bring cellphones in the building for the

23  lawyers?

24               MR. GREENBERG:  Yes.

25               THE COURT:  All right.  Just give my law

1  clerk your telephone number -- just your names and we'll
2  put that in an order right now and let the court
3  security officer know you can bring your phones in.
4          Do you want to bring an iPad or something
5  like that or laptop in?
6          MR. GREENBERG:  Yes, if we were able to use
7  the wifi --
8          THE COURT:  You have to bring your own wifi.
9  Do you need to do that?  Do you want to do that?
10          MR. GREENBERG:  I can use -- I have an iPad.
11  That would be great.  That would be helpful.
12          THE COURT:  Okay.  Well, add that to the
13  list.  You all set?
14          MR. MENHART:  Your Honor, we just have an
15  order that says 5th and 6th.  So, I guess if you could
16  write it up, maybe put our names on it.
17          THE COURT:  Yes, we will, phones and iPads
18  and laptops for all three of you.
19          MR. MENHART:  Yes.
20          THE COURT:  Okay, all right.  And you'll
21  give Mr. Hendrick your number so we can find you if the
22  jury has a question or a verdict.
23          MR. MENHART:  Yes.
24          MR. GREENBERG:  How close do we have to be,
25  5 minutes, 20 minutes, when you call?

1                    THE COURT:  20 minutes is about the outer

2     limits, I think, no more than 30.  20 minutes at the

3     outer limits.  The jury get anxious if they have to wait

4     that long.

5                    MR. GREENBERG:  Of course.

6                    THE COURT:  Thank you very much.  We're in

7     recess.

8                    (Proceedings concluded at 5:28 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2                   CERTIFICATE OF REPORTER
3
4              I, Renecia Wilson, an official court
5    reporter for the United State District Court of
6    Virginia, Alexandria Division, do hereby certify that I
7    reported by machine shorthand, in my official capacity,
8    the proceedings had upon the trial in the case of
9    Patrick Hately vs. Nicole Torrenzano.
10             I further certify that I was authorized and
11   did report by stenotype the proceedings and evidence in
12   said trial, and that the foregoing pages, numbered 1 to
13   223, inclusive, constitute the official transcript of
14   said proceedings as taken from my shorthand notes.
15             IN WITNESS WHEREOF, I have hereto
16   subscribed my name this _24th_ day of _July_, 2017.
17
18   _____/s/_____
                                Renecia Wilson, RMR, CRR
19                              Official Court Reporter
20
21
22
23
24
25